# UNITED STATES COURT OF APPEALS
### *for the* District of Columbia Circuit

|  |  |
|---|---|
| ) | |
| ) | |
| ) | |
| ) | Case No. 23-___1294___ |
| *In re: Encep Nurjaman,* ) | |
| *Petitioner* ) | |
| ) | Dated: October 24, 2023 |
| ) | |
| ) | |
| ) | |
| ) | |

## PETITION FOR A WRIT OF MANDAMUS AND PROHIBITION
## TO THE MILITARY COMMISSION
## CONVENED BY CONVENING ORDER # 21-01

Adam Thurschwell
James Hodes
U.S. Department of Defense
Military Commission Defense Organization
1620 Defense Pentagon
Washington, DC 20301

Alana F. Genderson
Mathew J. McKenna
Morgan, Lewis & Bockius LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004

Brian D. Fahy
Jason S. Mills
Morgan, Lewis & Bockius LLP
300 South Grand Avenue, 22nd Floor
Los Angeles, CA 90071

*Counsel for Petitioner*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

## I.    PARTIES AND *AMICI* APPEARING BELOW

This writ is filed pursuant to this Court's supervisory jurisdiction over the military commission created by Convening Order #21-01 (Jan. 21, 2021), reproduced in the attachments at [A1-A20].  The parties below are:

1. Encep Nurjaman, *Defendant-Accused*

2. Mohammed Nazir Bin Lep, *Defendant-Accused*

3. Mohammed Farik Bin Amin, *Defendant-Accused*

4. United States of America

## II.    PARTIES AND *AMICI* APPEARING IN THIS COURT

1. Encep Nurjaman, *Petitioner*

2. United States of America, *Respondent*

3. Amici: Brock Chisholm, Sondra Crosby, David Luban and Stephen Xenakis

## III.    RULINGS UNDER REVIEW

The rulings of the military commission and Court of Military Commission Review denying the relief sought in this petition are reproduced in the attachments to this petition at A1-60:

1. *In re Encep Nurjaman*, --- F.Supp.3d --- (USCMCR, June 13, 2023) (Page A1)

2. *United States v. Encep Nurjaman*, AE 0032.010 (TJ) Defense Motion to Dismiss Due to *Prosecution Use of Prohibited Evidence Obtained by Torture* (October 6, 2022) (Page A52)

# IV.    RELATED CASES

This case has not previously been filed with this court.  Petitioner filed a petition for mandamus in the Court of Military Commissions Review (CMCR) below.  The CMCR opinion in that action is styled *In re Encep Nurjaman*, CMCR 22-001 (June 23, 2023).

Dated: October 24,2023

By: /s/ Adam Thurschwell
*Counsel for Petitioner*

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES .............i

TABLE OF CONTENTS..................................................................... iii

TABLE OF AUTHORITIES ................................................................v

GLOSSARY OF ACRONYMS..............................................................ix

INTRODUCTION ...............................................................................1

JURISDICTION...................................................................................3

RELIEF SOUGHT ...............................................................................3

ISSUES PRESENTED...........................................................................3

STATEMENT OF FACTS .....................................................................3

    A.    Petitioner's Seizure and Confinement.................................3

    B.    Petitioner's Torture by the United States. ...........................4

    C.    The Proceedings Below....................................................8

REASONS FOR GRANTING THE WRIT...............................................10

I.    IT IS CLEAR AND INDISPUTABLE THAT EVIDENCE
    OBTAINED BY TORTURE IS INADMISSIBLE AT ALL PHASES
    OF A MILITARY COMMISSION PROSECUTION, INCLUDING
    REFERRAL ...........................................................................11

    A.    10 U.S.C. § 948r bars the use of evidence obtained by torture to
    decide whether an accused should be referred for trial.....................11

    B.    The Due Process Clause bars the use of evidence obtained by
    torture at every stage of a commission proceeding............................16

II.    THE HARMLESS-ERROR PRINCIPLE DOES NOT APPLY TO
    EVIDENCE DERIVED FROM TORTURE...............................................18

    A.    Use of evidence obtained by torture is a structural defect in the
    proceeding, not a mere trial error .......................................................19

    B.    Treating evidence obtained by torture as harmless "destroys the
    appearance of justice and thereby casts doubt on the integrity of
    the judicial process" ..........................................................................24

C.  If the Court holds that harmless error does apply to the use of torture-obtained evidence, Petitioner reserves the right to argue on direct appeal that the use of his statements for referral was not harmless.........................................................................28

CONCLUSION .......................................................................32

CERTIFICATE OF COMPLIANCE....................................................34

CERTIFICATE OF SERVICE ............................................................35

ADDENDUM OF STATUTES & REGULATIONS...........................................36

# TABLE OF AUTHORITIES

*Authorities upon which Petitioner chiefly relies are marked with an asterisk.

**Page(s)**

## Cases

*Al-Hela v. Biden,*
  66 F.4th 217 (2023) (*en banc*) .......................................17, 18

*In re al-Nashiri,*
  47 F.4th 820 (D.C. Cir. 2022).....................................1, 2, 8, 11, 12,15

*Andrus v. Glover Constr.,*
  446 U.S. 608 (1980)...........................................................14

*Arizona v. Fulminante,*
  499 U.S. 279 (1991).....................................................*passim*

*Ashcraft v. Tennessee,*
  322 U.S. 143 (1944)...........................................................26

*Boumediene v. Bush,*
  553 U.S. 723 (2008)...........................................................17

*Brown v. Mississippi,*
  297 U.S. 278 (1936)....................................................11, 17, 20, 25

*Chambers v. Florida,*
  309 U.S. 227 (1949).........................................................25

*Chapman v. California,*
  386 U.S. 18 (1967)....................................................18, 19, 28

*Cheney v. U.S. District Court,*
  542 US 367 (2004)......................................................1, 10

*Crawford v. Washington,*
  541 U.S. 36 (2004)...........................................................23

*Ingraham v. Wright,*
  430 U.S. 651 (1977)...........................................................25

*Jackson v. Denno,*
　378 U.S. 368 (1964)..............................................................22

*LaFrance v. Bohlinger,*
　499 F.2d 29 (1st Cir. 1974)................................................31

*Lego v. Twomey,*
　404 U.S. 477 (1972)............................................................16

*Lyons v. Oklahoma,*
　322 U.S. 596 (1944)............................................................17

*Marbury v. Madison,*
　1 Cranch (5 U.S.) ..................................................................8

*McKune v. Lile,*
　536 U.S. 24 (2002)..............................................................26

*Murray v. The Schooner Charming Betsy,*
　2 Cranch (6 U.S.) ................................................................14

*Rochin v. California,*
　342 U.S. 165 (1952)......................................................16, 24

*Rose v. Mitchell,*
　443 U.S. 545 (1978)..............................................11, 19, 20, 21

*Strauder v. West Virginia,*
　100 U.S. 303 (1880)............................................................20

*United States v. Brooks,*
　449 F.2d 1077 (D.C. Cir. 1971).......................................30

*United States v. Gonzales,*
　164 F.3d 1285 (10th Cir. 1999) .......................................31

*Vasquez v. Hillery,*
　474 U.S. 254 (1986)......................................................19, 20, 24

*Williams v. Woodford,*
　384 F.3d 567 (9th Cir. 2002) ...........................................31

**Statutes**

10 U.S.C. § 948r.............................................................................3, 11

10 U.S.C. § 948r(a) .......................................................................*passim*

10 U.S.C. § 949a(b)(3)(D) ...................................................................23

10 U.S.C. § 950g ...................................................................................3

18 U.S.C. § 2340A .................................................................................1

28 U.S.C. § 1651 ...................................................................................3

Military Commissions Act of 2009, Pub. L. No. 111-84 (2009)..................3, 21, 23

**Other Authorities**

Amal Clooney & Philippa Webb, *The Right to a Fair Trial in Int'l
  Law* (2020) ......................................................................................14

Jeremy Waldron, *Torture and Positive Law: Jurisprudence for the
  White House*, 105 Colum. L. Rev. 1681 (2005) .....................................26, 27, 28

John H. Langbein, Torture and the Law of Proof: Europe and
  England in the Ancien Régime (1977) ...........................................25

Luban & Newell, *Personality Disruption as Mental Torture: The CIA,
  Interrogational Abuse, and the U.S. Torture Act*, 108 Geo. L.J. 333
  (2023). .............................................................................................22

Neal Lewis, *Red Cross Finds Detainee Abuse in Guantánamo*, New
  York Times, Nov. 30, 2004
  (https://www.nytimes.com/2004/11/30/politics/red-cross-finds-
  detainee-abuse-in-guantanamo.html)...........................................30

Peter S. Hyun, Acting Ass't Att. Gen., Letter to Sens. Richard J.
  Durbin and Patrick Leahy, July 18, 2022
  (https://www.judiciary.senate.gov/imo/media/doc/2022.07.18-
  OUT-Durbin-Leahy-Military%20Mistreatment.pdf) ........................................12

Report on Torture: Committee Study of the Central Intelligence
    Agency's Detention and Interrogation Program, Senate Report
    (https://www.intelligence.senate.gov/sites/default/files/documents/
    CRPT-113srpt288.pdf) ..............................................................4, 6, 7

Int'l Comm. of the Red Cross Report on the Treatment of Fourteen
    "High Value Detainees" in CIA Custody, Feb. 2007 ...........................................4

United Nations Convention Against Torture and Other Cruel,
    Inhuman or Degrading Treatment or Punishment, G.A. Res. 39/46,
    U.N. GAOR, 39th Sess., Supp. No. 51, U.N. Doc. A/39/51 (1984) ..............1, 14

Wright & Miller, 21A Fed. Prac. & Proc. Evid. § 5055 (2d ed.) ...........................16

# GLOSSARY OF ACRONYMS

Convening Authority...............................................................................CA

Convention Against Torture ...............................................................CAT

Court for Military Commissions Review.........................................CMCR

International Commission of the Red Cross ...................................... ICRC

Letterhead Memoranda ......................................................................LHM

Military Commission Rules of Evidence....................................... MCRE

**INTRODUCTION**

Mandamus is a "drastic and extraordinary remedy reserved for really extraordinary causes." *Cheney v. U.S. District Court*, 542 US 367, 380 (2004) (cleaned up). This is such an extraordinary cause. The Government now agrees that torture-obtained evidence is categorically inadmissible at all stages of a military commission proceeding. That interpretation is the only one consistent with Congress's criminalization of torture, 18 U.S.C. § 2340A; the only one consistent with the United States' obligations under international agreements to which it is party, s*ee e.g.* United Nations Convention Against Torture[1]; and the only one consistent with every declaration by the President or Executive Branch agency to have addressed the issue.[2] Yet in the decisions below, first the military judge and then the Court for Military Commissions Review ("CMCR") held that evidence obtained by torture *is* admissible in pretrial commission proceedings.

This issue is not new to the Court. Last year, the same issue was presented in *In re al-Nashiri*, 47 F.4th 820 (D.C. Cir. 2022). Upon reaching this Court, the Government reversed its earlier position that pretrial use was permitted; pledged

---

[1] United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. Res. 39/46, U.N. GAOR, 39th Sess., Supp. No. 51, at 197, U.N. Doc. A/39/51 (1984).
[2] *See e.g.* Statement from President Biden on International Day in Support of Victims of Torture, June 26, 2023 (the United States seeks to "continue to ensure that torture remains prohibited in all of its forms, without exception.").

that it would henceforth not use evidence obtained by torture at any stage of any military proceeding; and further promised that it would scour the record below and voluntarily withdraw any evidence found to be torture-derived, without further action by this Court. *Id.* at 825. Expressly based on these promises, the Court held that Abd al-Nashiri's argument was moot (1) because of the Government's assurance that it would not offer such evidence again in any commission proceeding, and (2) because the Government had "withdrawn the statements identified to have been made under torture" from consideration by the military commission below. *Id.*

Here, regardless of whether the Government repeats its earlier promise and satisfies the first condition, it cannot satisfy the second, because torture-related evidence was already put before the Convening Authority ("CA") and considered in support of Petitioner's referral. Nor can this Court any longer rely on the Government's promise even if it repeats it here. Notwithstanding any good-faith promises by the current prosecution team, with the holding below the CMCR has authorized the use of torture-obtained evidence in every pretrial proceeding in every current and future military commission case *as a matter of law*.

Accordingly, nothing short of a holding that evidence derived from torture *may never be used for any purpose at any phase of a military commission* can ensure that this issue will not again come before this Court.

## JURISDICTION

This Court has supervisory jurisdiction over all military commissions created under the Military Commissions Act of 2009, Pub. L. No. 111-84 (2009). 10 U.S.C. § 950g. This Court can issue all writs necessary and appropriate in aid of that jurisdiction pursuant to 28 U.S.C. § 1651.

## RELIEF SOUGHT

Petitioner, Encep Nurjaman, requests that this Court issue a writ of mandamus and prohibition vacating Convening Order #21-01 (Jan. 21, 2021).

## ISSUES PRESENTED

I.  Do 10 U.S.C. § 948r and the Due Process Clause of the Fifth Amendment categorically prohibit the admission of evidence derived from torture at all stages of a criminal proceeding under the Military Commissions Act of 2009, including referral?

II.  May the admission of evidence in violation of this prohibition ever be treated as harmless error?

## STATEMENT OF FACTS

### A.  Petitioner's Seizure and Confinement.

Petitioner Encep Nurjaman is a citizen of Indonesia. In August 2003, Thai and United States security forces apprehended Petitioner in Thailand on suspicion

of funding terrorist activities.[3]  Shortly thereafter, he was remanded to Central

Intelligence Agency ("CIA") custody.  Subsequently, Petitioner was "almost

immediately subjected to the CIA's enhanced interrogation techniques."  Petitioner

remained in CIA custody for more than three years, during which time the CIA

held him incommunicado at various black sites and tortured him.[4]

On September 4, 2006, Petitioner was transferred to the custody of the U.S.

military on Guantanamo Bay, alongside thirteen other so-called High Value

Detainees.  After his transfer, Petitioner remained in solitary confinement for more

than ten years, and he remained under the operational control of the CIA for some

time after his relocation.[5]

### B.    Petitioner's Torture by the United States.

Petitioner has been continuously detained by the CIA and Department of

Defense for more than twenty years.[6]  It was not until June 2017, more than ten

---

[3] The Senate Intelligence Committee Report on Torture: Committee Study of the Central Intelligence Agency's Detention and Interrogation Program, Senate Report (https://www.intelligence.senate.gov/sites/default/files/documents/CRPT-113srpt288.pdf) ("Torture Report") at 311, 109.
[4] Torture Report at xiii, xxvii n.8, 76, 77 & n.409, 160 n.7, 310-11, 392 n.2211; *see also* Int'l Comm. of the Red Cross ("ICRC") Report on the Treatment of Fourteen "High Value Detainees" in CIA Custody, Feb. 2007 ("ICRC Report").  The Government does not contest that Petitioner was subjected to torture within the meaning of 10 U.S.C. § 948r(a) in the black sites.  *See* ICRC Report at 5, 11, 12, 17, 19-20, 20, 22.
[5] Torture Report at 310-11, 160.
[6] Torture Report at 310-11, 392 n.2211.

years after his transfer to Guantanamo Bay and nearly fourteen years after he was taken into custody, that he was first charged. (A127)

The CA referred his case for trial on January 21, 2021. Along with the charge sheet, the Government provided the CA with a "referral binder" that consisted of some of the evidence the Government intended to present if Petitioner were referred for trial.

One binder document, labeled "Tab D – 911 Commission Report, Chp 5, Al Qaida Aims," is a photocopy of chapter 5.1 of the 9/11 Commission Report. Chapter 5 was titled "Al Qaeda Aims at the American Homeland," and subchapter 5.1 was titled "Terrorist Entrepreneurs" and included profiles of Khalid Sheik Mohammed, Petitioner, and Abd al Rahim al Nashiri. The 9/11 Commission report was used in support of at least one element of every charge and for two elements of three of the charges.

The Report chapter reproduced in the binder was based on twenty-three intelligence interrogation reports regarding Petitioner and other detainees conducted by the CIA using torture and other cruel, inhuman, and degrading treatment. Petitioner was subjected to torture "almost immediately" upon his transfer to CIA custody.[7] He remained in CIA custody for more than three years.[8]

---

[7] Torture Report at 309-10.
[8] Torture Report at 160 n.7, 310-11, 392 n.2211.

His treatment was so offensive that one of his interrogators told him that he could never go to court because "we can never let the world know what I have done to you."[9]

Petitioner described his torture during interviews with ICRC representatives in 2007.[10]  Interrogators subjected Petitioner to prolonged stress standing for days at a time with his wrists shackled above his head, during which time he was stripped naked and forced to urinate and defecate on himself.  At one point, medical personnel intervened to prevent the further use of the stress standing position while telling Petitioner, "I look after your body only because we need you for information."[11]

Early in his CIA detention, interrogators beat Petitioner and placed a thick collar around his neck, which they used to slam his head against the wall.  Later, interrogators showed him the collar during sessions and threatened to repeat that treatment.  Throughout his detention, the CIA deprived Petitioner of basic

---

[9] Torture Report xiii, xxvii, n.8.  Four of the five interrogations of Petitioner mentioned in the 9/11 Commission Report occurred in the weeks immediately prior to the CIA interrogator making this admission.

[10] ICRC Report.  The Torture Report explains that "[t]he Committee found the ICRC [R]eport to be largely consistent with information contained in CIA interrogation records."  Torture Report at 161; *see also* Torture Report at 77 & n.409 (noting that Mr. Nurjaman was one of "at least six detainees [who] were stripped and shackled nude, placed in the standing position for sleep deprivation, or subjected to other CIA enhanced interrogation techniques prior to being questioned by an interrogator in 2003").

[11] ICRC Report at 11, 20, 22.

necessities. The CIA held him in solitary confinement and deprived him of access to open air, solid food, exercise, and appropriate hygiene facilities and basic hygiene items. The CIA also restricted his access to the Quran.[12]

The Torture Report also provides detail about some of the methods used by the CIA. "Sensory Dislocation" included shaving detainees' heads and faces and exposing them to loud music in white rooms with white lights and keeping them "unclothed and subjected to uncomfortably cool temperatures," all while shackling them "hand and foot with arms outstretched over [their] head (with [their] feet firmly on the floor and not allowed to support [their] weight with [their] arms"). This would take place prior to questioning, regardless of any cooperation the detainee had already provided. Other actions included "near constant interrogations, as well as continued sensory deprivation, a liquid diet, and sleep deprivation." Detainees were subjected to the "attention grasp, walling, the facial hold, the facial slap . . . the abdominal slap, cramped confinement, wall standing, stress positions, sleep deprivation beyond 72 hours, and the waterboard, as appropriate."[13]

On January 21, 2021, 471 days after receiving the charges, the CA referred Petitioner for trial by a military commission.

---

[12] ICRC Report at 12, 17, 19-20.
[13] Torture Report 77.

## C.     The Proceedings Below.

On March 14, 2022, Petitioner filed a motion to dismiss in the military

commission proceedings based on the CA's consideration of evidence obtained by

torture in making his referral decision.  On October 6, 2022, the presiding military

judge denied Petitioner's motion to dismiss, holding that 10 U.S.C. § 948r(a) does

not apply to the referral stage.  (A60) The military judge acknowledged that the

Government had represented to this Court in *Al-Nashiri*, 47 F.4th 820 (D.C. Cir.

2022) ("*Al-Nashiri IV*"), that "§ 948r(a) applies to all stages of a military

commission case," including pretrial proceedings.  However, because the

Government's position at the time of Petitioner's referral was that § 948r(a) did *not*

apply to pretrial proceedings, he held that its earlier interpretation governed.[14]

---

[14] That is, the military judge held in effect that it is the province of the Office of the
Chief Prosecutor, not the judiciary, to say what the law is.  *See Marbury v.
Madison*, 1 Cranch (5 U.S.) 137, 177 (1803) ("[I]t is emphatically the province and
duty of the judicial department to say what the law is.").  The military judge
reasoned that because *the Government interpreted* § 948r to permit pretrial use at
the time of referral, pretrial use was *in fact* authorized by the statute:

> The Government's current position is that § 948r(a) applies to
> all stages of a military commission case.  It is important to note the
> Government position at the time of referral was that § 948r(a) applied
> "only to the trial and sentencing phases of a military commission and
> not to pretrial proceedings."  Therefore, at the time of the referral, the
> inclusion of the 9/11 Commission Report in the referral binder was
> not in violation of § 948r(a).  (A57) (footnote omitted).

The CMCR agreed and adopted this analysis.  (A40) (noting that "at the time of
petitioner's referral, the government's stated position was that torture-derived

(A57)  He further held that, even assuming the inclusion of the 9/11 Commission

Report violated § 948r(a), the charging decision was valid based on other,

untainted evidence in the record.  (A59)

On November 22, 2022, Petitioner filed a petition with CMCR seeking a

writ of mandamus vacating the military commission ruling and directing the

military judge to dismiss the referral.  The Government opposed, noting that the

parties "are united in recognition that 'torture of any kind is legally and morally

unacceptable, and that the judicial system of the United States will not permit the

taint of torture in its judicial proceedings,'" but arguing again that the

Government's use of such evidence was merely cumulative to other evidence

before the Convening Authority.  (A166, A184-89)

On June 23, 2023, the CMCR denied Petitioner's petition.  The CMCR

affirmed that § 948r(a) only prohibits the use of statements obtained by torture at

trial and not at pretrial stages.  (A39-40)  It further held that, even if the use of the

9/11 Commission Report violated § 948r(a), Petitioner's due process rights were

not violated and any error was "harmless beyond a reasonable doubt" because

there was sufficient untainted evidence in the referral binder to support the charges.

---

evidence could be used during motions (and presumably during all other pretrial
points in the commission process).").

(A40-47)  In so ruling, the CMCR relied exclusively on witness statements, so-called Letterhead Memoranda ("LHM") obtained by the FBI, that the Government "claims . . . were not obtained by the use of torture."[15]  (A12)

## REASONS FOR GRANTING THE WRIT

Issuance of a writ of mandamus turns on three factors:  First, Petitioner must show that he has "no other adequate means to attain the relief he desires"; "[s]econd, the petitioner must [show] that his right to issuance of the writ is clear and indisputable"; and "third, . . . the issuing court . . . must be satisfied that the writ is appropriate under the circumstances."  *Cheney*, 542 U.S. at 380-81 (cleaned up).

**<u>Clear and indisputable right</u>**:  In Section I *infra*, we demonstrate that Petitioner's right to the issuance of the writ is clear and indisputable.

**<u>Other adequate means of relief</u>**:  Petitioner has none.  We show below that the use of torture-obtained evidence is a "structural defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself."[16]  In a system where so many of the witnesses and so much of the evidence is directly or indirectly derived from torture, the taint created by the admissibility of torture-obtained evidence metastasizes in a manner that is invisible at trial and

---

[15] *But see* A65-114 (*United States v. Al-Nashiri*, AE 467CCC (Mil. Comm. Aug. 18, 2023)), *and* Section II.C., *infra*.
[16] *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991).

on direct appeal.  *See e.g.* Section II.C.  Under these extraordinary conditions,

direct appeal is not an adequate means of vindicating Petitioner's right to trial

untainted by the Government's torture program.

**Appropriate under the circumstances**:  Issuance of the writ is eminently

appropriate – indeed, necessary – under the circumstances.  The legacy of the

torture program is not only the physical, mental and legal harm to Petitioner, but

fundamental harm to the criminal justice system itself.  *See* Section II.B.

Moreover, the public has an interest in seeing justice done untainted by "[t]he rack

and torture chamber."[17]  Finally, because Petitioner's requested relief is simply an

order vacating the current referral without prejudice, the Government's legitimate

interest in a (torture-free) prosecution is preserved.[18]

I.    **IT IS CLEAR AND INDISPUTABLE THAT EVIDENCE OBTAINED BY TORTURE IS INADMISSIBLE AT ALL PHASES OF A MILITARY COMMISSION PROSECUTION, INCLUDING REFERRAL**

A.    **10 U.S.C. § 948r bars the use of evidence obtained by torture to decide whether an accused should be referred for trial**

This is an issue that appeared to have been settled in *Al-Nashiri IV*.[19]  The

Court there held that the Government's unqualified representations during

---

[17] *Brown v. Mississippi*, 297 U.S. 278, 285-86 (1936).
[18] *See e.g. Rose v. Mitchell*, 443 U.S. 545, 557-58 (1978) ("Here, however, reversal does not render a defendant 'immune from prosecution,' nor is a subsequent reindictment and reprosecution 'barred altogether.'").
[19] *In re al-Nashiri*, at 820.

argument that "it will not seek to introduce any evidence obtained by the torture of Al-Nashiri or any third party in any stage of the proceedings" and that it had "also reviewed the ex parte record and withdrawn the only other two statements it uncovered as having been obtained through the use of torture" mooted al-Nashiri's claim that torture evidence was barred "at any stage of the proceedings."[20]  Based on those representations, this Court concluded that "there is no reasonable expectation that the alleged violation will recur," and that in these circumstances al-Nashiri had alleged "no remaining case or controversy."[21]

In this case, the CMCR acknowledged the Government's *Al-Nashiri IV* concessions and this Court's express reliance on them.  (A37-38)  Nevertheless, it held that because Petitioner had "not advanced any theory . . . for concluding that the government's position before the D.C. Circuit in *Al-Nashiri IV* is the law *in this case*" (A39) (emphasis original), the *Al-Nashiri IV* holding had no bearing on its decision.[22]  Accordingly, Petitioner had not demonstrated a clear and indisputable right to relief.  (A40)

---

[20] *Al-Nashiri IV*, at 825.

[21] *Id*.

[22] *Id*.  The CMCR also suggested that the Government's promise never again to use torture evidence would only be enforceable in Mr. Al-Nashiri's case.  (A39)  As of the date that the Court issued its opinion in *Al-Nashiri IV* (Sept. 2, 2022), however, the Government itself understood its commitment to the Court as applying "at any stage of a military commission proceeding *against any party*." Peter S. Hyun, Acting Ass't Atty. Gen., Letter to Sens. Richard J. Durbin and Patrick Leahy, July 18, 2022, at 1 (emphasis added)

The precise scope of the CMCR's interpretation of § 948r(a) is unclear.[23]

What is clear, however, is its holding that statements extracted by torture were a

proper basis to charge and refer Petitioner to trial. Accordingly, by virtue of its

superior jurisdiction over military commission trials, evidence extracted by torture

is now a proper and legal basis for charges in all current and future commission

proceedings. In so ruling, the CMCR has virtually invited the Government to

continue to base charges against detainees on statements they made while being

tortured, notwithstanding the categorical language this Court employed in *Al-*

*Nashiri IV*.

Regardless of *Al-Nashiri IV*, the CMCR's interpretation of § 948r(a) is

clearly and indisputably wrong on the merits. Section 948r(a) provides:

> No statement obtained by the use of torture or by cruel,
> inhuman, or degrading treatment (as defined by section 1003 of the
> Detainee Treatment Act of 2005 (42 U.S.C. 2000dd)), whether or not
> under color of law, shall be admissible in a military commission under
> this chapter, except against a person accused of torture or such
> treatment as evidence that the statement was made.

---

(https://www.judiciary.senate.gov/imo/media/doc/2022.07.18-OUT-Durbin-Leahy-Military%20Mistreatment.pdf).

[23] *Compare* A39 (section titled "'Admissible in a military commission' Refers to Evidence at Trial") *and* A39 ("We agree with the military judge's interpretation of the word 'admissible' in 10 U.S.C. § 948r(a)."), *with* A40 ("An at least equally plausible reading . . . is that evidence obtained by the use of torture or torture-derived evidence may not be introduced in a military commission, which encompasses motions practice, trial on the merits, and presentencing proceedings.").

On its face, the statute includes one express exception ("except against a person accused of torture or such treatment as evidence that the statement was made"); otherwise, the prohibition is couched in absolute terms. That is unsurprising, because both the exception and absolute prohibition are drawn from the Convention Against Torture (CAT),[24] with which Congress was fully familiar, having ratified it in 1994. The CAT could not be clearer that outside of that exception, the prohibition admits "[n]o exceptional circumstances whatsoever."[25] "Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent."[26] No such intent is manifest in this case.[27]

Nor is there anything about the justifications for the absolute prohibition – torture's inherent evil and inhumanity; its perversion of the justice system's moral

---

[24] United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (Art. 15), Dec. 10, 1984, 1465 U.N.T.S. 85 ("CAT"). Other international law authorities are to the same effect. *See generally* Amal Clooney & Philippa Webb, *The Right to a Fair Trial in Int'l Law* (2020), at 650 n.330. As a general matter, "an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains." *Murray v. The Schooner Charming Betsy*, 2 Cranch (6 U.S.) 64, 118 (1804) (Marshall, C.J.).
[25] CAT, art. 2(2).
[26] *Andrus v. Glover Constr.*, 446 U.S. 608, 616–17 (1980).
[27] Outside of military commission practice, the Executive Branch has never deviated from its absolute rejection of torture. *See e.g.* Statement from Pres. Biden on Int'l Day in Support of Victims of Torture, June 26, 2023 (the United States seeks to "continue to ensure that torture remains prohibited in all of its forms, without exception.").

basis; its deterrence of gross government misconduct; and its distorting effect on the practical functioning of such a system, among others – that suggests that the charging and referral phase of the process should be distinguished from any other phase for these purposes. It is no less offensive to legalize torture as a valid basis for charging crimes than it is to legalize it as a means of collecting evidence in support of the Government's case on the merits. In sum, it is neither "plausible," "rational" nor "direct" (A40) to believe that Congress intended to exclude the referral stage of commission proceedings alone from the scope of the otherwise absolute bar on the use of torture.

After initially agreeing with the military judges and CMCR that § 948r(a) applied only to trial on the merits,[28] the Government has conceded that the ban applies at every stage of the proceedings. The military judges and CMCR, however, have not. To date the Government's strategy has been to keep its hands at least superficially clean of the morally, politically and legally repugnant embrace of torture without undermining its litigation successes. With the CMCR's holding below, however, it has become apparent that Government's high-wire casuistry – promising never to use torture on one hand while on the other refusing to take a position on the legality of its use – is no longer a tenable position. If the Government in fact stands by its professed abhorrence of torture, it will now join

---

[28] *Al-Nashiri IV*, at 824-25.

Petitioner's request that this Court hold as a matter of law that evidence obtained by torture may not be used at any stage of any military commission proceeding for any purpose.

### B. The Due Process Clause bars the use of evidence obtained by torture at every stage of a commission proceeding

Although the Court can avoid the constitutional issue if it decides this case on statutory grounds, it is also clear that Petitioner's Due Process rights extend to suppression of his statements from his commission proceeding.

If it applies in Guantanamo at all, the Due Process Clause bars the use of torture-derived evidence at every stage of a commission proceeding.[29] While pretrial fact-finding is generally not subject to the rules of evidence, the prohibition on using evidence obtained by torture is not a technical rule of evidence.[30] Rather, "[t]he use of coerced confessions, whether true or false, is forbidden because the method used to extract them offends constitutional principles."[31] Thus, "[a] coerced confession is offensive to basic standards of justice . . . because declarations procured by torture are not premises from which a civilized forum will

---

[29] *See e.g. Rochin v. California*, 342 U.S. 165, 172 (1952) (review of criminal cases under the Due Process Clause extends to "the whole course of the proceedings . . . resulting in a conviction . . . .").
[30] Wright & Miller, 21A Fed. Prac. & Proc. Evid. § 5055 (2d ed.) ("Rule 104 cannot override the prohibitions on coerced confessions.").
[31] *Lego v. Twomey*, 404 U.S. 477, 484–85 (1972).

infer guilt."[32]  Hence in *Brown*, the Supreme Court ruled that the use of evidence

obtained by torture was not "mere error[]" or a "mere question of state practice,"

but instead was "a wrong so fundamental that it made the whole proceeding a mere

pretense of a trial and rendered the conviction and sentence wholly void."[33]

   This Court recently declined to determine the full scope of Due Process

Clause protections at Guantanamo Bay.[34]  However, it squarely rejected the

proposition that "the Due Process Clause does not apply to noncitizens at

Guantanamo,"[35] and recognized that the scope of the Clause's application is

governed by the Supreme Court's "impracticable or anomalous" analysis in

*Boumediene v. Bush*.[36]  In her concurrence, Judge Pillard applied the *Boumediene*

analysis to provide general guidance about the Clause's scope at Guantanamo,

concluding that "[i]t would be no more impracticable to apply the Due Process

Clause than the Suspension or *Ex Post Facto* Clause in this context."[37]

   Similarly, if it is not "impracticable or anomalous" to enforce Petitioner's

right to initiate separate judicial proceedings on United States territory before a

federal judge in a different system of justice, geographically far removed from his

---

[32] *Lyons v. Oklahoma*, 322 U.S. 596, 605 (1944).
[33] *Brown*, 297 U.S. at 286–87.
[34] *Al-Hela v. Biden*, 66 F.4th 217, 227–28 (2023) (*en banc*).
[35] *Id.* at 227.
[36] *Boumediene v. Bush*, 553 U.S. 723 (2008); *Al-Hela*, 66 F.4th at 220–21.
[37] *Al-Hela*, 66 F.4th at 248.

place of detention and military commission proceeding – that is, if it is not impracticable or anomalous to enforce Petitioner's rights under the Suspension Clause – then it is not "impracticable or anomalous" to require the Government to refrain from torturing detainees and using the fruits of that torture to prosecute them (arguably the most fundamental due process right of all).

In sum, if Petitioner has any due process rights at all in Guantanamo Bay – as the *Al-Hela* majority appears to have held, although it found no need to specify them – then he has the right to suppress statements extracted by torture.

## II.   THE HARMLESS-ERROR PRINCIPLE DOES NOT APPLY TO EVIDENCE DERIVED FROM TORTURE

The Supreme Court has long "recognized that most constitutional errors can be harmless," while at the same time holding that some violations can never be deemed harmless "even though there may be no reasonable doubt that the defendant is guilty and would be convicted absent the trial error."[38]  The use of torture is never "harmless," either in the strictly legal sense of *Chapman v. California* or the broader sense of the fundamental values grounding American systems of justice.

---

[38] *Fulminante*, 499 U.S. at 306, 294; *see also Chapman* 386 U.S. at 23.

### A. Use of evidence obtained by torture is a structural defect in the proceeding, not a mere trial error

It is an undisputed fact that Petitioner was tortured by the United States government for years, deliberately and systematically. Thus the CMCR's harmless-error[39] holding amounts to the claim that a legitimate judicial system can turn a blind eye to the systematic use of torture so long as doing so would not materially affect the decision in a particular case.

The CMCR's analysis flies in the face of the Supreme Court cases making it clear that some government conduct will not be condoned regardless of its effect on the ultimate outcome. In particular, the Supreme Court has drawn the line between "trial errors" (which may be treated as harmless errors) and "structural defects" (which may not).[40] That line is crossed at the point where government conduct "strikes at the fundamental values of our judicial system and our society as a whole."[41]

There are few constitutional violations, if any, that so pervasively "undermine[] the structural integrity of the criminal tribunal itself"[42] and the tribunal's fundamental legitimacy as the use of torture to obtain a conviction. Nor is there government conduct that more forcefully "strikes at the fundamental values

---

[39] *Chapman v. California*, 386 U.S. 18 (1967).
[40] *Fulminante*, 499 U.S. at 309.
[41] *Rose v. Mitchell*, 443 U.S. 545, 556 (1978).
[42] *Vasquez v. Hillery*, 474 U.S. 254, 263-4 (1986).

of our judicial system and our society as a whole" or – as the Court expressed it in *Fulminante* – that "transcends the criminal process"[43] so much as torture.

The Supreme Court's refusal to apply harmless-error analysis for certain constitutional violations has appeared most starkly in cases, such as this one, in which the constitutional violation occurs during the charging process. In *Vasquez v. Hillery*,[44] the Court held that racial discrimination in the composition of a grand jury requires automatic reversal, *even where the guilt of the defendant was proved at trial beyond a reasonable doubt on the basis of an error- and discrimination-free record*.[45]

The use of torture-induced evidence is no less "pernicious in the administration of justice"[46] than racial discrimination, nor is it any less "at war with our basic concepts of a democratic society and a representative government."[47] Nor, until now, has the Government suggested otherwise. The fact that officially sanctioned torture so uniquely "offends [a] principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental"[48] is what differentiates it from other serious errors and superficially

---

[43] *Fulminante*, 499 U.S. at 311.
[44] *Vasquez*, 474 U.S. at 254.
[45] *Id.* at 260-264. *See also Strauder v. West Virginia*, 100 U.S. 303 (1880); *Rose*, 443 U.S. at 556-7; *see generally Vasquez*, 474 U.S. at 261 (collecting cases).
[46] *Rose*, 443 U.S. at 555.
[47] *Id*. at 556.
[48] *Brown*, 297 U.S. at 285.

similar violations during the charging process, which are evaluated under the harmless-error standard.[49]

*Fulminante* in particular illustrates how torture differs from other constitutional violations. Like Fulminante, Petitioner was subject to government conduct that rendered his statements involuntary. The cases' similarity ends there, however. Fulminante was coerced into confessing by a fellow inmate who, acting as a government agent, offered to protect him from other prisoners if Fulminante told him the full truth about the murder he had committed. Only after that offer of protection did Fulminante confess to the crime, which five Justices held to be an implicit threat that made the confession involuntary.[50]

The wide moral, political, and legal gulf that separates systematic government torture from "credible threats of violence" by individual government agents constitutes the difference between torture and "ordinary" coercion. Torture "strikes at the fundamental values of our judicial system and our society as a whole"[51] in a manner and to a degree that run-of-the-mill police coercion, no matter how deplorable, does not.[52] Introduction of a statement extracted by an

---

[49] *Fulminante*, 499 U.S. at 310-12.

[50] *Id*. at 283

[51] *Rose*, 443 U.S. at 556.

[52] Indeed, the difference between torture and ordinary unconstitutional coercion is enshrined in the Military Commissions Act itself. *Compare* 10 U.S.C. § 948r(a), *with* 948r(c), (d); *see also e.g.* Military Commission Rule of Evidence, Rule 304.

individual act of police brutality may indeed be an isolatable "trial error" that may sometimes be disregarded in light of the other evidence in the case.[53]  That fact has no bearing, however, on the systemic distortions that result from a government-sanctioned, government-organized policy of deliberate torture, nor does it have any bearing on the legal treatment appropriate for a genuinely "structural defect" of this type.

Officially sanctioned torture "affect[s] the framework within which the trial proceeds, rather than simply [being] an error in the trial process itself."[54] Petitioner's torture was part of a government-approved plan to extract information from individuals by pain and fear, designed to break down their personalities to make them more compliant with the torturer's demands and suggestions.[55] Statements given under torture have long been recognized as inherently unreliable.[56]  Torture also makes its victims' memories unreliable, obstructs their ability to articulate the memories that remain, and otherwise causes psychological

---

[53] *But see Fulminante*, 499 U.S. at 295-302 (although harmless error applies to coerced confessions, Fulminante's confession was not harmless).
[54] *Id.* at 310.
[55] Luban & Newell, *Personality Disruption as Mental Torture: The CIA, Interrogational Abuse, and the U.S. Torture Act*, 108 Geo. L.J. 333, 376-77 (2023).
[56] *Jackson v. Denno*, 378 U.S. 368, 385-86 (1964).

disorders that directly disturb an accused's cognition, motivation and ability to engage in his own defense.[57]

Perhaps most significant, just because it was systematically carried out on *all* the detainees rendered to the black sites and many others at Guantanamo as well, the torture program affected not only Petitioner but other key witnesses in his case, including Petitioner's two former co-defendants, both of whom recently pleaded guilty and are expected to testify against him.[58]

Torture-obtained statements' multifaceted unreliability is compounded tenfold by the fact that the Military Commissions Act does not automatically exclude hearsay statements from black-site witnesses, hearsay that could not be admitted in federal court.[59] Finally, notwithstanding the Government's representation that they "were not obtained by the use of torture" (A12), some of the statements relied upon by the CMCR in its opinion may themselves be suppressible "fruit of the poisonous tree" derived from statements extracted by torture in the black sites or at

---

[57] *See e.g.* International Classification of Diseases 11th Revision (ICD-11) for Mortality and Morbidity Statistics (1/2023), § 6B41 (describing sequelae of complex post-traumatic stress disorder that "develop following exposure to an event or series of events of an extremely threatening or horrific nature, most commonly prolonged or repetitive events from which escape is difficult or impossible (e.g. torture, . . .")) (icd.who.int/browse11/l-m/en#/http://id.who.int/icd/entity/585833559) (last visited Oct. 15, 2023).
[58] A115-120 (notice of Bin Lep severance)); A121-26 (Bin Amin severance).
[59] *Compare* 10 U.S.C. § 949a(b)(3)(D) (hearsay admissible based in part on "the indicia of reliability within the statement itself") *with Crawford v. Washington*, 541 U.S. 36 (2004) (reliability not relevant to admissibility of testimonial hearsay).

Guantanamo.[60]  The systematic nature of the CIA's torture program spreads

"unreliability" throughout the trial record.

**B.    Treating evidence obtained by torture as harmless "destroys the appearance of justice and thereby casts doubt on the integrity of the judicial process"[61]**

There is another critical sense in which treating officially-sanctioned

Government torture as harmless error "undermines the structural integrity of the

criminal tribunal itself."[62]  To license courts to disregard Government conduct that

is indisputably torture in the course of convicting (or charging) a criminal accused

"would be to afford brutality the cloak of law. . . .  Nothing would be more

calculated to discredit law and thereby to brutalize the temper of a society."[63]

The integrity of a criminal proceeding rests on more than the reliability of its

fact-finding procedures; it rests on the perception that those procedures are

themselves legitimate and consistent with society's fundamental values.  The

absolute prohibition of torture is prominent among those values.  Indeed, the

Supreme Court has traced the Anglo-American concept of "due process of law" to

the "the popular hatred and abhorrence of illegal confinement, torture and extortion

of confessions":

---

[60] *See* Section II.C., *infra*.
[61] *Vasquez*, 474 U.S. at 270.
[62] *Vasquez*, 474 U.S. at 263-64.
[63] *Rochin*, 342 U.S. at 173-74.

From the popular hatred and abhorrence of illegal confinement, torture and extortion of confessions of violations of the 'law of the land' evolved the fundamental idea that no man's life, liberty or property be forfeited as criminal punishment for violation of that law until there had been a charge fairly made and fairly tried in a public tribunal free of prejudice, passion, excitement and tyrannical power. Thus, as assurance against ancient evils, our country, in order to preserve 'the blessings of liberty', wrote into its basic law the requirement, among others, that the forfeiture of the lives, liberties or property of people accused of crime can only follow if procedural safeguards of due process have been obeyed.[64]

The Due Process Clause is one constitutional provision rooted in the abhorrence of torture; the Cruel and Unusual Punishments Clause is another.[65]  And the anti-torture principle has even deeper roots going back at least to the English common law judges' rejection of Continental civil code jurisdictions' employment of torture as a legitimate means of obtaining evidence.[66]  "In the heritage of Anglo-American

---

[64] *Chambers v. Florida*, 309 U.S. 227, 236-37 (1949); s*ee also Brown*, 297 U.S. at 285-86 ("The rack and torture chamber may not be substituted for the witness stand.").

[65] *See Ingraham v. Wright*, 430 U.S. 651, 665-66 (1977):

> The Americans who adopted the language of this part of the English Bill of Rights in framing their own State and Federal Constitutions 100 years later feared the imposition of torture and other cruel punishments not only by judges acting beyond their lawful authority, but also by legislatures engaged in making the laws by which judicial authority would be measured.

[66] *See* John H. Langbein, TORTURE AND THE LAW OF PROOF: EUROPE AND ENGLAND IN THE ANCIEN RÉGIME (1977) (contrasting English jurists' repudiation of torture with its institutionalization in the Continent's Roman Law Codes).

law, there is a long tradition of rejecting torture and of regarding it as alien to our jurisprudence."[67]

Until its recent acceptance in the military commission system, torture has mostly played the role of rhetorical foil to the judiciary's enlightened understanding of due process and legitimate criminal processes.  In this regard, Justice Black's opinion in *Ashcraft v. Tennessee* is representative:

> There have been, and are now, certain foreign nations with governments dedicated to an opposite policy: governments which convict individuals with testimony obtained by police organizations possessed of an unrestrained power to seize persons suspected of crimes against the state, hold them in secret custody, and wring from them confessions by physical or mental torture. So long as the Constitution remains the basic law of our Republic, America will not have that kind of government.[68]

In these decisions, torture serves as the line that government conduct cannot cross and still remain legitimate, the *ne plus ultra* of tyrannical governments' deviation from our liberal, rights-respecting democracy.  Torture has thus represented the fixed touchstone against which the legitimacy of other government conduct has been measured.[69]

---

[67] Jeremy Waldron, *Torture and Positive Law: Jurisprudence for the White House*, 105 Colum. L. Rev. 1681, 1719 (2005).
[68] *Ashcraft v. Tennessee*, 322 U.S. 143, 155 (1944).
[69] *McKune v. Lile*, 536 U.S. 24, 41 (2002), is exemplary in this regard: "Determining what constitutes unconstitutional compulsion involves a question of judgment: Courts must decide whether the consequences of an inmate's choice to remain silent are closer to the physical torture against which the Constitution clearly protects or the de minimis harms against which it does not."

Because of how it has functioned in judicial decision making as a marker distinguishing legitimate from illegitimate Government conduct, Jeremy Waldron has suggested that the prohibition against torture is a "legal archetype[,] emblematic of our determination to break the connection between law and brutality and to reinforce its commitment to human dignity."[70]  The danger is that erosion of the absolute character of the torture prohibition leads to a parallel erosion in the confidence we have in the judicial system's ability to distinguish legitimate and illegitimate government conduct (a possibility that has haunted the military commissions system from its outset).

Categorizing the admission of evidence extracted by torture as "trial error" and treating it under the harmless-error doctrine does not, of course, necessarily imply a judicial endorsement of torture; judges can express disapproval while still holding the torture to be harmless in the cases before them.  Nevertheless, the specifically legal import of the judge's decision – the finding that use of the torture evidence was legally harmless to the victim – carries an indelible message that the Government's decision in a particular case to torture an individual can be dismissed as beneath legal notice.

Petitioner submits that that message, which is the ineluctable implication of applying the harmless-error doctrine to Petitioner's treatment in the black sites, is

---

[70] Waldron, *Torture and Positive Law*, at 1739.

not one that this or any other court should send if it is concerned with its own integrity and legitimacy.  To do so would be "to contemplate with equanimity the prospect that the rule of law will no longer hold out the clear promise of nonbrutality -- that the state, which it aims to control, will be permitted to operate toward some individuals who are wholly under its power with methods of brutality from which law itself recoils."[71]  No less than denial of an accused's right to a public trial or his right to self-representation,[72] allowing a prosecution in which torture has played any role whatsoever to go forward is a fundamental "structural defect" in the judicial process that no amount of untainted evidence can wash away.

**C.    If the Court holds that harmless error does apply to the use of torture-obtained evidence, Petitioner reserves the right to argue on direct appeal that the use of his statements for referral was not harmless.**

Under the harmless-error standard, a constitutional error is harmless only if the Government can show "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained."[73]

Assuming *arguendo* that harmless error applies here, it is impossible in principle to determine at this juncture whether in fact the CA's consideration of

---

[71] Waldron, *Torture and Positive Law*, at 1743.
[72] *Fulminante*, 499 U.S. at 310 (listing constitutional violations that have been classified as "structural defects").
[73] *Chapman*, 386 U.S. at 24.

Petitioner's black-site statements was harmless.  Petitioner therefore reserves the right to argue that that consideration was not harmless on direct appeal in the event he is convicted.

More important, the explanation of *why* it is impossible at this juncture to evaluate the harmless-error issue provides a concrete example of how the United States Government's official torture policy pervades and undermines the fact finding in the entirety of Petitioner's military commission proceeding, before and during trial.  It thus demonstrates one way in which the United States' official torture policy constitutes a "structural defect[] in the constitution of the trial mechanism, which def[ies] analysis by 'harmless-error' standards."[74]

In finding that the inclusion of the statements was harmless beyond a reasonable doubt, the CMCR relied on FBI LHM taken from Petitioner and other witnesses that were also included in the referral binder.  (A10-30)  As was the case for Petitioner, three of those witnesses had also been tortured in black sites prior to the LHM interrogations.[75]  From the dates of their FBI interviews, it is clear that three other declarants[76] were detained at Guantanamo during its early period when

---

[74] *Fulminante*, 499 U.S. at 310; *see generally* Section II.B. *supra*.

[75] Mohammed Bin Amin (discussed at A14); Mohammed Bin Lep (A16); and Khalid Sheikh Mohammad (A20).

[76] Faiz Abu Bakar Bafana (A22; statement dated 2002); Hashim Abbas (A25; statement dated 2004); Ja'afar Bin Mistooki (A29; statement dated 2004).

torture was routinely practiced as official policy.[77]  The remaining three named LHM witnesses gave statements on dates that do not conclusively demonstrate that they were detained at Guantanamo during the 2002 through 2004 period, but they also do not disprove that possibility.[78]

The significance of the LHM declarants' circumstances stems from the fact that these LHM may themselves be subject to suppression pursuant to the general ban on the use of torture.[79]  In another military commission proceeding,[80] a military judge ruled recently that FBI LHM taken from another former black site detainee were inadmissible at trial, because although "not *obtained by* torture or cruel, inhuman, and degrading treatment, they were *derived from* it."  (A108).

The harmless-error doctrine presupposes that the other evidence supporting the factual finding is itself untainted and thus not subject to suppression.[81]

---

[77] *See* Neal Lewis, *Red Cross Finds Detainee Abuse in Guantánamo*, New York Times, Nov. 30, 2004 (https://www.nytimes.com/2004/11/30/politics/red-cross-finds-detainee-abuse-in-guantanamo.html).

[78] Zulkifli Bin Marzuki (A13; statement taken 2009); Muhammad Rais (A27; statement taken 2006); Masran Bin Arshad (A28; statement taken 2009).

[79] Section I, *supra*.

[80] *United States v. Al-Nashiri*, AE 467CCC (Mil. Comm. 2023); *see* A65-114.

[81] *See e.g. United States v. Brooks*, 449 F.2d 1077, 1083 (D.C. Cir. 1971) ("Where the surrounding facts and evidence do not present a case of substantial doubt as to the possibility of misidentification, where there is an untainted identification testimony, where there is strong evidence independent of the testimony of resemblance witnesses showing that defendant was the offender, that combination of strengths in the Government case and weakness of the "resemblance" testimony in contributing to his convictions warrants a finding of harmless error from admission of the resemblance testimony.").

Accordingly, if – like al-Nashiri – the declarants of the LHM were subjected to torture in prior interrogations, it is non-speculative to take into account the possibility that a motion to suppress these statements would be similarly successful.[82]

Of course, the Court may require evidence in the record demonstrating that the LHM were the product of torture before excluding them from the harmless-error analysis. In that event, it should remand to the military commission for the necessary fact-finding related to the provenance of the LHM. That is, the Court should itself refrain from speculating (as the Government speculates, without support) that the LHM were "not obtained by the use of torture." (A12) Instead, Petitioner should be given the opportunity to develop the record to show that these LHM, like the LHM in *United States v. al-Nashiri*, should be excluded.

The complexity of this harmless-error analysis is a good example of the uncertainty and "reasonable doubt" that torture injects into all aspects of the commission proceedings. The Government's case against Petitioner and the other charged detainees rests on its fragile assumption that the LHM were "not obtained

---

[82] While the Military Commission Rules of Evidence (MCRE) treat statements obtained by torture of the defendant differently in certain respects from statements obtained by the torture of witnesses, the Due Process Clause prohibits the use of both. *Compare* MCRE 304 *with e.g. Williams v. Woodford*, 384 F.3d 567, 593–94 (9th Cir. 2002); *United States v. Gonzales*, 164 F.3d 1285, 1289 & n.1 (10th Cir. 1999); *LaFrance v. Bohlinger*, 499 F.2d 29, 34-36 (1st Cir. 1974).

by the use of torture." (A12) The Court should require the Government to prove that claim before accepting it as true.

## CONCLUSION

Immediate reversal by this Court with instructions to vacate the current referral is the only adequate means of rectifying the harm done to Petitioner and to the legitimacy of the federal judicial system by the CMCR decision below. As the law now stands, the Government is free to use evidence obtained by torture in any pretrial military commission proceeding for any purpose. Nor will a Government promise to never again introduce torture evidence moot Petitioner's requested relief (as in as in *Al-Nashiri IV*), because the torture evidence is already "baked into the record" by Petitioner's tainted referral.

For the foregoing reasons, Petitioner's writ should be granted and the referral in his case vacated without prejudice.

Respectfully submitted,

/s/ Adam Thurschwell
Adam Thurschwell (No. 52598)
James Hodes
U.S. Department of Defense
Military Commission Defense Organization
1620 Defense Pentagon
Washington, DC 20301

Alana F. Genderson (No. 56207)
Mathew J. McKenna (*pro hac vice* pending)
Morgan, Lewis & Bockius LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004

Brian D. Fahy (*pro hac vice* pending)
Jason S. Mills (*pro hac vice* pending)
Morgan, Lewis & Bockius LLP
300 South Grand Avenue, 22nd Floor
Los Angeles, CA 90071

*Counsel for Petitioner*

## CERTIFICATE OF COMPLIANCE

I certify that this document complies with the type-volume limitation of Fed. R. App. P. 21(d)(1) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 7,674 words.  This document complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5)-(6) because it has been prepared in a proportionally spaced typeface using Micorsoft 365 Office Word in Times New Roman 14-point font.

Dated: October 24, 2023

/s/ Adam Thurschwell
Adam Thurschwell

*Counsel for Petitioner*

## CERTIFICATE OF SERVICE

I certify that on October 24, 2023, I caused this petition and its attachments to be served via electronic mail on the Respondent's counsel, pursuant to the agreement of the parties, to the following address:

Danielle Tarin
Danielle.Tarin@usdoj.gov

Dated: October 24, 2023

/s/ Adam Thurschwell
Adam Thurschwell

*Counsel for Petitioner*

# ADDENDUM OF STATUTES & REGULATIONS

**10 U.S.C. § 948r(a) provides:**

No statement obtained by the use of torture or by cruel,

inhuman, or degrading treatment (as defined by section 1003 of the

Detainee Treatment Act of 2005 (42 U.S.C. 2000dd)), whether or not

under color of law, shall be admissible in a military commission under

this chapter, except against a person accused of torture or such

treatment as evidence that the statement was made.

# ATTACHMENTS

# Table of Contents

                                                         **Page**

A.   *In re Encep Nurjaman*, --- F.Supp.3d --- (USCMCR, June 13, 2023)............ 1

B.   *United States v. Encep Nurjaman*, AE 0032.010 (TJ) Defense Motion .........52 to Dismiss Due to *Prosecution Use of Prohibited Evidence Obtained by Torture (October 6*, 2022)

C.   AE 0032.004 Attachment D, "Summary of Additional Evidence: ................61 Hostilities (CUI)"

D.   *United* States *v. Al-Nashiri*, AE 467CCC (Mil. Comm. Aug. 18, 2023).........65

E.   *United* States *v. Encep Nurjaman*, et al., AE 0067.003 (GOV) ....................115 (filed October 4, 2023) (Attachment C omitted)

F.   *United States v. Encep Nurjaman*, et al., AE 0060.003 (GOV) .....................121 (filed August 30, 2023) (Attachment C omitted)

G.   *United States v. Encep Nurjaman*, Referred Charge Sheet ...........................127 (January 21, 2021)

H.   *In re Encep* Nurjaman, Case No. 22-001 (CMCR), Brief of ........................160 Respondent (filed Dec. 30, 2022) (CUI)

ATTACHMENT A

# UNITED STATES COURT OF MILITARY COMMISSION REVIEW

## BEFORE THE COURT
### Schenck, Presiding Judge,
### Parker and Kirkby, Appellate Judges

═══════════════

#### In re

#### Encep Nurjaman

#### CMCR 22-001

#### June 23, 2023

═══════════════

*Captain Hayes C. Larsen*, U.S. Navy, military commission judge.

On briefs for petitioner, Encep Nurjaman, also known as Hambali, were *James R. Hodes*; *Commander Eric S. Nelson*, JAGC, U.S. Navy; *Lieutenant Colonel Geoffrey S. DeWeese*, JA, U.S. Army Reserve; and *Major Cristina D. Curl*, U.S. Air Force.

On brief for respondent were *Michael J. O'Sullivan*; *Haridimos V. Thravalos*; and *Rear Admiral Aaron C. Rugh*, U.S. Navy.

For Center for Victims of Torture, amicus curiae for petitioner: Claire Finkelstein, David Glazier, Karen J. Greenberg, Jonathan Hafetz, Lisa Hajjar, Gail Helt, Sanford V. Levinson, David Luban, Elisa Massimino, Juan Mendez, Alberto Mora, Manfred Nowak, Gabor Rona, and Philippa Webb, on brief were *John S. Summers*, *Andrew M. Erdlen*, *Alexander J. Egerváry*, and *Michael J. Masciandaro*, Hangley Aronchick Segal Pudlin & Schiller, Philadelphia, Pennsylvania.

---------------------------------------------------
## PUBLISHED OPINION OF THE COURT
---------------------------------------------------

Opinion for the court filed by SCHENCK, PRESIDING JUDGE.

    SCHENCK, CHIEF JUDGE:

       Before a military commission, the military judge denied the motion of Petitioner Encep Nurjaman, also known as Hambali,[1] to dismiss charges and

---

[1] Petitioner Encep Nurjaman is also known as Riduan Isomudin and Riduan Isamuddin. App. 3, 20; Def. Mot. to Dismiss, Attach D (p. 145 of 9/11 excerpt) (Mar. 14, 2022) (Def. Mot.).

specifications. Petitioner now seeks a writ of mandamus and prohibition from this court vacating the military judge's ruling issued on October 6, 2022, App. Ex. 0032.10 (TJ), and directing the military judge to dismiss the referral of his case with prejudice. Pet'r's Br. 1–2 (Nov. 22, 2022); Pet'r's Reply 14 (Jan. 12, 2023). Petitioner argues in his petition that respondent's use of evidence *obtained by* torture, Pet'r's Br. 1, 17–18, 26, and evidence *derived from* statements obtained by torture, *id.* at 16, was unlawful. In his reply, he argues that respondent's use of evidence *derived from* torture was unlawful. Pet'r's Reply 9–12, 14.

At the military commission level, the defense filed a motion to dismiss, arguing that presentation of certain information to the convening authority with respect to the referral of his case to a trial by military commission, and the convening authority's use of that certain information, violated 10 U.S.C. § 948r(a). Def.'s Mot. to Dismiss 2 (Mar. 14, 2022) (Def. Mot.). He stated that information for his referral came from a nine-page excerpt of the 9/11 Commission Report, and that Report was based on "interrogations [] conducted through the use of torture and inhuman, cruel, and degrading treatment." *Id.* Before us, petitioner asserts that his referral to trial "was based on evidence *elicited by torture* or other cruel, inhumane, or degrading treatment in violation of 10 U.S.C. § 948r(a), international law, and the U.S. Constitution." Pet'r's Br. 2 (emphasis added), 27 (stating same).[2] We understand this statement to allege that respondent wrongfully and unlawfully used evidence that was derived from statements obtained through the use of torture in the referral binder.

In sum, petitioner asserts that the nine-page excerpt from the 9/11 Commission Report contained information (statements) obtained by torture and/or derived from information obtained by the use of torture, and that the excerpt was improperly included in the referral materials. Pet'r's Br. 3; Pet'r's Reply 10.

Respondent states in its brief to this court that petitioner and respondent "are united in recognition that 'torture of any kind is legally and morally unacceptable, and that the judicial system of the United States will not permit the taint of torture in its judicial proceedings.'" Resp't's Br. 1 (Dec. 30, 2022) (quoting *United States v. Abu Ali*, 395 F. Supp. 2d 338, 379 (E.D. Va. 2005) (Lee, J.)). Respondent does not address whether evidence derived from information obtained by the use of torture could be considered as part of the basis to refer a case to a military commission trial. Instead, respondent essentially argues that any evidence obtained by the use of torture was cumulative to other information properly before the convening authority. *See id.* at 19–24.

---

[2] *See* Pet'r's Reply 2 (characterizing military judge ruling as permitting "use of torture-derived evidence" in referral), 10 (arguing respondent seeks to use "torture-derived evidence to obtain referral"); *cf.* Pet'r's Br. 16 (stating "fruits of" information obtained from coercion cannot be used in prosecution of that detainee (citation omitted)).

At the military commission level, the military judge found that "[t]he Government's current position is that [10 U.S.C.] § 948r(a) applies to *all stages of a military commission case*." Resp't's App. 529 (Dec. 30, 2022) (App.);[3] *see also* App. 563–64 (Transcript of Oral Argument, *In re Al-Nashiri*, No. 21-1208 (D.C. Cir. May 4, 2022)[4] (respondent's counsel arguing "the Government now agrees that Section 948r(a) applies at all stages of a military commission case"). It is unclear whether this concession applies to any information derived from the use of torture included in the convening authority's referral materials for petitioner's case. Respondent's brief did not concede or oppose the proposition that § 948r(a) prohibits evidence derived from torture from being considered in the referral of petitioner's case to trial.

Respondent asserts that any error was harmless and asks the court to dismiss the petition because the petition does not satisfy the three-pronged test in *Cheney v. U.S. District Court*, 542 U.S. 367, 380 (2004). Resp't's Br. 2. We agree with respondent.

## I. FACTS

Petitioner, Mohammed Nazir Bin Lep (Lillie), and Mohammed Farik Bin Amin (Zubair)[5] are jointly charged with eight charges consisting of fifteen specifications: I. Murder in Violation of the Law of War; II. Attempted Murder in Violation of the Law of War; III. Intentionally Causing Serious Bodily Injury; IV. Terrorism; V. Attacking Civilians; VI. Attacking Civilian Objects; VII. Destruction of Property in Violation of the Law of War; and VIII. Conspiracy to Commit Substantive Offenses Triable by Military Commission, in violation of 10 U.S.C. §§ 950t(15), 950t(28), 950t(13), 950t(24), 950t(2), 950t(3), 950t(16), and 950t(29), respectively. App. 1–101. Lillie and Zubair also are each charged with one specification in Charge IX of Accessory After the Fact, in violation of 10 U.S.C. § 950r. App. 53, 87.

The prosecution sent the sworn charges and a binder of evidence (referral binder) to the convening authority and recommended referral of the charges to trial by military commission. App. 1–2 (Nurjaman Charge Sheet ¶¶ III, V (referred Jan. 21, 2021)). The supporting documents for the charges and their specifications totaled more than 1,300 pages. Resp't's Br. 6, 22–23.[6] Each charge included a summary cover sheet with relevant quotations from the

---

[3] Respondent's Appendix, filed on December 30, 2022, hereinafter is referred to as "App."

[4] Case No. 21-1208 was ultimately decided in *In re Al-Nashiri* (*Al-Nashiri IV*), 47 F.4th 820 (D.C. Cir. 2022).

[5] *Supra* note 1; *infra* note 33; App. 20 (discussing aliases).

[6] The parties did not submit to this court the complete referral binder, consisting of over 1,300 pages. Resp't's Br. 6, 22–23 (Dec. 30, 2022). We received statements from 10 witnesses, which were from the referral binder. Those 10 statements are detailed in this decision, *infra*.

Manual for Military Commissions, United States (MMC), and citations to various documents. *Id.* at 6; Def. Mot. 4, ¶ e. For example, the summary for the charge of murder in violation of the law of war referenced twenty-four tabbed documents and provided specific citations to sixty-four segments in eighteen of those tabbed documents. App. 228–30. For the conspiracy charge, the summary listed seven tabs and cited to nine segments in the documents behind those tabs. App. 233.

The summary cover sheets for the petitioner's charges cited the nine-page excerpt of the 9/11 Commission Report (designated as "Tab D" in the referral binder) a combined total of eighteen times. Resp't's Br. 6–7; Def. Mot. 5. Each summary specifically cited all or part of the same three pages from the excerpt, pages 150 through 152. Resp't's Br. 6–7. For example, the citation for the charge of murder in violation of the law of war indicated, "9/11 COMMISSION REPORT PG 151, PG 152, Para. 1 See TAB D." App. 228. For the conspiracy charge, the germane citation was, "9/11 COMMISSION REPORT PG 150-151 See Tab D." App. 233. Pages 150 through 152 discussed petitioner's support to and relationships with al Qaeda leaders, operatives, and members, including Khalid Shaikh Mohammad (KSM).[7] Def. Mot., Attach. D; Resp't's Br. 6–7.

The pretrial advice was issued on January 13, 2021; it did not specifically mention torture or the nine-page excerpt from the 9/11 Commission Report. Def. Mot., Attach. G (filed under seal) (App. Ex. 0032.001 (NUR)). The pretrial advice listed as attachments (i) the charge sheets for Nurjaman and his co-conspirators, Mohammed Nazir Bin Lep (Lillie) and Mohammed Farik Bin Amin (Zubair), (ii) the prosecutor's transmittal memorandum, and (iii) the referral binder. *Id.*

## A. Excerpt from 9/11 Commission Report

The referral binder cited to a nine-page excerpt from the 9/11 Commission Report, pages 145 through 153 of that Report. Def. Mot. 5 & n.12. That excerpt focused on the connection between KSM and petitioner. *See* Def. Mot. 5, ¶ g & Attach. D; App. 3. Beginning with KSM, pages 150 through 152 of the excerpt (including related notes on page 490) state as follows:[8]

At this point, late 1998 to early 1999, planning for the 9/11 operation began in earnest. Yet while the 9/11 project occupied the

---

[7] "Khalid Shaikh Mohammad" (KSM) is the spelling used in the common allegations of Nurjaman's referred charge sheet. *E.g.*, Resp't's App. 3 (Dec. 30, 2022) (App.). The 9/11 Commission Report used the "Khalid Sheikh Mohammed" spelling in its report. *See, e.g.*, Def. Mot., Attach. D. KSM is also known as Muhktar. App. 422. Regarding al Qaeda, this word is also sometimes spelled as al Qaida.

[8] Notes 10 through 19, *infra*, are quotations from notes in the 9/11 Commission Report, which are included in petitioner's motion to dismiss. Def. Mot., Attach. D. The content of notes 10 through 19 were not included in the materials provided to the convening authority. *See* Resp't's Br. 7 n.35.

bulk of KSM's attention, he continued to consider other possibilities for terrorist attacks. For example, he sent al Qaeda operative Issa al Britani to Kuala Lumpur, Malaysia, to learn about the jihad in Southeast Asia from Hambali. Thereafter, KSM claims, at Bin Ladin's direction in early 2001, he sent Britani to the United States to case potential economic and "Jewish" targets in New York City. Furthermore, during the summer of 2001, KSM approached Bin Ladin with the idea of recruiting a Saudi Arabian air force pilot to commandeer a Saudi fighter jet and attack the Israeli city of Eilat. Bin Ladin reportedly liked this proposal, but he instructed KSM to concentrate on the 9/11 operation first. Similarly, KSM's proposals to [Mohammed] Atef[9] around this same time for attacks in Thailand, Singapore, Indonesia, and the Maldives were never executed, although Hambali's Jemaah Islamiah operatives did some casing of possible targets.[10]

KSM appears to have been popular among the al Qaeda rank and file. He was reportedly regarded as an effective leader, especially after the 9/11 attacks. Co-workers describe him as an intelligent, efficient, and even-tempered manager who approached his projects with a single-minded dedication that he expected his colleagues to share. Al Qaeda associate Abu Zubaydah has expressed more qualified admiration for KSM's innate creativity, emphasizing instead his ability to incorporate the improvements suggested by others. Nashiri has been similarly measured, observing that although KSM floated many general ideas for attacks, he rarely conceived a specific operation himself.[11] Perhaps these estimates reflect a touch of jealousy; in any case, KSM was plainly a capable

---

[9] Mohammed Atef, also known as Abu Hafs al Masri, was the chief of operations for Usama Bin Laden (UBL), also known as Osama Bin Laden. Def. Mot., Attach. D (p. 145 of 9/11 excerpt); App. 384, 423. The "second in charge of al Qaida," App. 402, Abu Hafs was al Qaida's "military chief," App. 347. *See also* App. 402 (Bafana stating "Abu Hafs was UBL's right-hand man"); App. 446–47, 470 (indicating Abu Hafs' senior al Qaeda position given role in planning 9/11 with UBL and KSM's bayat to him).

[10] Note 18 in 9/11 excerpt, at p. 490, stating:

On a possible Southeast Asian operation, see Intelligence report, interrogation of Hambali, Sept. 4, 2003. On a possible U.S. operation, see Intelligence reports, interrogations of KSM, June 27, 2003; July 14, 2003. On a possible Israeli operation, see Intelligence report, interrogation of KSM, June 30, 2003. On other possible targets discussed with Atef, see Intelligence report, interrogation of Hambali, Sept. 4, 2003 (Thailand); Intelligence report, interrogation of KSM, Apr. 4, 2004 (Singapore, Indonesia, Maldives).

[11] Note 19 in 9/11 excerpt stating: "For an example of KSM's popularity, see Intelligence report, interrogation of al Qaeda facilitator, Oct. 11, 2002. See also Intelligence report, interrogation of Abu Zubaydah, Nov. 7, 2002; Intelligence report, interrogation of Nashiri, Feb. 10, 2003."

coordinator, having had years to hone his skills and build relationships.

## Hambali

Al Qaeda's success in fostering terrorism in Southeast Asia stems largely from its close relationship with Jemaah Islamiah (JI). In that relationship, Hambali became the key coordinator. Born and educated in Indonesia, Hambali moved to Malaysia in the early 1980s to find work. There he claims to have become a follower of the Islamist extremist teachings of various clerics, including one named Abdullah Sungkar. Sungkar first inspired Hambali to share the vision of establishing a radical Islamist regime in Southeast Asia, then furthered Hambali's instruction in jihad by sending him to Afghanistan in 1986. After undergoing training at Rasul Sayyaf's Sada camp (where KSM would later train), Hambali fought against the Soviets; he eventually returned to Malaysia after 18 months in Afghanistan. By 1998, Hambali would assume responsibility for the Malaysia/Singapore region within Sungkar's newly formed terrorist organization, the JI.[12]

Also by 1998, Sungkar and JI spiritual leader Abu Bakar Bashir had accepted Bin Ladin's offer to ally JI with al Qaeda in waging war against Christians and Jews.[13] Hambali met with KSM in Karachi to arrange for JI members to receive training in Afghanistan at al Qaeda's camps. In addition to his close working relationship with KSM, Hambali soon began dealing with Atef as well. Al Qaeda began funding JI's increasingly ambitious terrorist plans, which Atef and KSM sought to expand. Under this arrangement, JI would perform the necessary casing activities and locate bomb-making materials and other supplies. Al Qaeda would underwrite operations, provide bomb-making expertise, and deliver suicide operatives.[14]

---

[12] Note 20 in 9/11 excerpt citing: "Intelligence reports, interrogations of Hambali, Jan. 14, 2003; Mar. 5, 2004."

[13] Note 21 in 9/11 excerpt citing: "Rohan Gunaratna, *Inside Al Qaeda: Global Network of Terror* (Columbia Univ. Press, 2002), pp. 187, 199."

[14] Note 22 in 9/11 excerpt stating:

> On the trip to Karachi, see Intelligence report, interrogation of Hambali, Sept. 12, 2003. On Hambali's relationship with Atef and receipt of al Qaeda funds, see Intelligence report, interrogation of Hambali, Mar. 5, 2004. Al Qaeda began providing funds to JI for terrorist operations as early as 1999. Intelligence report, interrogation of detainee, Mar. 3, 2004.

The al Qaeda–JI partnership yielded a number of proposals that would marry al Qaeda's financial and technical strengths with JI's access to materials and local operatives. Here, Hambali played the critical role of coordinator, as he distributed al Qaeda funds earmarked for the joint operations. In one especially notable example, Atef turned to Hambali when al Qaeda needed a scientist to take over its biological weapons program. Hambali obliged by introducing a U.S.-educated JI member, Yazid Sufaat, to Ayman al Zawahiri in Kandahar. In 2001, Sufaat would spend several months attempting to cultivate anthrax for al Qaeda in a laboratory he helped set up near the Kandahar airport.[15]

Hambali did not originally orient JI's operations toward attacking the United States, but his involvement with al Qaeda appears to have inspired him to pursue American targets. KSM, in his post-capture interrogations, has taken credit for this shift, claiming to have urged the JI operations chief to concentrate on attacks designed to hurt the U.S. economy.[16] Hambali's newfound interest in striking against the United States manifested itself in a spate of terrorist plans. Fortunately, none came to fruition.

In addition to staging actual terrorist attacks in partnership with al Qaeda, Hambali and JI assisted al Qaeda operatives passing through Kuala Lumpur. One important occasion was in December 1999–January 2000. Hambali accommodated KSM's requests to help several veterans whom KSM had just finished training in Karachi. They included Tawfiq bin Attash, also known as Khallad, who later would help bomb the USS *Cole*, and future 9/11 hijackers Nawaf al Hazmi and Khalid al Mihdhar. Hambali arranged lodging for them and helped them purchase airline tickets for their onward travel. Later that year, Hambali and his crew would provide accommodations and other assistance (including information on flight schools and help in acquiring ammonium nitrate) for Zacarias

---

[15] Note 23 in 9/11 excerpt stating:

On Hambali's role as coordinator, see Intelligence report, interrogation of detainee, Mar. 4, 2004. On [Yazid] Sufaat, see Intelligence report, interrogation of KSM, Apr. 12, 2003; Intelligence report, interrogation of detainee, Apr. 30, 2003. In 1987, Sufaat received a bachelor's degree in biological sciences, with a minor in chemistry, from California State University, Sacramento. Sufaat did not start on the al Qaeda biological weapons program until after JI's December 2000 church bombings in Indonesia, in which he was involved. Intelligence report, interrogation of Hambali, Sept. 8, 2003. On Sufaat's schooling, see Intelligence report, interrogation of detainee, Dec. 14, 2001.

[16] Note 24 in 9/11 excerpt stating: "Intelligence report, interrogation of KSM, June 9, 2003. KSM also maintains that he persuaded Hambali to focus on 'soft' targets in Singapore, such as oil tankers, the U.S. and Israeli embassies, and Western airlines. Intelligence report, interrogation of KSM, June 24, 2003."

Moussaoui, an al Qaeda operative sent to Malaysia by Atef and KSM.[17]

Hambali used Bin Ladin's Afghan facilities as a training ground for JI recruits. Though he had a close relationship with Atef and KSM, he maintained JI's institutional independence from al Qaeda. Hambali insists that he did not discuss operations with Bin Ladin or swear allegiance to him, having already given such a pledge of loyalty to Bashir, Sungkar's successor as JI leader. Thus, like any powerful bureaucrat defending his domain, Hambali objected when al Qaeda leadership tried to assign JI members to terrorist projects without notifying him.[18]

Def. Mot., Attach. D.

[17] Note 25 in 9/11 excerpt stating:

As discussed in greater detail in section 5.2, Khallad [also known as Tawfiq bin Attash] was sent by Bin Ladin to Kuala Lumpur to case U.S. airline flights in the Far East for possible future attacks there, whereas [Nawaf al] Hazmi and [Khalid al] Mihdhar [future 9/11 hijackers] were on the first leg of their travel from Karachi to Los Angeles, where they would arrive on January 15, 2000. Intelligence report, interrogation of KSM, July 31, 2003. On Hambali's assistance at KSM's request, see Intelligence report, interrogation of KSM, July 31, 2003; Intelligence report, interrogation of Khallad, Aug. 8, 2003. On assistance to [Zacarias] Moussaoui, see Intelligence report, interrogation of KSM, Mar. 24, 2003; Intelligence report, interrogation of detainee, Apr. 9, 2002. According to statements attributed to Hambali and Sufaat, in each of these instances the al Qaeda guests were lodged at Sufaat's condominium, an apartment on the outskirts of Kuala Lumpur. Intelligence report, interrogation of detainee, Jan. 22, 2002; Intelligence reports, interrogations of Hambali, Sept. 8, 2003; Sept. 12, 2003.

[18] Note 26 in 9/11 excerpt stating:

On Hambali's relationship with Bin Ladin, see Intelligence reports, interrogations of Hambali, Aug. 29, 2003; Sept. 5, 2003 (in which Hambali also explains his relationship with al Qaeda as follows: he received his marching orders from JI, but al Qaeda would lead any joint operation involving members of both organizations). On Hambali's objections, see Intelligence report, interrogation of KSM, July 8, 2003. On KSM's coordination with Hambali, see Intelligence report, interrogation of KSM, Apr. 17, 2003. On KSM's recognition of Hambali's domain, see Intelligence report, interrogation of KSM, Aug. 18, 2003. According to KSM, his close relationship with Hambali prompted criticism from Bashir, the JI leader, who thought Hambali should focus more directly on Indonesia and Malaysia instead of involving himself in al Qaeda's broader terrorist program. Indeed, KSM describes Hambali as an al Qaeda member working in Malaysia. Intelligence report, interrogation of KSM, Aug. 18, 2003. Nashiri observes that al Qaeda's standard security practice dictated that no senior member could manage terrorist activities in a location where another senior member was operating. Intelligence report, interrogation of Nashiri, Jan. 14, 2003. Yet al Qaeda's deference to Hambali's turf apparently had limits. Khallad says he and Hambali never discussed the intended Southeast Asia portion of the original 9/11 plan. Intelligence report, interrogation of Khallad, Apr. 27, 2004.

The summary cover sheets for the referred charges cited the three pages from the 9/11 Commission Report excerpt eighteen times. Resp't's' Br. 6–7; Def. Mot. 5. Seventeen of those citations supported the "hostilities" term in each specification. Resp't's Br. 7. For each of the specifications, the prosecution is required to prove that offenses were "committed in the context of and associated with hostilities." 10 U.S.C. § 950p(c); MMC, Pt. IV-2, ¶ 1(c) (2019). The term "hostilities" is defined as "any conflict subject to the laws of war." 10 U.S.C. § 948a(9). The 9/11 Commission Report, however, was not the only source cited for the hostilities term—respondent cited twenty-three additional documents. Resp't's Br. 7–8.

The eighteenth citation in the referral binder to the 9/11 Commission Report excerpt related to Element 1 of the specification for the conspiracy charge against petitioner. *Id.* at 7; App. 19. Apart from that one citation, respondent cited to six other documents to support the conspiracy charge. Resp't's Br. 9–10. The Manual for Military Commissions, Part IV, ¶ 5(29)(b) (2019 ed.), describes Element 1 to conspiracy as follows:

> (1) The accused entered into an agreement with one or more persons to commit one or more substantive offenses triable by military commission or otherwise joined an enterprise of persons who shared a common criminal purpose that involved, at least in part, the commission or intended commission of one or more substantive offenses triable by military commission[.]

The conspiracy specification concerning Element 1 alleged:

> **Specification:** In that Encep Nurjaman, a/k/a Riduan bin Isomudin, a/k/a "HAMBALI," Mohammed Nazir bin Lep, a/k/a "LILLIE," and Mohammed Farik bin Amin, a/k/a "ZUBAIR" (see Charge Sheet Appendix A for a list of aliases), persons subject to trial by military commission as alien unprivileged enemy belligerents, did, from on or about August 1996 to on or about August 2003, at multiple locations in or around Afghanistan, Southeast Asia, and elsewhere, in the context of and associated with hostilities, knowingly conspire and agree with the following persons: Usama bin Laden, Khalid Shaikh Mohammad, Abu Bak'r Ba'aysir, Abdullah Sungkar and others, known and unknown (see Charge Sheet Appendix B for a list of known co-conspirators), to commit one or more substantive offenses triable by military commission, to wit: murder in violation of the law of war, attempted murder in violation of the law of war, intentionally causing serious bodily injury, terrorism, attacking civilians, attacking civilian objects, and destruction of property in violation of the law of war. Each of the three accused, knowing the unlawful purposes of the agreement, willfully joined the agreement with the intent to further its unlawful objectives and purposes and, thereafter, knowingly committed one or more overt acts in order to

accomplish some objective or purpose of the agreement, with the said conspiracy resulting in the deaths of civilians (see Charge Sheet Appendices C and E for a list of victims killed in the attacks), injuries to civilians (see Charge Sheet Appendices D and F for a list of victims injured in the attacks), and damage to personal property.

App. 19 (Paragraph on re-allegation and incorporation by reference of common overt acts is omitted.)

The 9/11 Commission expressed concerns about the integrity of some of the information relied upon for portions of the 9/11 Commission Report, which included pages 150 through 152 from the nine-page excerpt in the referral binder. The Report included the following caution:

**Detainee Interrogation Reports**

Chapters 5 and 7 rely heavily on information obtained from captured al Qaeda members. A number of these "detainees" have firsthand knowledge of the 9/11 plot.

Assessing the truth of statements by these witnesses—sworn enemies of the United States—is challenging. Our access to them has been limited to the review of intelligence reports based on communications received from the locations where the actual interrogations take place. We submitted questions for use in the interrogations, but had no control over whether, when, or how questions of particular interest would be asked. Nor were we allowed to talk to the interrogators so that we could better judge the credibility of the detainees and clarify ambiguities in the reporting. We were told that our requests might disrupt the sensitive interrogation process.

We have nonetheless decided to include information from captured 9/11 conspirators and al Qaeda members in our report. We have evaluated their statements carefully and have attempted to corroborate them with documents and statements of others. In this report, we indicate where such statements provide the foundation for our narrative. We have been authorized to identify by name only ten detainees whose custody has been confirmed officially by the U.S. government.[19]

[19] Note 2 in 9/11 excerpt stating:

Those detainees are Khalid Sheikh Mohammed, Abu Zubaydah, Riduan Isamuddin (also known as Hambali), Abd al Rahim al Nashiri, Tawfiq bin Attash (also known as Khallad), Ramzi Binalshibh, Mohamed al Kahtani, Ahmad Khalil Ibrahim Samir al Ani, Ali Abd al Rahman al Faqasi al Ghamdi (also known as Abu Bakr al Azdi), and Hassan Ghul.

Def. Mot., Attach. D (9/11 excerpt, at pp. 146, 490) (indention to first paragraph added).

## B. Additional Referral Materials[20]

The charged offenses relate to petitioner's alleged involvement with al Qaeda and Jemaah Islamiyah (sometimes spelled Islamiah) (JI) in the October 12, 2002, bombings of Paddy's Pub and Sari Club in Bali, Indonesia, and the August 5, 2003, bombing of the J.W. Marriott hotel in Jakarta, Indonesia.[21] App. 3, 9–11; Resp't's Br. 3. The charges state that the bombings resulted in the deaths of 213 people (including 7 Americans) and injuries to 109 people (including 6 Americans). App. 9–11, 23–33; Resp't's Br. 3.

The referral binder for the charged offenses included documents in addition to the 9/11 Commission Report, which appear to indicate that petitioner shared the same goals as UBL.[22] First, petitioner met with UBL, App. 438, and communicated directly or through intermediaries with KSM, the individual who linked al Qaeda and JI.[23] Second, he journeyed to Afghanistan several times, "received training from Afghans" for operations, and participated in jihad. *Id.* Third, petitioner received funding from al Qaeda, App. 439–40, and al Qaeda provided military training to his subordinates in JI, *e.g.*, App. 246. The referral

---

[20] At this stage of the proceedings, the statements in the referral binder are only allegations and not proven facts.

[21] Nothing in this decision should be interpreted to indicate the court has concluded that the referral binder or the assertions in respondent's brief establish petitioner's guilt of any offense beyond a reasonable doubt. At trial, petitioner will have the opportunity to contest the information in the referral binder and in respondent's brief.

[22] The exhortations of UBL to attack and kill U.S. military and civilian personnel served as a recruiting tool for JI. *See* App. 281–339 (including (i) UBL message, "Declaration of Holy War Against the Americans Who are Occupying the Land of the Two Holy Places" (Aug. 23, 1996); (ii) UBL CNN interview (televised May 10, 1997); (iii) UBL et al. message, "The International Islamic Front for Jihad against the Jews and the Crusaders: A Legal Fatwa" (Feb. 12, 1998); (iv) UBL ABC interview (televised June 10, 1998); (v) UBL ABC videotaped interview by John Miller (May 1998); (vi) UBL message, The World Islamic Front Communiqué #2, "The Islamic Nuclear Bomb" (May 29, 1998)); *see also, e.g.*, App. 246 (UBL telling military trainees about jihad and fighting Americans). Some interviewees stated petitioner advocated goals similar to those of UBL. *E.g.*, App. 250, 431 (Lillie stating petitioner's group targeted the U.S. government, Americans, and American soldiers and companies); App. 344 (Rais stating petitioner discussed UBL's 1998 fatwa with him); App. 368 (Mistooki stating he, petitioner, and others discussed targeting Jewish American military members); App. 382 (Bafana stating petitioner obtained maps of American presence in the Middle East); App. 389 (Bafana stating he and petitioner scouted U.S. and Israeli Embassies in the Philippines as potential targets); App. 416, 418 (Hashim Abbas stating that after UBL's 1998 fatwa, petitioner instructed him to find targets of U.S. interest and urged JI members to participate in jihad).

[23] *See, e.g.*, App. 458 (KSM stating he linked al Qaida and JI); App. 379 (Bafana stating petitioner led the JI division covering Malaysia and Singapore); *see infra* note 43 (Bafana explaining structure of JI).

materials also included documents indicating that petitioner encouraged subordinates to engage in hostilities with U.S. interests in Southeast Asia by telling JI members that U.S. targets were a priority. *E.g.,* App. 388 (petitioner explaining to JI leader UBL's desire for attacks on U.S. military in Singapore); App. 416 (petitioner instructing JI member and his group to find targets of U.S. interest); App. 389, 391 (petitioner discussing and surveilling U.S. targets in the Philippines with JI members); App. 368 (petitioner discussing with JI members Jewish American servicemembers as targets); *see also supra* note 22.

To support the conspiracy element, the 1,300-page referral material included, in addition to the 9/11 Commission Report excerpt, ten witness statements. App. 244–79, 341–497. Respondent claims the ten statements were not obtained by the use of torture. *See* Resp't's Br. 23–24. Respondent has highlighted four of those statements—from Hambali, KSM, Zubair, and Lillie. *See* App. 233. The ten statements included in the referral binder, summarized below, are from the following individuals: (1) Petitioner Hambali, (2) Zulkifli Marzuki, (3) Zubair, (4) Lillie, (5) KSM, (6) Bafana, (7) Hashim Abbas, (8) Rais, (9) Masran, and (10) Mistooki.

### (1) Encep Nurjaman's Statement (Hambali)

***Petitioner Hambali was the link between JI and al Qaeda, coordinated movement of al Qaeda funds to JI, secured military training in Afghanistan for operatives, and met UBL.***

Petitioner made two statements in 2007, totaling nine pages, to special agents of the Federal Bureau of Investigation (FBI) and Department of Defense Criminal Investigation Task Force (CITF), and an FBI intelligence analyst. App. 437–40 (June 21, 2007); App. 485–89 (Jan. 22–23, 2007). Both statements were included in the referral material. App. 221–22. Abdullah Sungkar, the founder of JI, encouraged petitioner to go to Afghanistan for jihad but apparently petitioner ultimately made that decision based on his own desire. App. at 438. Around 1986, petitioner went to Afghanistan for about eighteen months, received training from Afghans at Sadah Camp, and fought the Russians. *Id.* He returned to Afghanistan around 2000, and again around 2001. *Id.* He participated in jihad and met UBL. *Id.* Petitioner was angry because of the mistreatment of Muslims by Christians in Indonesia and Israel. App. 486. He did not like America because America supports Israel. *Id.* Petitioner said he is a member of JI, not al Qaida. *Id.*

Petitioner "considered the Bali bombing a successful operation except for the number of Muslims which were killed. In general, [he] believe[d] too many people were killed in the Bali attack. . . . [Petitioner] stated it is acceptable to kill civilians in an operation but you should try not to kill other Muslims." App. 439. In December 2002, Muhktar (KSM) provided funds to petitioner for an operation. App. 440. This was accomplished by delivery of the money to Zubair in Thailand, who then provided the money to petitioner. *Id.* Petitioner

explained that he was like a bank "just passing out the money." *Id*. The money he received from KSM was intended for jihad operations, which would result in death and destruction of property. App. 439. While he provided funding for operations, petitioner said he was not in control of operations or aware of the specifics of the operations. App. 439–40.

### (2) Zulkifli Bin Marzuki's Statement

*Marzuki was the Secretary for JI, worked directly for petitioner, and held key insight into JI's administration.*

Zulkifli Bin Marzuki[24] gave a five-page statement in 2009 to special agents or employees of the FBI and Department of Justice (DoJ), which was included in the referral material. App. 499–503 (Sept. 3, 2009); App. 221–22. Marzuki is named a co-conspirator in the common allegations of petitioner's charge sheet for involvement in the 2002 bombings in Bali, Indonesia. App. 9–10. Marzuki joined JI in 1998 and swore bayat (allegiance) to Abdullah Sungkar, JI's founder and leader. App. 499. Marzuki was the JI Secretary and recorded all meetings and tracked al Qaeda visitors and administrative matters. *Id.* He worked directly for petitioner and was aware of many of petitioner's activities. *Id.* As "'General'" for Abu Bakar Bashir[25] (Sungkar's successor), petitioner "was in charge of the JI in Malaysia." *Id.*

The five JI members closest to petitioner served in the following roles: Fathur Rahman Al Ghozi[26] and Dr. Azahari Bin Husin (Dr. Azahari)[27] in explosives; Marzuki and Faiz Bafana in finance; and Noordin Top[28] in

---

[24] The investigation report on Marzuki uses Zukepli Bin Marzuki and Zulkifli. App. 499–503; *see also* App. 21. Marzuki is also known as Moussa, Marzooki, and Azam. App. 249, 370, 394.

[25] Abu Bakar Bashir is also known as Abu Bakr Bashir, Abu Bakar Ba'aysir, Abu Bakar Baysir, and Abdus Samad. *E.g.*, App. 357, 416. Petitioner's charge sheet uses Abu Bak'r Ba'aysir. App. 3.

[26] Fathur Rahman Al Ghozi was also known as Fathur Abd al Rahman al Ghozi, Sa'ad, and Saad. App. 21, 411.

[27] Doctor Azahari Bin Husin is also known as Professor Azahari. *E.g.*, App. 4, 367, 480. He is named in the common allegations of the charge sheet as a co-conspirator in the bombing of two clubs in Bali, Indonesia, and the J.W. Marriott hotel in Jakarta, Indonesia. App. 9, 11. Doctor Azahari was an expert in bomb making and explosives and involved in planning and carrying out operations. *See, e.g.*, App. 367, 422, 430–31, 481.

[28] Noordin Top was also known as Nordin Bin Mat Mahd Top, App. 21, Noordin Mat Top, App. 258, Muhammad Tarmizi Bin Noordin, App. 349, and Dr. Tarmizi, App. 351. Nurdin may be another spelling of Noordin, as both Nurdin and Noordin Bin Top were close to petitioner and part of the JI operational group. App. 399, 401, 500; *see* App. 343; *infra* note 45 (discussing Nurdin). Noordin Top was an associate of Dr. Azahari and involved in the movement of explosives in Southeast Asia. App. 350–51. He was named in the common

operations. App. 500. Petitioner told Marzuki that Bandar, also known as Abu Hazem Sharqi, was involved in the plan to attack targets in Singapore, including the United States Navy. App. 500; App. 21 (aliases); *see* App. 5–6 (common allegations of charge sheet naming Bandar in a Singapore plot). Al-Ghozi and Dr. Azahari also were involved in the Singapore operation. App. 500. "When Bandar needed explosives, [petitioner] arranged for Bandar to meet with Al Ghozi." *Id.* Marzuki did not know if petitioner sought Bashir's approval "to carry out the Singapore project." App. 501. After the 9/11 attacks, Mohammed Jabarah, also known as Amat, a known co-conspirator, gave Marzuki $20,000 to give to Al-Ghozi and Dr. Azahari. *Id.*; *infra* note 45 (aliases). Jabarah and petitioner later met, possibly to discuss the Singapore project. App. 502.

At some point, petitioner told Marzuki that the Singapore project was cancelled. *Id.* After learning this, petitioner generally discussed attacking an Israeli building in Bangkok, an Israeli airline, and a United States Embassy. *Id.* Later, petitioner asked Dr. Azahari, Top, and Muklas (Muhklas), also known as Ali Ghufron Bin Nurhasyim,[29] a JI member, to plan an operation targeting "places where there were many tourists, Embassies or Israeli buildings." *Id.*; *see* App. 375. Petitioner said al Qaeda would fund these projects. App. 502. Petitioner had regular contact with Dr. Azahari, Muklas, and Top and knew general information about the trio's plan. App. 503. Marzuki believed, however, that petitioner did not know where and when the attack would occur as petitioner was a wanted man on the run. *Id.* Upon learning of the Bali bombings, petitioner expressed surprise to Marzuki about the death toll and used Bashir Bin Lap (Lillie) and Mohammed Bin Amin (Zubair) to provide funds to Indonesians. *Id.*

### (3) Mohammed Farik Bin Amin's Statement (Zubair)

*A charged co-conspirator, Zubair (an al Qaeda member) was a martyr volunteer; surveilled targets in Thailand; helped move al Qaeda funds to, and obtained fraudulent documents for, petitioner during petitioner's fugitive status; and was specially trained on how to make bombs.*

Mohammed Farik Bin Amin (Zubair) is charged as one of two co-conspirators with petitioner. App. 68–101; App. 20 (alias). Zubair made two statements in 2007 to FBI and CITF special agents, which were summarized in a

---

allegations for having participated in the 2002 bombings in Bali, Indonesia, and the 2003 bombing of the J.W. Marriott Hotel in Jakarta, Indonesia. App. 4, 9, 11.

[29] The name Muklas appears to have two additional spellings, Mu**hk**las and Mu**kh**las. These two names have the same alias, Ali Ghufron. App. 363, 370; *see* App. 21 (providing Ali Ghufron Bin Nurhasyim for Mu**kh**las); App. 274 (providing Ali Gufron for Mu**kh**las). Muklas is also spelled as Mukilis. App. 503. Muklas' first name may be Feril. *See* App. 375. Muklas took petitioner's place in JI as the leader of Mantiqi #1 when petitioner went on the run after the December 2000 church bombings in Indonesia. App. 343, 391, 404; *see infra* note 43 (Bafana explaining petitioner's place in Mantiqi #1).

sixteen-page document and a nine-page document. App. 264–79 (Feb. 1, 2007); App. 475–83 (June 21–22, 2007). Those statements were included in the referral material. App. 221–22.

In around August of 2000, Zubair paid for his own travel from Malaysia to Afghanistan where he received three months of basic al Qaeda military training at Al-Farouq.[30] App. 265–66; *see* App. 476–77. He trained on weapons, explosives, and mines.[31] App. 266. While initially stating he first met Lillie (a charged co-conspirator) at basic training, *id.*, Zubair later admitted to knowing him before training, App. 475. Zubair first met petitioner in Afghanistan in February 2001. App. 267. He learned that petitioner was the liaison between al Qaeda and JI. App. 267, 272. Petitioner had a leadership role in al Qaeda and "could give orders on behalf of UBL." App. 267. Zubair described petitioner, in his own words, as "'the leader of the Southeast Asians.'" App. 267–68. If petitioner gave an order, Zubair said he "would follow it without question." App. 267.

Zubair first heard of UBL at Al-Farouq in the fall of 2000 when UBL visited the training camp. App. 266. UBL visited again to emphasize the importance of training, which Zubair understood to mean that he was training for the battlefield. App. 267. Invited by petitioner in about October or November of 2001, Zubair agreed to participate in a martyr operation, along with Lillie, Abdul Aziz, also known as Masran Bin Arshad, and Afifi.[32] App. 268; App. 21 (alias). The four volunteers swore bayat to UBL, a condition for participating in a martyr operation. App. 268, 478. When he swore bayat, Zubair "considered UBL to be his spiritual leader" and "agreed to carry out an operation" in which "Americans would die." App. 478.

Zubair was in "disbelief" yet "pleased" over the World Trade Center attack and "awed" by the planning and training. App. 268. Zubair said the 9/11 attack was "'OK'" despite civilian deaths "because the World Trade Center was the economic center of the US and the US economy funds the US military." App. 267. Civilian deaths were further justified under "strict Islamic law." *Id.* Zubair further stated that this war was "between Muslims and Christians"—not Afghanistan and America. App. 267, 272. He believed the 2002 al Qaeda Bali bombing also was legitimate, adding that attacks like in Bali and against the USS COLE "were his duty." App. 267.

---

[30] Al-Farouq is also known as Al-Farook and Al-Farooq. App. 355.

[31] Zubair attended a second training course in 2001 in tactics at a small camp within walking distance from Al-Farouq. App. 476, 478.

[32] Afifi, also known as Nik Amran bin Mustafa, is a named co-conspirator in the common allegations of the charge sheet for involvement in a post-9/11 plot targeting civilians in the United States. App. 7–8; App. 21 (alias).

In November 2001, the four martyr volunteers left Afghanistan and Zubair and Lillie eventually arrived in Thailand. App. 269. Initially, Zubair and Lillie believed they were going to engage in a martyr operation under Aziz (Masran). *Id.* Petitioner, however, led the group after Aziz's arrest in Sri Lanka. *See id.* Zubair described himself as "a trusted member of [petitioner's] group who took direction from [petitioner]." App. 480. Either Zubair or Lillie were always present in Thailand to be available to petitioner. App. 270. Petitioner told Zubair to surveil the Bangkok International Airport, assess overall airport security, determine guard routines, and survey the Israeli airline El Al lounge and boarding areas "to determine when they would be the most crowded." App. 480; *see also* App. 270. Zubair also surveilled on his own the Israeli Embassy in Bangkok as a potential target. App. 480.

While Zubair and Lillie resided in Thailand, there were two transfers of "operational money" in U.S. dollars from al Qaeda to Zubair, who handed the funds over to petitioner. App. 270–72. Petitioner told Zubair the funds were for an "operation" (bombing or an attack), families of the Bali suicide bombers, and expenses. App. 271–72, 480. The first transfer of $50,000 came in two lots of $25,000 each between late 2002 and early 2003. App. 270–71. The second transfer of $49,900 was made in January 2003. App. 271–72. Zubair and Lillie understood that the funds they received from petitioner were from al Qaeda. App. 270. Zubair understood petitioner's group was to use al Qaeda money "for an operation in which people would be killed." App. 480. Petitioner approved the expenditure of funds used by Zubair to practice making bomb components; Zubair helped Lillie in this endeavor because he had an engineering background. App. 481; *see* App. 479. Petitioner also provided Zubair and Lillie funds that were used to obtain fake passports and for Lillie to purchase weapons. App. 270. On one occasion, Zubair paid $600 from the funds obtained from al Qaeda for a Spanish passport for petitioner. *Id.* Additionally, Zubair traveled to find safe locations for petitioner to stay (particularly in Cambodia), purchase weapons, and locate "business opportunities" for living expenses and future operations. App. 478–79.

At the time of his FBI interview in 2007, "Zubair stated that he was still loyal to both [petitioner] and . . . Lillie." App. 475. He "was still ready and willing to participate in a martyr operation." App. 270. Zubair also stated he had a "a lifelong obligation" to engage in jihad for al Qaeda and UBL. App. 272.

### (4) Mohammed Nazir Bin Lep's Statement (Lillie)

*A charged co-conspirator, Lillie was a martyr volunteer, helped move al Qaeda funds to, and obtained fraudulent documents for, petitioner during petitioner's fugitive status, and was specially trained on how to make bombs.*

Mohammed Nazir Bin Lep, also known as Lillie,[33] is charged as one of petitioner's co-conspirators. App. 34–67. Lillie made two statements in 2007 to FBI and CITF special agents, which were summarized in a nineteen-page document and a ten-page document and included in the referral material. App. 244–62 (Feb. 3–4, 2007); App. 426–35 (June 22–23, 2007); App. 221–22.

Petitioner taught Lillie about jihad. App. 245. Lillie volunteered "to travel for jihad," sold his motorcycle, and gave the money to petitioner. *Id.* Petitioner bought Lillie a plane ticket with that money and arranged for his training in Afghanistan. *Id.* In June 2000, Lillie and "his friend Zubair" flew to Pakistan and then made their way to an al Qaida training camp in Afghanistan, Al-Farouq. App. 245–46. Lillie met Masran Arshad, also known as Abdul Aziz (Masran), and Afifi at Al-Farouq. App. 246. Lillie and Zubair received training in military tactics, firearms, and rocket-propelled grenades, watched propaganda videos weekly, and discussed martyrdom, America, and Israel. *Id.* UBL visited the camp and gave an inspiring talk about jihad, grievances, and fighting Americans. *Id.* After two months, Lillie was sent to Kabul in the fall of 2000 to guard the Arab front lines, where he also learned how to operate Surface-to-Air Missiles (SAM-7). App. 246, 429. Lillie returned to camp Al-Farouq after six months for more training. App. 246; *see* App. 427–28.

Petitioner "occasionally met" with Lillie in Kandahar, Afghanistan, where Lillie went in about August 2001 for medical treatment. App. 246–47. Lillie stated that petitioner was a leader in a group called JI. App. 248. This group "was separate from UBL's group, but [] had the same goals" as al Qaeda. App. 250. Petitioner's group wanted to "send[] a message" and continue jihad.[34] *Id.* Lillie explained that petitioner "was a scholar and a leader" who gave advice or issued a "fatwah" on whether an attack should proceed and ensured that attacks were made "within Islamic law." App. 248. Petitioner taught Lillie that "non-believers should learn and worship Islam" and jihad's purpose was "to defend Islam." App. 248–49. Petitioner's lessons became Lillie's goals. App. 248.

[33] Mohammed Nazir Bin Lep (Lillie) is identified as Bashir Bin Lap in his February 2007 interview. App. 244; *see also* App. 20. He is also known as Ali, Mohd Nazir Bin Lep, Mohammed Nazir, Mohammad Bashir Bin Lap, Bashir, and Daoud. *E.g.*, App. 244, 258, 426.

[34] While petitioner did "not participate[] in the Bali bombing," his group "carried out" that attack. App. 250. Imam Samudra and Amrozi participated in the Bali bombing in Indonesia. *Id.* Lillie understood the Bali bombing as messaging that jihad would be used to defend Islam. App. 249. He added that petitioner "was not involved in personally carrying out operations in Thailand, Malaysia, or Cambodia." App. 248. Lillie also "had no personal knowledge about [petitioner's] alleged involvement in the Christmas Eve bombings in Indonesia." *Id.*

Appendix B to the charge sheet identifies Amrozi Bin Nurhasyim and Ali Ghufron Bin Nurhasyim (also known as Mukhlas) as two different known co-conspirators. App. 21. The common allegations to the charge sheet state that Amrozi bin Nurhasyim was involved in the bombing of churches in Indonesia, using also the shortened form "Amrozi" for that name in those allegations. App. 6. The common allegations also identify "Amrozi" as being involved in the Bali bombings. App. 9.

As understood by Lillie, petitioner's group intended to send a message that "jihad would continue in Indonesia 'forever'" to cause all of Southeast Asia to come under Islamic law. *Id.*; *see also* App. 250. The "primary target" of petitioner's group was American soldiers; civilians were a second priority. App. 250.

Petitioner "chose future martyrs who were 'not too young,' were strongly dedicated to Islam, and who lacked family problems." App. 247. Lillie was an al Qaeda member and "willing to become a martyr." *Id.* Petitioner "chose Lillie to swear bayat to UBL," along with Zubair, Masran, and Afifi. App. 246–247, 429–430. In about September 2001, the group swore bayat to UBL; Masran was selected leader of their group (although arrested a short time later in Sri Lanka). App. 247–48, 429–30. The group "knew the target [of their mission] was American." App. 247. Both petitioner and UBL told Lillie the group "would send a message." App. 249.

Lillie, Zubair, and Afifi headed for Malaysia in 2002 to obtain new passports for easier entry into the United States. App. 247, 430. Lillie and Zubair traveled via Thailand. App. 247–48. Once in Thailand, Lillie maintained contact with petitioner, typically meeting in person. App. 248, 430. Petitioner and Zulkifli Bin Marzuki were "wanted" and living in Cambodia and then in Thailand; when living in Thailand, they went back into Cambodia for fraudulent identification and explosives for "later 'actions.'" App. 248–249. Petitioner did not "task Lillie with a martyr operation in Thailand" although Lillie did whatever petitioner told him to do. App. 253. Lillie and Zubair worked in Thailand for petitioner, acquiring fraudulent passports and identification cards and delivering money. App. 248–49. A fraudulent passport cost about $200, which petitioner funded. App. 248.

Petitioner asked Dr. Azahari, an "expert bomb maker" wanted in Malaysia, to train Lillie and Zubair in bomb-making and made the introduction in Bangkok in 2002. App. 249, 430. Lillie, Zubair, and Dr. Azahari discussed potential targets in Thailand, including U.S. and Israeli Embassies, the Bangkok airport, and American businesses. App. 430–31. Lillie considered Dr. Azahari "to be a genius." App. 430. He told Dr. Azahari that he wanted to learn how to make bombs. App. 249. Lillie wanted this knowledge to later carry out an attack. *Id.* Doctor Azahari trained Lillie and Zubair "on several occasions." *Id.* Instruction included "sketching directions on paper for them in both English and Malay," construction of electronic components, how to detonate a bomb, construction of a "vehicle bomb," use of explosive material, and demonstrations using wire and metal. App. 430–31. Petitioner gave Lillie printed material on how to construct bombs, although Lillie admitted to not having studied the material. App. 432; *see* App. 255 (item 6A). Petitioner also approved funds for the purchase of material used by Lillie and Zubair in their construction of a basic ignition. App. 432.

Lillie believed it was likely that Dr. Azahari was involved in the Indonesian bombings. App. 249. Lillie denied knowledge of Dr. Azahari *asking petitioner* for funding for operations, App. 252, but stated that Dr. Azahari had requested funding for operations, App. 431. Lillie asked petitioner for money on Dr. Azahari's behalf and exchanged emails with Dr. Azahari about these money transfers. App. 431. He thought Dr. Azahari had similar communications with Zubair. *Id.* Petitioner told Lillie that one batch of money Lillie gave to an intermediary "was intended for Doctor Azahari." App. 252. Lillie thought some of that money was used for bombings in Indonesia "and felt proud." *Id.* Petitioner wanted attacks against the U.S. government and military and American companies. App. 431; *see* App. 250. Yet, he "permitted Azahari to plan and carry out an attack" on his own because of petitioner and Dr. Azahari's mutual trust. App. 431. Petitioner had no expectation of Dr. Azahari executing an immediate attack after receipt of funds. *Id.*

In 2002 and early 2003, Lillie received three deliveries of $100 bills in U.S. currency from "'UBL,' 'the Arabs,' or 'Al Qa'ida.'" App. 250, 253. Each time, petitioner informed Lillie the delivery was coming and petitioner's brother, Hadi,[35] confirmed by email the delivery. App. 250. In the first transaction, petitioner told Lillie to meet an Arab called "Mansour" and gave Lillie's telephone number to Mansour's contact. *Id.* Mansour delivered the money in a plastic bag to Lillie in Thailand. *Id.* Once Lillie returned to his apartment, he looked into the bag to confirm receipt of money. *Id.* The other two transactions were similar, except Zubair met the al Qaeda courier. App. 251. Petitioner told Lillie and Zubair to exchange the money and they did so several times into regional currencies. *Id.*

Petitioner gave Lillie $10,000 from the three al Qaeda deliveries for Lillie and Zubair's expenses and tasks, which Lillie stored in his and Zubair's apartment.[36] *Id.* The remaining money from these al Qaeda funds also was kept in Lillie and Zubair's apartment until petitioner retrieved it or until he told Lillie or Zubair to deliver it somewhere. *Id.* A portion of this al Qaeda money was kept in Lillie and Zubair's apartment for about one year. *Id.* There is no indication in the record that the al Qaeda money stored in Lillie and Zubair's apartment was replenished by al Qaeda from time to time.

This al Qaeda money was "for savings, passports, and visas" and "intended for the mujahidin brothers in Indonesia and the Philippines." *Id.*

---

[35] Petitioner's brother, Hadi, is also known as Rusman "Gun Gun" Gunawan. App. 250.

[36] In early 2002, petitioner tasked Lillie to surveil an Israeli airline counter at the Bangkok Airport for a possible attack and Lillie did so, twice visiting to make the observations and obtain flight schedules. App. 252, 432. Lillie also reported to petitioner as a possible target the number of Israeli air passengers who boarded a VIP bus. *Id.* Neither the Israeli airline nor the bus was attacked. App. 252. In 2002 and 2003, Lillie traveled on his own initiative to Laos, Myanmar, and the Vietnam border for information about explosives, which he said would be "'stand-by'" for a future martyr operation. App. 432–33. On another occasion, he assessed security at the U.S. Embassy in Bangkok several times from a bus. App. 253.

Petitioner visited the apartment periodically to retrieve some of the al Qaeda money, and Lillie or Zubair delivered other portions of this money to members of petitioner's group when petitioner told them to do so.  *Id.*  As instructed by petitioner, Lillie secured the transfer of about $10,000 (which petitioner had placed in a biscuit box) to someone in Indonesia.  App. 251–52.  Lillie used Johan, also known as Muhammad Nazir bin Ismail, an old schoolmate who Lillie said was not a JI member, to act as an intermediary; petitioner and Zubair later told Lillie that Dr. Azahari had been the recipient.  App. 252, 434; App. 21 (alias).  Lillie similarly transferred some of this al Qaeda money to Zulkifli abd Hir (Marzuki)[37] in the Philippines, again using Johan.  App. 252, 434.  In these transactions, Lillie provided to Johan a contact telephone number provided by petitioner.  App. 252.

After Zubair's arrest in the summer of 2003, Lillie shared an apartment with petitioner and maintained email contact with petitioner's brother (Hadi) and Marzuki.  App. 253, 431–32.  During this time frame, Lillie continued to obtain false identification for petitioner and Marzuki and obtained some for himself.  App. 433–34.  Lillie summarized his relationships with petitioner and UBL, stating that petitioner gave Lillie "more specific guidance on a daily basis" but UBL "strengthened his belief in jihad."  App. 434.  Lillie believed he still owed bayat to UBL in 2007 and, if ordered by UBL, would carry out a martyr operation as his duty.  App. 253.

### (5) Khalid Shaikh Mohammad's Statement (KSM)

***KSM forged the al Qaeda/JI link, sent funds and operatives to petitioner for JI operations, provided funding for al Qaeda's anthrax program, and played a key role in the 9/11 attacks.***

Khalid Shaikh Mohammad (KSM), also known as Muhktar, made statements in 2007 to special agents of the FBI and CITF and to an FBI intelligence analyst.  App. 442–73 (Jan. 12, 13, 14, and 16, 2007); App. 21 (alias).  His statements were summarized in a thirty-two-page document and included in the referral material.  App. 442–73; App. 221–22.  KSM is identified as a co-conspirator in the common allegations of petitioner's charge sheet for his involvement in Southeast Asian and Australian plots, a post-9/11 plot targeting civilians in the United States, and the 2003 bombing of the Marriott hotel in Jakarta, Indonesia.  App. 5–8, 10.  KSM "was responsible for linking Al Qaeda and JI in Southeast Asia."  App. 458.  He played a key role in the attacks on September 11, 2001.  *See, e.g.*, App. 446–47.  After his studies, including in the United States, KSM traveled to Afghanistan and Pakistan and was unconcerned about America; the Russian defeat in Afghanistan, however, inspired him.  App. 444–45.  "The reason for fighting America was simple. America was a friend of their enemies, Israel and corrupt regimes in Arab

---

[37] Lillie's interview report uses both Zulki**f**li abd Hir and Zulki**p**li in discussing a shipment of money to someone in the Philippines.  App. 434.  The Zulki**p**li name spelling was not located elsewhere in the government appendix.

countries, America was also their enemy." App. 444. KSM pledged bayat to Mullah Omar in Afghanistan, Abu Hafs al-Masri (Abu Hafs), and UBL. App. 470; *supra* note 9 (aliases). KSM explained that persons holding leadership positions in al Qaeda had to give bayat to UBL. App. 470.

KSM first met with UBL in 1996. App. 447, 456. After this meeting, KSM flew to Thailand, Indonesia, and Malaysia to visit JI members. App. 456–57. In Malaysia he met with JI leaders Abu Bakar Ba'aysir (Bashir), Abdullah Sungkar, and Muhklas (Muklas). App. 457. KSM convinced Bashir and Sungkar to visit UBL in Afghanistan and facilitated that travel, which occurred at a later date. *Id.* On the return home from their UBL visit, Bashir and Sungkar told KSM that UBL told them to "acquire a world view" and join al Qaeda in its fight. *Id.*

In 1999, while preparing for the 9/11 attacks, "KSM began training people for activities in Southeast Asia, and started sending people to the area." App. 458. Moussaoui, also known as John, was one of the many operatives KSM sent to Southeast Asia. App. 450; App. 387 (alias). Petitioner or his people in JI, including Yazid Sufaat, *infra*, were responsible for providing operatives a place to stay and how they were "taken care of." App. 450–51; *see also* App. 400. When petitioner relocated to Afghanistan after the Indonesian church bombings in December 2000, JI "started sending people to Afghanistan for training." App. 458.[38] It was at this time that petitioner met KSM for the first time. App. 457. KSM had some direct contact with petitioner, but generally relied upon intermediaries, including petitioner's brother. *Id.*

"KSM suggested to UBL that there were nightclubs in Southeast Asia for American and British visitors, and they could use JI for an operation to target these clubs. Once UBL agreed, it was KSM's responsibility to conduct the operation." App. 458. UBL sent operatives to KSM and KSM "would decide how to use them," with occasional input from UBL. App. 459. KSM was aware of a big upcoming Southeast Asian operation; he did not know the target and date, but petitioner did. App. 457. Members of JI sent to KSM videos of clubs in Thailand as possible targets. App. 458. KSM also received reports from Abu Hazem Sharqi (Bandar) about "possible targets and the availability of explosives in Southeast Asia." *Id.* The upcoming operation apparently was the 2002 Bali bombing. *See* App. 457, ¶¶ 5–6. After the Bali operation, KSM transferred $50,000 through intermediaries to petitioner for the next operation because he knew petitioner "could carry out an operation" and to help the families of those arrested in Bali. App. 457, 460–61.[39]

---

[38] *See infra* Statements (7) and (10) for discussion on church bombings.

[39] Other potential targets considered by KSM, before and/or after September 11, 2001, included commercial and military targets in Singapore, commercial and civilian targets in the United States, U.S. military personnel in Kuwait, transportation hubs in England, the Djerba Synagogue in Tunisia, an embassy in Australia (with some funds to be provided by petitioner), a cargo plane perhaps in Hong Kong, and bridges. App. 458, 460–62, 464.

KSM knew that Yazid Sufaat, "a biologist from the JI in Southeast Asia," was involved in Al Qaeda's anthrax program. App. 456. Upon Abu Hafs' death, KSM was responsible for maintaining this program and provided funding until Sufaat was arrested. *Id.*

Regarding his particular role in the 9/11 attacks, KSM first discussed "flying planes into buildings" with Ramzi Yousef[40] and then with Abu Hafs in the Sudan in 1995. App. 446. Abu Hafs said he would discuss the idea with UBL. *Id.* In 1996 in Afghanistan, during their first meeting, KSM "discussed his idea of crashing planes into buildings directly with UBL." App. 447; *see also* App. 456. UBL agreed with KSM's concept. App. 447. UBL realized the value of KSM's proposal after an EgyptAir plane crash. *Id.* "So much time, effort, and money, was put into the East Africa bombings and only a small number of Americans were killed, but when the pilot crashed the Egypt Air plane, hundreds were killed." *Id.* UBL looked to the Oklahoma City bombing as a model for success. *Id.* KSM, UBL, and Abu Hafs agreed that the World Trade Center in New York City was the "biggest possible economic target." *Id.*

"UBL selected the hijackers and sent them to KSM so KSM could prepare them for travel to the U.S." *Id.* "KSM had contact with all four of the [9/11] hijacker pilots," met three of them, and personally trained Mohammed Atta and Marwan Al Shehi,[41] *id.*, two of the hijacker pilots. "Atta was the leader of the 9/11 group in the U.S." App. 451; *see* App. 452. KSM's 9/11 preparations included studying airport security and instructing hijackers on what they needed, identifying the steps for a successful entry and assimilation into the United States, and planning for a successful completion of the mission once a plane was hijacked (including "how to slit throats" by practicing on animals). App. 447–50.

### (6) Faiz Abu Bakar Bafana's Statement (Bafana)

***Bafana worked in JI's treasury section, surveilled potential U.S. targets in Singapore, and submitted his written proposal for an attack on a bus to Abu Hafs al Masri, al Qaeda's second in command, and watched his surveillance video with Abu Hafs.***

Faiz Abu Bakar Bafana[42] made statements in 2002 to FBI special agents and DoJ employees, which were summarized in a forty-one-page document and included in the referral material. App. 373–413 (May 16–20, 2002); App. 221–22. Bafana is named in the common allegations of petitioner's charge sheet as a

---

[40] *See* App. 444 (identifying Yousef's first name as "Ramzi").

[41] Marwan Al Shehi is also known as Marwan al Shehhi. App. 408.

[42] The investigative report of Faiz Abu Bakar Bafana's interview uses Faiz Abu Bak**e**r Bafana. App. 382. Other aliases include Abu Bak'r Ba'aysir, Faiz Bin Abu Bakar Bafana, and Mahmoud. App. 3, 343, 373.

co-conspirator in plots against Singapore and the Philippines. App. 5–7. In 1987, he met Sungkar (the leader of JI) and Bashir (his deputy), joined JI, and pledged bayat to Sungkar.[43] App. 375. Bafana stated one goal of JI was an Islamic state with jihad "impos[ing] Islamic law." App. 378. He trained in Afghanistan in 1991. App. 376.

Bafana and petitioner became "close associates" in the mid-1990s, although they met in about 1989. App. 377. He stated petitioner was "close" with Bashir but "not very close" with Sungkar. App. 379. Bafana had a business with Zulkifli Ismail[44] in this time frame, which contributed money to JI. App. 373–74. In 1998, petitioner moved Bafana from the economy section of JI into the treasury section, and Bafana attended JI training in the Philippines. App 381, 405.

After training, Bafana and petitioner went to Pakistan and Afghanistan for two weeks. App. 381–82. They met Muhktar (KSM) at a bus station in Pakistan, the only time Bafana saw KSM. *Id.* Petitioner "spoke of Muhktar very often" and Bafana believed that petitioner was the link between JI and UBL. App. 382. Petitioner obtained maps on this trip that showed the American and foreign presence in the Middle East. *Id.* He told Bafana that "the Americans were coming after Muslim land" and Israel and America were the same. *Id.*

In 1999, petitioner gave Bafana "a map and videotape of the Yishan MRT [Mass Rapid Transit] station in Singapore," and asked for a proposal on how to conduct an attack. *Id.* Bafana saw this effort as "an attempt by JI to follow the course set by UBL." *Id.* He scouted the MRT station, which was near U.S. military housing. *Id.* Bafana and a JI associate presented to petitioner in May 1999 "a proposal for a pickup truck loaded with explosives to hit the bus that carries U.S. military personnel." App. 383. Petitioner then told Bafana to go to Afghanistan and gave him Muhktar's (KSM's) telephone number. *Id.*

Unable to reach Muhktar by phone, Bafana continued to Afghanistan and delivered the information about the Singapore target to an unknown person, along with a letter from petitioner. *Id.* A few days later, he watched his video with Abu Hafs al Masri, "the number two man in al Qaida." App. 384; *see also* App. 402. Abu Hafs agreed to "provide the money and suicide bombers" for the operation, but Bafana had to provide explosives and a transportation route for

---

[43] Bafana explained the structure of JI. The Shura council at the top "dealt with religious issues," App. 380, and provided guidelines for JI, App. 401. Mantiqi sections covered different regions under JI influence. App. 379. Mantiqi #1 covered Malaysia and Singapore and was led by petitioner with Zulkifli Bin Marzuki as secretary and Bafana as treasurer. *Id.* Each Mantiqi was further divided into Wakalahs, which were divided into cells. App. 380.

[44] No other references to Zulkifli Ismail were located in the government appendix. Based on the same first name, Zulkifli Ismail and Zulkifli Marzuki may be the same person or perhaps related.

the explosives.  App. 384.  Bafana replied "that he would inform" petitioner. *Id.*  Abu Hafs later provided $20,000 to petitioner.  *Id.*

Around mid-2000, petitioner held a meeting attended by some Arabs from UBL's group "to discuss the operation targeting the Churches in Indonesia, and the Singapore operation against the U.S. Embassy."  App. 387.  Petitioner argued churches should be attacked for causing unrest in Ambon, Indonesia. App. 387–88.  Petitioner discussed his proposal with Bashir (JI's leader) and also told Bashir that UBL wanted to attack U.S. military targets in Singapore. App. 388.  Bafana did not help plan the church attacks, but petitioner informed him of them.  *Id.*

In about December 2000, Bandar (who Bafana thought was sent to follow up on Bafana's bus attack proposal) asked Bafana for information on American warships in Singapore.  App. 390.  Bafana went to Singapore to coordinate a response; a video was made (funded by JI) and a shipping schedule and maps were obtained.  App. 390–91.  Petitioner was on the run in February 2001, but still wanted reports on Bandar's program.  App. 391.  JI paid for the TNT.  App. 392.  In May 2001, Bafana and Zulkifli obtained photos of American ships in Singapore, *id.*, and Bafana tracked a transportation route to move explosives into Singapore, App. 393.  Bafana returned to Malaysia and provided a written plan and a $160,000 cost estimate to Bandar.  App. 393.  This proposed operation for an attack on American ships was not executed, Bandar left Malaysia in mid-summer 2001, and Bafana never saw him again.  App. 393–94.

Bafana frequently sent JI money to various people on behalf of petitioner. App. 493.  In 1998, for example, he sent about 20,000 Malaysian Ringgits (MRs) from JI funds to support a training camp in Mindanao in the Philippines. *Id.*  Sometimes Bafana gave money to people to hand-carry to the Philippines to support JI.  *Id.*  Bafana also occasionally sent MRs in amounts of about 10,000 to Sulieman bin Abbas in Cebu, an island of the Philippines.  *Id.*  Petitioner authorized $2,000 of JI money for John (Moussaoui) to seek out flight training, which money Bafana personally handed to John.  App. 494.  Petitioner mistakenly spent about $5,000 of the $20,000 brought by KSM (Muhktar) from Afghanistan on fertilizer, ammonium nitrate, and aluminum powder for John and on expenses for Fathur Ghozi (Saad).  App. 385, 394–95, 493.

In about late summer 2001, petitioner sent two Arabs, Amat (Jabarah) and his associate, to Bafana and they, along with Zulkifli, discussed available funds. App. 394.  Amat, who likely was in communication with Muhktar (KSM), then visited the Philippines; later, the group discussed targets in the Philippines and Singapore and explosive requirements.  App. 395–96.  Ultimately, a Singapore target was selected with the understanding that it would be an American target. App. 396–97.

Bafana, along with others, met with petitioner three times in late 2001 in Thailand and Malaysia, before Bafana's arrest in mid-December 2001.[45] App. 396. In these meetings, petitioner managed JI expenditures. He delayed funding for Indonesian church operations, directed that funding for the flight training of Zaini[46] (someone under UBL) remain untouched, and told Bafana to transfer all JI money to a person called "Amran" and "lie low." App. 397–99; *see* App. 402–04. The group also discussed the Singapore operation.[47] App. 399. On December 15, 2001, the day after the third meeting, "Bafana knew he had a problem" because officials questioned Bafana when he visited his brother, who had been arrested. App. 399–400.

Bafana believed that "JI must help any way they can" based on UBL's fatwas. App. 389. He added, "JI supported UBL's fight and JI members were aware of the fatwahs issued by UBL. . . . The members of JI were happy to work with UBL for Islam because UBL Sheikh had many resources such as training, which were free." *Id.* Petitioner "coordinated relationships with the foreign groups, and JI was happy about [petitioner's] link to the Sheik [UBL] because they obtained training." App. 402.

### (7) Hashim Abbas' Statement

***Hashim Abbas was in a "Special Group" that surveilled and reported on potential U.S. targets in Singapore and in another group where he placed a bomb in a church in Batam, Indonesia, which was detonated.***

Hashim Abbas made statements in 2004 to three FBI special agents in a meeting attended by a DoJ employee. App. 415–24 (Oct. 19, 2004). The statement was summarized in a ten-page document and included in the referral

---

[45] Petitioner and Bafana attended each of the three meetings. App. 396, 398–399. Others present for at least one of the meetings included Zulkifli (Marzuki), Muklas (Muhklas), Qudama (also known as Imam Samudra and Sumudra, App. 250, 366, 370), Amran, Nurdin, and Ismail Lutfe (leader of the Abdul Fateh Thai group). App. 396, 398–399. Samudra (Qudama) was involved in the Batam church bombings and apparently the Bali bombings. App. 250, 366–67; App. 370 (alias). Nurdin, who may be Noordin Bin Top, held a meeting at his home that was attended by petitioner and KSM. App. 399; *see supra* note 28 (discussing Noordin Bin Top). Petitioner also may have met and discussed targets with Amat, an alleged al Qaeda associate and known co-conspirator, also known as Mohammed Jabarah, Ahmad, and Sammy. App. 21, 397–98; *supra* Statement (2) (discussing Amat).

[46] Bafana took Zaini to a flight school in early 2000; Zaini later completed a twin-seater course. App. 403; *see also* App. 394 (Bafana stating 23,000 Malaysian Ringgits in funds was set aside for Zaini's flight school). Zaini may be Zaini Zakaria. *See* App. 274 (item 1U).

[47] Bafana also was involved in the planning of other JI operations from about mid-2000 up to the December 2000 Indonesian church bombings. Bafana's efforts included (i) obtaining $2,000 from petitioner for Zacarias Moussaoui (John) (convicted of conspiracy in the al Qaeda 9/11 attacks against America), App. 385–87; *United States v. Moussaoui*, 591 F.3d 263 (4th Cir. 2010), (ii) providing his home as a meeting space for petitioner's discussion in support of attacks in Medan, Indonesia, App. 388–89, and (iii) assessing with petitioner the American and Israeli Embassies in the Philippines as potential targets, App. 389–91.

material.  *Id.*; App. 221–22.  Abbas is named a co-conspirator in the common allegations of petitioner's charge sheet for his involvement in the Christmas Eve 2000 church bombings in Batam, Indonesia.  App. 6–7.  Abbas pledged bayat to Abdullah Sungkar, the Emir of Darul Islam (DI, later known as JI).  App. 415.  He met Abu Bakar Bashir in about 1991 or 1992.  App. 416.  Abbas watched a taped version of UBL's 1998 Fatwa in Singapore with Haji Ibrahim Maidin, Ja'afar Bin Mistooki, and others in his JI training group, and Abbas concluded that UBL's fatwa was justified.  *Id.*

After the 1998 fatwa, petitioner told Abbas and his training group to find targets of U.S. interest.  *Id.*  Abbas next met petitioner and Mas Salamat in Johor, Malaysia, and a "Special Group" was formed for operations against the United States.  *Id.*  This group included Abbas, Mohamed Kalim Bin Jafaar, Salamat as leader, and later Mistooki.  App. 416–17.  Orders to the group came only from petitioner and Muhklas (Muklas), App. 417, who was a brother-in-law of Abbas, App. 415.  Around 1998 or 1999, the Special Group conducted surveillance in Singapore of an MRT bus station, the Eagle Club, the Sembawang Wharf, and United States Navy ships at the wharf, and obtained from garbage the names and schedules of persons associated with the U.S. Embassy for possible targets.  App. 417.  Abbas edited and narrated a video of the bus stop and wharf.  *Id.*  The Special Group chose the bus station, wharf, and club as targets for petitioner to consider and provided petitioner the surveillance information.  *Id.*  Petitioner asked if the group wanted to do the operation themselves, and Abbas told petitioner that an "outside group" should be used.  App. 417–18.  In 2000, Muhklas told the Special Group that the Arabs had rejected the proposed targets.  App. 418.

When Sungkar died in 1999, petitioner told Abbas there was no need to give bayat to Bashir, the new Emir of JI.  *Id.*  Bashir had spoken many times in Singapore and, in 2000, he gave a lecture at Abbas' home and stayed over one night.  *Id.*  In a 2000 meeting in Kuala Lumpur, Malaysia, Bashir told his audience that "JI must now participate in 'dawah' and 'jihad' at the same time."[48]  *Id.*  Abbas understood this to mean that "JI was to actively recruit more members, while undertaking terrorist operations against their enemies."  *Id.*  Petitioner then spoke to the audience to reinforce Bashir's statements.  *Id.*  A short time later, petitioner started a new group "that would be 'operations ready.'"  App. 419.  Abbas was elevated to a leadership position in this group and appointed to train in tactics.  *Id.*

In October 2000, Abbas, Mistooki, and Abu Rahim met petitioner at petitioner's home in Kuala Lumpur, and petitioner introduced the Batam operation to the group.  *Id.*  Petitioner explained that "Christians were planning to attack Muslims in Indonesia, and they had to counter such an attack."  *Id.*  Petitioner designated Samudra as leader of the group and told the group to meet

---

[48] Dawah is "the practice or policy of conveying the message of Islam to non-Muslims."  https://www.collinsdictionary.com/us/dictionary/english/dawah (last visited Mar. 6, 2023).

Samudra in Indonesia.  *Id.*  When the trio arrived in Batam, Samudra "provided a house and a motorcycle" for them.  *Id.*  Each member of the group separately conducted surveillance of different churches; Samudra "ultimately chose the targets."  *Id.*  Abbas purchased ingredients for seven bombs and helped prepare those ingredients.  *Id.*  Samudra and an Indonesian named Muktib "actually built the bombs."  *Id.*  Samudra "coordinated the timing of the attacks with an unknown person or group."  *Id.*  In December of 2000 after three weeks of preparations, the bombs were planted in several churches.  *Id.*  The day after the bombings, Abbas, Mistooki, and Abu Rahim fled from Indonesia to Singapore without Samudra and Muktib.  App. 420.  They heard that the bombs exploded from the news and radio.  *Id.*

After the Batam bombings, Abbas gained employment with a company that required significant traveling, which could later help Muhklas with computer hacking.  *Id.*  In 2000, Abbas and Muhklas attended an explosives course that concerned basic training in chemicals.  App. 421.  Later, Abbas attended a course on circuitry in explosive devices taught by Dr. Azahari at Dr. Azahari's residence in Malaysia.  App. 422.  Abbas was rejected for training in Afghanistan and the Philippines, which he attributed to his inability to pay for a plane ticket and his importance in the Wakalah.[49]  App. 421.  In 2001, Abbas participated in the surveillance of marine police in Singapore for a couple of hours.  App. 420.  On another occasion, Abbas traveled to Kalantan, Malaysia, on behalf of Salamat to deliver a message to petitioner; Abbas was met by Samudra, who took the message as the new leader of the Mantiqi.  App. 420–21.

### (8) Muhammad Rais' Statement

*Rais picked up and delivered over 200 kilograms of explosive material to JI members for use against U.S. targets.*

Muhammad Rais made a statement in 2006 over three sessions to an employee of the DoJ, with a United States Department of State translator in attendance.  App. 341–353 (Feb. 23–27, 2006).  His statement was summarized in a thirteen-page document and included in the referral material.  *Id.*; App. 221–22.  Rais is named in the common allegations of petitioner's charge sheet as a Southeast Asian who traveled to Afghanistan "to train for and practice jihad."  App. 4.  Rais was introduced to petitioner in 1998 at a communal prayer in Malaysia.  App. 343.  Rais heard of the struggle in Afghanistan from "the media."  *Id.*  "He knew about Al Qaeda from the American Embassy bombings in Africa."  App. 344; *see* App. 466.  Rais learned the United States was the "main enemy" from UBL's 1998 fatwa against the United States, which petitioner also discussed with him.  App. 344.  While Rais was teaching at the Lukmanul Hakim School in Malaysia, petitioner and Bafana asked Rais if he was interested in

---

[49] Also spelled as "Wakallah," App. 421, the Wakalah is a level within the JI organization.  In the statement of Ja'afar Bin Mistooki, he explains that instructions for a cell "would originate with the Shurah committee, then the Mantiqi, the Wakalah, and ending with the cell."  App. 361; *see also supra* note 43 (Bafana explaining structure of JI).

going to Afghanistan.  App. 342–43.  Petitioner gave Rais six months to make money for the trip, a passport, and a visa.  App. 343.  Rais quit teaching to make more money at a factory.  *Id.*  "[I]t was his 'dream' to work and train with Al Qaeda" and Rais was "very happy" when he was informed by petitioner that he (Rais) "would join with Al Qaeda in Afghanistan."  App. 344.  Rais "never considered" volunteering to be a martyr or suicide bomber because he was "not ready."  App. 352.  He instead described himself, in his own words, as a "'foot soldier'" following the orders of his superiors.  App. 343, 352.

In about October 1999, Rais and someone called Harus met with petitioner and Bafana at the Kuala Lumpur International Airport in Malaysia.  App. 343.  Petitioner told Rais that Bafana was his guide to Afghanistan.  *Id.*  Rais, Bafana, and Harus then flew to Karachi, Pakistan, and made their way to Kandahar, Afghanistan.  App. 344.  During this period, Rais and petitioner contacted each other frequently in Kandahar.  App. 348.  Rais spent two years at camp Al-Farouq from 1999 until 2001, in training, as an instructor, and as a soldier.  App. 345–46.  He trained on light weapons, urban warfare, grenades, improvised explosive devices, and poisons.  *Id.*  Rais stated that "it was only after he went to Afghanistan that he learned how to kill Americans."  App. 342.  UBL visited the camp frequently, and Rais attended the wedding of UBL's son.  App. 345, 347.  Rais never met KSM.  App. 347.

In September 2001, Rais returned home to Indonesia.  App. 348–50.  In January or February of 2003, he picked up about 200 kilograms of "aluminum powder and black powder mixed together" and detonation cord from one or more homes.  App. 351.  Rais gave this material to a bus agent for delivery via a bus to Noordin Top.  *Id.*  Top was Rais' brother-in-law and had taught at the Lukmanul Hakim School with Rais, and Top and petitioner were "associates."  App. 342–43.  About one week later, Rais delivered more explosives in person to a boarding house where Dr. Azahari and Top were staying.  App. 351.  Rais was arrested in April 2003 shortly after delivering the explosives.  App. 350–51.  "[T]he ultimate goal was to use the explosives against an American target."  App. 351.  Rais "did not know how TOP and AZAHARI got enough funding to conduct the Marriott attack."  *Id.*  He believed the explosives he transported to Top were used in the Marriott hotel bombing.  App. 352–53.  Tohir (a former classmate of Rais) and Ismail (a former student of Rais and later a teacher at Lukmanul Hakim School)[50] admitted to Rais that they were involved in the bombing of the Marriott.  App. 350, 352.  Ismail told Rais "that the Marriott bombing was done by 'our group[]'."  App. 352.

### (9) Masran Bin Arshad's Statement

*Masran met with KSM to deliver funds to petitioner in Bangkok, Thailand, but was arrested with those funds in Sri Lanka before delivery.*

---

[50] Tohir is also known as Masrizal Bin Ali Umar, and Ismail is also known as Mohammed Ikhwan, Muhammed Ikwan, and Agus.  App. 11, 21.

Masran Bin Arshad, also known as Abdul Aziz (Masran), made a statement in 2009 to two FBI special agents in a meeting attended by DoJ employees. App. 355–59 (Sept. 2, 2009); App. 21 (alias). His statement was summarized in a five-page document and included in the referral material. App. 355–59; App. 221–22. Masran is a named co-conspirator in the common allegations of petitioner's charge sheet for his involvement in a post-9/11 plot targeting civilians in the United States. App. 7–8. In 2000, Masran left Malaysia for military training in Afghanistan, where he first briefly stayed in a guest house for Malaysians. App. 355–56. The guest house was run by petitioner, who also arranged Masran's training. App. 356. Masran received three months of basic training on weapons and bombs at camp Al-Farook (Al-Farouq). App. 355–56. He swore bayat to UBL on two separate occasions and agreed to fight for Islam. App. 356–57. Petitioner helped arrange Masran's second meeting with UBL; petitioner was in charge and "gave the orders," which were followed. App. 357. Masran stated that "UBL was their overall spiritual leader, but they [took] their specific orders" from petitioner or Mukhtar (KSM). *Id.*

Regarding KSM, petitioner arranged a meeting between Masran and KSM, telling Masran that KSM would provide him with money and instructions. *Id.* Masran stayed at KSM's house in Afghanistan for a few days. *Id.* KSM told Masran to expect receipt of funds for delivery to petitioner in Bangkok, which required Masran to travel through several countries. *Id.* KSM provided the funds to Masran, and Masran was arrested in Sri Lanka with the money intended for petitioner. App. 357–58. KSM also told Masran during their meeting that there was "another 9/11/01 operation plan for California," App. 357, but later informed Masran that the operation had been cancelled due to some arrests in America, App. 358. Masran attended about ten UBL sermons prior to his arrest. App. 358.

### (10) Ja'afar Bin Mistooki's Statement

***Mistooki was on the Singapore Shurah Committee, surveilled and reported on potential U.S. targets in Singapore, delivered JI letters to al Qaeda leadership, and was group leader for church bombings in Batam, Indonesia.***

Ja'afar Bin Mistooki made a statement in 2004 to three FBI special agents and a DoJ employee. App. 361–71 (Oct. 18, 2004). This statement was summarized in an eleven-page document and included in the referral material. *Id.*; App. 221–22. Mistooki is named a co-conspirator in the common allegations of petitioner's charge sheet for his involvement in the Christmas Eve 2000 church bombings in Batam, Indonesia. App. 6–7. In 1989, Mistooki joined JI and pledged bayat to Abdullah Sungkar, the JI leader. App. 361. He was placed in a Singapore cell and in 1991 was asked to go to Afghanistan. *Id.* Mistooki personally paid for his airline ticket, flew from Malaysia to Karachi, Pakistan, and then traveled on to Afghanistan with others, including Fathi

Bafana.[51]  App. 362.  He received six months of military training, to include training with explosives.  *Id.*  Mistooki then returned home to Singapore and his former cell.  App. 362–63.  Mistooki first met petitioner in 1993 during a training session in Malaysia.  App. 365.

In late 1993 or early 1994, Mistooki was assigned to a JI military cell in Singapore to train others.  App. 363.  After about three years, he was assigned to the Singapore Shurah committee, which read UBL's fatwa on targeting the U.S. military.  *Id.*  In about 1997, Mistooki went to Malaysia to the home of Muhklas (Muklas).  *Id.*  Mistooki, Khalim bin Ja'afar, and Hashim Abbas met Muhklas, who gave Mistooki an order from petitioner to pick U.S. targets.  *Id.* Upon return to Singapore, Mistooki, Hashim Abbas, and others picked the Sembawang Wharf, the Yishun MRT (a transit stop frequented by U.S. military personnel), and other sites.  *Id.*  They took pictures, observed bus patterns, videotaped the potential targets and bus routes, and discussed ways to attack. App. 363–64.  Ja'afar prepared a report and presumably passed all information to Muhklas.  App. 364.

In 1998, Mistooki accompanied Mas Salamat to Kandahar, Afghanistan, and together they delivered letters from JI leadership to UBL and Ayman Zawahiri.[52]  *Id.*  A Pakistani paid for the airline tickets in exchange for transporting his belongings to Afghanistan.  *Id.*  The purpose of this trip was to deliver the letters but once there, Mistooki and Salamat then traveled to Jalalabad, Afghanistan, and "asked for training."  *Id.*  They were unable to obtain training due to their lack of time and returned to Singapore.  App. 364– 65.  In 2000, petitioner chose Mistooki to return to Afghanistan and JI paid for the travel expenses.  App. 365.  "Mistooki was given the [airline] ticket by Hambali [petitioner]."  *Id.*  Mistooki received two weeks of chemical explosive training and four weeks of artillery training.  App. 365–66.  In October 2000, petitioner chose Mistooki, Ja'afar, Hashim Abbas, and Abdul Rahim to participate in the 2000 Batam church bombing operation in Indonesia on Christmas Eve.  App. 366.  Mistooki remarked in his interview that it would cost a large amount of money to conduct the church bombings.  App. 369.  At his home in Kuala Lumpur, Malaysia, petitioner personally briefed Mistooki, Abbas, and Abdul Rahim about the Batam operation, and Mistooki was designated the leader of the group.  App. 366.

Mistooki and his group went to Batam in late November of 2000; upon arrival they called petitioner, who instructed them to wait.  *Id.*  Imam Sumudra (Qudama) arrived a few days later and "gave a briefing consisting of a plan [to] place bombs in churches."  *Id.*  Each group member picked a main target,

---

[51] Fathi Bafana is also known as Fateh Bafana.  App. 4.  Fathi is the brother of Faiz Abu Bakr Bafana (Bafana), discussed *supra* at Statement (6).  App. 6, 399.

[52] Ayman Zawahiri officially joined al Qaeda in July 2001 as head of al Qaeda's media committee; he had a long history of challenging corruption in the Egyptian regime.  App. 444–45, 467.

attended Sunday services at their target church, conducted surveillance, made sketches, and determined a good place to leave a bomb. *Id.* The group, including Mistooki, assisted in construction of the bombs. *Id.* Doctor Azahari and Sumudra assembled the circuits for the bombs. App. 367. The bombs were disguised as Christmas presents. *Id.* Mistooki and each person in his group set the timers for their bombs, placed the bombs in their assigned church, and left the targeted sites. *Id.* Mistooki placed his bomb under his seat in the church, but it failed to explode when detonated. *Id.* Mistooki and his group left Batam the next day, and Mistooki returned to Singapore. *Id.* Petitioner and KSM visited Batam "to give moral support for the Batam operation." *Id.*

In about January 2001, Mistooki attended an after-action meeting with petitioner, Muhklas, Bafana, Sumudra, and others to discuss the church bombing operation. App. 369. After this meeting, petitioner went to Singapore to discuss the targeting of Jews. *Id.* About two months after the church bombings, Mistooki and his cell began planning an attack on the Singapore Army Headquarters and a Singapore/Malaysian pipeline. App. 367. Surveillance was similar to prior surveillance by Mistooki of potential targets, discussed *supra*. *See* App. 368. The group also entered the Army Headquarters by ruse for observations. *Id.* In mid-2001, Mistooki, petitioner, the Singapore military cell, and others met in Singapore and discussed the possibility of targeting Jewish American military personnel but decided this was not feasible. *Id.*

## II. LAW AND ANALYSIS

This court has jurisdiction over mandamus petitions for extraordinary relief under the All Writs Act, 28 U.S.C. § 1651(a). *See In re Al-Nashiri* (*Al-Nashiri III*), 921 F.3d 224, 227, 233 (D.C. Cir. 2019). A writ of mandamus may only be granted when a petitioner meets the following three-pronged test:

> First, the party seeking mandamus must have "no other adequate means to attain the relief he desires." [*In re Al-Nashiri*, 791 F.3d 71, 78 (D.C. Cir. 2015)] (quoting *Cheney v. United States Dist. Court*, 542 U.S. 367, 380 (2004)). Second, he must show that "his right to issuance of the writ is clear and indisputable." *Id.* (quoting *Cheney*, 542 U.S. at 381). And even if the first two conditions are satisfied, the court must believe "the writ is appropriate under the circumstances." *Id.*

*In re Al-Nashiri* (*Al-Nashiri II*), 835 F.3d 110, 136 (D.C. Cir. 2016) (parallel citations omitted).

Mandamus "is a drastic and extraordinary remedy reserved for really extraordinary causes." *In re Hawsawi*, 955 F.3d 152, 157 (D.C. Cir. 2020) (citation omitted). The remedy is only justified in "exceptional circumstances amounting to a judicial 'usurpation of power'" or for a "clear abuse of discretion." *Cheney*, 542 U.S. at 380 (some quotation marks omitted) (first

quoting *Will v. United States*, 389 U.S. 90, 95 (1967); and then quoting *Bankers Life & Cas. Co. v. Holland*, 346 U.S. 379, 383 (1953)). The United States Supreme Court has recognized a "policy against piecemeal appellate review"—a policy generally undermined by granting mandamus. *Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36 (1980) (per curiam); *see also In re Papandreou*, 139 F.3d 247, 250 (D.C. Cir. 1998) (concluding lax approach to mandamus petitions undermines final judgment rule and "would lead to piecemeal appellate litigation"). Petitions for writs of mandamus "will be denied where another adequate remedy is available." *United States v. Poindexter*, 859 F.2d 216, 222 (D.C. Cir. 1988) (per curiam).

"Mandamus is inappropriate in the presence of an obvious means of review: direct appeal from final judgment." *In re Al-Nashiri* (*Al-Nashiri I*), 791 F.3d 71, 78 (D.C. Cir. 2015). This means petitioner "must identify some 'irreparable' injury that will go unredressed if he does not secure mandamus relief." *Id.* at 79 (quoting *Banks v. Office of Senate Sergeant-At-Arms & Doorkeeper of U.S. Senate*, 471 F.3d 1341, 1350 (D.C. Cir. 2006)). The fact that petitioner might have to wait until after his trial to obtain relief does not, in and of itself, warrant interlocutory interference with ongoing lower proceedings. *See Parr v. United States*, 351 U.S. 513, 519–20 (1956).

"[I]t is established that the extraordinary writs cannot be used as substitutes for appeals, even though hardship may result from delay and perhaps unnecessary trial." *In re Flynn*, 973 F.3d 74, 79 (D.C. Cir. 2020) (en banc) (per curiam) (quoting *Bankers*, 346 U.S. at 383). The enormity of the burdens imposed on petitioner "without more, generally do not suffice to bring a case within mandamus's ambit." *Id.* at 79–80.

This court must guard against issuing advisory mandamus opinions. *See Al-Nashiri I*, 791 F.3d at 81 (citing *United States v. Hubbard*, 650 F.2d 293, 309–10 n.62 (D.C. Cir. 1980); *Banks*, 471 F.3d at 1350).

## A. Standards for Referral to Trial by Military Commission

Rule for Military Commissions (R.M.C.) 406(a), MMC, specifies that "[b]efore any charge may be referred for trial by a military commission, it shall be referred to the legal advisor of the convening authority for consideration and advice." Rule 406(b) describes the contents of the pretrial legal advice as follows:

(b) *Contents*. The advice of the legal advisor shall include a written and signed statement which sets forth that person's:

(1) Conclusion with respect to whether each specification alleges an offense made punishable under chapter 47A of title 10, United States Code;

(2) Conclusion with respect to whether the allegation of each offense is warranted by the evidence indicated in the report of investigation (if there is such a report);

(3) Conclusion with respect to whether a military commission would have jurisdiction over the accused and the offense;

(4) Conclusion, after consultation with the Office of the Director of National Intelligence and appropriate intelligence agencies, with respect to whether trial of the charges would be harmful to national security; and

(5) Recommendation of the action to be taken by the convening authority.

Rule 406 does not specify that the referral material must include documentary evidence supporting the charges. The Discussion to Rule 406 provides:

The advice need not set forth the underlying analysis or rationale for its conclusions. Ordinarily, the charging document is forwarded with the pretrial advice. In addition, the pretrial advice should include when appropriate: a brief summary of the evidence; and discussion of significant aggravating, extenuating, or mitigating factors. Whatever matters are included in the advice, whether or not they are required, should be accurate. Information which is incorrect or so incomplete as to be misleading may result in a determination that the advice is defective. The standard of proof to be applied in R.M.C. 406(b)(2) is probable cause. *See* R.M.C. 601(d). Defects in the pretrial advice are not jurisdictional and are raised by pretrial motion.

In petitioner's case, the legal advisor to the convening authority provided the requisite pretrial advice, in which he made general references to the charges and the referral binder; however, he did not include any meaningful summary of the evidence. His pretrial advice did not mention the 9/11 Commission Report or torture. Def. Mot., Attach. G (App. Ex. 0032.001 (NUR)). It also did not include a discussion of the aggravating, extenuating, or mitigating factors.

Rule for Military Commissions 601(d)(1) does not address how or if information derived from torture can be included in the pretrial advice or referral materials for a military commission trial. The rule, however, explicitly states the convening authority and legal advisor "may consider information from any source." The standard for referral of charges to trial by military commission at Rule 601(d) is as follows:

(1) If the convening authority finds, or is advised by a legal advisor that there are reasonable grounds to believe that an offense

triable by a military commission has been committed and that the accused committed it, and that the specification alleges an offense, the convening authority may refer the charge and specification to a military commission for trial. The finding may be based on hearsay in whole or in part. The convening authority or legal advisor may consider information from any source and shall not be limited to the information reviewed by any previous authority, but a case may not be referred to a military commission except in compliance with R.M.C. 406. The convening authority or legal advisor shall not be required before charges are referred to resolve legal issues, including objections to evidence, which may arise at trial.

## B. Admissibility of Evidence Derived from Torture

Title 10, section 948r(a) of the United States Code, states:

**(a) Exclusion of statements obtained by torture or cruel, inhuman, or degrading treatment**. No statement obtained by the use of torture or by cruel, inhuman, or degrading treatment (as defined by section 1003 of the Detainee Treatment Act of 2005 (42 U.S.C. 2000dd)), whether or not under color of law, shall be admissible in a military commission under this chapter, except against a person accused of torture or such treatment as evidence that the statement was made.

The Detainee Treatment Act of 2005 states:

**(d) Cruel, inhuman, or degrading treatment or punishment defined.** In this section, the term "cruel, inhuman, or degrading treatment or punishment" means the cruel, unusual, and inhumane treatment or punishment prohibited by the Fifth, Eighth, and Fourteenth Amendments to the Constitution of the United States, as defined in the United States Reservations, Declarations and Understandings to the United Nations Convention Against Torture and Other Forms of Cruel, Inhuman or Degrading Treatment or Punishment done at New York, December 10, 1984.

42 U.S.C. § 2000dd(d) (citing Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, S. Treaty Doc. No. 100-20, 1465 U.N.T.S. 85 (ratified Oct. 21, 1994) [hereinafter CAT]).

The CAT provides for application of an exclusionary rule when a state seeks to use evidence obtained from torture in legal proceedings. CAT art. 15; *see also In re Al-Nashiri* (*Al-Nashiri IV*), 47 F.4th 820, 823 (D.C. Cir. 2022) (citing International Covenant on Civil and Political Rights, Dec. 16, 1966, S. Exec. Rep. 102-23, 999 U.N.T.S. 175; Universal Declaration of Human Rights, G.A. Res. 217 (III) A, U.N. Doc. A/RES/217(III) (Dec. 10, 1948)).

Article 15 of the CAT states, "Each State Party shall ensure that any statement which is established to have been made as a result of torture shall not be invoked as evidence in any proceedings, except against a person accused of torture as evidence that the statement was made."

Admissibility of evidence in the Manual for Military Commissions is not mentioned outside of Part III, Military Commission Rules of Evidence, which concerns admissibility of evidence at trial. *See, e.g.*, Mil. Comm. R. Evid., MMC, 304(a)(1) ("*Exclusion of Statements Obtained by Torture or Cruel, Inhuman, or Degrading Treatment*. No statement, obtained by the use of torture, or by cruel, inhuman, or degrading treatment (as defined by section 1003 of the Detainee Treatment Act of 2005 (42 U.S.C. 2000dd)), whether or not under color of law, shall be admissible in a trial by military commission, except against a person accused of torture or such treatment as evidence that the statement was made.").

## C. Litigation on Use of Evidence Derived from Torture in *In re Al-Nashiri*

Before this court, in *In re Al-Nashiri*, No. 21-001, the government offered two of Al-Nashiri's statements as exhibits during pretrial discovery litigation. Ord. Dismissing Pet. 2 (CMCR Sept. 20, 2021). Al-Nashiri's two statements were made "while he was in the former Rendition, Detention, and Interrogation ('RDI') Program." *Id.* (citation omitted). The RDI Program employed "harsh interrogation techniques to obtain information from detainees, including petitioner [Al-Nashiri]." *Id.* This court dismissed Al-Nashiri's writ as moot because the prosecution moved to withdraw the evidence. *Id.* at 5. We noted, however, that the military judge had said, "[T]he Commission makes no ruling on the question of whether it will consider similar statements on other interlocutory issues or how much weight it would give such statements in resolving any future disputed factual issue raised in motion practice." *Id.* at 2 (alteration in original; citation omitted). This court said:

> Respondent has not indicated whether [Al-Nashiri's] statements obtained during the RDI program will be proffered on interlocutory matters. The admissibility of such statements is not a moot issue. *Compare Porup v. CIA*, 997 F.3d 1224 (D.C. Cir. 2021) (strong assurances from agency about future practices mooted complaint about prior practices) with *Payne Enters., Inc. v. United States*, 837 F.2d 486, 492 (D.C. Cir. 1988) (finding "weak assurance" about the likelihood of recurrence of the agency policies and poor history insufficient to moot challenge). *See also Trinity Lutheran Church of Colum., Inc. v. Comer*, 137 S. Ct. 2012, 2019 (2017) (stating that "voluntary cessation of a challenged practice does not moot a case unless 'subsequent events ma[ke] it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" (alteration in original) (quoting *Friends*, 528 U.S. at 189)).

> . . . If [the military judge] used such evidence to support an
> interlocutory decision, then this admissibility issue would not be
> moot, and it would be ripe.

*Id.* at 4–5.

Respondent provided clarification regarding the government's use of statements obtained from harsh interrogation techniques during oral argument in *Al-Nashiri IV*, 47 F.4th at 822. App. 570. Respondent stated "that the Government's position with respect to Section 948r(a) is that statements obtained through torture of anyone, whether it is the defendant or the -- or a third party, are inadmissible under Section 948r(a) at any stage of the proceedings." *Id.* Respondent also said the government has not "yet established a position" on the admissibility of evidence derived from torture. *Id.* at 571. Respondent added that derivative evidence from torture includes statements not "directly obtained" from the torture of a person. *Id.*

Upon appeal from our September 20, 2021, ruling, the Court of Appeals for the District of Columbia Circuit (D.C. Circuit) concluded that oral argument and subsequent letters from the government, submitted pursuant to Fed. R. App. P. 28(j), had provided the Court, "with 'strong' and 'sufficient' assurances that the Government ha[d] changed its practice regarding the use of these statements in pretrial proceedings." *Al-Nashiri IV*, 47 F.4th at 825. The Court noted that respondent "withdr[ew] the statements identified to have been made under torture" and assured the Court that "it will not offer any statements obtained by the torture of anyone at any stage in the proceedings." *Id.* Based on this assurance, the D.C. Circuit concluded "[t]here is simply no remaining case or controversy with respect to the identified statements obtained by Al-Nashiri's torture" and dismissed petitioner's interlocutory appeal as moot. *Id.*

## D. Pretrial Litigation at the Military Commission

Before the military commission, petitioner asserted that: (i) the CIA tortured him and several other detainees and the resulting intelligence interrogation reports provided the basis for the 9/11 Commission Report excerpt; (ii) information obtained by or derived from tortured detainees was included in the 9/11 Commission Report; (iii) evidence obtained by or derived from torture is inadmissible under 10 U.S.C. § 948r(a), international law, and constitutional law; and (iv) the excerpt from the 9/11 Commission Report was used as a basis to refer petitioner's charges to a military commission for trial. Pet'r's Br. 2–5; *see also* Def. Mot. 1–3.

Admittedly, for some portion of Chapter 5 of the 9/11 Commission Report (from which the excerpt was drawn), the 9/11 Commission relied "heavily" on intelligence reports derived from interrogations over which it essentially had "no control." Def. Mot., Attach. D (p. 146 of 9/11 excerpt). Yet, it remains unclear which of the many statements in the 9/11 excerpt petitioner finds

objectionable. Petitioner did not present witness testimony or documentary evidence to the military commission specifying the particular statements in the excerpt he believed to be based on statements resulting from enhanced interrogation techniques under the RDI program. He did not present testimony or documents on whether there was evidence in the referral binder *not derived from torture* that supported the conclusions of the excerpt. He did not address the extent to which any such other evidence supported referral of his case.

Petitioner moved to have the military judge dismiss the charges with prejudice because the use of information obtained by and derived from torture was illegal and highly prejudicial. Pet'r's Br. 5–6 (citing App. Ex. 0032.001 (NUR), at 27 (Def. Mot.)); Def. Mot. 2, 23. In the alternative, petitioner proposed that the military judge dismiss the charges without prejudice and disqualify the entire offices of the chief prosecutor and the convening authority from further involvement in his case. Def. Mot. 23, 26–27. Petitioner did not renew this alternative remedy before us. *See* Pet'r's Br. 1–2.

Respondent did not take a position on whether the information in the excerpt from the 9/11 Commission Report resulted from torture. Instead, respondent assumed for purposes of resolving the petition "that the 9/11 Commission Report relied on statements obtained by torture," Resp't's Br. 22, and urged denial of the petition "because 'there was sufficient evidence other than the nine-page excerpt [at issue] to support the referral decision of the' Convening Authority," *id.* at 24 (alteration in original) (quoting App. 530 (military judge's ruling)). Respondent contended that there was sufficient independent evidence to support the referral of charges, and the information in the 9/11 Commission Report excerpt was cumulative. *Id.* at 23, 24 & n.122.

The military judge found for purposes of resolving the defense motion that the 9/11 Commission Report "in the referral binder contained citations to statements which were obtained by the use of torture or by cruel, inhuman or degrading treatment." App. 527; *see* App. 208 (government response on April 21, 2022, making argument based on assumption that "inclusion of the 9/11 Commission Report excerpt was in error"); App. 210 (referencing same assumption). The military judge suggested "a plain reading of [section 948r(a)] does not support [petitioner's] argument" that inclusion of the 9/11 Commission Report in the referral binder violates the statute. App. 527. He explained this is so because § 948r(a) is limited to admissibility of statements in a military commission trial. *Id.* The military judge added, however, that the term "admissible" in § 948r(a) is nonetheless "*instructive* on how" evidence obtained by torture "may be utilized in other ways, to include the referral process." *Id.* (emphasis added).

The military judge acknowledged a concession by the government about the applicability of § 948r(a) made before the D.C. Circuit in a different military commission case, *Al-Nashiri IV*, 47 F.4th 820. App. 528–29. That case involved a petition for a writ of mandamus and prohibition. The government

said in its *Al-Nashiri* opposition brief, filed on January 31, 2022, that it "will not seek admission, at any stage of the proceedings, of any of petitioner's statements while he was in CIA custody." Resp't's Opp. Br. 4, *Al-Nashiri IV*, No. 21-1208 (D.C. Cir. Jan. 31, 2022) (Def. Mot. 12, Attach. F); App. 529 (military judge quoting same in his ruling); *see also Al-Nashiri IV*, 47 F.4th at 824 (noting government concession that "statements obtained by torture" are inadmissible in "pre-trial discovery stages"), and at 825 (noting similar). In *Al-Nashiri IV*, the government's concession resulted in the D.C. Circuit dismissing the mandamus petition for mootness, inter alia. 47 F.4th at 828; *see* App. 529; *supra* Part II.C (discussing *In re Al-Nashiri*).

On January 21, 2021, the Nurjaman charges were referred to trial. App. 1–2. On January 31, 2022, the government made assurances in *Al-Nashiri IV* that it would not seek to admit "at any stage of the proceedings" statements made by Al-Nashiri when he was in CIA custody. Def. Mot., Attach. F, at p.12 of 37. The military judge in the case before us noted that the new government policy announced in *Al-Nashiri* was not retroactive. App. 529. He assumed, however, that the new policy applied retroactively to the referral in petitioner's case to determine if the referral was defective. *Id.* Alternatively, the military judge concluded as follows:

> Even with a finding that the inclusion of the SSCI Report[53] [and consequently the 9/11 Commission Report] in the referral binder was a violation of § 948r(a), the Accused is not entitled to the relief sought. When faced with challenges to charging decisions that may have been based on impermissible or improper evidence, courts have concluded the charging decision is valid as long as "there was sufficient other [evidence] to support" the decision.

*Id.* (last alteration in original) (quoting *Coppedge v. United States*, 311 F.2d 128, 131 (D.C. Cir. 1962)). In his analysis of prejudice, the military judge said:

> [M]ilitary courts require a showing that the defect "materially prejudiced the substantial rights of an accused."[54] The M.C.A. [Military Commissions Act] § 950a(a) expresses the same test as used by the military courts and thus, this Commission will use it in evaluating the alleged deficiency in referral. While the Defense claims "[t]he prejudice resulting from the use of information

---

[53] Senate Report No. 113-288, Report of the Senate Select Committee on Intelligence: Committee Study of the Central Intelligence Agency's Detention and Interrogation Program (Dec. 9, 2014), reported on enhanced interrogation techniques that "were used in interrogations conducted during the time period of the cited intelligence reports in the 9/11 Commission Report." App. 526. "Some of these techniques allegedly constituted torture under United States and international law." *Al-Nashiri IV*, 47 F.4th at 823; App. 526 (military judge ruling quoting same text).

[54] Note 27 in App. 530 (quoting Art. 59, Uniform Code of Military Justice, 10 U.S.C. § 859).

obtained by torture when referring charges in this case is clear and apparent"[55], the Defense does not convincingly provide concrete examples of the "clear and apparent" prejudice.

*Id.* at 530 (last alteration in original).

## E. Merits of Petitioner's Arguments

### 1. "Admissible in a military commission" Refers to Evidence at Trial

We agree with the military judge's interpretation of the word "admissible" in 10 U.S.C. § 948r(a). The term "admissible" is a legal term of art, typically associated with the admission of evidence during a trial or in a preliminary hearing. Petitioner cites no authority for extending the word "admissible" to matters considered during the referral decision process—a decision which Rule for Military Commission 601(d)(1) explains may be based on "information from any source." Instead, he relies on a definition of "admissible" from Black's Law Dictionary, which includes, inter alia, "[c]apable of being legally admitted." Pet'r's Br. 13 (alteration in original).[56] Petitioner seeks to bolster this argument by pointing to the fact that 10 U.S.C. § 948r(a) falls under the subchapter titled, "Pre-Trial Procedure," arguing this placement indicates the statute is tied to pretrial matters. *Id.* at 14. Petitioner urges the court to broadly construe 10 U.S.C. § 948r(a)'s reference to evidence "admissible in a military commission" so that it reaches every stage of a commission proceeding, including stages occurring before, or at least contemporaneous with, the formation of a commission. *Id.* at 14–15.

The plain language of the statute, however, does not compel such an interpretation, or even provide much support for it. Indeed, the more straightforward reading of the statute is that Congress has prohibited the admission of statements obtained by torture into evidence in a trial by military commission.

In his brief, petitioner has demonstrated the government's position in *Al-Nashiri IV* as being that the government would not offer evidence obtained by torture in that case during pretrial litigation. *Id.* at 6–7. Petitioner, however, has not advanced any theory—much less identified any controlling authority—for concluding that the government's position before the D.C. Circuit in *Al-Nashiri IV* is the law <u>in this case</u>. Even if the government's position in one case binds the government in every other commission case, it is unclear whether application of the new position to "stage[s] of the proceedings" and "pretrial phases of a military commission case" reach the referral process, which occurs before a commission has been convened. *Id.*

---

[55] Note 28 in App. 530 (quoting App. Ex. 0032.001 (NUR), at 20 (Def. Mot. 20)).

[56] Black's Law Dictionary (11th ed.) includes the same definition of *admissible* as quoted by petitioner.

An expansive reading of the meaning of the phrase "admissible in a military commission" in 10 U.S.C. § 948r(a) would operate to prohibit the government from ever using evidence obtained by torture or torture-derived evidence with respect to a person being considered for trial by a commission, when the case is in a pre-referral status. An at least equally plausible reading— especially given the post-referral motions stage of trial at which the *Al-Nashiri IV* matter was raised—is that evidence obtained by the use of torture or torture-derived evidence may not be introduced in a military commission, which encompasses motions practice, trial on the merits, and presentencing proceedings.

In light of this rational, and more direct interpretation of the government's position in *Al-Nashiri IV* on the meaning of "admissible in a military commission," petitioner has not established a "clear and indisputable" right to relief. *Cheney*, 542 U.S. at 381 (citation omitted). This is so even if we were to conclude that respondent is bound in the case now before this court by a position it has taken in another case before a different commission. Notably, petitioner also has not reconciled an internal inconsistency lying within his suggestion that the government's position in *Al-Nashiri IV* is binding in his case. The government apparently made a change in its position on admissibility <u>after</u> the convening authority decided to refer petitioner's case. Thus, at the time of petitioner's referral, the government's stated position was that torture-derived evidence could be used during motions (and presumably during all other pretrial points in the commission process). The government's new position raises the question of retroactivity—yet another aspect of petitioner's request that fails to reveal a clear wrong. *See* App. 529; *supra* Part II.D.

## 2. The Constitution's Due Process Clauses Are Not Applicable

In this section, we make three assumptions. First, we assume without deciding that, under 10 U.S.C. § 948r(a), evidence obtained by and derived from torture is inadmissible as part of the basis for a referral decision. Second, we assume that such information was erroneously included in the referral materials the convening authority considered before referring petitioner's charges to trial by military commission. Third, we assume without deciding that the Fifth Amendment Due Process Clause is implicated in this case. We need not decide, however, the nature and scope of any constitutional violation or constitutional error because, assuming a violation, the controlling issue is the remedy. *See Al-Hela v. Biden*, 66 F.4th 217, 221 (D.C. Cir. 2023) (en banc). In that case, the Court stated:

> We hold that we need not decide whether due process protections apply to Guantanamo detainees, because even assuming the Due Process Clause applies, we find that the procedures employed by the District Court to adjudicate Mr. al-Hela's habeas petition satisfy procedural due process.

*Id.* at 222; *see generally, e.g.*, *Qosi v. United States*, 462 F. Supp. 3d 1181, 1188–89, 1191 n.10, 1193 (CMCR 2020) (discussing application of Due Process Clause for an accused tried by a military commission). Here and in subpart 4 *infra*, we consider further the issue of remedy.

Petitioner contends that inclusion of information obtained by or derived from torture in the referral material warrants automatic dismissal of the charges with prejudice because this "government conduct 'strikes at the fundamental values of our judicial system and our society as a whole.'" Pet'r's Br. 20–21 (quoting *Rose v. Mitchell*, 443 U.S. 545, 556 (1979)); *see id.* at 23 n.8, 26. Petitioner asks us to dismiss the charges with prejudice because torture applied deliberately by the United States Government is a constitutional violation "so serious that it must never be treated as harmless by a reviewing court." *Id.* at 19; *see id.* at 16–19.

In support of his argument, petitioner cites five Supreme Court cases discussing application of the constitutional guarantee of due process. *Id.* at 16–22 (citing *County of Sacramento v. Lewis*, 523 U.S. 833, 836 (1998) (tort case indicating police chase resulting in a death does not violate Fourteenth Amendment's substantive Due Process Clause in absence of "arbitrary conduct shocking to the conscience"); *Arizona v. Fulminante*, 499 U.S. 279, 295–302 (1991) (applying harmless error analysis in case involving Fourteenth Amendment Due Process and erroneous admission of coerced confession at trial); *United States v. Lovasco*, 431 U.S. 783, 795–96 (1977) (holding that prosecution after investigative delay does not deprive defendant of due process under Fifth Amendment); *Rochin v. California*, 342 U.S. 165, 166, 168, 174 (1952) (concluding admission at trial of evidence pumped from defendant's stomach violated Fourteenth Amendment Due Process Clause); *Brown v. Mississippi*, 297 U.S. 278, 279, 287 (1936) (stating admission at trial of confession obtained by brutality violated Fourteenth Amendment Due Process Clause)); *see also Payne v. Arkansas*, 356 U.S. 560, 568 (1958) (holding admission of coerced confession where "general verdict is returned" violated Due Process Clause of Fourteenth Amendment, even where other evidence may have supported conviction).

Petitioner has not clearly established that he has due process rights under the Fourteenth Amendment. That amendment states, in part: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law . . . ." *Lewis*, *Fulminante*, *Rochin*, and *Brown* concerned due process under the Fourteenth Amendment. As such, they are inapplicable to petitioner's case, as no State is involved in the military commission process. Petitioner's cited cases also are factually distinguishable. *Lewis* involved a civil tort action and *Fulminante*, *Rochin*, and *Brown* concerned evidence improperly admitted *at trial*.

*Lovasco*, also cited by petitioner, concerned whether there was a Fifth Amendment Due Process violation because of a long investigation before indictment. 431 U.S. at 795–96. Assuming without deciding that the Fifth Amendment is implicated in this case, petitioner has received all the process that was due based on the record before us. "'[R]emedies should be "tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests."'" *United States v. Knight*, 981 F.3d 1095, 1107 (D.C. Cir. 2020) (quoting *Lafler v. Cooper*, 566 U.S. 156, 170 (2012)). Determining whether there was sufficient support for the charges after excising the information in the 9/11 Commission Report is a sufficient and appropriate remedy.

In petitioner's case, we are able to conclude that petitioner was not prejudiced by inclusion of the excerpt from the 9/11 Commission Report in the referral materials. The record before the convening authority (referral binder) was more than sufficient to sustain the charges had the nine-page excerpt been excluded from the referral binder. *Infra* Subpart 3.b. Moreover, under jurisprudence involving analogous grand jury proceedings, any error in charging is corrected in the merits adjudication because the military commission judge will not be relying on the tainted material. *See, e.g.*, *United States v. Mechanik*, 475 U.S. 66, 70 (1986) (holding that "[m]easured by the petit jury's verdict, [] any error in the grand jury proceeding connected with the charging decision was harmless beyond a reasonable doubt"); *United States v. Robinson*, 367 F.3d 278, 289 (5th Cir. 2004) (stating "petit jury's unanimous finding" was "at a minimum, persuasive evidence of how a grand jury would find" (citing *Mechanik*)); *United States v. Borda*, 905 F. Supp. 2d 201, 204 (D.D.C. 2012) (stating petit jury's guilty verdict "after a full trial on the merits renders harmless any non-constitutional error in the grand jury's charging decision" (citing *Mechanik*)). *Lovasco* also is distinguishable because that case did not involve the admission of evidence.

In sum, petitioner has not clearly established that his due process rights were violated. Four of the five United States Supreme Court cases he cites are inapposite because they concern the Fourteenth Amendment, which does not apply to Guantanamo Bay detainees. Like the defendant in *Lovasco*, discussing the Fifth Amendment, petitioner received all the due process due to him during the referral process. The five cases also are distinguishable on their facts. Accordingly, we find no support for petitioner's position in his cited authority.

### 3. Any Error Was Harmless Beyond a Reasonable Doubt

When addressing a military commission issue of first impression we consider whether and how that issue was addressed in an appeal of a military court-martial. *See* 10 U.S.C. § 948b(c) ("The procedures for military commissions set forth in this chapter are based upon the procedures for trial by general courts-martial . . . ."). In courts-martial jurisprudence, the Court of Criminal Appeals may not hold "[a] finding or sentence of a court-martial . . .

incorrect on the ground of an error of law unless the error materially prejudices the substantial rights of the accused." 10 U.S.C. § 859(a). Similarly, this court is not permitted to set aside a finding "unless the error materially prejudices the substantial rights of the accused." 10 U.S.C. § 950a; *see* Fed. R. Crim. P. 52(a) ("Any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded."); *United States v. Lustig*, 830 F.3d 1075, 1086 (9th Cir. 2016) ("[G]enerally, constitutional errors in criminal proceedings must be disregarded if the government can prove that they are harmless 'beyond a reasonable doubt.'" (quoting *Neder v. United States*, 527 U.S. 1, 7 (1999))).

In a criminal trial, a constitutional error requires the appellate court to be satisfied beyond a reasonable doubt that the error was harmless. *See Harrington v. California*, 395 U.S. 250, 254 (1969) (stating evidence from two confessions by co-accused "was of course cumulative" and "apart from them the case against Harrington was so overwhelming that . . . this violation of [his right to confrontation] was harmless beyond a reasonable doubt"); *United States v. Burden*, 934 F.3d 675, 689 (D.C. Cir. 2019) (concluding that admission of deposition of available witness was not harmless error); *United States v. Moore*, 651 F.3d 30, 58, 62–63, 64, 74, 76 (D.C. Cir. 2011) (per curiam) (finding harmless (i) cumulative effect of any prosecutorial misconduct given overwhelming evidence and limiting instructions, (ii) any Sixth Amendment violation, and (iii) any improper admission of uncharged conduct and witness testimony on religious faith); *United States v. Slough*, 641 F.3d 544, 555 (D.C. Cir. 2011) (stating harmless error standard is required for assessment of improperly admitted evidence in grand jury proceeding); *Marshall v. United States*, 436 F.2d 155, 160 (D.C. Cir. 1970) (finding "two identifications made at the trial," if improper, were harmless error given extent of other admissible evidence).

### a. *Pretrial advice in a court-martial*

Article 34(a), Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 834(a), and Rule for Courts-Martial (R.C.M.) 406(b), Manual for Courts-Martial, United States (2019 ed.), require the staff judge advocate (SJA), the convening authority's legal advisor, to provide written legal advice to the convening authority regarding his or her proposal on whether court-martial charges should be referred to a general court-martial. That advice need only provide conclusions on whether:  the "specification alleges an offense under the UCMJ"; "there is probable cause to believe that the accused committed" the alleged offense; and the "court-martial would have jurisdiction over the accused and the offense." R.C.M. 406(b)(1)–(3). The SJA also must provide a recommendation on the action to be taken by the convening authority "in the interest of justice and discipline." R.C.M. 406(b)(4). The SJA may, but is not required to, provide a brief summary of the evidence and "failure to do so is not error." R.C.M. 406(b), Discussion.

In the military justice system, if a court concludes that the pretrial advice omitted important information or included improper information, that court determines whether the accused was prejudiced. In that analysis, military courts generally inquire whether the convening authority would have disposed of the charges differently had he or she been presented with a correct pretrial advice. *See, e.g.*, *United States v. Foley*, 37 M.J. 822, *17–21 (A.F.C.M.R. 1993) (applying factors in *United States v. Murray*, 25 M.J. 445 (U.S.C.M.A. 1988), in analysis for prejudice, and finding harmless error where non-mandatory pretrial advice on subordinate commander's recommendations was incorrect); *United States v. Rivera*, 20 U.S.C.M.A. 6, 7, 42 C.M.R. 198, 199 (1970) (stating "substantial rights" of accused may be prejudiced when SJA's advice to convening authority is "erroneous, inadequate, or misleading," and reversing and remanding for new post-trial review and action by convening authority because pretrial and post-trial advice failed to include unit commander's favorable recommendation); *United States v. Foti*, 12 U.S.C.M.A. 303, 304, 30 C.M.R. 303, 304 (1961) (stating factors having "a substantial influence" on convening authority's decision "should be furnished," and affirming decision to reassess sentence where pretrial advice did not include such favorable information).

A referral to court-martial may be defective under some circumstances, which are not present in this case. *See, e.g.*, *United States v. Boyce*, 76 M.J. 242, 252 (C.A.A.F. 2017) (stating "particularly troubling and egregious" unlawful command influence over referral decision warranted new referral); *United States v. Youngman*, 48 M.J. 123, 128 (C.A.A.F. 1998) (stating "appellant's immunized statements caused or played a substantial role in referral of remaining offenses against him to a general court-martial," which resulted in a defective referral); *United States v. Mercier*, 75 M.J. 643, 646 (C.G. Ct. Crim. App. 2016) (concluding pretrial advice was defective for relying on anticipated evidence instead of evidence from Article 32, UCMJ, Pretrial Investigation).

We find this body of law "instructive," MMC, Pt. I, pmbl, ¶ 1(a), but also look to grand jury decisions as more relevant to our analysis.

### b. *Grand jury process*

Grand jury decisions are the decisions most closely analogous to a referral decision. Although the procedures are distinct, we find the grand jury process and military commission referral process to be functionally equivalent in that both serve to inform the charging decision. Based upon our review of the law, harmless error analysis is appropriate regarding defects in the grand jury process, unless the structural integrity of that process is undermined. *E.g.*, *United States v. Perez*, 246 Fed. App'x 140, 143–44 (3d Cir. 2007) (where allegation of improper evidence before grand jury was non-structural, applying harmless error review). Here, the question of what information was presented to the convening authority is a procedural, not structural, matter. In petitioner's

case, the convening authority is alleged to have considered materials that he should not have; this fact scenario is akin to improper evidence being placed before a grand jury, a procedural matter. *See Robinson*, 367 F.3d at 285–86 (finding lack of aggravating factor to justify death penalty in indictment is a non-structural error and reviewing for harmless error). Petitioner has failed to adequately allege an error that undercuts the structural integrity of the referral process, as occurred in the grand jury indictments of *Vasquez v. Hillery*, 474 U.S. 254, 263–64 (1986), and *Rose*, 443 U.S. at 556, discussed *infra*. Thus, we will test the alleged error for harm and prejudice.

In *Coppedge*, the trial judge reviewed the remaining evidence presented to the grand jury after "exclusion of the alleged perjurious testimony of the co-defendant" and concluded "that there was sufficient competent evidence to support the indictment herein challenged." 311 F.2d at 130 (citation omitted). The trial judge "held that in a Grand Jury proceeding the government need only produce some evidence which would support the indictment and that the presence of other evidence, incompetent or inadmissible for some reason, including its reliability, did not vitiate the indictment." *Id*. at 131. The D.C. Circuit agreed with the trial judge and held "that there is some competent evidence to sustain the charge issued by the Grand Jury even though other evidence before it is incompetent or irrelevant in an evidentiary sense or even false." *Id*. at 132; *see also United States v. Laughlin*, 226 F. Supp. 112, 114 (D.D.C. 1964) (stating "an indictment will not be dismissed if there is some incompetent evidence before the grand jury, as long as there is sufficient competent evidence to sustain it").

Petitioner states, however, that "even under a harmless error standard of review, there was insufficient untainted evidence to show beyond a reasonable doubt that the inclusion of the torture evidence was harmless." Pet'r's Br. 19. Petitioner does not discuss why the remaining evidence is insufficient to meet the harmless error standard.

Setting aside the nine-page 9/11 Commission Report excerpt, the remaining referral materials clearly establish that petitioner went to Afghanistan, met with UBL, and acted as the liaison between al Qaeda and JI. App. 267, 272, 382, 438. Inter alia, petitioner encouraged JI members to bomb multiple Christian churches in Indonesia that resulted in the deaths of civilians. *E.g.*, App. 366–67, 387–88, 419. He obtained and coordinated the providing of money from al Qaeda to the families of suicide bombers and those arrested for the Bali bombings (also resulting in civilian deaths), other operatives, and fugitives from the law, and he coordinated support for fugitives. *E.g.*, App. 248–52, 270–72, 460–61, 478–480. Petitioner secured al Qaeda money to support operations and surveillance activities, *e.g.*, App. 419, 439–40, 460, 480, and provided al Qaeda money to purchase explosives and make bombs, *e.g.*, App. 249, 385, 392, 419. Petitioner also was responsible for the lodging and well-being of operatives in Southeast Asia, App. 450–51, and arranged for military training in, and travel to, Afghanistan, *e.g.*, App. 245, 343, 365.

The parties have not cited any court-martial appellate cases involving a convening authority's consideration of improper evidence when making a referral decision. As discussed, the closest analogy to a referral decision outside of the military justice system is a grand jury decision to indict a criminal defendant. "[A]s a general matter, a district court may not dismiss an indictment for errors in grand jury proceedings unless such errors prejudiced the defendants." *Bank of Nova Scotia*, 487 U.S. at 254 (1988). The United States Supreme Court has concluded that dismissal "is appropriate only 'if it is established that the violation substantially influenced the grand jury's decision to indict,' or if there is 'grave doubt' that the decision to indict was free from [such] substantial influence." *Id*. at 256. A presumption of prejudice exists in some cases, however, as when "the structural protections of the grand jury have been so compromised [rendering] the proceedings fundamentally unfair." *Id*. at 257.

To support his argument for a presumption of prejudice in his case, petitioner cites to *Vasquez v. Hillery*, 474 U.S. 254, 263–64 (1986) (stating racial discrimination in grand jury membership "undermines the structural integrity of the criminal tribunal itself, and is not amenable to harmless-error review"), and *Rose*, 443 U.S. at 556 (stating similar in case having similar fact scenario concerning grand jury selection). Pet'r's Br. 21; *see also Bank of Nova Scotia*, 487 U.S. at 257 (stating exclusion of women from grand jury results in a presumption of prejudice (citing *Ballard v. United States*, 329 U.S. 187 (1946))). We are not confronted, however, with a situation comparable to an improper grand jury selection. *See Mechanik* , 475 U.S. at 70 n.1 (1986) (remarking that considerations underlying remedy of automatic reversal for racism in grand jury selection "have little force outside" cases involving grand jury composition based on racism). The alleged error in petitioner's case concerns improper evidence in the referral binder submitted to the convening authority, not improper convening authority selection. Instead of *Vasquez* and *Rose*, we thus look to the Tenth Circuit for persuasive authority.

In *United States v. Thompson*, 287 F.3d 1244 (10th Cir. 2002), the Tenth Circuit considered an interlocutory appeal regarding an improperly sealed indictment. The government argued that the harmless-error analysis should be made only after trial, citing *Bank of Nova Scotia*. *Id*. at 1253. The Tenth Circuit Court disagreed, noting that the government's own authority, *Bank of Nova Scotia*, conducted the harmless-error review *pretrial*. *Id*. The court remarked that the improper sealing of the indictment could have "harmed the defendants' ability to defend against the charges even before the commencement of trial." *Id*. On the standard for assessment of harmless error, the Tenth Circuit stated the court "is to consider the sealing error in context and determine whether it substantially influenced a defendant's ability to defend against the charges" and that this assessment "may be properly conducted before trial." *Id*. at 1254.

For purposes of the analysis in this section, we will assume without deciding that any consideration by the convening authority of evidence obtained by or derived from torture against petitioner implicates the Constitution. An appellate court must be satisfied that a constitutional error in a criminal trial is harmless beyond a reasonable doubt. *See, e.g.*, *Harrington*, 395 U.S. at 254. Establishing harmless error beyond a reasonable doubt is a difficult, but not an insurmountable burden. The harmless error "test is stringent"—"[t]he core of the inquiry is the strength of the government's residual case" after excluding the inadmissible evidence. *United States v. Stock*, 948 F.2d 1299, 1302 (D.C. Cir. 1991) (citing *Delaware v. Van Arsdal1*, 475 U.S. 673, 684 (1986)).

Petitioner's claim is rooted in the notion that the convening authority referenced the 9/11 Commission Report excerpt to conclude that petitioner participated in "hostilities" and conspired with others to commit offenses such as murder in violation of the law of war, terrorism, and destruction of property in violation of the law of war. Setting aside the excerpt, the additional referral materials before the convening authority covered these same matters in detail, discussed *supra* Part I.B. We see nothing that would indicate that the convening authority was improperly swayed by the nine-page excerpt. We see no persuasive argument that the convening authority would have declined referral of the charges against petitioner but for the excerpt. Even assuming it was error for the convening authority to consider the excerpt, we are convinced, beyond a reasonable doubt, that this error was harmless, and petitioner would be facing the same charges in the absence of the error.

### 4. Failure to Allege a Mandamus Claim

This court may make an exception to the restrictions on issuance of a writ of mandamus in *Cheney* if "the appellate court is convinced that resolution of an important, undecided issue will forestall future error in trial courts, eliminate uncertainty and add importantly to the efficient administration of justice." *Colonial Times, Inc. v. Gasch*, 509 F.2d 517, 524 (D.C. Cir. 1975) (citing *Schlagenhauf v. Holder*, 379 U.S. 104 (1964)); *see In re Clinton*, 973 F.3d 106, 118, 121 (D.C. Cir. 2020) (granting mandamus request in a "discovery context where necessary to correct an error with potentially far-reaching consequences" (citing *In re Kellogg Brown & Root, Inc.*, 756 F.3d 754, 763 (D.C. Cir. 2014))). Admittedly, the government's current position—that it "will not seek [the] admission, at any stage of the proceedings," of statements obtained by torture— was made in a case where the issue presented itself in the *litigation phase* (during discovery). Resp't's Opp. Br. 4, *Al-Nashiri IV*, No. 21-1208 (D.C. Cir. Jan. 31, 2022) (Def. Mot. 12, Attach. F). Nonetheless, there is no evidence before us indicating that the government intends to take a different position in the referral stage of a future case. Declining to speculate about the government's future intent, as we must, we remain unconvinced that future referrals to trial by a military commission will include the 9/11 Commission Report or excerpts from that report. Given the burdens this controversy has placed on the prosecution of petitioner's case and on petitioner having his day

in court, it seems rather more likely to us that the government will refrain from using the 9/11 Commission Report, or excerpts, in future referrals.

Moreover, proper referral to a military commission is a right that can be vindicated on direct appeal to this court and the D.C. Circuit, as recently commented on again by our Superior Court in *Al-Nashiri IV*.

> "[M]andamus is inappropriate in the presence of an obvious means of review: direct appeal from final judgment." *In re Al-Nashiri*, 791 F.3d 71, 78, 416 U.S. App. D.C. 248 (D.C. Cir. 2015). The "MCA empowers this Court to review all 'matters of law' once a military commission issues a final judgment and both the convening authority and the [USCMCR] review it." *Id*. at 79 (citing 10 U.S.C. § 950g(a), (d)). Thus, Al-Nashiri again has adequate means to attain the relief he desires for this issue; namely, a direct appeal to this Court from any final judgment of the Commission with which he disagrees.

47 F.4th at 827 (second brackets in original). The D.C. Circuit noted the government's promises in *Al-Nashiri* to not use evidence from torture in pretrial litigation. *Id*. at 825. "If the Government abandons this promise and the Commission relies on any such statements, Al-Nashiri can directly appeal the Commission's final judgment to this Court." *Id*. at 827–28. The Court stated that consideration of evidence from torture is an issue for direct appeal from final judgment, as opposed to interlocutory appeal. *See id.* at 827. There has not been a final judgment in petitioner's case.

Petitioner has not shown that issuance of a writ of mandamus is appropriate in his case. At its foundation, petitioner's argument is that the consideration of any information obtained by torture or derived from torture during the referral decision process irreparably taints the referral decision, no matter what the information is or what role it played in the referral decision. Petitioner makes no effort to explain the significance of the information in the 9/11 Commission Report excerpt. He does not explain why he believes the remaining evidence after exclusion of the excerpt would be insufficient for the convening authority to have the factual basis necessary to conclude that referral was appropriate. Nor does he attempt to refute respondent's well-grounded explanation that the elements of petitioner's alleged offenses are supported by a variety of other documents in the referral binder.

Instead, petitioner simply argues that we should not ask whether any error was harmless here, under the theory that prejudice is inherent in the employment of information obtained by or derived from torture for any purpose. *See* Pet'r's Br. 18–19. Yet, when inappropriate evidence is presented in grand jury proceedings, the result is not to automatically set aside the indictment, but rather to assess whether the other evidence presented is adequate to support the indictment. *Coppedge*, 311 F.2d at 131–32. Similarly, when a coerced

confession is admitted at trial, that error is tested for harmlessness. *Fulminante*, 499 U.S. at 310.

Respondent maintains that if the 9/11 Commission Report excerpt were excised from the referral binder, adequate other information in the binder supported referral. We adopt this position based upon respondent's demonstration that the nine-page excerpt was, at most, cumulative to the fair amount of other information that was presented to the convening authority. Petitioner makes no effort to refute this argument. Nor does petitioner explain why information from a well-known and publicly available document is so absolutely corrosive as to render the entire referral decision invalid. Instead, petitioner merely stands on the premise that any consideration of any information obtained by torture or derived from torture renders the referral void.

Petitioner similarly has not demonstrated that he has no other adequate means to attain his requested relief, which is dismissal of the referral with prejudice. Petitioner's requested relief has shifted since he raised the matter before the commission. There, petitioner asked the military judge to dismiss *the charges with prejudice*. Def. Mot. 25–27. In the event the military judge chose not to dismiss the charges with prejudice, petitioner asked the military judge to dismiss *the charges without prejudice* "and disqualify the Office of the Convening Authority and the Office of the Chief Prosecutor from taking any further action on these charges." Def. Mot. 26–27. Petitioner does not explain what the substantive effect of dismissing the charges "without prejudice" would be in this case. A new convening authority presumably would find sufficient evidence to refer the charges again without reference to the 9/11 excerpt. *See* Part I.B (discussing other evidence in referral binder).

In any case, petitioner now asks this court to "dismiss *the referral with prejudice* because it was based on and irrevocably tainted by torture-derived information," Pet'r's Reply 14 (emphasis added), and for use of statements obtained by torture, *e.g.*, Pet'r's Br. 17–18. Petitioner is effectively asking this court to leave his preferred charges intact but dissolve the current commission, thereby returning his case to the pre-referral stage. He does not explain why respondent's removal of the 9/11 Commission Report excerpt from the referral binder and a request for reconsideration of his referral decision by the convening authority—a remedy akin to the one found to be acceptable by the D.C. Circuit in *Al-Nashiri IV*, 47 F.4th at 823—would be inadequate here.

Petitioner also contends we should grant the interlocutory relief he seeks now, before the matter of the 9/11 Commission Report excerpt "can metastasize into the rest of the proceedings." Pet'r's Reply 6. Notably, however, petitioner does not explain how or why consideration of the excerpt during the referral process would be a consideration in his trial, much less how it might take on a degree of outsized significance. Truly, it is difficult to understand how the referral decision-making process would ever be an issue for such fact-finder's consideration.

If petitioner is ultimately convicted, he will have the opportunity on direct appeal to challenge the military judge's ruling denying his trial-level motion for dismissal. "Mandamus is inappropriate in the presence of an obvious means of review: direct appeal from final judgment." *Al-Nashiri I*, 791 F.3d at 78 (citing *Roche v. Evaporated Milk Ass'n*, 319 U.S. 21, 27–28 (1943)). Admittedly, this would require petitioner to first be tried, but that is true of anyone suffering an adverse ruling during pretrial motions practice. Being tried hardly amounts to an irreparable injury warranting extraordinary mandamus relief at this stage. *See Parr*, 351 U.S. at 519–20. Petitioner points to no other injury that will go unredressed. Furthermore, on direct appeal, this court will have a much clearer picture of what impact, if any, inclusion of the 9/11 Commission Report excerpt in the referral material had on the outcome of the trial.

Finally, petitioner does not cite any cases where a referral was dismissed due to inadmissible evidence being included in the materials provided to the convening authority who referred the case to a court-martial or military commission. "[A] petitioner's right to relief is 'clear and indisputable' where he or she can point to 'cases in which a federal court has held that' relief is warranted 'in a matter involving like issues and comparable circumstances.'" *In re Al Baluchi*, 952 F.3d 363, 369 (D.C. Cir. 2020) (quoting *Doe v. Exxon Mobil Corp.*, 473 F.3d 345, 355 (D.C. Cir. 2007)). Petitioner has failed to "demonstrate a 'clear and indisputable' right to the writ." *Al-Nashiri I*, 791 F.3d at 82 (quoting *Cheney*, 542 U.S. at 381). "Given its 'exceptional' nature, we cannot use mandamus to remedy anything less than a 'clear abuse of discretion or usurpation of judicial power.'" *Id.* (quoting *Bankers*, 346 U.S. at 383).

## III. CONCLUSION

Petitioner has failed to satisfy the requirements for a writ of mandamus and prohibition. *See Al-Nashiri II*, 835 F.3d at 136 (citing *Cheney*, 542 U.S. at 380–81). Therefore, it is hereby

**ORDERED** that the unopposed motion for leave to file an amicus brief of the Center for Victims of Torture, amicus curiae, is **GRANTED**; and it is

**FURTHER ORDERED** that the transmittal letter for forwarding charges, App. Ex. 0032.001 (NUR), Attach. E (Oct. 8, 2019), and the legal review constituting the pretrial advice, App. Ex. 0032.001 (NUR), Attach. G (Jan. 13, 2021), are **UNSEALED**; and it is

**FURTHER ORDERED** that the petition for a writ of mandamus and prohibition seeking vacatur of the military judge's ruling issued on October 6, 2022, and dismissal of the referral with prejudice is **DENIED**.

FOR THE COURT:

Mark Harvey
Clerk of Court, U.S. Court of Military
Commission Review

ATTACHMENT B

## MILITARY COMMISSIONS TRIAL JUDICIARY
## GUANTANAMO BAY, CUBA

| | |
|---|---|
| | **AE 0032.010 (TJ)** |
| **UNITED STATES OF AMERICA** | |
| v. | **RULING** |
| **ENCEP NURJAMAN;** **MOHAMMED NAZIR BIN LEP;** **MOHAMMED FARIK BIN AMIN** | **Defense Motion** to Dismiss Due to Prosecution Use of Prohibited Evidence Obtained by Torture |
| | **6 October 2022** |

**1. Procedural History**.

a. On 14 March 2022, Counsel for Mr. Nurjaman filed a Motion to Dismiss[1] with prejudice all charges and specifications in this case. In the alternative, Mr. Nurjaman requested dismissal without prejudice accompanied by permanent disqualification of the Office of the Chief Prosecutor (OCP) and the Office of the Convening Authority (OCA) from involvement in any future prosecution against him. The Defense argued that the Government committed prosecutorial misconduct due to the use of prohibited torture-derived evidence in their referral package to the OCA.

b. On 21 April 2022, the Government requested the Commission deny Mr. Nurjaman's request for relief.[2] The Government argues that the CA was presented with sufficient independent evidence to find reasonable grounds to believe the Accused committed triable offenses. The Government argues that Mr. Nurjaman has failed to meet his burden to establish entitlement to the requested relief.

---

[1] AE 0032.001 (NUR), Defense Motion to Dismiss Due to Prosecution Use of Prohibited Evidence Obtained by Torture, filed 14 March 2022.

[2] AE 0032.004 (GOV), Government Response to AE 0032.001 (NUR), Defense Motion to Dismiss Due to Prosecution Use of Prohibited Evidence Obtained by Torture, filed 21 April 2022.

A52

c. The Defense filed a reply[3] on 5 May 2022. Mr. Nurjaman renewed his requests in AE 0032.001 (NUR) and argued that only dismissal of the charges can adequately address the issue concerning the use of illegal evidence to support the preferral and referral of charges. Upon the Defense's request, counsel for Mr. Nurjaman was granted permission to amend AE 0032.007 (LEP) and to file the amendment out of time. Mr. Nurjaman filed his amended pleading[4] on 12 May 2022.

**2. Findings of Fact.**

a. The charges before this Commission were preferred on 5 April 2019. On 8 October 2019, the charges, along with a referral binder containing evidentiary documentation, were transmitted to the CA for his consideration. The referral binder included a "cover sheet" delineating "each element of each specification with pinpoint citations to the corresponding evidence."[5] The evidentiary documentation included more than 1,300 pages of supporting documents. Charges were referred to Military Commission on 21 January 2021.

b. Tab D of the referral binder is a nine-page excerpt from the National Commission on Terrorist Attacks Upon the United States, The 9/11 Commission Report (2004) ("The 9/11 Commission Report").[6] Specifically, the excerpt includes Subchapter 5.1 "Terrorist Entrepreneurs" which profiles Khalid Sheikh Mohammed (KSM), Riduan Isamuddin (Hambali), and Abd Al Rahim Al Nashiri.[7] A pull-out text box titled "Detainee Interrogation Reports" states that the authors of Chapter 5 relied heavily on information from captured al Qaeda members. The

---

[3] AE 0032.007 (NUR), Defense Reply to AE 0032.004 (GOV), Government Response to AE 0032.001 (NUR), Defense Motion to Dismiss Due to Prosecution Use of Prohibited Evidence Obtained by Torture, filed 5 May 2022.
[4] AE 0032.007 (AMEND) (NUR), Amendment* to Defense Reply to AE 0032.004 (GOV), Government Response to AE 0032.001 (NUR), Defense Motion to Dismiss Due to Prosecution Use of Prohibited Evidence Obtained by Torture, filed 12 May 2022.
[5] AE 0032.004 (GOV), Government Response to AE 0032.001 (NUR), Defense Motion to Dismiss Due to Prosecution Use of Prohibited Evidence Obtained by Torture, filed 21 April 2022, page 2.
[6] AE 0032.004 (GOV).
[7] AE 0032.001 (NUR), Att. C (filed under seal).

A53

authors accessed this information from intelligence reports that were "based on communications received from the locations where the actual interrogations take place."[8] Of the nine-pages, the Government highlighted the section titled "Hambali", which included the last 11 lines of text on page 150, all of page 151, and 5 lines of text on page 152.[9] There are seven footnotes in this subchapter – all but one of them cite to intelligence reports.[10] The cited intelligence reports are dated from December 2001 to April 2004[11], prior to the transfer of the Accused to Guantanamo Bay in September 2006.[12]

c. In 2004, the Report of the Senate Select Committee on Intelligence Committee Study of the Central Intelligence Agency's Detention and Interrogation Program ("SSCI Report")[13] was published. The SSCI Report provides details concerning the enhanced interrogation techniques ("EITs") which were used in interrogations conducted during the time period of the cited intelligence reports in the 9/11 Commission Report.[14] According to the U.S. Court of Appeals for the District of Columbia Circuit "[s]ome of these techniques allegedly constituted torture under United States and international law."[15]

d. The excerpt from the 9/11 Commission Report (or Tab D) of the referral binder is cited as proof of 2 elements: (1) the "hostilities" element for each charged offense and (2) an element for the conspiracy charge. In addition to citing to the 9/11 Report, the Government cited to

---

[8] *Id.*
[9] *Id.*
[10] AE 0032.001 (NUR), Attachment D.
[11] *Id.*
[12] AE 0032.001 (NUR), page 7.
[13] Senate Report 113-288 - Report of the Senate Select Committee on Intelligence Study of the Central Intelligence Agency's Detention and Interrogation Program, dated 9 December 2014.
[14] See AE 0032.001 (NUR), Attachments D.
[15] In Re: Abd Al-Rahim Hussein Muhammed Al-Nashiri, SEPT 2, 2022, page 2.

23 additional sources to support the hostilities element and 5 additional sources to support the conspiracy element.[16]

**3. Law and Analysis.**

    a. <u>Applicability of 10 U.S.C. § 948r(a) to Referral Process.</u>

        (1) The Defense argues the Government improperly included the excerpt of the 9/11 Commission Report in the "referral binder." The referral binder was presented to the Convening Authority along with the charges on 8 October 2019.  The Convening Authority reviewed and considered the documents contained in the referral binder when making his referral determination.[17] Relying on the SSCI Report, the Defense concludes the 9/11 Commission Report relied on statements obtained by torture. For purposes of resolving this motion, the Commission finds the section of the SSCI Report in the referral binder contained citations to statements which were obtained by the use of torture or by cruel, inhuman or degrading treatment.

        (2) 10 U.S.C. § 948r(a) states "No statement obtained by the use of torture or by cruel, inhuman, or degrading treatment … shall be *admissible* in a military commission under this chapter, except against a person accused of torture or such treatment as evidence that the statement was made." While the Defense argues that the statute "strictly prohibited"[18] the use of statements obtained by the use of torture, a plain reading of the statute does not support this argument. Rather than provide for a strict prohibition, the statute references the admissibility of statements within a military commission. The Commission finds this term instructive on how, or if, such evidence may be utilized in other ways, to include the referral process. While the defense

---

[16] AE 0032.004 (GOV), page 5.
[17] AE 0032.004 (GOV) at 2.
[18] AE 0032.001 (NUR) at 2.

correctly highlights that the relevant statute is located in the Military Commissions Act, titled "Pre-Trial Procedures,"[19] its argument proves too much. Even if the Commission were to conclude that the mere placement of the statute in this section is sufficient to overcome the plain reading of the statute, the prohibition the Defense seeks would not apply to the referral process. A military commission forms after the referral of charges[20] and as such, the statute does not apply to the referral stage. Simply based on the reading of the statute, there is no violation of § 948r(a).

(3) However, given the government position taken in a recent appellate court case, the inquiry into the impact of the inclusion of the SSCI Report in the referral packet cannot be resolved by interpreting the statute alone.

(4) Subsequent to the referral of charges in this Commission (21 January 2021), attorneys representing the United States before the United States Court of Appeals for the District of Columbia have taken a more expansive positon in regards to § 948r(a) when responding to a Writ of Mandamus filed in a different Military Commission. In its Opposition Brief which was filed 31 January 2022, the Government represented by Department of Justice attorneys and the Interim Chief Prosecutor of the Military Commissions stated:

> "In the absence of direct authority interpreting Section 948r(a), the government took the position below that Section 948r(a)'s prohibition on admission of statements obtained through torture or cruel, inhuman, or degrading treatment applies only to the trial and sentencing phases of a military commission and not to pretrial proceedings. Since that filing, the government has reconsidered its interpretation of Section 948r(a) and, as a result of that review, has concluded that Section 948r(a) applies to all stages of a military commission case, including pretrial proceedings. In accordance with that conclusion, the

---

[19] AE 0032.007 (NUR) (Amend), filed 12 May 2022, page 3 (footnote 5).
[20] *See* R.M.C. 504(a) "A military commission is created by a convening order of the convening authority."; R.M.C. 601 "Referral is the order of a convening authority that charges against an accused will be tried by a specified military commission.:"; *U.S. v. Tonev*, No. NMCCA 200200935, 2004 CCA LEXIS 101, at *1 (N-M Ct. Crim. App. Apr. 19, 2004)

A56

government will not seek admission, at any stage of the proceedings, of any of petitioner's statements while he was in CIA custody."[21]

On 2 September 2022, the United States Court of Appeals for the District of Columbia Circuit dismissed the petition for Writ of Mandamus for lack of jurisdiction. Specifically, the appellate court, citing the government position set out above, found it lacked jurisdiction as the issue was moot.[22]

(5) The Government's current position is that § 948r(a) applies to *all stages of a military commission case*. It is important to note the Government position at the time of referral was that § 948r(a) applied "only to the trial and sentencing phases of a military commission and not to pretrial proceedings."[23] Therefore, at the time of the referral, the inclusion of the 9/11 Commission Report in the referral binder was not in violation of § 948r(a). A violation of § 948r(a) can only be found if the new Government position was applied retroactively. For purposes of determining whether or not there was a defective referral, the Commission will assume the new Government position retroactively applies to the referral process in this case.

b. Defective Referral.

(1) Even with a finding that the inclusion of the SSCI Report in the referral binder was a violation of § 948r(a), the Accused is not entitled to the relief sought. When faced with challenges to charging decisions that may have been based on impermissible or improper evidence, courts have concluded the charging decision is valid as long as "there was sufficient other [evidence] to support" the decision.[24]

---

[21] In Re: Abd Al-Rahim Hussein Muhammed Al-Nashiri, SEPT 2, 2022, page 4.

[22] *Id.* at pages 5-8. This Commission notes the appellate court does not, in fact, make a determination on the legality of section 948r(a) *applying at all stages of a military case*. Rather, the court finds the question in front of it is mooted given the Government position.

[23] AE 0032.001 (NUR), Tab F, page 11 of 37.

[24] *Coppedge v. United States*, 311 F.2d 128, 131 (D.C. Cir. 1962)

(2) The referral binder in this commission contained in excess of 1,300 pages of evidence. The excerpt of the SSCI Report, or Tab D, merely contained nine-pages. Of these nine-pages, less than two of those pages were highlighted for the convening authority. In its response, the Government acknowledges that it cited to the 9/11 Commission Report excerpt to support the "hostilities" and "conspiracy" elements. For the hostilities element, the Government references 23 other additional sources other than Tab D which support the hostility element.[25] For the conspiracy element, the Government references six other additional sources other than Tab D which support the conspiracy element.[26] After reviewing the Government response and the evidence provided by the Government, this Commission finds there was sufficient evidence other than the nine-page excerpt of the SSCI Report to support the referral decision of the CA.

(3) The Commission further finds the inclusion of nine-page excerpt of the SSCI Report in the referral binder (assuming the inclusion was in fact a violation of § 948r(a)) does not support the requested relief by the Defense. In determining the impact of a defective referral for courts-martial, military courts require a showing that the defect "materially prejudiced the substantial rights of an accused."[27] The M.C.A. § 950a(a) expresses the same test as used by the military courts and thus, this Commission will use it in evaluating the alleged deficiency in referral. While the Defense claims "[t]he prejudice resulting from the use of information obtained by torture when referring charges in this case is clear and apparent"[28], the Defense does not convincingly provide concrete examples of the "clear and apparent" prejudice. The Defense claims that Government tried to "unlawfully bolster" their case by including the

---

[25] *See* AE 0032.004 (GOV), page 7 & Tabs F-S.
[26] *See* AE 0032.004 (GOV), page 7-8 & Tabs F, G, T-V.
[27] Article 59, UCMJ (10 U.S.C.A. § 859); United States v. Loving, 41 M.J. 213 (C.A.A.F. 1994); United States v. Murray, 22 M.J. 700 (A.C.M.R. 1986).
[28] AE 0032.001 (NUR), page 20.

excerpt from the SSCI Report[29] and that the inclusion of the Report was "highly prejudicial". The Commission is not convinced by Defense's arguments, nor does it find that the inclusion of the excerpt from the SSCI Report "materially prejudiced the substantial rights" of the Accused.

     c. Prosecutorial Misconduct.

     (1) Defense asserts the Prosecution committed prosecutorial misconduct by including excerpts from the SSCI Report in the referral binder. The Defense states, "Prosecutorial misconduct occurs when trial counsel "overstep[s] the bounds of that propriety and fairness which should characterize that conduct of such an officer in the prosecution of a criminal offense."[30] "Prosecutorial misconduct can be generally defined as action or inaction by a prosecutor in violation of some legal norm or standard, e.g. a constitutional provision, a statute, a Manual rule, or an applicable professional ethics cannon."[31] Furthermore, the "prosecutorial misconduct inquiry is an objective one, requiring no showing of malicious intent on behalf of the prosecutor."[32]" For purposes of this ruling, the Commission will accept the Defense's standard for prosecutorial misconduct.

     (2) The bases of the Defense's allegation of prosecutorial misconduct is the alleged violation of 10 U.S.C. § 948r(a). As stated above, the plain language of § 948r(a) does not support a finding that the use of statements obtained by torture is strictly prohibited in pretrial proceedings. In order to strengthen its argument, the Defense cites to the Government position first taken in the Government Opposition Brief filed in the United States Court of Appeals for the District of Columbia.[33] This brief was filed on 31 January 2022 – a year after the

---

[29] *Id.* at page 21.
[30] AE 0032.001 (NUR), Defense Motion to Dismiss Due to Prosecution Use of Prohibited Evidence Obtained by Torture, filed 14 March 2022.
[31] *Id.*
[32] *Id.*
[33] In Re: Abd Al-Rahim Hussein Muhammed Al-Nashiri, SEPT 2, 2022, pages 5-8.

A59

current case was referred. In the brief, the Government attorney clearly stated the original position of the attorneys was that § 948r(a) did not apply to pretrial proceeding and that the change in position for the Government occurred between September 2021 and the filing of the brief on 31 January 2022. The Commission finds the actions of the Prosecution during the referral process, as well as the legal advice provided by the legal advisor, did not constitute prosecutorial misconduct.  Therefore, there is no basis to disqualify the Office of the Chief Prosecutor and/or the Office of the Convening Authority.

**4. Ruling**. The Defense motion set forth in AE 0032.001 (NUR) is **DENIED**.

So **ORDERED** this 6th day of October, 2022.


*//s//*
HAYES C. LARSEN
CAPT, JAGC, USN
Military Judge

# ATTACHMENT C

## SUMMARY OF ADDITIONAL EVIDENCE: HOSTILITIES

| Source[1] | Tab[2] | Attach.[3] | Page[4] | Statement[5] |
|---|---|---|---|---|
| Khalid Shaikh Mohammad (KSM) | G | U | 9 | KSM sent potential suicide operative Zacharias Moussaoui to Southeast Asia to assist Nurjaman. |
| KSM | G | U | 16–20 | KSM sent money to Nurjaman to carry out terrorist operations. |
| | | | | |
| Faiz Bafana | H | Q | 7 | Nurjaman was the leader of Mantiqi I. |
| Faiz Bafana | H | Q | 9–10 | Nurjaman met with KSM. |
| Faiz Bafana | H | Q | 10–11 | Nurjaman plotted an attack against U.S. persons in Singapore. At Nurjaman's direction, Faiz Bafana delivered operational proposal to al Qaeda leadership in Afghanistan. Al Qaeda sent $20,000 to fund JI operation. |
| Faiz Bafana | H | Q | 19, 25 | Nurjaman was involved in a plot targeting the U.S. Embassy in Manila. |
| Faiz Bafana | H | Q | 25 | Nurjaman directed that an operation in Indonesia be quickly executed following death of al Qaeda leader Abu Hafs. |
| Faiz Bafana | H | Q | 30 | Nurjaman served as the connection between al Qaeda and JI. |
| | | | | |
| Hashim Abbas | P | R | 2 | UBL's fatwa was the impetus for JI conducting terrorist operations. |
| Hashim Abbas | P | R | 2 | Nurjaman directed Hashim Abbas and his training group to find targets against U.S. interests. |
| Hashim Abbas | P | R | 3–4 | Hashim Abbas's "Special Group" reported directly to Nurjaman and conducted surveillance operations in Singapore. The video was eventually delivered to al Qaeda leadership in Afghanistan. |

---

[1] The individual identified in this column is the source of the information set forth in the "Statement" column.

[2] The letter in this column corresponds with the identified tab in the "Referral Binder" that the Prosecution provided to the Convening Authority.

[3] The letter in this column corresponds with the identified Attachment to this response.

[4] This column refers to the page number within each Attachment.

[5] This column summarizes excerpts of particular relevance drawn from the referenced document that the Prosecution provided to the Convening Authority. For further context, the complete document is attached separately to the response.

| Source[1] | Tab[2] | Attach.[3] | Page[4] | Statement[5] |
|---|---|---|---|---|
| Hashim Abbas | P | R | 5 | Nurjaman created an "operations ready" group led by Hashim Abbas. |
| | | | | |
| Muhammad Rais | Q | N | 2–3 | Nurjaman facilitated Rais's travel to Afghanistan where Rais learned to kill Americans. |
| Muhammad Rais | Q | N | 4 | Nurjaman told Rais that Rais's military training would be with al Qaeda. |
| Muhammad Rais | Q | N | 4 | Nurjaman discussed UBL's fatwa with Rais. Nurjaman identified the United States as the main enemy. |
| Muhammad Rais | Q | N | 5, 7 | Al Qaeda leadership (UBL, Abu Hafs, Al-Zawahiri) preached that the United States was the enemy. |
| Muhammad Rais | Q | N | 10–13 | Rais prepared explosives that were ultimately used in the JW Marriott bombing. Rais assisted the eventual suicide bomber and four other named co-conspirators in the planning and preparation stage. |
| | | | | |
| Bin Lep | R | F | 2 | Nurjaman arranged for Bin Lep's military training at al Qaeda camp in Afghanistan. |
| Bin Lep | R | F | 4 | Nurjaman selected Bin Lep to swear bayat to UBL. Bin Lep, Bin Amin, and others met with UBL, swore bayat, and agreed to participate in an operation which they believed would target the United States. |
| Bin Lep | R | F | 4, 10 | Bin Lep considered himself to be a member of al Qaeda. |
| Bin Lep | R | F | 5 | Nurjaman's purpose was to serve as the leader ensuring operations were conducted in accordance with Islamic law. |
| Bin Lep | R | F | 7 | Nurjaman identified Americans as targets. |
| Bin Lep | R | F | 7 | The Bali bombing was carried out by Nurjaman's group. |
| Bin Lep | R | F | 7 | Bin Lep facilitated money transfers from al Qaeda to Nurjaman. |
| Bin Lep | R | F | 9 | Nurjaman told Bin Lep that money from al Qaeda was delivered to JI bomb maker Dr. Azahari. |
| | | | | |
| Bin Amin | S | G | 3 | Bin Amin attended al Qaeda military training with Bin Lep. |

| Source[1] | Tab[2] | Attach.[3] | Page[4] | Statement[5] |
|---|---|---|---|---|
| Bin Amin | S | G | 5 | Nurjaman was the leader of Southeast Asians in Afghanistan and ran the guesthouse used by those attending military training. |
| Bin Amin | S | G | 5 | Nurjaman asked Bin Amin to participate in a martyrdom operation. Bin Amin agreed and traveled with Bin Lep and two others to swear bayat to UBL. Bin Amin and the others told UBL they would participate in an operation which they assumed would target America. |
| Bin Amin | S | G | 7–9 | Bin Amin facilitated money transfers from al Qaeda to Nurjaman. |
| Bin Amin | S | G | 9 | Bin Amin considered himself a member of al Qaeda. |
| Bin Amin | T | V | 6 | Bin Amin facilitated money transfers from al Qaeda to Nurjaman for operations. |
| Bin Amin | T | V | 6 | Nurjaman met with JI bomb maker Dr. Azahari regarding the Bali operation. |
| Masran Bin Arshad | X | O | 2 | Nurjaman ran the guesthouse used by JI members who were in Afghanistan for military training. |
| Masran Bin Arshad | X | O | 2 | Nurjaman arranged military training in Afghanistan for Masran, Bin Lep, and Bin Amin. |
| Masran Bin Arshad | X | O | 3 | Nurjaman arranged for Masran, Bin Lep, Bin Amin, and one other operative to meet with UBL. Nurjaman, who was in charge as the senior man, gave the order to meet with UBL so they could become stronger in jihad. At the meeting, they swore bayat to UBL and agreed to fight for Islam. |
| Masran Bin Arshad | X | O | 3 | Nurjaman sent Masran to meet with KSM to obtain funds and instructions for the operation. KSM instructed Masran to courier money to Nurjaman. KSM said there was another 9/11 operation planned for California. |
| Masran Bin Arshad | X | O | 3 | UBL was the spiritual leader but specific orders came from KSM and Nurjaman. |
| Ja'afar Bin Mistooki | AA | P | 5 | Nurjaman arranged for Mistooki's travel to Afghanistan for military training. |
| Ja'afar Bin Mistooki | AA | P | 6 | Nurjaman chose Mistooki to participate in a bombing operation against churches in Indonesia. |

| Source[1] | Tab[2] | Attach.[3] | Page[4] | Statement[5] |
|-----------|--------|------------|---------|--------------|
| Bin Lep | WW | S | 4 | Bin Lep completed military training at an al Qaeda camp in Afghanistan. |
| Bin Lep | WW | S | 4–5 | Bin Lep traveled with Bin Amin and others to meet with, and swear bayat to, UBL. |
| Bin Lep | WW | S | 5 | Nurjaman, Bin Lep, and Bin Amin discussed potential U.S./Western targets in Thailand with JI bomb maker Dr. Azahari. |
| Bin Lep | WW | S | 6 | Nurjaman sent money to JI bomb maker Dr. Azahari for attacks against U.S. Government, military, or business targets. |

ATTACHMENT D

|  | **AE 467CCC** |
| **UNITED STATES OF AMERICA** | **RULING** |
| v. | **Defense Motion** to Suppress Custodial Statements Allegedly made by Mr. Al-Nashiri in January, February, and March 2007 |
| **ABD AL RAHIM HUSSAYN MUHAMMAD AL NASHIRI** | **18 August 2023** |

1. **Procedural Background**.

   a. On 17 February 2022 in AE 467, the Defense moved the Commission to suppress custodial statements made by the Accused to U.S. government officials from January to March 2007 under 10 U.S.C. § 948r. The Government opposed the motion in AE 467C on 22 March 2022. The Defense replied in AE 467F on 12 April 2022.

   b. The Commission held evidentiary hearings on AE 467 from July 2022 through June 2023 and heard oral argument following the presentation of evidence on 30 June 2023 at United States Naval Station Guantanamo Bay, Cuba (NSGB).

   c. Additional procedural history described in the Commission's rulings at AEs 467J, 467S, and 467SS is hereby incorporated by reference.

2. **Burden of Proof**. "When an appropriate motion or objection has been made by the defense under [Military Commission Rule of Evidence (M.C.R.E.) 304], the prosecution has the burden of establishing the admissibility of the evidence" by a preponderance of the evidence. M.C.R.E. 304(d).

3. **Findings of Fact.**[1]

## I. RDI Program

a.   In the aftermath of the terrorist attacks on the United States perpetrated on 11 September 2001, the Central Intelligence Agency (CIA) developed the Rendition, Detention, and Interrogation (RDI) program to gather intelligence from suspected terrorists captured during the so-called war on terror. As a part of the RDI program, the CIA developed, with the approval of the Department of Justice (DOJ), a list of "Enhanced Interrogation Techniques" (EITs) to be used during interrogations of terrorism suspects. It was assumed that the use of such techniques would assist in the gathering of useful intelligence from terrorist operatives who were otherwise trained to resist interrogation.

b.   The EITs adopted by the CIA were based on techniques employed in a training environment in U.S. military SERE[2] training. SERE training was designed to expose U.S. military personnel to the types of coercive interrogation techniques that have been employed in the past by communist adversaries such as North Korea, the Soviet Union, and China. SERE training mimics the exploitative communist model in order to equip U.S. servicemembers with the ability to resist should they be taken captive. Service members in positions with increased risk of capture are trained at SERE schools. During the training, these service members are "captured" by course cadre performing the roles of enemy captors. Captured students are subjected to examples of harsh treatment and the use of coercive interrogation techniques by the simulated enemy while being subjected to other physical and psychological pressures.

---

[1] *See* AE 467DDD for additional classified findings of fact.
[2] "SERE" stands for Survival, Evasion, Resistance, and Escape.

c.   The goal of the communist techniques was to gain the compliance of subjects, more so than to gather useful intelligence. Instead, harsh techniques were used to extract false confessions and to create propaganda through the infliction of severe mental pain or suffering. For example, waterboarding and sleep deprivation, going back to antiquity, have been used in political or religious persecutions to elicit recantations or confessions. Such techniques do not elicit reliable information.

d.   In developing the RDI program, the CIA contracted with two staff psychologists from the U.S. Air Force SERE school, Doctor James Mitchell and Doctor Bruce Jessen. During their employment at the Air Force SERE school, Drs. Mitchell and Jessen were responsible for monitoring the mental health of the cadre administering the course and the servicemembers going through the course. Both Mitchell and Jessen were highly familiar with the SERE techniques as well as the techniques used by foreign adversaries. However, neither Mitchell nor Jessen were trained interrogators.

e.   The CIA employed Drs. Mitchell and Jessen to implement a program of interrogation for use on high-value detainees (HVDs) in CIA custody. The objective of the program was to service CIA intelligence requirements. In so doing, the program officers sought to put detainees in a "compliance condition"[3] and to force the detainees to answer questions from debriefers. In the event a detainee in the program was not providing the type, amount, or quality of information the agency desired, EITs would be employed—or escalated—in an attempt to extract that information.

f.   In the words of Dr. Mitchell (AE 467AA), the approved EITs included:[4]

---

[3] Unofficial/Unauthenticated Transcript of the *United States v. Nashiri* Motions Hearing dated 2 May 2022 at 16852.
[4] The use of insects and mock burial were considered for use with Abu Zubaydah, but not the Accused.

~~CONFIDENTIAL//NOFORN~~

Below are the descriptions of potential physical and psychological pressures discussed in the July 8, 2002 meeting. The aim of using these techniques is to dislocate the subject's expectations concerning how he is apt to be treated and instill fear and despair. The intent is to elicit compliance by motivating him to provide the required information, while avoiding permanent physical harm or profound and pervasive personality change.

1. Attention Grasp:
In a controlled and quick motion, grasp the individual with both hands, one on each side of the collar opening. In the same motion, draw the individual toward you.

2. Walling: The individual is stood in front of a specially constructed flexible wall. The individual's heels touch the wall. The individual is pulled forward and then quickly and firmly pushed into the wall. The head and neck are supported with a rolled hood or towel that provides a c-collar effect to help prevent whiplash. Contact with the wall is made with the individual's shoulder blades. To reduce the probability of injury, the individual is allowed to rebound from the wall.

3. Facial Hold: One open palm is placed on either side of the individual's face, fingertips well away from the individual's eyes. The goal is to hold the head immobile.

4. Facial Slap (Insult Slap): The slap is delivered with fingers slightly spread. Contact should be made with the area directly between the tip of the chin and the bottom of the corresponding earlobe. The goal of the facial slap is to induce shock and surprise, not severe pain.

5. Cramped Confinement: Individuals are placed in a confined space the dimension of which restricts movement. The container is usually dark. Individuals may be kept in larger confinement spaces for up to 18 hours, and smaller confinement boxes for one hour.

6. Wall Standing: This technique is used to induce fatigue. The individual stands approximately 4 or 5 feet from a wall, with his feet spread approximately shoulder width. With arms out stretched in front, fingers resting on the wall supporting body weight. Individuals are not allowed to move or reposition their feet or hands.

7. Stress Positions: A variety of stress positions are possible. They focus on producing mild physical discomfort from prolonged muscle use, rather than pain associated with contortions or twisting of the body. The two discussed were (1) the subject sitting on the floor with legs extended straight out in front of him with his arms raised above his head; and (2) having the subject kneel on the floor and lean back at a 45 degree angle.

8. Sleep Deprivation: Preventing sleep is intended to have the effect of reducing the subject's ability to think on his feet secondary to fatigue and to motivate him to cooperate because of the discomfort associated with sleep debt. For most people, the effects of sleep deprivation remit after one or two nights of uninterrupted sleep. In rare circumstances, individuals predisposed to psychological problems may display abreactions, but these too generally remit after the individual sleeps. The record (Guinness Book of World Records) for voluntary sleep deprivation is 205 hours with the subject showing no significant psychological problems and quick recovery after one or two days of sleep.

9. Water Board: With this procedure, individuals are bound securely to an inclined bench. Initially a cloth is placed over the subject's forehead and eyes. As water is applied in a controlled manner, the cloth is slowly lowered until it also covers the mouth and nose. Once the cloth is saturated and completely covering the mouth and nose, subject would be exposed to 20 to 40

CONFIDENTIAL//NOFORN

seconds of restricted airflow. Water is applied to keep the cloth saturated.
After the 20 to 40 seconds of restricted airflow, the cloth is removed and the
subject is allowed to breath unimpeded. After 3 or 4 full breaths, the
procedure may be repeated. Water is usually applied from a canteen cup or
small watering can with a spout.

10: Use of Diapers: The subject appears to be very fastidious. He spend much
time cleaning himself and seems to go out of his way to avoid circumstances
likely to bring him in contact with potentially unclean objects or material.
He is very sensitive to situations that reflect a loss of status or are
potentially humiliating. One way to leverage his concerns, while helping
ensure his wound doesn't become infected with human waste when in cramped
confinement is to place him in an adult diaper. If soiled, care would have to
be taken to keep human waste out of his leg wound.

11. Insects: The subject appears to have a fear of insects. One possibility is
to threaten to place stinging insects into the cramped confinement box with
him, but instead place harmless insects. The purpose of this would be to play
off his fears and increase his sense of dread and motivate him to avoid the box
in the future by cooperating with the interrogator's requests.

12. Mock Burial: The individual is placed in a cramped confinement box that
resembles a coffin. The box has hidden air holes to prevent suffocation. The
individual is moved to a prepared site where he hears digging. The site has a
prepared hole, dug in such a way that the box can be lowered into the ground
and shovels of dirt thrown in on top of it without blocking the air holes or
actually burying the individual. This procedure would be used as part of a
threat and rescue scenario where the "burial" is interrupted and the subject is
rescued by a concerned party. The rescuers then use the subject's fear of
being returned to the people trying to bury him as a means of pressuring the
subject for information.

Hope this helps.

Jim Mitchell

Sent on 8 July 2002 at 04:15:15 PM

g.   Using a combination of classical and operant conditioning, the interrogators intended to provoke compliance in the form of an involuntary stimulus response in the detainee following their cues. According to Dr. Jessen, the goal of the program was to deprive detainees of creature comforts to cause them to consider their dilemma and wonder if maybe they could find a way out. Essentially, the interrogator's goal was to cause detainees discomfort leading to compliance.

h.   After a determination was made that a detainee was providing enough useful information to be considered compliant and cooperative, he would be transitioned into debriefing mode. This occurred either after an interrogation or after the application of EITs, depending on the detainee's responsiveness. Once a detainee was deemed compliant, debriefers would come in to question him and to service intelligence requirements. The debriefers were not authorized to use EITs.

i.   The interrogators hoped EITs would only be necessary once; however, in practice, the techniques were used on several detainees, including the Accused, multiple times. Mitchell and Jessen believed, however, that going back to EITs after a detainee demonstrated compliance would lose a significant amount of goodwill in terms of the detainee's future compliance.

j.   Mitchell and Jessen's purpose for the EITs was to impart in the detainees a belief that the detainees themselves could end or even prevent their own suffering if they would comply and answer questions from the interrogator or debriefer. For example, Mitchell explained to the Accused that the Accused could stop the waterboarding by cooperating.

k.   After the EIT phase, detainees generally had a fear of going back into the EIT phase. Jessen described their program as creating a "contract" between the interrogators and detainees, whereby the interrogators made sure the detainees understood that they would not go back into

EITs if they continued to cooperate and provide intelligence. The interrogators wanted the detainee to realize that he had a "pathway" whereby, if he provided even a little information, he could start to find a way out of captivity. The interrogators tried to ensure the detainees understood the contract was valid and EITs would not happen unless the detainee became non-compliant again. Therefore, the threat of a return to the EIT phase continued to dangle over the heads of detainees such as the Accused like a proverbial sword of Damocles.

l.   The first person subjected to EITs was Abu Zubaydah, a detainee who was shot in the back during his capture and nearly died from his wounds. After receiving authorization to proceed with the EITs and allowing for some physical recovery, the CIA implemented its new program, overseen by Mitchell and Jessen, with full approval of CIA Headquarters. The plan implemented on Abu Zubaydah became the template for the plan used on the Accused. Present at the site during the implementation of the EITs on Abu Zubaydah was Federal Bureau of Investigation (FBI) Special Agent (SA) Stephen Gaudin, who participated in the interrogations. Agent Gaudin would later be part of the "clean team" tasked with taking the statement of the Accused which is before the Commission in this motion.

## II. The Accused's "Sojourn through Captivity"[5]

a.   The Accused was captured in the United Arab Emirates in mid-October 2002.[6]

b.   The Accused was suspected by the U.S. government of being an Al Qaeda operations planner who was involved in the 1998 East Africa Embassy bombings and the attack on the USS COLE in 2000.

---

[5] Transcript dated 14 April 2023 at 23894.
[6] U.S. Senate Select Committee on Intelligence, *Committee Study of the Central Intelligence Agency's Detention and Interrogation Program*, Executive Summary at 66 (2014) (hereinafter SSCI). As stated during oral argument, the Commission takes judicial notice of the SSCI Executive Summary with the consent of the parties.

c.    While still in foreign custody, the Accused provided information on multiple terrorist plots including the USS COLE and *MV Limburg*, as well as plans to attack oil tankers in the Strait of Hormuz and locations in Dubai and Jeddah. This information was disseminated in CIA intelligence reports prior to the Accused's transfer to U.S. custody.[7]

d.    The Accused was rendered to U.S. CIA custody at DETENTION SITE COBALT (Location 2) in November 2002. Standard operating procedures at COBALT during this period included total darkness, standing sleep deprivation, loud music, isolation, and dietary manipulation. Dr. Jessen saw paramilitary forces there and described it as "gloomy and dark,"[8] "very unpleasant,"[9] "deplorable,"[10] and "medieval."[11] It was very cold, and detainees were shackled to metal rings mounted in concrete walls. Detainees were held naked in their cells— which Dr. Mitchell described as "like a horse stall"[12]—with only a waste bucket.

e.    Detainee Gul Rahman died of exposure at COBALT after being left overnight in cold temperatures wearing only a sweatshirt and after having been doused in cold water.

f.    When the Accused arrived at COBALT, he was placed in a cell and shackled for approximately one hour before Dr. Mitchell approached him. Mitchell then asked a guard to bring the Accused into the interrogation room, which was a small room constructed out of plywood. The room contained bright halogen lights that would shine into the Accused's face. Dr. Mitchell then removed the Accused's hood and asked the Accused, "[w]hat would you like me to know about you?" Initially, the Accused was "perfectly willing" to talk about the USS COLE but

---

[7] SSCI at 73 n.373, 187.
[8] Transcript dated 13 April 2023 at 23743.
[9] *Id*. at 23702.
[10] *Id*. at 23751.
[11] *Id*. at 23742.
[12] Transcript dated 2 May 2022 at 16824.

refused to answer questions about future operations. Mitchell told the Accused that he wanted to hear about future threats. Mitchell told the Accused that the next time the Accused talked to someone they were going to ask him questions and if he answered those questions nothing bad would happen to him. The Accused was returned to his cell and shackled to the wall.[13]

    g.   The Accused was labeled as a "typical resister"[14] and Mitchell and Jessen nicknamed him "Little Shit."[15]

    h.   After only a few days at COBALT, the Accused was rendered to DETENTION SITE GREEN (Location 3), accompanied by Mitchell and Jessen. At GREEN, Abu Zubaydah was already being held and subjected to EITs. Upon his arrival at GREEN, the Accused was also interrogated using EITs, beginning with less-intrusive measures. The Accused was formally subjected to EITs during four periods: December 5–8, 2002; December 27, 2002 – January 1, 2003; and January 9–10 and 15–27, 2003.[16] The Government concedes that all statements of the Accused made during this time are inadmissible under 10 U.S.C. § 948r.

    i.   Use of EITs at GREEN included cramped confinement in large and small boxes. The Accused was often left naked in the boxes for hours at a time. The larger of the boxes was approximately the size of a coffin and the smaller was slightly larger than a miniature refrigerator. The temperature of the site was cold enough that the Accused could see condensation forming on the walls of the box. Mitchell and Jessen were actually under the impression that the Accused preferred going into the boxes because it provided a break from the lights, cold, and interrogators.

---

[13] *Id*. at 16823–31.
[14] Transcript dated 13 April 2023 at 23778.
[15] Transcript dated 14 April 2023 at 23895.
[16] SSCI at 67 n.338.

j.   On day one of the "aggressive interrogation phase," the Accused said he was ready to talk. Interrogators told the Accused that "they would do whatever it takes to get the information they wanted from him." *See* AE 402, Attach. C, Cable 2. The interrogators began using EITs on the Accused, including the attention grab and walling. His clothes were ripped off him by the security team. "[The Accused] whimpered that he would do anything the interrogators wanted." *Id*. Eventually interrogators warned the Accused that he would be left alone to consider the information the interrogators were seeking, and he was told that "if he refused to cooperate, he would suffer in ways he never thought possible." *Id*. Later that day, he was forcibly shaved by security staff while the Accused "moaned and wailed." He was then locked inside of the large box at 0445 hours.

k.   During the second session of day one, the Accused was pulled out of the large box at 1703 hours. He was backed against the "walling panel" in his cell, a rolled-up towel was placed around his neck, and the hood was slowly removed from his head, revealing his interrogator. His interrogator stood silent for 30 seconds, then "repeated with a hiss" that the interrogators wanted complete, accurate information from him. The Accused almost immediately again confessed to his role in the attack on the USS COLE. AE 402, Attach. C, Cable 3. When he did not provide additional information the interrogators were seeking, he was walled and placed in the small box. His interrogators were left "guardedly optimistic that the aggressive procedures may already be having an impact on [the Accused's] resistance posture." *Id*.

l.   So it went for the Accused. Each time the Accused was subjected to EITs, interrogators generally concluded he was "compliant and cooperative." However, CIA

Headquarters disagreed and instructed on-site officers to continue using EITs. When the Accused did not respond to certain questions, the interrogators escalated the measures.

m.   Eventually, Mitchell and Jessen turned, with CIA Headquarters' blessing, to the waterboard to try to obtain more information from the Accused. Waterboarding was conducted by strapping the Accused onto a medical gurney which would be angled down at a 40-degree angle at the head, such that the Accused's feet would be higher than his head. The Accused would have a neck brace put around his neck to hold his head in place. The interrogators would then cover the Accused's face with a thin piece of cotton fabric, like a towel, and pour water over the cloth for anywhere from 2–40 seconds at a time, usually starting with shorter "pours" and proceeding to longer "pours." Between pours, Mitchell would lift the cloth and talk to the Accused, then put the cloth back and the pouring would re-commence. After they reached a long pour, which may have gone on for 40 seconds, the gurney would then be lifted upright so the detainee could clear his sinuses and take at least three breaths. The interrogators would then lower the gurney and begin pouring again. This process would continue for up to fifteen minutes. The waterboarding of the Accused was administered by Mitchell with the assistance of Jessen. Mitchell conceded during his testimony that it would not have surprised him if the Accused experienced the sensation of drowning during the waterboard episodes.

n.   On one of the occasions where the Accused was subjected to waterboarding, he began to slide out of the straps onto the floor because he was too small in stature for the straps to hold him on the gurney. Mitchell described the Accused during waterboarding sessions as "anxious"[17] and "struggling."[18] Jessen described waterboarding as "visually and psychologically very

[17] Transcript dated 2 May 2022 at 16877.
[18] *Id*. at 16876.

uncomfortable for all of those involved."[19] In fact, Jessen described a waterboarding session of Abu Zubaydah in which some observers in the room cried while watching the procedure.

o.   The Accused was at GREEN for approximately three weeks. That site was also dark; there was no natural light. Temperature was manipulated to leave the Accused naked in a cold cell. Loud music was played in the cells. The cells were empty except for a waste bucket. The guards dressed in all black. The Accused was subjected to sleep deprivation. There were bars on the ceiling from which to hang detainees with their arms above their heads as part of standing sleep deprivation. Detainees were also short shackled to the floor.

p.   Interrogations at GREEN were videotaped, but these videotapes were taped over and later destroyed by the CIA in 2005[20] out of apparent fear of their discovery during legal proceedings.

q.   Like at COBALT, at GREEN the Accused was willing to talk about past events and information, but stated he had nothing to tell interrogators or debriefers about future plots.

r.   In December 2002, GREEN was closed, and the Accused and Abu Zubaydah were rendered to DETENTION SITE BLUE (Location 4). BLUE included bright lights, loud music, empty cells with waste buckets, nudity, and constant monitoring.

s.   Shortly after the Accused's arrival at BLUE, officers again judged him as compliant, cooperative, engaged, and willing to answer questions. Nevertheless, CIA Headquarters believed the Accused was withholding further actionable intelligence.

---

[19] Transcript dated 13 April 2023 at 23682.
[20] SSCI, Foreword at 4.

t.   After multiple debriefings, officers at BLUE wrote to headquarters that the Accused was providing "logical and rational" answers and that no further enhanced measures were needed. Headquarters disagreed again.

u.   CIA officer NX2, who at times was referred to as "the New Sheriff,"[21] took over the interrogation of the Accused, supervising several interrogators who used a series of unauthorized techniques. They placed the Accused in a standing stress position with his hands above his head for approximately two-and-a-half days. They put a pistol to the Accused's head and also threatened the Accused with a power drill. They slapped the Accused multiple times on the back of the head and blew cigar smoke in his face. At least one interrogator told the Accused that the Accused's mother could be brought in and sexually abused while the Accused was forced to watch.[22] The Accused was forcibly washed and scrubbed, including his buttocks and genitals, with a stiff boar brush which was then forced into the Accused's mouth. The Accused reported to Dr. Crosby, a defense expert on torture, that he was sodomized with the brush. Additionally, the Accused was also placed in "improvised" stress positions that caused cuts and bruises.

v.   One of these stress positions involved tying the Accused's elbows together behind his back with a belt and hanging him from them. On at least one occasion, the use of this stress position caused Mitchell to intervene because he believed the Accused's shoulders might become dislocated. Mitchell also witnessed NX2 put a broomstick behind the Accused's knees, force him to kneel, and then lean back, causing him extreme pain. He also saw people lean the Accused's head against the wall and then lean their own bodies on him, putting all the weight onto the

---

[21] Transcript dated 12 April 2023 at 23429.
[22] SSCI at 70.

Accused's neck. According to Mitchell, NX2 was using some of these unapproved measures not for operational reasons but because the Accused refused to call NX2 "sir."[23]

w.  During the use of the unapproved stress positions, Mitchell thought the CIA officers were going to hurt the Accused unnecessarily, which surprised him because the Accused was cooperating and providing useful answers. Mitchell testified that the Accused "looked like he was in pain . . . was hollering. He looked uncomfortable . . . he was in distress, that's for sure, and he was in pain."[24] Mitchell claims he unsuccessfully tried to intervene to prevent the use of unauthorized techniques against the Accused.

x.  While at BLUE, the Accused was put in a debriefing phase where he was debriefed by a female analyst. Mitchell sat in on the debriefing and encouraged the Accused to cooperate, reminding the Accused that they wanted to avoid any more "hard times"[25] if he failed to cooperate.

y.  Formal guidelines were promulgated in January 2003 following the death of Gul Rahman and the use of a gun and a drill to threaten the Accused.[26]

z.  Also in January 2003, Jessen arrived at BLUE to conduct a psychological assessment of the Accused for continued use of EITs. Following the assessment, Jessen developed an interrogation plan which authorized the full range of measures. According to the interrogation plan, once the interrogators had eliminated the Accused's "sense of control and predictability"

[23] Transcript dated 2 May 2022 at 16662.
[24] *Id*. at 16663.
[25] Transcript dated 3 May 2022 at 16951.
[26] SSCI at 62.

and established a "desired level of helplessness," they would reduce the use of EITs and return to debriefing mode.[27]

aa.  CIA Headquarters approved the plan to reinstitute EITs with the Accused, beginning with shaving him, cutting off his clothes, and placing him in standing sleep deprivation[28] with his arms affixed over his head. Cables describe the Accused during subsequent interrogations as nude, standing, handcuffed, and shackled.[29]

bb. After what the Accused experienced at BLUE at the hands of NX2 and his subordinates, Jessen described the Accused as angry and more unwilling to engage in dialogue. Jessen's presence and work with the Accused ultimately convinced the Accused to go down the road of cooperation again and continue fulfilling the terms of the contract between him and his debriefers.

cc.  Locations 3, 4, and 5 had bright lights, empty cells with only waste cans, shackling, stress positions, loud music, and solitary confinement. Location 5 had foreign guards and no physical pressures were used.

dd. Location 6 was a black site located at Echo II on NSGB, where the Accused was held from approximately late 2003 until early 2004. Evidence demonstrates that some detainees had access to fresh air, sunlight, socialization, and outdoor recreation for the first time at Location 6. However, it is unclear whether this was actually the case for the Accused.

---

[27] *Id*. at 71.
[28] Sleep deprivation—keeping the person awake—is used "to impact their will to continue to withhold information." Interrogators also used sleep interruption, whereby they allowed the detainee to sleep, but only for very short periods of time.
[29] *Id*. at 72.

ee.  Jessen conducted a "maintenance visit" with the Accused at Location 6 after an incident when the Accused made a mess in his cell and refused to clean it up. As a ploy to get the Accused to clean up the mess, Jessen had Abu Zubaydah brought to the Accused's cell and ordered him to clean up the Accused's mess. This was done to manipulate the Accused into cleaning up the mess. Because the Accused apparently felt guilty about Abu Zubaydah being forced to clean up the mess, the Accused cleaned it up himself.

ff.  The purpose of maintenance visits was to remind detainees to be compliant and to provide information to debriefers when requested. Maintenance visits served as a reminder to the Accused that a failure to cooperate would breach the contract and result in the possibility of returning to the "hard times," reimplementation of the EITs. Mitchell and Jessen believed their presence alone, given they had participated in the implementation of the EITs themselves, was enough to encourage compliance. They would also monitor debriefings, sometimes coming in and out of the room. Essentially, maintenance visits were intended to extend the impact of the physical duress applied to the Accused.

gg.  The Accused and other HVDs were moved out of NSGB in anticipation of the U.S. Supreme Court's potential ruling related to detainees in *Rasul v. Bush*, 542 U.S. 466 (2004).

hh.  Over the years, the Accused alleged that the CIA drugged his food and complained of pain and insomnia. He occasionally undertook hunger strikes, in his words, to protest being treated like an animal. At Location 6, the CIA responded to a hunger strike by "force feeding" him rectally.[30] As described in the context of his rectal feeding, "Ensure was infused into al-Nashiri 'in a forward-facing position (Trendlenberg) with head lower than torso.'"[31] Since the

---

[30] SSCI at 100 n.584.
[31] Unlubricated rectal examinations were part of the rendition intake process.

early twentieth century, medical knowledge has concluded that there is no medical reason to conduct so-called "rectal feeding." Although *fluids* can be absorbed through the rectum in emergencies, food or nutrition cannot.

ii. After leaving NSGB in mid-2004, the Accused was rendered to DETENTION SITE BLACK (Location 7). Conditions at BLACK included solitary confinement, constant light, sleep deprivation, attention grasp, and facial hold. Detainees could earn "amenities" and had access to showers for the first time in the program, being allowed to shower once a week.

jj. An October 2004 psychological assessment of the Accused was used by the CIA to discuss reaching an "endgame" for the program.[32] In June 2005, the Chief of Base at DETENTION SITE BLACK suspended debriefings of the Accused because it was rare for the Accused to recognize any photographs being shown to him and the repeat debriefings often caused outbursts.[33] In July 2005, the CIA was concerned that the Accused was depressed, uncooperative, and on the "verge of a breakdown."[34]

kk. In late 2005 the Accused was then rendered to DETENTION SITE VIOLET (Location 8), which also included solitary confinement and bright lights. There were no EITs, as Mitchell and Jessen concluded physical pressures were no longer necessary because the contract could be maintained with emotional and psychological coercion.

ll. Next, in mid-2006, the Accused was rendered to DETENTION SITE ORANGE (Location 9). ORANGE was an open compound, but detainees were still held in solitary confinement. Detainees had access to a library and food choices. This is where Jessen conducted

---

[32] SSCI at 114.
[33] *Id*. at 73 n.372.
[34] *Id*. at 114.

his last maintenance visit with the Accused sometime in 2006, the same year the Accused was transferred for the last time to Guantanamo Bay.

mm.  Locations 7, 8, and 9 were an improvement compared to 3, 4, and 5. Though the detainees remained in solitary confinement with constant bright lights, they got bunks in Location 7 and a real toilet in Location 9.

nn. Over the course of the Accused's time in the RDI program, the CIA disseminated 145 intelligence reports based on his debriefings. He provided information on past plots, associates, and Al Qaeda's structure and methods.[35]

oo. The Accused was transferred to NSGB on 5 September 2006. During this time, CIA officials diagnosed the Accused with anxiety and major depressive disorder.

pp. During the entirety of his time in the black sites, the Accused had no contact with anyone that was not either an employee or agent of the United States or another detainee. The Accused never knew where he was and was essentially held in solitary confinement for the better part of four years.

qq. Between 2002 and 2006 in the RDI program, the Commission finds that the Accused was subjected by the CIA to physical coercion and abuse amounting to torture as well as living conditions which constituted cruel, inhuman, and degrading treatment.

### III. Transfer to NSGB and the Accused's 2007 Statements

a.  In October 2006, after being transferred to NSGB, 14 HVDs including the Accused were allowed to meet with the International Committee of the Red Cross (ICRC). They all provided similar detailed accounts of the RDI program.[36] This was the Accused's first contact

---

[35] *Id*. at 73. *See also* AE 467F at 23 (stating the Accused was interrogated over 200 times).
[36] SSCI at 160.

with a person who was not an agent or employee of the United States since he was turned over to CIA custody in 2002.

b.   During the intervening period between September 2006 to March 2007, confinement conditions at NSGB improved slightly. For example, the Accused was permitted joint outdoor recreation time where he could communicate with one other detainee.[37]

c.   At least fifteen forced cell extractions (FCEs) of the Accused were conducted between November 2006 to March 2007. *See* AE 467ZZ. Not unlike how the contract operated in the RDI program, the guard force responded with the overwhelming physical force of FCEs to assert control over him when the Accused was non-compliant or misbehaved in some way.

## IV. Law Enforcement Interview

a.   FBI SA Steve Gaudin, Naval Criminal Investigative Service SA Robert McFadden, and Air Force Office of Special Investigations SA Kristen (Sendlein) Lange interviewed the Accused at Echo II, NSGB, from 31 January to 2 February 2007. During this time, an HVD prosecution task force was operating at NSGB with the goal of obtaining evidence for prosecution. Multiple detainees were being interviewed by various agencies during this time.

b.   The interview team had a DOJ attorney assigned to their team. The attorney monitored the interview and consulted with the agents on breaks.

c.   The agents reviewed intelligence products prior to the interviews in order to be able to demonstrate to detainees that the agents knew a lot about them. Federal agents from various organizations in the HVD prosecution task force had access to electronic systems containing intelligence products. Although some of those products included prior statements of the Accused

---

[37] *See* AE 467DDD for additional classified relevant facts.

and other detainees from the RDI program, many of the reports were not attributable to specific sources.

     d.   The room where the Accused was interviewed was a holding cell adjacent to an interview area with outdoor plastic furniture. The law enforcement agents were escorted to the interview by military members whose uniforms bore no identifying insignia. There is no evidence in the record that the Accused was given a choice about whether or not he would initially meet with the agents.

     e.   Inside the interview room, the Accused was shackled to the floor, but his hands were free. The Accused, however, appeared clean, healthy, and alert.

     f.   The agents began the interview by identifying themselves by name and agency. Gaudin was the lead, but because McFadden had so much experience in the USS COLE investigation, he was co-lead on questioning. Gaudin and McFadden both were proficient in Arabic. Gaudin took notes. Sendlein also asked some questions. FBI linguist John Elkaliouby acted as the interpreter for the interview.

     g.   At the start of the interview, the agents proceeded to go through a six-point admonishment form drafted specifically by the DOJ for the Accused. AE 518. The agents were instructed to verbally go through the form with the Accused but not to place it on the table or show it to the Accused.

     h.   The agents were instructed not to read *Miranda*[38] rights to the detainees they interviewed at NSGB, which Gaudin described as "not normal."[39] However, the agents were instructed to obtain a statement that could be used in a criminal or law enforcement prosecution

---

[38] *Miranda v. Arizona*, 384 U.S. 436 (1966).
[39] Transcript dated 12 August 2022 at 19335.

in a military court.[40] The Commission concludes that the agents were instructed not to give traditional *Miranda* warnings in order to increase the likelihood of obtaining incriminating information from detainees who were being considered for possible criminal charges and trial.

i.   First, the agents stated they did not work for and were independent from any organization that previously held the Accused.

j.   Second, they told the Accused he was in the legal custody of the Department of Defense (DOD) and he would not return to his previous captors. However, unbeknownst to the agents, after the 14 HVDs including the Accused arrived at NSGB in September 2006, they were held separately from other detainees and "remained under the operational control of the CIA."[41]

k.   Third, they told the Accused that he was not required to speak with them and that his being in the custody of the DOD was not conditional upon agreeing to speak with them. They explained to him that his speaking with the interviewing agents was voluntary and that the agents were at his pleasure as to if they would speak at all, when they would speak, as well as what they would speak about. They told the Accused they were aware he may have made prior statements but that they were "not interested" in the previous questioning or his previous answers. The agents also told the Accused that any statements he made could be used in court.

---

[40] *See* AE 496 at 9, "If the detainee asks whether any prior statements can be used against the detainee at a criminal proceeding, the agent should tell the detainee that decision will be made by the court if he is charged with a crime . . . Allegations of misconduct will not be included in this LHM." *See id*. at 17, referencing "FBI policy that *Miranda* warnings generally need not be given prior to interviews of [Department of Defense] detainees held at [NSGB]."
[41] SSCI at 160.

l. Fourth, the agents advised the Accused that the room where the interview was taking place may have been familiar[42] to him from his time in the custody of a different organization but that, even so, he was in DOD custody now.

m. Fifth, the agents asked the Accused if he was willing to answer questions. The Accused agreed to do so.

n. Lastly, the agents instructed the Accused, regarding any documents or photographs shown to him, that the agents did not care what he may have said in the past and they were only interested in his current answers.

o. The Accused acknowledged each point on the form as it was read, and Gaudin placed a checkmark next to each item on the form.

p. The agents were instructed, in the event that the Accused were to ask for an attorney, to tell him he was not entitled to one.

q. The agents did not tell the Accused that prior statements he made while in CIA custody and while being abused by the CIA interrogators could not be used against him in court.

r. The agents were instructed to include any allegations of mistreatment by detainees in a separate document recorded on a separate computer.[43]

s. During the interview, the Accused did state that he had been tortured and specifically mentioned waterboarding. He stated he had been hung from the ceiling for long periods of time, left naked to soil himself, and was submerged in water to the point he felt like he was drowning.

---

[42] The Accused was previously held in Echo II when it was a black site in 2003–2004. The FBI interview in 2007 actually occurred in the same complex—and perhaps even the same cell—where the Accused was subjected to abuses such as "rectal feeding."
[43] *See* AE 467, Attach. B; AE 467M.

t.  The agents and the Accused shared tea and pastries during the interviews, and the Accused was permitted to and did take breaks at his discretion. The interviews lasted approximately three to six hours per day, including breaks. The atmosphere during the interviews was cordial and friendly. The Accused generally appeared to be in good spirits during the interview.

u.  Throughout the interview process, the agents continued to remind the Accused after breaks that he did not have to speak with them. The Accused was generally informed that he was "in charge" or "the boss"[44] of the interview and that he could choose what they spoke about.

v.  None of the interviews of the Accused were recorded via audio or visual means. Additionally, no transcript was made of the interview. The only recording of what happened during the interviews is the Letterhead Memorandum (LHM) prepared by the agents, summarizing what the Accused said during the interviews, as well as individual agents' notes.

w.  During the three days of interviews, the Accused directly incriminated himself, providing extensive details regarding his direct role in the conspiracy that culminated in the attack on the USS COLE.

x.  At the end of the third day of interviews, the Accused told the agents that he did not want to continue the interviews as he had nothing more to say.

### V. Combatant Status Review Tribunal

a.  The Accused's Combatant Status Review Tribunal (CSRT) took place on 14 March 2007 on Camp Delta, NSGB. The CSRT was a fact-finding proceeding held so that tribunal members could determine whether a detainee should be classified as an enemy combatant.

---

[44] Transcript dated 11 August 2022 at 18998, 19074.

b.   The Accused was assigned a personal representative to assist him during the proceeding. The personal representative was not an attorney.

c.   The hearing took place in a prefabricated trailer with tables and chairs. Present in the room were the presiding officer, two other voting members of the tribunal, a recorder, and a court reporter. The Accused was then brought into the room with his personal representative and a translator.

d.   The Accused was advised of the following rights: the right to be present; the right to not be compelled to testify; the right to testify voluntarily either under oath or in an unsworn statement; the right to have a personal representative; the right to present evidence, including witnesses; the right to question witnesses; and the right to examine unclassified evidence. AE 467C, Attach. M.

e.   The hearing was recorded, and a verbatim transcript of the proceeding was created. AE 467C, Attach. M, N.

f.   The Accused appeared calm and alert at the CSRT. He was shackled, but his hands were free.

g.   The presiding officer was a judge in both his civilian and military capacities.

h.   During the open portion of the CSRT, the recorder read a summary of allegations of fact related to the Accused's suspected involvement in the attack on the USS COLE.

i.   After the allegations were read by the recorder, the Accused was offered an opportunity to make a statement. The Accused opted to have his personal representative read a prepared statement on his behalf. The Accused was offered the opportunity to take an oath to tell

the truth, but he was advised that he was not required to do so. The Accused opted to take the Muslim oath prior to the presentation of his statement.

j. The Accused's personal representative then read the Accused's prepared statement. It began by asserting that the Accused was "tortured into confession and once he made a confession his captors were happy and they stopped torturing him." In the statement, the Accused also asserted that he "made up stories during the torture in order to get it to stop." AE 467C, Attach. M. Thereafter, the statement responded to the individual factual allegations previously read by the recorder. As a part of the statement, the Accused denied any involvement in the USS COLE bombing. While the Accused admitted that he knew people who were involved in the USS COLE bombing, he insisted that he only had a business relationship with them and did not know what they were planning to do.

k. Following his statement, the president of the CSRT asked the Accused about his allegations of torture. The Accused described some of the abuse he endured. After that discussion, the president asked the Accused if he was under any pressure or duress at the CSRT proceeding. The Accused answered "no, not today." *Id*.

l. The president and other panel members proceeded to ask the Accused questions about his statement, including about the allegations that the Accused participated in the attack on the USS COLE. During the questioning the Accused admitted meeting Usama Bin Laden on many occasions, but he generally denied involvement in the conspiracy that led to the attack on the USS COLE.

m. The open portion of the CSRT lasted for about two hours, including breaks.

n.   A subsequent, closed, classified portion of the CSRT occurred outside the presence of the Accused and his personal representative in which the Government presented further alleged evidence against the Accused without any opportunity for rebuttal.

## VI. Effects of Trauma

a.   The Accused was diagnosed with Post-Traumatic Stress Disorder (PTSD) by a Rule for Military Commissions (R.M.C.) 706 sanity board in 2013,[45] as well as by defense expert Dr. Sandra Crosby in 2014.[46]

b.   The Commission finds that the Accused's PTSD is likely related, at least in part, to the abuse he experienced in the RDI program.[47] There is no evidence of the Accused having ever received any treatment specifically for PTSD.[48]

c.   Significant physical and psychological effects of torture can last for ten years or more.

d.   If a captive faces a choice between compliance and "extreme pain or suffering, then that's not a real choice."[49] A subsequent interviewer cannot know whether the results of their interview are the product of their current questioning or prior coercion.[50]

4.   **Law & Analysis**.

a.   "No statement obtained by the use of torture or by cruel, inhuman, or degrading treatment [] whether or not under color of law, shall be admissible in a military commission . . . ." 10 U.S.C. § 948r(a); *see* M.C.R.E. 304(a)(1). M.C.R.E. 304(a)(2) provides:

---

[45] AE 467C, Attach. R.
[46] Dr. Crosby has previously been recognized by the Commission as an expert in the diagnosis and treatment of torture victims, as well as on the appropriate standard of medical care.
[47] *See* AE 467DDD.
[48] *See generally* AE 467WW, para. 49.
[49] Transcript dated 20 April 2023 at 24476 (testimony of Government Expert Dr. Welner).
[50] Transcript dated 16 June 2023 at 25433–34 (testimony of Defense Expert Kleinman).

A statement of the accused may be admitted in evidence in a military commission only if the military judge finds—(A) that the totality of the circumstances renders the statement reliable and possessing sufficient probative value; and (B) that—(i) the statement was made incident to lawful conduct during military operations at the point of capture or during closely related active combat engagement, and the interests of justice would best be served by admission of the statement into evidence; or (ii) the statement was voluntarily given.

   b.   M.C.R.E. 304(a)(5)(A) addresses the admissibility of evidence derived from

statements obtained by torture or cruel, inhuman, or degrading treatment. It states:

   Evidence derived from a statement that would be excluded under section (a)(1) of this rule may not be received in evidence against an accused who made the statement if the accused makes a timely motion to suppress or an objection, unless the military judge determines by a preponderance of the evidence that—(i) the evidence would have been obtained even if the statement had not been made; or (ii) use of such evidence would otherwise be consistent with the interests of justice.

*see also* M.C.R.E. 304(a)(5)(B); AE 335N at 8–16.

   c.   "A coerced confession is offensive to basic standards of justice, not because the

victim has a legal grievance against the police, but because declarations procured by torture are

not premises from which a civilized forum will infer guilt." *Lyons v. Oklahoma*, 322 U.S. 596,

605 (1944). Some interrogations can be "so inherently coercive that [their] very existence is

irreconcilable with the possession of mental freedom by a lone suspect against whom [the

government's] full coercive force is brought to bear." *Ashcraft v. Tennessee*, 322 U.S. 143, 154

(1944). "The Court's role when faced with an allegedly coerced confession is to 'enforce[] the

strongly felt attitude of our society that important human values are sacrificed where an agency

of the government, in the course of securing a conviction, wrings a confession out of an accused

against his will.'" *United States v. Karake*, 443 F.Supp.2d 8, 89 (D.D.C. 2006) (citing

*Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973).

d.   The Supreme Court recognized almost 90 years ago that statements obtained from an accused through torture or physical coercion should not be admitted at trial. In *Brown v. Mississippi*, 297 U.S. 278, 280 (1936), the Supreme Court held that it was error for the trial court to receive into evidence statements coerced from the defendants by torture. In that case, the defendants were mercilessly whipped by a mob that included a deputy sheriff until their backs were "cut to pieces with a leather strap with buckles on it." *Id*. at 282. The Court went on to further describe the defendants' ordeal as follows:

> [T]hey were likewise made by the said deputy definitely to understand that the whipping would be continued unless and until they confessed, and not only confessed, but confessed in every matter of detail as demanded by those present . . . When the confessions had been obtained in the exact form and contents as desired by the mob, they left with the parting admonition and warning that, if the defendants changed their story at any time in any respect from that last stated, the perpetrators of the outrage would administer the same or equally effective treatment.
>
> Further details of the brutal treatment to which these helpless prisoners were subjected need not be pursued. It is sufficient to say that in pertinent respects the transcript reads more like pages torn from some medieval account than a record made within the confines of a modern civilization which aspires to an enlightened constitutional government.

*Id*. The next day, two officials came "to hear the free and voluntary confession of these miserable and abject defendants. The sheriff of the county of the crime admitted that he had heard of the whipping, but averred that he had no personal knowledge of it." *Id*. at 283. "Nevertheless the solemn farce of hearing the free and voluntary confessions was gone through with, and . . . used in court to establish the so-called confessions." *Id*.[51]

---

[51] *See also Brooks v. Florida*, 389 U.S. 413 (1967), in which the Supreme Court reversed a conviction based upon a confession given by an inmate almost immediately after having been held for two weeks in a small punishment cell with no windows, no bed, little food, and with only a hole in the floor to use as a commode. The Court noted that for "two full weeks he saw not one friendly face from outside the prison, but was completely under the control and domination of his jailers." *Id*. at 414. The Court commented that "the record in this case documents a shocking display of barbarism which should not escape the remedial action of this Court." *Id*. at 415.

e.    The Government concedes here that "the military commission should assume that statements petitioner made while he was in U.S. -- while he was in CIA custody should be treated as statements -- quote, statements obtained by the use of torture or by cruel, inhuman, or degrading treatment under 10 U.S.C. Section 948r(a), which provides that such statements are not admissible in a military commission."[52] The Government has not sought to introduce those statements at the Accused's military commission. However, the Government argues that the statements made by the Accused in early 2007 to law enforcement agents and to the CSRT should be admissible at trial because they were not obtained through torture or coercion and because the circumstances surrounding the making of those statements are sufficiently attenuated from the taint of the abuses inflicted upon the Accused between 2002–2006.

f.    The significant distinction between *Brown* and this case is the four-year gap between the worst of the abuses suffered by the Accused and the interviews and proceedings that led to the statements being offered by the Government.[53] The Government's position begs the question of whether, if the *Brown* defendants had continued to be held in jail for four years, without access to an attorney or anyone other than members of the sheriff's department, while periodically being paid "maintenance visits" by the mob that tortured them to remind them that they better continue answering questions or risk a return to the "hard times," similar confessions made to a different sheriff's deputy, with minimal rights advisement, would be sufficiently attenuated from the torture. Having found that the Accused made incriminating statements to CIA interrogators while being subjected to torture and cruel, inhuman, or degrading treatment,

[52] Transcript dated 30 June 2023 at 26684.
[53] This is not to say that all of the Accused's abuse ceased in 2003. The Accused continued to be subjected to confinement conditions and treatment that qualify as inhuman and degrading up until 2006, long after the use of EITs was terminated.

this Commission must address how long the taint of that torture and abuse lasts and under which circumstances it may be considered attenuated.

g.   In *Lyons*, 322 U.S. 596, the Supreme Court addressed a case where the defendant had given an initial confession under physically coercive circumstances. Then, eleven days later, he gave another confession. In assessing the admissibility of the second confession, the Court observed, "the voluntary or involuntary character of a confession is determined by a conclusion as to whether the accused, at the time he confesses, is in possession of 'mental freedom' to confess or to deny a suspected participation in a crime." *Id*. at 602 (citing *Ashcraft*, 322 U.S. at 154). The Court also explained:

> The Fourteenth Amendment does not protect one who has admitted his guilt because of forbidden inducements against the use at trial of his subsequent confessions under all possible circumstances. The admissibility of the later confession depends upon the same test -- is it voluntary. Of course the fact that the earlier statement was obtained from the prisoner by coercion is to be considered in appraising the character of the later confession. The effect of earlier abuse may be so clear as to forbid any other inference than that it dominated the mind of the accused to such an extent that the later confession is involuntary.

*Id*. at 603.

h.   In *Oregon v. Elstad*, 470 U.S. 298, 307 (1985), the Supreme Court again addressed the question of whether a second confession given by an accused was admissible at trial. However, in that case, the first confession was not the product of physical coercion. In eliciting the first confession, law enforcement officers did not inform the accused of his *Miranda* rights. The Court concluded that a prior unwarned confession that was voluntarily given did not preclude the admissibility of a subsequent voluntary confession given after a proper rights advisement. The Court cited its own ruling in *United States v. Bayer*, 331 U.S. 532, 540–541 (1947), for the proposition that "this Court has never gone so far as to hold that making a

confession under circumstances which preclude its use, perpetually disables the confessor from making a usable one after those conditions have been removed." *Elstad*, 470 U.S. at 311.

      i.   Distinct from the instant case, *Elstad* did not deal with a situation where the initial confession was the product of coercion. Instead, the Court recognized the crucial difference between an unwarned statement and a coerced statement. The Court noted, "[w]hen a prior statement is actually coerced, the time that passes between confessions, the change in place of interrogations, and the change in identity of the interrogators all bear on whether that coercion has carried over into the second confession." *Id*. at 310. Ultimately the Court held that, "absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion." *Id*. at 314. A subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admissibility of the earlier statement. In so holding, however, the Court acknowledged that a second confession could be considered the fruit of a previous confession that was obtained by improper means. *Id*. at 308.

      j.   The Court of Appeals for the Armed Forces has held that, "[w]here a confession is obtained at a lawful interrogation that comes after an earlier interrogation in which a confession was obtained due to *actual* coercion, duress, or inducement, the subsequent confession is presumptively tainted as a product of the earlier one." *United States v. Cuento*, 60 M.J. 106, 108–09 (C.A.A.F. 2004) (quoting *United States v. Phillips*, 32 M.J. 76, 79 (C.M.A. 1991) (emphasis in original)). If the first statement was unwarned, the absence of a "cleansing

warning"[54] before a subsequent statement is a factor to be considered in determining

voluntariness. *Cuento*, 60 M.J. at 109. However, the absence of a cleansing warning has

generally not been fatal to a finding that a subsequent confession was given voluntarily. *See, e.g.*,

*United States v. Brisbane*, 63 M.J. 106, 114 (C.A.A.F. 2006); *United States v. Lewis*, 78 M.J. 447

(C.A.A.F. 2019).

    k.   Mirroring the Supreme Court's holding in *Elstad*, M.C.R.E. 304(a)(4) provides:

> [i]n determining whether a statement was voluntarily given, the military judge
> shall consider the totality of the circumstances, including, as appropriate, the
> following: (A) the details of the taking of the statement, accounting for the
> circumstances of the conduct of military and intelligence operations during
> hostilities; (B) the characteristics of the accused, such as military training, age,
> and education level; and (C) the lapse of time, change of place, or change in
> identity of the questioners between the statement sought to be admitted and any
> prior questioning of the accused.

This multi-factor inquiry addresses whether there has been a sufficient break in the stream of

events separating the coercion from the statement. *Clewis v. State of Texas*, 386 U.S. 707, 710

(1967).[55] "[L]ess traditional forms of coercion, including psychological torture, as well as the

conditions of confinement have been considered by courts in their assessment of the

voluntariness of the statements." *Karake*, 443 F.Supp.2d at 51 (citing *Brooks*, 389 U.S. at

313–15). "The critical question with respect to attenuation is not the length of time between a

previously coerced confession and the present confession, it is the length of time between the

---

[54] A "cleansing warning" serves to advise a suspect that statements they previously made cannot be used against them in court.

[55] The test has already been applied in the context of Guantanamo Bay litigation. *See Al Rabiah v. United States*, 658 F.Supp.2d 11, 36–37 (D.D.C. 2009) (approximately two years was not long enough to dissipate coercion); *see also Anam v. Obama*, 696 F.Supp.2d 1, 7 (D.D.C. 2010) ("The Court is particularly concerned that the interrogators at Guantanamo relied on, or had access to, Petitioner's coerced confessions from Afghanistan.").

removal of the coercive circumstances and the present confession." *Id*. at 89 (citing *Lyons*, 322 U.S. at 597).

l.   Consideration of the details of the taking of the January–February 2007 statements includes not only the specific manner in which the agents conducted the interviews in 2007, but also the totality of the circumstances surrounding the Accused's detention beginning in 2002. The Government bears the burden of producing sufficient evidence that the coercive circumstances of the Accused's confinement by the CIA from 2002 to September 2006, including the extreme abuse inflicted upon the Accused in 2002 and 2003, his continuous interrogation, continued isolation, detention, and psychological abuse, were attenuated over the course of the few short months between September 2006 to January 2007 when the law enforcement interviews were conducted. During the litigation of the motion, the Government offered no significant evidence to demonstrate that the coercive circumstances which began in October 2002 changed in any significant way through late 2006, when he was finally ostensibly turned over to the DOD.

m.   The Government concedes the Accused was tortured by the CIA. As part of the psychology-based EIT program, the Accused was conditioned through torture and other inhumane and coercive methods by trained psychologists—who also participated in the torture—to become compliant during interrogations and debriefings. This conditioning was continued through repeated maintenance visits to ensure the Accused remained compliant. Therefore, although the EITs may have ceased in 2003, the Accused was subjected to constant reminders by his original tormentors of the unwritten contract, and the fact that a failure to cooperate with debriefers upon demand could lead to a return to the "hard times." Unsurprisingly, the Accused

continued to make statements while in CIA custody from late 2002 until September 2006. These statements, made during the course of scores[56] of interrogations and debriefings over four years, were not merely unwarned, but instead were actually coerced, with the constant looming threat of "hard times" to come if the Accused failed to live up to his end of the "contract." As in *Karake*, "here, the coercion was a product of both discrete beatings, as well as the general conditions of confinement." *See* 443 F.Supp.2d at 89. The Government has failed to establish that there was any meaningful relief from those conditions prior to the FBI interview.

    n.  Having found that the Accused was subjected to torture and other physical and mental abuse which created the coercive conditions in which he gave numerous incriminating statements to the CIA over four years, any subsequent statements made by the Accused are presumptively tainted by the prior statements obtained by torture. It is for the Government to prove that the statements at issue in the instant motion are sufficiently attenuated from that taint.

    o.  Following four years of essentially solitary confinement[57] in a series of CIA-controlled black sites—including the very location where the LHM statement was taken— the Accused was "transferred" to DOD custody in September 2006.[58] The LHM was taken four months later. Four months is a considerable amount of time; however, it is a small fraction of time compared to the years the Accused spent held incommunicado in inhumane and degrading living conditions. Surely, the Supreme Court that described the conditions in *Brooks* as

---

[56] *See supra* note 20.
[57] *See, e.g.*, *In re Medley*, 134 U.S. 160, 167–69 (1890) ("solitary confinement bears 'a further terror and peculiar mark of infamy'"); *Davis v. Ayala*, 576 U.S. 257, 287 (2015) (Kennedy, J., concurring); *Glossip v. Gross*, 135 S. Ct. 2726, 2765 (2015) (Breyer, J., dissenting); *Gallina v. Wilkinson*, 988 F.3d 137 (2d Cir. 2021); *Porter v. Pennsylvania Dep't of Corr.*, 974 F.3d 431 (3d Cir. 2020); *Porter v. Clarke*, 923 F.3d 348 (4th Cir. 2019), as amended May 6, 2019; *Grissom v. Roberts*, 902 F.3d 1162 (10th Cir. 2018); *Williams v. Sec'y Pennsylvania Dep't of Corr.*, 848 F.3d 549 (3d Cir. 2017); *United States v. King*, 61 M.J. 225 (C.A.A.F. 2005).
[58] *See* Classified Addendum, AE 467DDD.

"barbarism," would likely struggle to find adequate words to describe what the Accused endured in this case.

p.   Additionally, the Accused's conditions of confinement improved only incrementally and in small measures from the time he was in CIA custody to the time he was in DOD custody. Aside from two visits with the ICRC once he was returned to NSGB, the Accused was still held in the same location as the former CIA black site where he was previously held and subjected to forced "rectal feeding." Additionally, he was still under the complete domination and control of his captors as demonstrated by forced cell extractions and forced grooming.[59] Under those circumstances, it is difficult to conceive how the Accused would have believed that his circumstances had significantly changed or that "the contract" was not still in full effect.

q.   With this backdrop, U.S. law enforcement agents arrived in January 2007 with the purpose of obtaining incriminating statements from the Accused. A prosecution team was in place and likely knew that the Accused's prior statements during the RDI program would never be admissible in any trial. The solution to that problem was to obtain new incriminating statements. To obtain new statements that could be used in court, the prosecution team came up with a rights advisement for the agents to provide to the Accused, which was carefully constructed to strike a balance between avoiding outright coercion but also leaving the Accused in the dark in several important respects. Despite demonstrating, on numerous occasions, the ability to provide a full rights advisement to other detainees in foreign countries, including during interviews of alleged Al Qaeda operatives Owhali, Badawi, and Quso,[60] the U.S.

---

[59] *See* AE 467ZZ.
[60] When Jamal Al-Badawi was interviewed by U.S. law enforcement agents, including FBI SA Ali Soufan, he was provided the standard FBI FD-395 Advice of Rights form prior to each interview. AE 327, Attach. A; AE 319MM, Tabs 47–48; Transcript dated 12 June 2023 at 24887 ("similar to our *Miranda* warnings"). When Fahd Al-Quso was

government, including the DOJ and the CIA, chose to create a specific and limited rights advisement for the Accused. AE 518. For example, the Accused was not to be advised that he could consult counsel. That right would have to wait until after he further incriminated himself and the Government got around to charging him with crimes.[61] Additionally, the rights advisement failed in one major respect: it did not notify the Accused that his prior statements, which were obtained through torture, could not be used against him at any future trial.[62]

     r.   The Government cites to two somewhat comparable cases in *United States v. Elsheikh*, 578 F. Supp. 3d 752 (E.D. Va. 2022) and *United States v. Khweis*, 971 F.3d 453, 459-64 (4th Cir. 2020) as instances where courts did not suppress statements made by terrorism suspects to law enforcement agents after the suspects had previously given unwarned confessions during interrogations. In both cases, the primary issue was whether the men had been subjected to what amounted to two-part interviews which were designed to obtain confessions from the men before they were later read their rights and provided additional confessions, a technique rejected in *Missouri v. Seibert*. The Court in *Elsheikh*, for example, rejected the accused's

---

interviewed by NCIS SA Robert McFadden, he was also advised of his rights as set forth in the FD-395. AE 319MM, Tabs 55–56; Transcript dated 11 April 2023 at 23096–97 ("Almost like a full *Miranda* warning"). And when Mohammed Al-Owhali was interviewed by FBI SA Steve Bongardt, he was provided a printed copy of the Advice of Rights document prepared by Assistant United States Attorney Pat Fitzgerald including "full *Miranda* rights." Owhali was read the form at the beginning of each interview session. AE 482, Attach. D; AE 482M, Attach. B; AE 319MM, Tab 74; Transcript dated 11 March 2023 at 22637–38.

[61] This is not to imply that the Accused is entitled to a *Miranda* warning or that he is entitled to suppression of his statements due to the lack of such a warning. Clearly, the Military Commissions Act does not require such a warning and the Commission does not find that *Miranda* applies to unprivileged alien enemy belligerents held at NSGB while awaiting trial for alleged law of war violations. However, the nature of the rights advisement provided to the Accused by the law enforcement agents can be considered among the totality of the circumstances surrounding the January–February 2007 interviews.

[62] *See, e.g.*, *Missouri v. Seibert*, 542 U.S. 600, 612 (2004) ("Could the warnings effectively advise the suspect that he had a real choice about giving an admissible statement at that juncture? Could they reasonably convey that he could choose to stop talking even if he had talked earlier? For unless the warnings could place a suspect who has just been interrogated in a position to make such an informed choice, there is no practical justification for accepting the formal warnings as compliance with *Miranda*, or for treating the second stage of interrogation as distinct from the first, unwarned and inadmissible statement.").

argument, noting that "any reasonable person in Defendant's position would have readily 'appreciate[d] that the interrogations had taken a new turn.'" *Elsheikh*, 578 F. Supp. 3d at 38.

s.   *Elsheik* and *Khweis* are easily distinguishable from the instant case. Neither case involved allegations of significant abuse suffered by the accused, much less conditions or treatment that amounted to torture, during their initial interviews. Neither man was held for four years, incommunicado, in what amounted to solitary confinement. In both cases, prior to the second sets of interviews, the accused were given at least modified *Miranda* warnings, wherein they were advised of the rights to remain silent and to consult with an attorney. In *Elsheikh*, the accused was even advised that his prior statements would likely not be usable against him in court. *Id*. at 14–15. In *Khweis*, agents advised him of the right to counsel, told him his family had retained counsel for him in the United States, and told him "he did 'not need to speak with [them] today just because [he] h[ad] spoken with others in the past.'" *Khweis*, 971 F.3d at 458.

t.   While a deficient cleansing statement alone does not require suppression, it is appropriate for the Commission to consider under the totality of the circumstances surrounding the January–February 2007 interviews. As discussed above, the rights warning for the Accused was drafted with the input of the same agency that coerced the Accused and conditioned his compliance to obtain the previous statements. This rights warning was crafted to omit notice to the Accused that his prior coerced statements might not be admissible against him. The Military Commissions Act of 2006, which was in effect at the time of the 2007 interviews, did not specifically prohibit the admission of involuntary statements.[63] M.C.R.E. 304 was added after

---

[63] Pub.L. 109-366, October 17, 2006, 120 Stat 2600, § 948r(c)–(d). These provisions allowed for the admission of coerced statements without regard to voluntariness. *See also id*. at 949a(b)(2)(C) ("A statement of the accused that is otherwise admissible shall not be excluded from trial by military commission on grounds of alleged coercion or compulsory self-incrimination so long as the evidence complies with the provisions of section 948r of this title.").

the promulgation of the Military Commissions Act of 2009.[64] The Commission is left to conclude that the warning given to the Accused was designed to fit the rules in effect in 2007, which were drafted with the specific intent to leave an open question as to the admission of involuntary statements. Under these circumstances, the Commission finds that at the time of the January–February 2007 interviews the Accused was given no reason to believe that his many prior incriminating statements made over the years under torture or cruel, inhuman, or degrading treatment would not eventually be used against him if he ever saw the inside of a courtroom.

u.   The Government urges the Commission to conclude that the Accused should have been or was aware that his conditions had changed in some meaningful way. While it is true and the Commission finds that the agents that conducted his January–February 2007 statements treated the Accused with fairness and respect and did not subject him to any form of coercion, this fact alone does not necessarily erase all that had come before. The Accused, having been required to answer the questions of various debriefers over the years under the threat of return to the "hard times," could not be expected to ascertain whether Agents Gaudin, McFadden, and Sendlein were actually from a different agency than the one that had tortured him for years. He was in no position to know whether Drs. Mitchell and/or Jessen were watching the interviews in the next room and prepared to intervene with more abusive treatment should he violate the contract. He had no reason to doubt that he might, without notice, suddenly be shipped back to a dungeon like the ones he had experienced before. He had no real reason to know whether NX2

The Act also made inapplicable the portions of the Uniform Code of Military Justice relating to compulsory self-incrimination. § 948b(d)(B). The words "voluntary" and "voluntariness" do not appear in the bill's text.
[64] 10 U.S.C. § 948r. Added Pub.L. 111-84, Div. A, Title XVIII, § 1802, Oct. 28, 2009, 123 Stat. 2580.

lurked nearby with a pistol, a drill, or a broomstick in hand in the event he chose to remain silent or to offer versions of events that differed from what he told his prior interrogators.

v. In essence, when the agents finally provided the Accused with some form of a rights advisement, he had to ask himself whether he was willing to risk that he could say nothing, without harsh ramifications, or whether he would just continue to abide by the contract, as he was conditioned to do for several years, and repeat the same incriminating statements he had made numerous times. Given all he had experienced before and with the understanding that he had already incriminated himself numerous times in the past, the Commission is unsurprised that the Accused chose not to gamble by immediately putting his faith and trust in yet another group of U.S. officials who showed up at a former black site to "debrief" him.

w. The Government also points to statements made by the Accused after interview sessions on 1 and 2 February 2007 in arguing that the Accused knew that his situation had changed, that he had rights, and that he did not have to speak to the agents.[65] The Government notes that the Accused stated that he was "denying everything." However, a quick review of the LHM belies any suggestion that the Accused denied everything when speaking to the agents. Throughout the LHM, the Accused thoroughly implicates himself in the conspiracy that led to the attack on the USS COLE. The Accused's statement that he was denying everything may have been little more than wishful thinking or braggadocio designed to make him feel better about once again complying with the "contract" and incriminating himself to U.S. personnel.

x. The Government has a stronger argument with respect to the Accused's statements on 2 February 2007. At that time, the Accused indicated his understanding that meeting with the

_____

[65] AE 467C at 6, 19, 22; see AE 467C, Attach. H, I; *see* AE 467DDD.

agents was actually optional. By that time, of course, the Accused had also made clear that he understood that fact by telling the agents that he did not want to talk to them anymore. The agents documented in the LHM that they would have preferred to continue the interviews past the third day. But by the end of the third day, the Accused apparently trusted what the agents told him starting on day one, that he was not required to speak to them. Although the Commission is convinced that by the end of the third day of the interviews, the Accused understood that he was not required to speak to the agents and that he was confident that he would not suffer a return to the "hard times" by refusing to speak, the Commission cannot find that he understood that fact when the interviews began. Further, because the interviews were not recorded and the LHM does not reflect a timeline of when statements certain admissions were made, the Commission cannot assume that the incriminating statements reflected therein were only made after the Accused finally came to the realization that he could trust what Agents Gaudin, McFadden and Sendlein had told him about his right to refuse to talk.

<u>*Admissibility of LHM Statements*</u>

y.   As noted previously, in determining whether an accused's will was overborne in a particular case, courts consider the totality of all the surrounding circumstances, regarding both the characteristics of the accused and the details of the interrogation. *Schneckloth*, 412 U.S. at 226–27 (listing cases). The Commission has considered, among others, the following factors in the analysis of the voluntariness of the Accused's statements to investigators in January–February 2007:

1. Youth. From the time the Accused was taken into custody until the 2007 statements

were made, he was approximately in his late twenties to early thirties. Therefore, this factor does not weigh heavily in the evaluation.

2. Education and intelligence. The Accused has a high school education but finished school sometime into his twenties. There is evidence in the record to suggest that he may be of below-average intelligence. However, there is also evidence suggesting that he is clever and skilled in logistics. Dr. Jessen testified the Accused may be smarter than others give him credit for. This factor does not tip the scale in either direction.

3. Lack of rights advisement. As discussed previously, the U.S. agents who interviewed the Accused in 2007 were specifically directed not to advise the Accused that he could consult an attorney. Although he was told that he did not have to speak to the agents, the Accused had no reason to think that his prior confessions would not seal his fate in any future judicial proceedings as he was not informed that his prior statements could not be used against him. This weighs toward suppression.

4. Length of detention. At the time of the 2007 statements, the Accused had been in U.S. government custody for over four years. For the vast majority of that time, he was held incommunicado in solitary confinement. This weighs heavily toward suppression.

5. Repeated and prolonged nature of the questioning. Prior to the 2007 interviews, the Accused had been interrogated or debriefed somewhere between 145 to 200 times. The record indicates that, especially from 2005 on, these debriefings were repetitive and unfruitful, leading to concerns about the Accused's mental health. These interrogations were repeated over the four years of the Accused's detention. The 2007 interviews themselves took place over several days, multiple hours each day. This weighs heavily toward suppression.

6. Use of physical punishment such as the deprivation of food or sleep. The Commission has previously addressed the horrific abuses inflicted upon the Accused during his years in CIA custody and need not belabor the point here. While the Accused was no longer experiencing most of the abuses he had previously been subjected to by 2007, he was still under the complete domination and control of the U.S. government under circumstances not entirely dissimilar to those he had experienced the previous several years. This weighs heavily toward suppression.

7. Circumstances of the statement. The circumstances of the interviews in 2007, evaluated on their own merit, were not actually coercive in nature. The agents involved in the 2007 interviews acted professionally and in no way coerced the Accused. This weighs against suppression. However, the agents, perhaps unknowingly, could not help but benefit from the terms of the contract established by the CIA and Drs. Mitchell and Jessen years before.

8. Psychological impact on the accused. This factor is perhaps the most important and weighs most heavily towards suppression. The entire goal of the RDI program and the contract created by Drs. Mitchell and Jessen was to provoke an involuntary response to stimuli which would condition compliance from the Accused. The compounding effects of the program—both physical and psychological—could not be removed by the law enforcement agents in 2007 and cannot be ignored by the Commission.

z. The Commission has carefully considered the aforementioned factors among the totality of the circumstances surrounding the 2007 LHM statements, to include the treatment of the Accused from the time his detention began in late 2002 until 2 February 2007. The Commission has also considered the limited advisement of rights given the Accused by the interviewing agents as well as the non-coercive environment of those interviews. The

Government, although conceding the Accused was tortured during the RDI program, argues the 2007 statements were sufficiently attenuated from that mistreatment. The Commission is not convinced.

aa.  Any resistance the Accused might have been inclined to put up when asked to incriminate himself was intentionally and literally beaten out of him years before. For years, the Accused was coerced and psychologically conditioned to cooperate with questioners—dozens, if not hundreds of times. To refuse to cooperate was to face the prospect once again of experiencing drowning, the fear of summary execution, days of sleeplessness while shackled naked in a cell, confinement to small boxes, forced rectal feeding, or other physical and mental abuse. Through all that, the Accused implicated himself again and again. The Commission finds that the limited changes in the Accused's circumstances from September 2006 until February 2007 were not meaningful enough to erase the effects of what came before. The change of interlocutors also means little under these circumstances as the Accused was met by numerous different debriefers over the years. From his perspective, Agents Gaudin, McFadden, and Sendlein were merely the newest faces. Further, the Government has done little to establish that the Accused's circumstances materially changed from 2003 until his arrival at NSGB in September 2006.

bb. Most, if not all, Supreme Court and U.S. Court of Appeals for the Armed Forces cases dealing with the issue of subsequent statements made following an initial unwarned or coerced statement deal with a *single* prior inadmissible statement being made before a second warned or uncoerced statement. As discussed above, here, the Accused was in U.S. custody for four years prior to the "second" statement. During those four years, the Accused was coerced and

psychologically conditioned to cooperate with questioners—dozens of times. If there was ever a case where the circumstances of an accused's prior statements impacted his ability to make a later voluntary statement, this is such a case.[66]

cc. Considering the totality of all relevant circumstances, the Commission is most persuaded by the contract established and maintained by Drs. Mitchell and Jessen. The contract required the Accused to speak to the agents in January and February 2007. The Accused had no reason to believe the contract had lapsed. He therefore had only the Hobson's choice of refusing to talk and risking the consequences or continuing to comply and implicating himself for the 201st time. The Commission finds this to be no choice at all and cannot be confident the Accused believed he was free to remain silent on 31 January 2007.

dd. The Commission finds that the Government has not met its burden to establish that the statements made by the Accused between 31 January 2007 and 2 February 2007 were made voluntarily. Even if the 2007 statements were not *obtained by* torture or cruel, inhuman, and degrading treatment, they were *derived from* it. The Commission is not convinced that the 2007 statements would have been obtained if not for the Accused's prior experience with being tortured and abused in the RDI program. On the facts presented, the Commission does not find that the Accused should or could have reasonably believed that his circumstances had substantially changed when he was marched in to be interviewed by the newest round of U.S. personnel in late January 2007. The limited rights advisement given was insufficient to attenuate

---

[66] *See, e.g.*, *United States v. Bayer*, 331 U.S. 532, 540 (1947) ("Of course, after an accused has once let the cat out of the bag by confessing, no matter what the inducement, he is never thereafter free of the psychological and practical disadvantages of having confessed. He can never get the cat back in the bag. The secret is out for good. In such a sense, a later confession always may be looked upon as fruit of the first."). Though *Elstad* found this theory inapplicable as to that case, it is helpful here in evaluating the totality of the circumstances.

the lingering taint of the torture, the psychological abuse associated with incommunicado and solitary confinement for years, and the constant threat of a return of the "hard times" if the Accused were to fail to live up to the contract.

ee.  Returning to the words of the Supreme Court in *Lyons*, "the effect of the earlier abuse may be so clear as to forbid any other inference than that it dominated the mind of the accused to such an extent that the later confession is involuntary." 322 U.S. at 603. The Commission concludes that the Government has not proven by a preponderance of the evidence that the presumed taint from the prior years of physical and psychological torment was dissipated when the Accused was again confronted with interrogators in January–February 2007. Instead, the evidence supports a conclusion that the Accused did what he was trained to do: comply. Compliance is not the same as the "mental freedom" addressed by the Supreme Court in *Ashcraft*. Compliance is not enough to establish the voluntariness of the Accused's statements. The LHM statements must be suppressed pursuant to 10 U.S.C. § 948r and M.C.R.E. 304.

ff.  Exclusion of such evidence is not without societal costs. However, permitting the admission of evidence obtained by or derived from torture by the same government that seeks to prosecute and execute the Accused may have even greater societal costs. Permitting admission of this evidence would greatly undermine the actual and apparent fairness of the criminal proceeding against the Accused in this case and infect the trial with unfairness sufficient to make any resulting conviction a denial of whatever process is due. *See Romano v. Oklahoma*, 512 U.S. 1, 12 (1994).

*Admissibility of CSRT Statements*

gg. The Commission does not reach the same conclusion with respect to the Accused's statements made during the CSRT hearing on 14 March 2007, as the CSRT statements are distinguishable in a number of important respects. Once again, the Commission has considered the totality of the circumstances surrounding the making of the statements during the CSRT hearing on 14 March 2007, to include the Accused's experiences in CIA and DOD custody from 2002 to 2007.

hh. The crucial difference between the LHM and the CSRT statements is what happened over the course of the three days of the LHM interviews. When the Accused was brought in to talk to the agents, the Commission finds that the Accused was likely in compliance mode. He was trained to comply or face harsh consequences, so he initially complied even despite limited warnings that suggested he could refuse to talk. After all, he had little to risk by repeating what he had already said many times; he had much to risk if he refused to talk and faced a return to the "hard times." After day three of the LHM interviews, however, likely based upon the relaxed and cordial interactions between himself and the agents and the repeated reminders that he was "the boss" during the interviews, the Accused reached a point where he was willing to assert his right to terminate the interview. When he terminated the interview after three days, he presumably did so because he no longer feared unknown consequences that might follow. By the time of the CSRT hearing, the Accused knew for sure that he did not suffer any consequences for terminating the interview in early February. In other words, the Accused would have known after the LHM interviews that he had an actual choice whether or not he would speak.

ii.  There are other substantial differences between the interview that began on 31 January 2007 and the CSRT. Where the Accused had no advance warning that he would again be debriefed at the end of January 2007, in preparation for the CSRT he was assigned a personal representative to explain the nature of the CSRT and assist during the proceeding. This would have been a clear signal to the Accused that the situation was substantially different from debriefings and interrogations he experienced with the CIA.

jj.  Among other substantial differences for the Accused were the location, the forum, the formality, and the personnel involved in the CSRT. Rather than his prior experiences of being interrogated in a cell in front of a walling wall with a towel ominously draped around his neck or while trying to avoid drowning, the CSRT was conducted as an official proceeding in a hearing room presided over by a military judge with two other military officers sitting as panel members. The Accused had a personal representative to speak for him and to assist him during the proceeding. While the personal representative was not an attorney, the availability of a representative marked a sea change in what the Accused had previously experienced and clearly signaled that the Accused had rights. Further, the personal representative was a Lieutenant Commander in the United States Navy, someone who clearly would have had significant military training and experience, as well as advanced education.

kk. When the proceeding began, the president clearly explained the purpose of the hearing and advised the Accused that he could not be compelled to testify at the tribunal, but instead had the choice to either testify or not to testify, including the right to make an unsworn statement if he so chose. He was also advised of his right to present evidence at the hearing and to question witnesses that might testify. When asked, the Accused indicated that he understood

the purposes of the proceeding as well as his rights. When asked if he had any questions concerning the tribunal process, he responded "[n]o."

     ll.  During the hearing, the allegations were read to the Accused. The allegations referenced statements made by individuals other than the Accused, to include Mohammed Al 'Owhali and Jamal Al-Badawi, which implicated the Accused in the conspiracy to attack the USS COLE. None of the allegations read to the Accused made reference to any statements previously made by the Accused. In other words, there was no mention of the fact that the Accused had previously admitted his involvement in the USS COLE operation.

     mm. Finally, when asked if he would like to make an oral statement to the Tribunal, the Accused opted to have a written statement presented by his personal representative. He was then asked if he wished to take an oath but was told that he was not required to do so. He chose to take the oath. He was even offered the option of a Muslim oath, which he accepted.

     nn. Perhaps one of the most significant considerations in determining that the Accused believed by the time of the CSRT that he faced no further danger from his former interrogators came during the Accused's sworn statement, when he denied much of what he previously told interrogators and investigators from 2002 through 2007. He denied having anything to do with the bombing of the USS COLE. He also denied being a member of Al Qaeda. He denied allegations made by Al-Badawi, insisting that his interactions with Al-Badawi and others related to the USS COLE bombing were simply a business relationship in the fishing industry. The Accused further insisted that incriminating statements he made to the CIA were the product of torture. He then went on to apparently discuss the torture he endured.[67] The president then

---

[67] This portion is redacted from the transcript of the proceedings at AE 467C, Attach. H at 16 of 36.

acknowledged the Accused's assertion that he was tortured and asked the Accused if he was "under any pressure or duress today." The Accused responded, "No. Not Today."[68]

oo. The Accused went on to answer questions from the president and the other tribunal members. Although some of his statements tend to incriminate him in certain respects, he continued to insist that he was not knowingly involved in the plan to attack the USS COLE and that he was involved only in a plan to run a fishing business.

pp. Considering the totality of the circumstances, it is clear that the Accused understood by 14 March 2007 that he had rights, to include the right not to incriminate himself further. He apparently no longer feared potential ramifications as reflected in his denial of involvement in the USS COLE operation or with Al Qaeda, along with his insistence that his admissions in the past were obtained due to torture. He was clearly informed of his right not to testify at the tribunal and indicated that he understood that right. He was also asked whether he was under duress and denied that he was. The fact that he complained of prior torture indicates that he would have been willing to reveal if he was under duress at the CSRT hearing. Further, the CSRT allegations and evidence focused not on any statement previously made by the Accused, but only on allegations made by others as well as other forms of evidence.

qq. The Commission finds, based on the totality of the circumstances, that the Accused's statements to the CSRT were made voluntarily and were not obtained through or derived from torture or any other form of coercion or abuse he was subjected to at the hands of his former captors and interrogators.

---

[68] *See* AE 467C, Attach. H at 16 of 36.

6. **Ruling**. The defense motion to suppress set forth in AE 467 is **GRANTED in part** and **DENIED in part**. That portion of the motion related to the LHM statements made by the Accused to investigators during the January–February 2007 interviews is **GRANTED**. That portion of the motion that seeks to suppress the Accused's statements to the CSRT is **DENIED**.

So **ORDERED** this 18th day of August 2023.

//s//
LANNY J. ACOSTA, JR.
COL, JA, USA
Military Judge

# ATTACHMENT E

**MILITARY COMMISSIONS TRIAL JUDICIARY**
**GUANTANAMO BAY, CUBA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **AE 0067.003 (GOV)** |
| **v.** | **Notice of Severance** |
| **ENCEP NURJAMAN AND MOHAMMED NAZIR BIN LEP** | **4 October 2023** |

1.      **Timeliness**

The Government timely files this notice pursuant to this Commission's order AE 0067.002 (TJ), dated 27 September 2023.

2.      **Notice**

On 3 October 2023, the Convening Authority effectuated the severance of the trial of the charges referred against Mr. Mohammed Nazir Bin Lep from his co-accused, Mr. Nurjaman and joinder to his co-accused Mr. Mohammed Farik Bin Amin.  Consistent with the Convening Authority's direction, the Charge Sheets in the case were amended.

**3.**     <u>**Attachments**</u>

    A.  Certificate of Service, dated 4 October 2023

    B.  Direction of the Convening Authority

    C.  Amended Charge Sheets

Respectfully submitted,

_____//s//_____
Christopher J. Goewert, Lt Col, USAF
Managing Deputy Trial Counsel

2

# ATTACHMENT A

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on the 4th day of October, I filed AE 0067.003 (GOV), Notice of Severance and I served copies on all counsel of record.


Respectfully submitted,


_____//s//_____
Christopher J. Goewert, Lt Col, USAF
Managing Deputy Trial Counsel

# ATTACHMENT B



**DEPARTMENT OF DEFENSE**
OFFICE OF MILITARY COMMISSIONS
4800 MARK CENTER DRIVE
ALEXANDRIA, VA 22350

## DIRECTION OF THE CONVENING AUTHORITY

Pursuant to the *Ex Parte*/Under Seal Ruling (AE 0067.002 (TJ)) in *United States v. Nurjaman, et al.*, I direct the following to effectuate the severance of the trial of the charges referred against Mr. Mohammed Nazir Bin Lep from that of his co-accused, Mr. Encep Nurjaman and joinder of Mr. Bin Lep's case with the case of Mr. Mohammed Farik Bin Amin:

1. On the charge sheet of Mr. Encep Nurjaman, the language be stricken in Block VI. (Referral) that reads "The charges against the above named accused will be tried at a joint trial with the trial of Mohammed Nazir Bin Lep."
2. On the charge sheet of Mr. Mohammed Nazir Bin Lep, the language be stricken in Block VI. (Referral) that reads "Encep Nurjaman" and the language be added in Block VI. (Referral) that reads "Mohammed Farik Bin Amin."
3. On the charge sheet of Mr. Mohammad Farik Bin Amin, the language be added in Block VI. (Referral) that reads "The charges against the above named accused will be tried at a joint trial with the trial of Mohammed Nazir Bin Lep."

The charges in the cases of the three accused remain referred for trial to Military Commissions convened by Military Commission Convening Order (MCCO) 21-01, unless amended orders are instituted.

Appropriate orders or actions will be implemented to accomplish the foregoing.

Jeffrey D. Wood
Convening Authority
for Military Commissions

Date: 3 oct 23

A120



ATTACHMENT F

**MILITARY COMMISSIONS TRIAL JUDICIARY**
**GUANTANAMO BAY, CUBA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **AE 0060.003 (GOV)** |
| **v.** | **Notice of Severance** |
| **ENCEP NURJAMAN;** **MOHAMMED NAZIR BIN LEP;** **MOHAMMED FARIK BIN AMIN** | 30 August 2023 |

1.     **Timeliness**

The Government timely files this notice pursuant to this Commission's order AE 0060.002 (TJ), dated 23 August 2023.

2.     **Notice**

On 29 August 2023, the Convening Authority effectuated the severance of the trial of the charges referred against Mr. Mohammed Farik Bin Amin from that of his co-accused, Mr. Nurjaman and Mr. Mohammed Nazir Bin Lep. Consistent with the Convening Authority's direction, the Charge Sheets in the case were amended.

3.     **Attachments**

    A. Certificate of Service, dated 30 August 2023

    B. Direction of the Convening Authority, dated 29 August 2023

    C. Amended Charge Sheets

Respectfully submitted,

//s//
George C. Kraehe, COL, USA

Trial Counsel

Imelda U. Antonio, Maj, USAF
Deputy Trial Counsel

Jeffrey M. Larson, LCDR, JAGC, USN
Assistant Trial Counsel

Patrick R. Rigney, LT, JAGC, USN
Assistant Trial Counsel

2

# ATTACHMENT A

## CERTIFICATE OF SERVICE

(U) I certify that on the 30h day of August 2023, I filed AE 0060.003 (GOV), Notice of Severance, with the Office of Military Commissions Trial Judiciary, and I served copies on all counsel of record.

Respectfully submitted,

_____//s//_____
Jeffrey M. Larson, LCDR, JAGC, USN
Assistant Trial Counsel

# ATTACHMENT B



**DEPARTMENT OF DEFENSE**
**OFFICE OF MILITARY COMMISSIONS**
**4800 MARK CENTER DRIVE**
**ALEXANDRIA, VA 22350**

## DIRECTION OF THE CONVENING AUTHORITY

Pursuant to the *Ex Parte*/Under Seal Order (AE 0060.002 (TJ)) in *United States v. Nurjaman, et al.*, I direct the following to effectuate the severance of the trial of the charges referred against Mr. Mohammed Farik Bin Amin from that of his co-accused, Mr. Encep Nurjaman and Mr. Mohammed Nazir Bin Lep:

1. On the charge sheet of Mr. Encep Nurjaman, the language in Block VI. (Referral) that reads "s" at the end of the word "trials" and "and Mohammed Farik Bin Amin" be stricken.
2. On the charge sheet of Mr. Mohammed Nazir Bin Lep, the language in Block VI. (Referral) that reads "s" at the end of the word "trials" and "and Mohammed Farik Bin Amin" be stricken.
3. On the charge sheet of Mr. Mohammad Farik Bin Amin, the language in Block VI. (Referral) that reads "The charges against the above named accused will be tried at a joint trial with the trials of Encep Nurjaman and Mohammed Nazir Bin Lep" be stricken.

The charges in the cases of the three accused remain referred for trials to the military commission convened by Military Commission Convening Order (MCCO) 21-01, unless amended orders are instituted.

Appropriate orders or actions will be implemented to accomplish the foregoing.

Jeffrey D. Wood
Convening Authority
for Military Commissions

Date: 29 AUG 2023

# ATTACHMENT G

| CHARGE SHEET | | |
|---|---|---|
| **I. PERSONAL DATA** | | |

**1. NAME OF ACCUSED:**
ENCEP NURJAMAN; Mohammed Nazir Bin Lep; Mohammed Farik Bin Amin

**2. ALIASES OF ACCUSED:**

SEE APPENDIX A

**3. ISN NUMBER OF ACCUSED (LAST FOUR):**
Encep Nurjaman (10019); Mohammed Nazir Bin Lep (10022); Mohammed Farik Bin Amin (10021);

| **II. CHARGES AND SPECIFICATIONS** | | |
|---|---|---|

**4. CHARGE:** VIOLATION OF SECTION AND TITLE OF CRIME IN PART IV OF M.M.C.

**SPECIFICATION:**

See Attached Charges and Specifications.

| **III. SWEARING OF CHARGES** | | |
|---|---|---|
| **5a. NAME OF ACCUSER (*LAST, FIRST, MI*)**<br>Gentry, Megan L. | **5b. GRADE**<br>O-5/Lt Col | **5c. ORGANIZATION OF ACCUSER**<br>Office of Military Commissions |
| **5d. SIGNATURE OF ACCUSER** | | **5e. DATE (YYYYMMDD)**<br>20190405 |

AFFIDAVIT: Before me, the undersigned, authorized by law to administer oath in cases of this character, personally appeared the above named accuser the __05__ day of __April__, __2019__ and signed the foregoing charges and specifications under oath that he/she is a person subject to the Uniform Code of Military Justice and that he/she has personal knowledge of or has investigated the matters set forth therein and that the same are true to the best of his/her knowledge and belief.

| Kambhampaty, Ravi T. | Office of Military Commissions |
|---|---|
| *Typed Name of Officer* | *Organization of Officer* |
| O-3/CPT | Judge Advocate, Article 136(a)(1), UCMJ |
| *Grade* | *Official Capacity to Administer Oath*<br>*(See R.M.C. 307(b) must be commissioned officer)* |
| *Signature* | |

MC FORM 458 JAN 2007

## IV. NOTICE TO THE ACCUSED

6. On _____19 April_____, ___2019___ the accused was notified of the charges against him/her (See R.M.C. 308).

_____Hracho, Matthew R., O-4_____
Typed Name and Grade of Person Who Caused
Accused to Be Notified of Charges

*Matthew Hracho*
Signature

Office of Military Commissions
Organization of the Person Who Caused
Accused to Be Notified of Charges

## V. RECEIPT OF CHARGES BY CONVENING AUTHORITY

7. The sworn charges were received at _1405_ hours, on _8 October 2019_, at _____

_Arlington, Virginia_
Location

For the Convening Authority: _Donna L. Wilkins_
Typed Name of Officer

_GS-15_
Grade

*Donna L. Wilkins*
Signature

## VI. REFERRAL

| 8a. DESIGNATION OF CONVENING AUTHORITY | 8b. PLACE | 8c. DATE (YYYYMMDD) |
|---|---|---|
| Convening Authority, 10 U.S.C. § 948h, designated on 17 April 2020 | Alexandria, VA | 20210121 |

Referred for trial to the (non)capital military commission convened by military commission convening order ___21-01___ dated 21 January 2021 _____.

_____ subject to the following instructions[1]: The charges against the above named accused will be tried at a joint trial with the trials of Mohammed Nazir Bin Lep and Mohammed Farik Bin Amin

By _____Direction_____ of _____the Convening Authority_____
Command, Order, or Direction

_____Donna L. Wilkins, GS15_____
Typed Name and Grade of Officer

*Donna L. Wilkins*
Signature

Convening Authority, Chapter 47A
of Title 10 U.S.C. § 948h
Official Capacity of Officer Signing

## VII. SERVICE OF CHARGES

9. On _____, _____ I (caused to be) served a copy these charges on the above named accused.

_____
Typed Name of Trial Counsel

_____
Grade of Trial Counsel

_____
Signature of Trial Counsel

## FOOTNOTES
[1] See R.M.C. 601 concerning instructions. If none, so state.

MC FORM 458 JAN 2007

CONTINUATION SHEET - MC Form 458, Block II. Charges and Specifications in the case of the UNITED STATES OF AMERICA V. ENCEP NURJAMAN; United States of America v. Mohammed Nazir Bin Lep; United States of America v. Mohammed Farik Bin Amin

## COMMON ALLEGATIONS

These common allegations set forth the manner and means by which the accused, Encep Nurjaman, a/k/a Riduan bin Isomudin, a/k/a "HAMBALI," Mohammed Nazir bin Lep, a/k/a "LILLIE," and Mohammed Farik bin Amin, a/k/a "ZUBAIR," (see Appendix A for a list of aliases) and their co-conspirators participated in a common plan and agreement, and aided, abetted, counseled, commanded, and procured the commission of each of the offenses listed at Charges I though VIII. Further, these common allegations set forth the manner and means by which the accused, by virtue of their positions, knew, had reason to know, and should have known that their co-conspirators were about to commit such acts and had done so and that the accused failed to take the necessary and reasonable measures to prevent such acts. The accused, people subject to trial by military commission as alien unprivileged enemy belligerents, did, from multiple locations in or around Afghanistan, Southeast Asia and other locations, in the context of and associated with hostilities, from approximately January ~~1993~~, 1996 through approximately August 2003, knowingly conspire and agree with each other, Usama bin Laden, a/k/a UBL (UBL), Khalid Shaikh Mohammad, a/k/a Mukhtar, a/k/a KSM (KSM), Abu Hafs al-Masri, a/k/a Mohammed Atef (al-Masri), Abu Bak'r Ba'aysir (Ba'aysir), Abdullah Sungkar (Sungkar), and other individuals, known and unknown (see Appendix B for a list of co-conspirators and aliases), to commit substantive offenses triable by military commission, including murder in violation of the law of war, attempted murder in violation of the law of war, intentionally causing serious bodily injury, terrorism, attacking civilians, attacking civilian objects, and destruction of property in violation of the law of war. To that end, the accused and their co-conspirators committed the following overt acts to accomplish the objectives and purposes of the conspiracy:

[margin handwritten: MnY 1/13/21]

1.    In the mid-1980s, **HAMBALI**, then in his early 20s, went to Malaysia. There, he met Abdullah Sungkar and Abu Bak'r Ba'aysir, who later founded the Southeast Asian terrorist organization Jemaah Islamiyah (JI). **HAMBALI** came to believe that he was obligated to personally practice "jihad," which he understood as using violence to advance the interests of the Islamic faith and to oppose enemies of Islam. With Sungkar's encouragement, **HAMBALI** traveled to Afghanistan in 1986 or 1987 and fought with Muslims against Soviet forces.

2.    In 1996, KSM, a senior leader of the international terrorist organization al Qaeda, brokered a meeting in Afghanistan between Usama bin Laden (UBL), al Qaeda's leader, and Sungkar and Ba'aysir, JI's senior leaders. The JI leaders agreed to partner with al Qaeda in jihad.

3.    In August 1996, UBL publicly called for attacks on U.S. military personnel serving on the Arabian Peninsula, in what he referred to as a "Declaration of Holy War Against the Americans Who Are Occupying the Land of the Two Holy Places."

4.    In 1997, **HAMBALI** became the leader of Mantiqi 1, one of JI's four organizational regions. In this capacity, and in furtherance of his belief in the duty to carry out violent jihad, from 1997 until at least 2000, **HAMBALI** recruited prospective jihadi fighters in Southeast Asia, to include Malaysia and Singapore, and facilitated their travel to other countries in order to receive

CONTINUATION SHEET - MC Form 458, Block II. Charges and Specifications in the case of the UNITED STATES OF AMERICA V. ENCEP NURJAMAN; United States of America v. Mohammed Nazir Bin Lep; United States of America v. Mohammed Farik Bin Amin

military training, including mixing and handling explosives. The training locations included Afghanistan and the Philippines.

5.     In 1997, **HAMBALI** sent Abdul Aziz, a/k/a Imam Samudra (Samudra), Noordin Mat Top, a/k/a Top (Top), and Dr. Azahari Husin (Dr. Azahari) to the Philippines to receive military training. Dr. Azahari eventually became an explosives expert and participated in building explosive devices for several terror attacks. Samudra and Top eventually participated in the 2002 terror bombings in Bali, Indonesia, and Top in the 2003 terror bombing of the J.W. Marriott Hotel in Jakarta, Indonesia (both discussed in detail below).

6.     In 1998, UBL issued further calls for violent jihad against the United States and its allies. In February 1998, UBL issued a *fatwah*, or purported religious ruling, declaring that "to kill Americans and their allies, both civilian and military, is the individual duty of every Muslim able to do so, and in any country where it is possible" or words to that effect. UBL's 1998 *fatwah* further declared it is "God's order to kill Americans and plunder their wealth wherever and whenever they find it," or words to that effect. UBL repeated this call to attack the United States during a May 1998 interview with ABC News, during which he also stated, "We do not differentiate between those dressed in military uniforms and civilians. They are all targets in this *fatwah*." UBL further stated that if his demands were not met, al Qaeda would "send" to the United States "the wooden boxes and the coffins" containing "the corpses of American troops and the American civilians."

7.     After UBL's 1998 *fatwah* and until on or about October 2001, **HAMBALI** recruited jihadi fighters in Southeast Asia, to include Fateh Bafana, a/k/a Fathi (Fateh Bafana), Zulkepli bin Marzuki, a/k/a Zulkifli (Marzuki), Jack Roche (Roche), Mohamed Ellias (Ellias), Muhammad Rais (Rais), Ja'afar Bin Mistooki (Mistooki), and others, and facilitated their travel to Afghanistan to train for and practice jihad.

8.     Between 1999 and the first half of 2000, at a Mosque in Malaysia, **HAMBALI** delivered a sermon on jihad to **LILLIE** and others. **LILLIE** told **HAMBALI** that he (**LILLIE**) was willing to travel for jihad.

9.     In or about June 2000, **HAMBALI** arranged for **LILLIE** and **ZUBAIR**, to travel to Afghanistan so that they could train for jihad with al Qaeda. **HAMBALI** provided both **LILLIE** and **ZUBAIR** with airline tickets for travel from Malaysia to Pakistan and coordinated their illegal border crossing into Afghanistan. In accordance with **HAMBALI**'s plan, **LILLIE** and **ZUBAIR** traveled from Malaysia to Qandahar, Afghanistan, where they stayed at an al Qaeda guesthouse. Beginning in approximately early July 2000, **LILLIE** and **ZUBAIR** attended approximately two months of basic military training at an al Qaeda camp near Qandahar.

10.     While in Afghanistan, in accordance with the common practice for jihad fighters to adopt a pseudonym, **LILLIE** adopted the name "Bashir," and **ZUBAIR** adopted the name "Ahmed al Filipini."

CONTINUATION SHEET - MC Form 458, Block II. Charges and Specifications in the case of the UNITED STATES OF AMERICA V. ENCEP NURJAMAN; United States of America v. Mohammed Nazir Bin Lep; United States of America v. Mohammed Farik Bin Amin

11.     In late 2000, **HAMBALI** arranged for Masran Bin Arshad, a/k/a Abdul Aziz (Masran) to receive basic training similar to that arranged for **LILLIE** and **ZUBAIR**.

12.     In or around September 2000, **LILLIE** traveled to the front lines of the battle between the Taliban and the Northern Alliance near Kabul, Afghanistan. There, **LILLIE** guarded Taliban positions and received basic training on using a surface-to-air missile (SAM).

13.     Between approximately October 2000 and December 2000, **ZUBAIR** helped treat wounded fighters at an al Qaeda medical clinic near Qandahar, Afghanistan.

14.     Between in or around November 2000 and in or around March 2001, at or near Qandahar, Afghanistan, **LILLIE** continued to hone his military training from al Qaeda, to include urban warfare, the use of SAMs and rocket propelled grenades (RPG). After completing this training, **LILLIE** worked for several months as a "storekeeper" at an al Qaeda camp, maintaining inventory of the camp's property, including RPGs, SAMs, explosives, and clothing.

15.     Beginning in or around February 2001, at the "Al Farouq" training camp in Afghanistan, **ZUBAIR** received advanced training from al Qaeda in tactical movements, ambushes, land navigation, and guerrilla warfare. He also trained and helped erect buildings at another camp located about a 45-minute walk away from Al Farouq.

16.     Between in or around June 2000 and November 2001, while **LILLIE** and **ZUBAIR** were training in Afghanistan, UBL visited their training sites. UBL spoke about jihad and the duty to fight Americans. Knowing this, **LILLIE** and **ZUBAIR** willingly remained and continued their training and preparation for combat.

## SINGAPORE PLOT

17.     Sometime after UBL's 1998 *fatwah*, at or near Johor Bahru, Malaysia, **HAMBALI** ordered the formation of a special group of JI members in Singapore (the "Singapore Special Group"). **HAMBALI** tasked this group with identifying U.S. military and civilian targets in Singapore. In accordance with **HAMBALI's** order, the Singapore Special Group, led by Hashim Abas, conducted video surveillance of a bus station in Singapore used by U.S. military personnel. **HAMBALI** gave this video to JI member Faiz Abu Bakr Bafana, a/k/a Mahmoud (Faiz Bafana) and ordered him to draft a plan to attack U.S. military and civilian targets in Singapore.

18.     On or about May 1999, at or near Kuala Lumpur, Malaysia, **HAMBALI** approved Faiz Bafana's plan to attack the Singapore bus station. **HAMBALI** ordered Faiz Bafana to travel to Afghanistan and present the plan to al Qaeda leader leader Abu Hafs al Masri, a/k/a Mohammed Atef (Abu Hafs). Abu Hafs agreed that al Qaeda would supply money and suicide bombers for the attack, but directed that JI would have to supply the explosives.

19.     In or around April 2000, JI and al Qaeda members discussed an alternative plan for an attack on U.S. targets near Singapore – specifically, a plan to attack U.S. Navy warships in the Johor Straits. KSM sent al Qaeda operative Abu Hazem Sharqi, a/k/a/ Bandar, (Bandar) to Southeast Asia to work on this plan. In or around December 2000, **HAMBALI** facilitated

CONTINUATION SHEET - MC Form 458, Block II. Charges and Specifications in the case of the UNITED STATES OF AMERICA V. ENCEP NURJAMAN; United States of America v. Mohammed Nazir Bin Lep; United States of America v. Mohammed Farik Bin Amin

meetings between Bandar and members of JI, including Fathur Abd al Rahman al Ghozi, a/k/a Sa'ad (al Ghozi), who helped them obtain explosives.

20.     In or around December 2000, **HAMBALI** ordered Faiz Bafana to carry out video surveillance of U.S. warships in Singapore. Faiz Bafana enlisted his brother, Fateh Bafana, to help with this surveillance. Shortly thereafter, Fateh Bafana, al Qaeda associate Mohammed Jabarah, a/k/a Ahmad, a/k/a, Sammy, a/k/a Amat (Jabarah), Mohamed Ellias, and other JI members conducted video surveillance of U.S. military warships in Singapore. The Singapore plot ultimately failed, and **HAMBALI** later planned an alternative to this plot.

## AUSTRALIA PLOT

21.     In or around early 2000, in Kuala Lumpur, Malaysia, **HAMBALI** tasked Australian JI member Roche to identify U.S. and Israeli interests in Australia, including airlines, embassies, and consulates. **HAMBALI** coordinated and funded Roche's travel to Afghanistan, where Roche received basic military training and met with al Qaeda members KSM, Saif al Adel, and Abu Hafs, who directed Roche to surveil U.S. and Israeli targets in Australia for possible attack. KSM gave Roche approximately $4,000 to conduct the Australia surveillance, and told Roche that **HAMBALI** would give Roche additional money for the operation.

22.     In or around early 2000, Roche returned to Kuala Lumpur, Malaysia, where he again met with **HAMBALI**. Roche presented **HAMBALI** with a note from KSM, and **HAMBALI** and Roche discussed the proposed terrorist attack in Australia, including that **HAMBALI** was to give Roche additional money. A few weeks later, at or near Kuala Lumpur, **HAMBALI** gave Roche additional money for the operation. In June 2000, using the money received from **HAMBALI**, Roche conducted video surveillance of the Israeli consulate in Sydney, Australia, and the U.S. and Israeli Embassies in Canberra, Australia.

## CHRISTMAS EVE 2000 BOMBINGS IN INDONESIA

23.     In mid-2000, at or near Kuala Lumpur, Malaysia, **HAMBALI** held a joint meeting of al Qaeda and JI members to discuss proposed operations in Singapore (described above) and a plan to bomb Christian churches in Indonesia on Christmas Eve.

24.     In or around September 2000, at or near Surabaya, Indonesia, **HAMBALI** met with Ali Imron (Imron), Utomo Pamungkas, a/k/a Mubarok, (Mubarok) and Amrozi bin Nurhasyim, and told them about the plan to bomb churches in Indonesia. **HAMBALI** gave Amrozi money for the operation and ordered the group to make small bombs disguised as Christmas gifts.

25.     On or about November 25, 2000, at or near Batam, Indonesia, **HAMBALI** ordered Abdul Rahim Ba'aysir (Rahim), Hashim Abbas, and Mistooki to wait in a hotel for further instructions. Samudra – whom **HAMBALI** had earlier sent to the Philippines to train for jihad – met the group and briefed them on the plan to surveil and bomb churches. Hashim Abbas, Mistooki, Rahim, Mubarok, Imron, and other co-conspirators surveilled churches and built bombs. On December 24

CONTINUATION SHEET - MC Form 458, Block II. Charges and Specifications in the case of the UNITED STATES OF AMERICA V. ENCEP NURJAMAN; United States of America v. Mohammed Nazir Bin Lep; United States of America v. Mohammed Farik Bin Amin

(Christmas Eve) of 2000, **HAMBALI'S** co-conspirators carried out the attacks on the civilian population and civilian property, killing more than a dozen Indonesian civilians.

## PHILIPPINES PLOT

26.     In or about December 2000, **HAMBALI** and Faiz Bafana met with al Ghozi in Manila, Philippines, to discuss potential attacks against the U.S. and Israeli embassies in Manila. **HAMBALI** and Faiz Bafana surveilled these embassies and other potential U.S. targets in Manila.

27.     In or around September 2001, at or near Karachi, Pakistan, **HAMBALI** met with KSM and al Qaeda associate Jabarah. **HAMBALI** gave Jabarah information about the Philippines operation and provided him with contact information for JI members in Malaysia who were involved in the planning.

28.     In September or October 2001, Jabarah traveled to Manila, Philippines. There, he met with al Ghozi and other co-conspirators and conducted surveillance of the U.S. and Israeli embassies.

29.     In or around December 2001, at or near Kuala Lumpur, Malaysia, **HAMBALI** met with Jabarah and other co-conspirators to discuss the proposed Philippines and Singapore operations. **HAMBALI** ordered the Philippines attack because explosives were already in the Philippines and the attack could be executed sooner. The Philippines plot ultimately failed.

## POST-9/11 PLOT TARGETING THE UNITED STATES

30.     For several months leading up to the attacks of September 11, 2001, **HAMBALI** operated the "Philippine House," a guesthouse in Afghanistan at which **LILLIE, ZUBAIR**, Masran, and fellow Southeast Asian JI associates Yazid Sufaat and Abu Rahim, a/k/a Abu Harris (Abu Harris) stayed. The term "Philippine House" was a cover intended to disguise the fact that Malaysians were living there.

31.     In or around October 2001 – after the attacks of September 11, 2001, and with knowledge that UBL and al Qaeda had directed and carried out those attacks – at or near Qandahar, Afghanistan, **HAMBALI** selected four co-conspirators—**LILLIE, ZUBAIR**, Masran, and Nik Amran bin Mustafa, a/k/a Afifi (Afifi) — to participate in a terrorist operation targeting civilians in the United States.

32.     In or around October 2001, as part of the planning for this operation, **HAMBALI** arranged for the four co-conspirators, **LILLIE, ZUBAIR**, Masran, and Afifi, to meet UBL in or near Kabul, Afghanistan. The four co-conspirators traveled to Kabul and met UBL. They agreed to take part in an al Qaeda suicide operation to attack Americans and swore a personal oath of loyalty ("ba'yat") to UBL.

CONTINUATION SHEET - MC Form 458, Block II. Charges and Specifications in the case of the UNITED STATES OF AMERICA V. ENCEP NURJAMAN; United States of America v. Mohammed Nazir Bin Lep; United States of America v. Mohammed Farik Bin Amin

33.    In or around October 2001, **HAMBALI** arranged a meeting between Masran and KSM in Qandahar, Afghanistan. KSM gave Masran instructions for a future task to transport money for **HAMBALI** to Bangkok, Thailand. KSM told Masran that **HAMBALI** would know what to do with the money.

34.    In or around November 2001, Masran ordered **LILLIE, ZUBAIR,** and Afifi to return to Malaysia via Thailand in order to get new passports. On or around December 26, 2001, **LILLIE, ZUBAIR,** and Afifi traveled together from Pakistan to Thailand. Masran was arrested, and the plan to attack the United States was therefore cancelled. Around the same time, **HAMBALI** also instructed **LILLIE** and **ZUBAIR** to join him in Bangkok, Thailand.

## LILLIE AND ZUBAIR'S SUPPORT TO HAMBALI
## AND PREPARATION FOR ATTACKS

35.    After returning to Southeast Asia from Pakistan, **LILLIE** and **ZUBAIR** used Thailand as a base of operations. They also traveled to Cambodia for operational purposes. During this period, from the end of 2001 until on or about August 2003 – and including the periods before, during, and after the October 12, 2002 Bali bombings (discussed below) – **LILLIE** and **ZUBAIR** helped **HAMBALI** transfer money for operations, and obtain and store items such as fraudulent identification documents, weapons, and instructions on how to make bombs. On **HAMBALI's** orders, **LILLIE** and **ZUBAIR** also conducted surveillance for potential attacks on an airport in Bangkok, Thailand.

36.    On multiple occasions, between January 2002 and August 2003, in or near Bangkok, Thailand, Dr. Azahari trained **LILLIE** and **ZUBAIR** on making bombs. **LILLIE** also received CD-ROMs containing bomb-making instructions from **HAMBALI** and, on **HAMBALI's** orders, stored these CD-ROMs in an apartment in Bangkok.

37.    From the end of 2001 until on or about August 2003, **HAMBALI** gave **LILLIE** and **ZUBAIR** money to buy fraudulent identification documents for **HAMBALI**. On multiple occasions, **LILLIE** helped obtain fraudulent identification documents for **HAMBALI**.

38.    Between in or around early 2003 through mid-2003, in Cambodia, **ZUBAIR** bought an M-16 rifle, a handgun, and ammunition for **HAMBALI's** use and smuggled them into Thailand. **ZUBAIR** also tried to buy explosives and a SA-7 SAM in Cambodia.

39.    On two separate occasions in early 2002, **HAMBALI** ordered **LILLIE** to surveil an Israeli airline counter at an airport in Bangkok, Thailand, as part of a plan to conduct an attack targeting Israeli airline customers. **HAMBALI** also ordered **ZUBAIR** to surveil the counter of an Israeli airline counter at an airport in Bangkok, and to determine how many people were near the counter during the busiest time of the day. On multiple occasions in 2002 and 2003, **ZUBAIR** also surveilled the Israeli embassy in Bangkok on his own initiative.

CONTINUATION SHEET - MC Form 458, Block II. Charges and Specifications in the case of the UNITED STATES OF AMERICA V. ENCEP NURJAMAN; United States of America v. Mohammed Nazir Bin Lep; United States of America v. Mohammed Farik Bin Amin

## 2002 BALI BOMBINGS

40.     Between on or about December 2001 and on or about February 2002, in Thailand, **HAMBALI** met with Marzuki, Top, Dr. Azahari, Mukhlas, and other co-conspirators. **HAMBALI** ordered the group to plan an operation to replace the Singapore Plot (discussed above) and to target embassies, Israeli buildings, and locations frequented by tourists such as bars, cafes, and nightclubs. **HAMBALI** said that he could get al Qaeda funding for such attacks. Around the same time, **HAMBALI** also instructed **LILLIE** and **ZUBAIR** to join him in Bangkok, Thailand (as stated above in common allegation 34).

41.     In or around January 2002, **HAMBALI** met with Jabarah in Thailand. **HAMBALI** told Jabarah that he planned to have his group conduct small bombings in bars, cafes, or nightclubs frequented by "Westerners" in Indonesia, Malaysia, the Philippines, and Thailand. **HAMBALI** told Jabarah that he had one ton of explosives in Indonesia.

42.     In or around ~~August~~ October 2002, co-conspirators Mubarok and Amrozi delivered a Mitsubishi L300 van to co-conspirators Imron and Jhoni Hendrawan, a/k/a Idris (Idris), in Bali, Indonesia. On or about September 9, 2002, Idris, Joko Pitono a/k/a Dulmatin, a/k/a Abdul Matin (Abdul Matin), Abdul Ghoni, Amrozi, Mubarok, and Imron surveilled areas in Bali to identify a target to bomb.

*[handwritten in margin: October; JDW 1/21/21]*

43.     In mid-2002, **HAMBALI** told **LILLIE** to meet an Arab, "Mansour," who would be traveling to Thailand to deliver money. Mansour obtained **LILLIE'S** phone number from **HAMBALI** and contacted **LILLIE** when he arrived in Thailand. **LILLIE** and Mansour had lunch at the Bangkok Marriott Hotel, where Mansour gave **LILLIE** a plastic bag containing money. **LILLIE** later gave that money to **HAMBALI**.

44.     In September and October 2002, Dr. Azahari, Amrozi, Mubarok, Imron, Samudra, Mukhlas, Umar Patek, and others fabricated a suicide vest, and built and installed a bomb in the Mitsubishi L300. They also built a bomb to be used against the U.S. Consulate in Bali, Indonesia.

45.     Knowing that the bombing was imminent, **HAMBALI** instructed Marzuki to rent a hotel room with a television that carried CNN so that he could watch television coverage of the bombing. **HAMBALI** also kept in contact with Mukhlas before, during, and after the Bali attacks, until Mukhlas's arrest in December 2002.

46.     On October 12, 2002, a group of co-conspirators attacked the civilian population and civilian property at Paddy's Pub on Legian Street, Sari Club on Legian Street, and the U.S. Consulate, all located in Bali, Indonesia. One suicide bomber walked into Paddy's Bar and detonated the suicide vest. A second suicide bomber drove the explosives-laden Mitsubishi L300 van to a location near the Sari Club and detonated the bomb. Finally, Imron placed a third bomb on a sidewalk near the U.S. Consulate, and Idris remotely detonated it using a cellular telephone. Collectively, the attacks killed approximately 202 civilians, including seven U.S. civilian citizens

CONTINUATION SHEET - MC Form 458, Block II. Charges and Specifications in the case of the UNITED STATES OF AMERICA V. ENCEP NURJAMAN; United States of America v. Mohammed Nazir Bin Lep; United States of America v. Mohammed Farik Bin Amin

(See Charge Sheet Appendix C for list of victims killed in attack), injured at least 28 civilians (See Charge Sheet Appendix D for list of victims injured), and destroyed civilian buildings.

## 2003 J.W. MARRIOTT BOMBING IN JAKARTA

47.     On or about late 2002, **HAMBALI** told **ZUBAIR** that he would receive money from al Qaeda. **ZUBAIR** understood that when al Qaeda sent money, it was to be used for an "operation" in which people would be killed.

48.     KSM and Ali Abdul Aziz Ali a/k/a Ammar al Baluchi (Ali) directed Majid Shoukat Khan (Khan) to deliver $50,000 to **HAMBALI** to fund an attack. **HAMBALI** directed **ZUBAIR** to serve as an intermediary and to receive the money from Khan on **HAMBALI**'s behalf. KSM directed Khan to retrieve the money in Bangkok from a *hawala* - an underground banking system based on trust whereby money can be made available internationally without actually moving it or leaving a record of the transaction – so as to avoid traveling and passing through customs while carrying a large amount of cash. Ali Abdul Aziz Ali provided Khan with **ZUBAIR**'s phone number in Thailand and the phone number for a Bangkok-based *hawaladar* – a hawala dealer.

49.     On or about December 24, 2002, Khan and his wife traveled from Pakistan to Bangkok, Thailand. As instructed, he retrieved $50,000 from a Bangkok-based *hawala*. On or about December 28, 2002, Khan notified Ali that he had successfully received $50,000 and that he would deliver the money to **ZUBAIR**.

50.     On or around December 28, 2002, in Bangkok, Thailand, Khan delivered $30,000 of al Qaeda money to **ZUBAIR**. The two arranged to meet again later in order to transfer additional money.

51.     On or about December 28, 2002, at or near Bangkok, Thailand, **ZUBAIR** and Khan met a second time. Khan delivered an additional $20,000 of al Qaeda money to **ZUBAIR**.

52.     On or about December 28, 2002, on **HAMBALI**'s orders, **ZUBAIR** took the $50,000 he had received from Khan and stored it for safekeeping in the apartment he shared with **LILLIE** in Bangkok, Thailand.

53.     In or around January 2003 on **HAMBALI**'s orders, **ZUBAIR** met with a second al Qaeda money courier at or near Bangkok, Thailand. At this meeting, the courier gave **ZUBAIR** approximately $49,900. **ZUBAIR** stored this money in the apartment he shared with **LILLIE** in Bangkok.

54.     In the spring of 2003, **HAMBALI** directed **LILLIE** to deliver al Qaeda money to Indonesia and the Philippines. **HAMBALI** told **LILLIE** and **ZUBAIR** that **HAMBALI** was sending money to Indonesia for two reasons, one of which was to fund an upcoming operation.

CONTINUATION SHEET - MC Form 458, Block II.  Charges and Specifications in the case of the UNITED STATES OF AMERICA V. ENCEP NURJAMAN; United States of America v. Mohammed Nazir Bin Lep; United States of America v. Mohammed Farik Bin Amin

55.     In the spring of 2003, **LILLIE** met with a friend, Muhammad Nazir bin Ismail, a/k/a Johan (Johan), at a restaurant in Hat Yai, Thailand.  **LILLIE** instructed Johan to deliver money to Indonesia.  During the meeting, **LILLIE** gave Johan money, recognition codes, and a codename and phone number for the individual in Indonesia who would receive the money.

56.     Johan delivered the money to JI associate Mohammed Ikhwan, a/k/a Agus, a/k/a Ismail, (Ismail) at the Dumai Harbor in Sumatra, Indonesia.  Johan then notified **LILLIE** that the delivery was complete.  Sometime thereafter, **HAMBALI** told **LILLIE** that the money which Johan had delivered to Indonesia was intended for Dr. Azahari.

57.     After receiving the money, Ismail took it to a rented room in Lampung, Sumatra, Indonesia, where he met with Top, Dr. Azahari, Asmir Latin Sani (Asmir), and Masrizal Bin Ali Umar, a/k/a Tohir (Tohir).  Top assigned each of the others tasks relating to the planning and execution of a bombing using a vehicle-borne explosive device.

58.     In or around July 2003, Asmar and Tohir rented a house with a garage in Jakarta, Indonesia.  Tohir and Asmar bought a Toyota truck.  Ismail and Dr. Azahari built a bomb to place in the truck.

59.     In or about mid-July 2003, Ismail, Top, Tohir, Dr. Azahari, Asmar, and others began surveilling potential targets in Jakarta, Indonesia.  They sought a target that was American-owned and where many Americans were likely to be present.  The group selected a set of potential targets, one of which was the J.W. Marriott Hotel in Jakarta ("J.W. Marriott").  In or around July of 2003, Dr. Azahari and Top chose the J.W. Marriott as the specific target.  The group surveilled the J.W. Marriott for approximately one week to determine the time and manner of delivering the bomb that would cause the most destruction and loss of life.

60.     On August 5, 2003, the group attacked the civilian population and civilian property at the J.W. Marriott.  Dr. Azahari and Ismail, riding on a motorcycle, escorted Asmar to the J.W. Marriott.  Asmar drove the truck bomb into the J.W. Marriott's front entrance and detonated it.  The explosion killed 11 civilians (See Charge Sheet Appendix E for a list of victims killed), wounded 81 other civilians (See Charge Sheet Appendix F for a list of victims injured), and damaged the J.W. Marriott (civilian property).

CONTINUATION SHEET - MC Form 458, Block II. Charges and Specifications in the case of the UNITED STATES OF AMERICA V. ENCEP NURJAMAN; United States of America v. Mohammed Nazir Bin Lep; United States of America v. Mohammed Farik Bin Amin

## CHARGE I: VIOLATION OF 10 U.S.C. § 950t(15), MURDER IN VIOLATION OF THE LAW OF WAR

**Specification 1:** In that Encep Nurjaman, a/k/a Riduan bin Isomudin, a/k/a HAMBALI, Mohammed Nazir bin Lep, a/k/a LILLIE, and Mohammed Farik bin Amin, a/k/a ZUBAIR (see Charge Sheet Appendix A for a list of aliases), persons subject to trial by military commission as alien unprivileged enemy belligerents, did, on or about October 12, 2002, at or near Bali, Indonesia, in the context of and associated with hostilities, intentionally and unlawfully kill one or more persons in violation of the law of war by intentionally detonating explosives in Paddy's Pub on Legian Street, in front of the Sari Club on Legian Street, ~~and near the U.S. Consulate~~, located ᴬᵘⁿ in or around Bali, Indonesia. (See Charge Sheet Appendix C for a list of victims killed in the attack).  1/13/21

The accused Encep Nurjaman, a/k/a Riduan bin Isomudin, a/k/a HAMBALI, Mohammed Nazir bin Lep, a/k/a LILLIE and Mohammed Farik bin Amin, a/k/a ZUBAIR, are liable for the above alleged offense as principals, as co-conspirators, and as participants in a common plan as set forth under the "Common Allegations."

**Specification 2:** In that Encep Nurjaman, a/k/a Riduan bin Isomudin, a/k/a HAMBALI, Mohammed Nazir bin Lep, a/k/a LILLIE, and Mohammed Farik bin Amin, a/k/a ZUBAIR (see Charge Sheet Appendix A for a list of aliases), persons subject to trial by military commission as alien unprivileged enemy belligerents, did, on or about August 5, 2003, at or near Jakarta, Indonesia, in the context of and associated with hostilities, intentionally and unlawfully kill one or more persons in violation of the law of war by intentionally detonating a vehicle laden with explosives in front of the J.W. Marriott Hotel located in or around Jakarta, Indonesia. (See Charge Sheet Appendix E for a list of victims killed in the attack).

The accused Encep Nurjaman, a/k/a Riduan bin Isomudin, a/k/a HAMBALI, Mohammed Nazir bin Lep, a/k/a LILLIE, and Mohammed Farik bin Amin, a/k/a ZUBAIR, are liable for the above alleged offense as principals, as co-conspirators, and as participants in a common plan as set forth under the "Common Allegations."

CONTINUATION SHEET - MC Form 458, Block II. Charges and Specifications in the case of the UNITED STATES OF AMERICA V. ENCEP NURJAMAN; United States of America v. Mohammed Nazir Bin Lep; United States of America v. Mohammed Farik Bin Amin

## CHARGE II: VIOLATION OF 10 U.S.C. § 950t(28), ATTEMPTED MURDER IN VIOLATION OF THE LAW OF WAR

**Specification 1:** In that Encep Nurjaman, a/k/a Riduan bin Isomudin, a/k/a HAMBALI, Mohammed Nazir bin Lep, a/k/a LILLIE, and Mohammed Farik bin Amin, a/k/a ZUBAIR (see Charge Sheet Appendix A for a list of aliases), persons subject to trial by military commission as alien unprivileged enemy belligerents, did, on or about October 12, 2002, at or near Bali, Indonesia, in the context of and associated with hostilities, with the specific intent to commit Murder in Violation of the Law of War, attempt to intentionally and unlawfully kill one or more persons in violation of the law of war, by detonating explosives in Paddy's Pub on Legian Street, AND in front of the Sari Club on Legian Street, and near the U.S. Consulate, located in Bali, Indonesia, which actions amounted to more than mere preparation and apparently tended to effect the commission of the offense of Murder in Violation of the Law of War. (See Charge Sheet Appendix D for a list of victims injured).

MLT
1/13/21

The accused Encep Nurjaman, a/k/a Riduan bin Isomudin, a/k/a HAMBALI, Mohammed Nazir bin Lep, a/k/a LILLIE, and Mohammed Farik bin Amin, a/k/a ZUBAIR, are liable for the above alleged offense as principals, as co-conspirators, and as participants in a common plan as set forth under the "Common Allegations."

**Specification 2:** In that Encep Nurjaman, a/k/a Riduan bin Isomudin, a/k/a HAMBALI, Mohammed Nazir bin Lep, a/k/a LILLIE, and Mohammed Farik bin Amin, a/k/a ZUBAIR (see Charge Sheet Appendix A for a list of aliases), persons subject to trial by military commission as alien unprivileged enemy belligerents, did, on or about August 5, 2003, at or near Jakarta, Indonesia, in the context of and associated with hostilities, with the specific intent to commit Murder in Violation of the Law of War, attempt to intentionally and unlawfully kill one or more persons, by intentionally detonating a vehicle laden with explosives in front of the J.W. Marriott Hotel located in or around Jakarta, Indonesia, which actions amounted to more than mere preparation and apparently tended to effect the commission of the offense of Murder in Violation of the Law of War. (See Charge Sheet Appendix F for a list of victims injured).

The accused Encep Nurjaman, a/k/a Riduan bin Isomudin, a/k/a HAMBALI, Mohammed Nazir bin Lep, a/k/a LILLIE, and Mohammed Farik bin Amin, a/k/a ZUBAIR, are liable for the above alleged offense as principals, as co-conspirators, and as participants in a common plan as set forth under the "Common Allegations."

CONTINUATION SHEET - MC Form 458, Block II. Charges and Specifications in the case of the UNITED STATES OF AMERICA V. ENCEP NURJAMAN; United States of America v. Mohammed Nazir Bin Lep; United States of America v. Mohammed Farik Bin Amin

## CHARGE III: VIOLATION OF 10 U.S.C. § 950t(13), INTENTIONALLY CAUSING SERIOUS BODILY INJURY

**Specification 1:** In that Encep Nurjaman, a/k/a Riduan bin Isomudin, a/k/a HAMBALI, Mohammed Nazir bin Lep, a/k/a LILLIE, and Mohammed Farik bin Amin, a/k/a ZUBAIR (see Charge Sheet Appendix A for a list of aliases), persons subject to trial by military commission as alien unprivileged enemy belligerents, did, on or about October 12, 2002, at or near Bali, Indonesia, in the context of and associated with hostilities, intentionally cause and inflict serious injury to the body and health of one or more persons, with unlawful force or violence, in violation of the law of war, by intentionally detonating explosives in Paddy's Pub on Legian Street, in front of the Sari Club on Legian Street, ~~and near the U.S. Consulate,~~ located in or around Bali, Indonesia.

The accused Encep Nurjaman, a/k/a Riduan bin Isomudin, a/k/a HAMBALI, Mohammed Nazir bin Lep, a/k/a LILLIE, and Mohammed Farik bin Amin, a/k/a ZUBAIR, are liable for the above alleged offense as principals, as co-conspirators, and as participants in a common plan as set forth under the "Common Allegations."

**Specification 2:** In that Encep Nurjaman, a/k/a Riduan bin Isomudin, a/k/a HAMBALI, Mohammed Nazir bin Lep, a/k/a LILLIE, and Mohammed Farik bin Amin, a/k/a ZUBAIR (see Charge Sheet Appendix A for a list of aliases), persons subject to trial by military commission as alien unprivileged enemy belligerents, did, on or about August 5, 2003, at or near Jakarta, Indonesia, in the context of and associated with hostilities, intentionally cause and inflict serious injury to the body and health of one or more persons, with unlawful force or violence, in violation of the laws for war, by intentionally detonating a vehicle laden with explosives in front of the J.W. Marriott Hotel located in or around Jakarta, Indonesia.

The accused Encep Nurjaman, a/k/a Riduan bin Isomudin, a/k/a HAMBALI, Mohammed Nazir bin Lep, a/k/a LILLIE, and Mohammed Farik bin Amin, a/k/a ZUBAIR, are liable for the above alleged offense as principals, as co-conspirators, and as participants in a common plan as set forth under the "Common Allegations."

CONTINUATION SHEET - MC Form 458, Block II. Charges and Specifications in the case of the UNITED STATES OF AMERICA V. ENCEP NURJAMAN; United States of America v. Mohammed Nazir Bin Lep; United States of America v. Mohammed Farik Bin Amin

## CHARGE IV: VIOLATION OF 10 U.S.C. § 950t(24), TERRORISM

**Specification 1:** In that Encep Nurjaman, a/k/a Riduan bin Isomudin, a/k/a HAMBALI, Mohammed Nazir bin Lep, a/k/a LILLIE, and Mohammed Farik bin Amin, a/k/a ZUBAIR (see Charge Sheet Appendix A for a list of aliases), persons subject to trial by military commission as alien unprivileged enemy belligerents, did, on or about October 12, 2002, at or near Bali, Indonesia, in the context of and associated with hostilities, intentionally kill and inflict great bodily harm on one or more protected persons and engage in an act that evinced a wanton disregard for human life, in a manner calculated to influence and affect the conduct of government and civilian population by intimidation and coercion, and to retaliate against government conduct, by intentionally detonating explosives in Paddy's Pub on Legian Street, in front of the Sari Club on Legian Street, and near the U.S. Consulate located in Bali, Indonesia. (See Charge Sheet Appendix C for a list of victims killed in the attack and Appendix D for a list of the injured persons).

The accused Encep Nurjaman, a/k/a Riduan bin Isomudin, a/k/a HAMBALI, Mohammed Nazir bin Lep, a/k/a LILLIE, and Mohammed Farik bin Amin, a/k/a ZUBAIR, are liable for the above alleged offense as principals, as co-conspirators, and as participants in a common plan as set forth under the "Common Allegations."

**Specification 2:** In that Encep Nurjaman, a/k/a Riduan bin Isomudin, a/k/a HAMBALI, Mohammed Nazir bin Lep, a/k/a LILLIE, and Mohammed Farik bin Amin, a/k/a ZUBAIR (see Charge Sheet Appendix A for a list of aliases), persons subject to trial by military commission as alien unprivileged enemy belligerents, did, on or about August 5, 2003, at or near Jakarta, Indonesia, in the context of and associated with hostilities, intentionally kill and inflict great bodily harm on one or more protected persons and engage in an act that evinced a wanton disregard for human life, in a manner calculated to influence and affect the conduct of government and civilian population by intimidation and coercion, and to retaliate against government conduct, by intentionally detonating a vehicle laden with explosives in front of the J.W. Marriott Hotel located in or around Jakarta, Indonesia. (See Charge Sheet Appendix E for a list of victims killed in the attack and Appendix F for a list of the 144 injured persons).

JPU
1/21/21

The accused Encep Nurjaman, a/k/a Riduan bin Isomudin, a/k/a HAMBALI, Mohammed Nazir bin Lep, a/k/a LILLIE, and Mohammed Farik bin Amin, a/k/a ZUBAIR, are liable for the above alleged offense as principals, as co-conspirators, and as participants in a common plan as set forth under the "Common Allegations."

CONTINUATION SHEET - MC Form 458, Block II. Charges and Specifications in the case of the UNITED STATES OF AMERICA V. ENCEP NURJAMAN; United States of America v. Mohammed Nazir Bin Lep; United States of America v. Mohammed Farik Bin Amin

## CHARGE V: VIOLATION OF 10 U.S.C. § 950t(2), ATTACKING CIVILIANS

**Specification 1:** In that Encep Nurjaman, a/k/a Riduan bin Isomudin, a/k/a HAMBALI, Mohammed Nazir bin Lep, a/k/a LILLIE, and Mohammed Farik bin Amin, a/k/a ZUBAIR (see Charge Sheet Appendix A for a list of aliases), persons subject to trial by military commission as alien unprivileged enemy belligerents, did, on or about October 12, 2002, at or near Bali, Indonesia, in the context of and associated with hostilities, intentionally engage in an attack on a civilian population to wit: the civilian population of Bali, Indonesia, by intentionally detonating explosives in Paddy's Pub on Legian Street, in front of the Sari Club on Legian Street, and near the U.S. Consulate, located in or around Bali, Indonesia, intending the object of the attack to be, and the object of the attack in fact was, a civilian population as such, and individual civilians not taking direct or active part in hostilities, and knew or should have known of the factual circumstances that established the civilian status. (See Charge Sheet Appendix C for a list of the civilians killed and Appendix D for a list of civilians injured.)

The accused Encep Nurjaman, a/k/a Riduan bin Isomudin, a/k/a HAMBALI, Mohammed Nazir bin Lep, a/k/a LILLIE, and Mohammed Farik bin Amin, a/k/a ZUBAIR, are liable for the above alleged offense as principals, as co-conspirators, and as participants in a common plan as set forth under the "Common Allegations."

**Specification 2:** In that Encep Nurjaman, a/k/a Riduan bin Isomudin, a/k/a HAMBALI, Mohammed Nazir bin Lep, a/k/a LILLIE, and Mohammed Farik bin Amin, a/k/a ZUBAIR (see Charge Sheet Appendix A for a list of aliases), persons subject to trial by military commission as alien unprivileged enemy belligerents, did, on or about August 5, 2003, at or near Jakarta, Indonesia, in the context of and associated with hostilities, intentionally engage in an attack on a civilian population, to wit: by intentionally detonating a vehicle laden with explosives in front of the J.W. Marriott Hotel located in or around Jakarta, Indonesia, intending the object of the attack to be, and the object of the attack in fact was, a civilian population as such, and individual civilians not taking direct or active part in hostilities, and knew or should have known the factual circumstances that established the civilian status. (See Charge Sheet Appendix E for a list of the civilians killed and Appendix F for a list of civilians injured)

The accused Encep Nurjaman, a/k/a Riduan bin Isomudin, a/k/a HAMBALI, Mohammed Nazir bin Lep, a/k/a LILLIE, and Mohammed Farik bin Amin, a/k/a ZUBAIR, are liable for the above alleged offense as principals, as co-conspirators, and as participants in a common plan as set forth under the "Common Allegations."

CONTINUATION SHEET - MC Form 458, Block II. Charges and Specifications in the case of the UNITED STATES OF AMERICA V. ENCEP NURJAMAN; United States of America v. Mohammed Nazir Bin Lep; United States of America v. Mohammed Farik Bin Amin

## CHARGE VI: VIOLATION OF 10 U.S.C. § 950t(3), ATTACKING CIVILIAN OBJECTS

**Specification 1:** In that Encep Nurjaman, a/k/a Riduan bin Isomudin, a/k/a HAMBALI, Mohammed Nazir bin Lep, a/k/a LILLIE, and Mohammed Farik bin Amin, a/k/a ZUBAIR (see Charge Sheet Appendix A for a list of aliases), persons subject to trial by military commission as alien ~~enemy unprivileged~~ belligerents, did, on or about October 12, 2002, at or near Bali, Indonesia, in the context of and associated with hostilities, intentionally engage in an attack on civilian property, to wit: Paddy's Pub on Legian Street, the Sari Club on Legian Street, and near the U.S. Consulate located in ~~Jakarta~~, Indonesia, that is, property that was not a military objective, intending such civilian property to be an object of the attack, knowing or having reason to know that such property was not a military objective, by intentionally detonating explosives in Paddy's Bar on Legian Street, ~~near~~ the Sari Club, and near the U.S. Consulate located in or around Bali, Indonesia. in front of on Legian Street

The accused Encep Nurjaman, a/k/a Riduan bin Isomudin, a/k/a HAMBALI, Mohammed Nazir bin Lep, a/k/a LILLIE, and Mohammed Farik bin Amin, a/k/a ZUBAIR, are liable for the above alleged offense as principals, as co-conspirators, and as participants in a common plan as set forth under the "Common Allegations."

**Specification 2:** In that Encep Nurjaman, a/k/a Riduan bin Isomudin, a/k/a HAMBALI, Mohammed Nazir bin Lep, a/k/a LILLIE, and Mohammed Farik bin Amin, a/k/a ZUBAIR (see Charge Sheet Appendix A for a list of aliases), persons subject to trial by military commission as alien ~~enemy unprivileged~~ belligerents, did, on or about August 5, 2003, at or near Jakarta, Indonesia, in the context of and associated with hostilities, intentionally engage in an attack on civilian property, to wit: the J.W. Marriott Hotel located in or around Jakarta, Indonesia, that is, property that was not a military objective, intending such civilian property to be an object of the attack, knowing or having reason to know that such property was not a military objective, by intentionally detonating a vehicle laden with explosives in front of the J.W. Marriott Hotel located in or around Jakarta, Indonesia.

The accused Encep Nurjaman, a/k/a Riduan bin Isomudin, a/k/a HAMBALI, Mohammed Nazir bin Lep, a/k/a LILLIE, and Mohammed Farik bin Amin, a/k/a ZUBAIR, are liable for the above alleged offense as principals, as co-conspirators, and as participants in a common plan as set forth under the "Common Allegations."

CONTINUATION SHEET - MC Form 458, Block II. Charges and Specifications in the case of the UNITED STATES OF AMERICA V. ENCEP NURJAMAN; United States of America v. Mohammed Nazir Bin Lep; United States of America v. Mohammed Farik Bin Amin

## CHARGE VII: VIOLATION OF 10 U.S.C. § 950t(16), DESTRUCTION OF PROPERTY IN VIOLATION OF THE LAW OF WAR

**Specification 1:** In that Encep Nurjaman, a/k/a Riduan bin Isomudin, a/k/a HAMBALI, Mohammed Nazir bin Lep, a/k/a LILLIE, and Mohammed Farik bin Amin, a/k/a ZUBAIR (see Charge Sheet Appendix A for a list of aliases), persons subject to trial by military commission as alien unprivileged enemy belligerents, did, on or about October 12, 2002, at or near Bali, Indonesia, in the context of and associated with hostilities, and in violation of the law of war, intentionally destroy property belonging to another person, without that person's consent, to wit: Paddy's Pub and the Sari Club on Legian Street, in Bali, Indonesia.

The accused Encep Nurjaman, a/k/a Riduan bin Isomudin, a/k/a HAMBALI, Mohammed Nazir bin Lep, a/k/a LILLIE, and Mohammed Farik bin Amin, a/k/a ZUBAIR, are liable for the above alleged offense as principals, as co-conspirators, and as participants in a common plan as set forth under the "Common Allegations."

**Specification 2:** In that Encep Nurjaman, a/k/a Riduan bin Isomudin, a/k/a HAMBALI, Mohammed Nazir bin Lep, a/k/a LILLIE, and Mohammed Farik bin Amin, a/k/a ZUBAIR (see Charge Sheet Appendix A for a list of aliases), persons subject to trial by military commission as alien unprivileged enemy belligerents, did, on or about August 5, 2003, at or near Jakarta, Indonesia, in the context of and associated with hostilities, and in violation of the law of war, intentionally destroy property belonging to another person, without that person's consent, to wit: J.W. Marriott Hotel located in or around Jakarta, Indonesia.

The accused Encep Nurjaman, a/k/a Riduan bin Isomudin, a/k/a HAMBALI, Mohammed Nazir bin Lep, a/k/a LILLIE, and Mohammed Farik bin Amin, a/k/a ZUBAIR, are liable for the above alleged offense as principals, as co-conspirators, and as participants in a common plan as set forth under the "Common Allegations."

CONTINUATION SHEET - MC Form 458, Block II. Charges and Specifications in the case of the UNITED STATES OF AMERICA V. ENCEP NURJAMAN; United States of America v. Mohammed Nazir Bin Lep; United States of America v. Mohammed Farik Bin Amin

**CHARGE VIII: VIOLATION OF 10 U.S.C. §950t(29), CONSPIRACY**

**Specification**: In that Encep Nurjaman, a/k/a Riduan bin Isomudin, a/k/a "HAMBALI," Mohammed Nazir bin Lep, a/k/a "LILLIE," and Mohammed Farik bin Amin, a/k/a "ZUBAIR" (see Charge Sheet Appendix A for a list of aliases), persons subject to trial by military commission as alien unprivileged enemy belligerents, did, from on or about August 1996 to on or about August 2003, at multiple locations in or around Afghanistan, Southeast Asia, and elsewhere, in the context of and associated with hostilities, knowingly conspire and agree with the following persons: Usama bin Laden, Khalid Shaikh Mohammad, Abu Bak'r Ba'aysir, Abdullah Sungkar and others, known and unknown (see Charge Sheet Appendix B for a list of known co-conspirators), to commit one or more substantive offenses triable by military commission, to wit: murder in violation of the law of war, attempted murder in violation of the law of war, intentionally causing serious bodily injury, terrorism, attacking civilians, attacking civilian objects, and destruction of property in violation of the law of war. Each of the three accused, knowing the unlawful purposes of the agreement, willfully joined the agreement with the intent to further its unlawful objectives and purposes and, thereafter, knowingly committed one or more overt acts in order to accomplish some objective or purpose of the agreement, with the said conspiracy resulting in the deaths of civilians (see Charge Sheet Appendices C and E for a list of victims killed in the attacks), injuries to civilians (see Charge Sheet Appendices D and F for a list of victims injured in the attacks), and damage to personal property.

The paragraphs numbered 1-60, listed in the section entitled "Common Allegations," are hereby re-alleged and incorporated by reference as overt acts as if set forth fully here.

### CHARGE SHEET: APPENDIX A

### Aliases of Encep Nurjaman

- Hambali
- Riduan Bin Isomuddin
- Riduan Isamuddin
- Hendrawan
- Mizi
- Halim Osmann
- Azman
- Osama Turkestani

### Aliases of Mohammed Nazir Bin Lep

- Lillie
- Lilie
- Bashir Al Filipini
- Bashir bin Lep
- Bashir bin Lap
- Nazir Lep
- Nazir
- Daoud
- Ali
- Nazir
- Wak bin Lep
- Dawud
- Dawod

### Aliases of Mohammed Farik Bin Amin

- Zubair
- Ahmed
- Achmad
- Fariq
- Fariq Amin
- Muhammad Fariq bin Amin
- Mohd Farik bin Amin
- Mohammad Bin Amin
- Mohammed Farik bin Amin
- Zack
- Awe bin Amin
- Muhammad Zubair
- Zaid
- Mussa
- Ahmed al-Filipini

**CHARGE SHEET: APPENDIX B**

**List of Known Co-Conspirators**

a) Usama bin Laden, a/k/a UBL

b) Khalid Shaikh Mohammad, a/k/a Mukhtar, a/k/a KSM

c) Abu Hafs al Masri, a/k/a Mohammed Atef

d) Abu Bak'r Ba'aysir

e) Ali Abdul Aziz Ali, a/k/a Ammar al Baluchi

f) Majid Shoukat Khan

g) Dr. Azahari Husin

h) Nik Amran bin Mustafa, a/k/a Afifi

i) Masran Bin Arshad, a/k/a Abdul Aziz

j) Hashim Abbas

k) Faiz bin Abu Bakr Bafana, a/k/a Mahmoud

l) Mohammed Khalim Bin Ja'afar

m) Ja'afar Bin Mistooki

n) Mohammed Jabarah, a/k/a Ahmad, a/k/a, Sammy, a/k/a Amat

o) Wan Min Wan Mat

p) Abdullah Sungkar

q) Abdul Rahim Ba'aysir

r) Nordin Bin Mat Mahd Top, a/k/a Top

s) Nasir Bin Abas

t) Fateh Bafana, a/k/a Fathi

u) Fathur Abd al Rahman al Ghozi, a/k/a Sa'ad

v) Jack Roche

w) Masrizal Bin Ali Umar, a/k/a Tohir

x) Muhammad Rais

y) Zukepli bin Marzuki, a/k/a Zulkifli

z) Mohamed Ellias

aa) Muhammad Nazir bin Ismail, a/k/a Johan

bb) Ali Imron

cc) Abdul Aziz, a/k/a Imam Samudra

dd) Utomo Pamungkas, a/k/a Mubarok

ee) Amrozi Bin Nurhasyim

ff) Ali Ghufron Bin Nurhasyim, a/k/a Mukhlas

gg) Rusman Gunawan

hh) Joko Pitono, a/k/a Dulmatin, a/k/a Abdul Matin

ii) Yazid Sufaat

jj) Saif al Adel

kk) Jhoni Hendrawan, a/k/a Idris

ll) Abdul Ghoni

mm) Umar Patek

nn) Abdul Rauf

oo) Muhammed Ikwan, a/k/a Agus, a/k/a Ismail

pp) Abu Hazem Sharqi, a/k/a/ Bandar

qq) Arnasan a/k/a Iqbal One
rr) Isa, a/k/a Iqbal Two
ss) Ismail
tt) Abu Rahim, a/k/a Abu Harris
uu) Mohammed Farooq Ali
vv) Asmir Latin Sani

## CHARGE SHEET: APPENDIX C

### The following 202 People were killed in the 2002 Bali Bombing

**UNITED STATES**

**Dead - 7**

Megan Eileen Heffernan
Deborah Lea Snodgrass
Karri Jane Casner
George Hamilton Milligan
Robert Alan McCormick II
Steven Brooks Webster
Jacob Cardwell Young

**CANADA**

**Dead – 2**

Richard Gleason
Mervin Popadynec

**UNITED KINGDOM**

**Dead – 23**

Timothy John Arnold
Neil Bowler
Daniel Braden
Christopher Bradford
Jonathon Ellwood
Lucy S.O. Empson
Ian Findley
Emma Louise Fox
Laura France
Marc Gajardo
Tom Holmes
Paul Martin Hussey
Christopher John Kays
Annika Kerstin Linden
Dan (Nathaniel) Miller
Natalie Perkins
Peter Record
Christian Redman
Stevie Speirs
Michael Standring
Ed Waller

Clive John Walton
Douglas Warner

**SWEDEN**

**Dead – 5**

Linda Cronqvist
Ulrika Gustafsson
Maria Johansson
Johanna Bergander
Carina Rafling

**GERMANY**

**Dead – 6**

Marie Cecile Wendt
Angelika Helene Kohnke
Caludia Dietlinde Thiele
Bettina Christina Brandes
Alexandra Koppke
Udo Paul Hauke

**FRANCE**

**Dead – 4**

Guillaume Breant.
Lionel Erisey
Manuel Mordelet
Anthony Underwood

**NETHERLANDS**

**Dead – 4**

Norbet Edgar Freriks
Sander Harskamp
Mark Antonio Schippers
Marjanne Van Lijen Noomen

**DENMARK**

**Dead – 3**

Lise Tanghus Knudsen
Laerke Cecile Bodker
Anette Overgaard Jensen

**SWITZERLAND**

**Dead – 3**

Serina Leish
Michale Pascal Dolf
Andrea Gian Rupp

**AUSTRALIA**

**Dead – 88**

Gayle Airlie
Belinda Allen
Renae Anderson
Peter Basioli
Christina Betmilik
Matthew Bolwerk
Abbey Borgia
Debbie Borgia
Gerardine Buchan
Steve Buchan
Chloe Byron
Anthony Cachia
Rebecca Cartledge
Bronwyn Cartwright
Jodie Cearns
Jane Corteen
Jenny Corteen
Paul Cronin
Donna Croxford
Kristen Curnow
Francoise Dahan
Sylvia Dalais
Joshua Deegan
Andrew Dobson
Michelle Dunlop
Craig Dunn
Shane Foley
Dean Gallagher
Angela Golotta
Angela Gray

Byron Hancock
Simone Hanley
James Hardman
Billy Hardy
Nicole Harrison
Tim Hawkins
Andrea Hore
Adam Howard
Paul Hussey
Josh Iliffe
Carol Johnstone
David Kent
Dimmy Kotronakis
Elizabeth Kotronakis
Aaron Lee
Justin  Lee
Stacey Lee
Danny Lewis
Scott Lysaght
Linda Makawana
Sue Maloney
Robert Marshall
David Mavroudis
Lynette McKeon
Marissa McKeon
Jenny Murphy
Amber O'Donnell
Jessica O'Donnell
Sue Ogier
Jodie O'Shea
Corey Paltridge
Charles van Renen
Brad Ridley
Ben Roberts
Bronwyn Ross
David Ross
Kathy Salvatori
Greg Sanderson
Cathy Seelin
Lee Sexton
Tom Singer
Anthony Stewart
Julie Stevenson
Jason Stokes
Behic Sumer
Nathan Swaine

Tracy Thomas
Clint Thompson
Robert Thwaites
Jonathan Wade
Vanessa Walder
Jodie Wallace
Shane Walsh-Till
Robyn Webster
Marlene Whiteley
Charmaine Whitton
Gerard Yeo
Luiza Zervos

## NEW ZEALAND

### Dead – 3

Mark Parker
Jamie Wellington
Jared Gane

## INDONESIA

### Dead – 38

I Wayan Yustara
R Destria Bimo Adhi Wibowo
Ni Kadek Alit Margarini
Gusti Ayu Made Artini
Arsoyo Rahmat
I Made Wija
I Ketut Nana Wijaya
I Nyoman Mawa
Elly Susanti Suharto
I Wayan Sukadana
I Ketut Cindra
Ati Savitri
I Ketut Sumarawat
I Gede Badrawan
Hanny
I Made Wijaya
I Komang Candra
Tata Duka
Lilis Puspita
Jonathan Simanjuntak
I Made Mertana

I Made Sujana
Salwindar Singh
Juniardi
I Kadek Ngartina
I Wayan Tamba
Rudy Armansyah
Mochamad Khotib
Imawan Sardjono
Endang
Mugianto
Widayati
Faturrahman
Achmad Suharto
Arismanandar
Agus Suheri
Kadek Sukerna
I Kadek Beni Prima

**JAPAN**

**Dead – 2**

Kosuke Suzuki
Yuka Suzuki

**SOUTH AFRICA**

**Dead – 2**

Godfrey Fitz
Craig Russel Harty

**SOUTH KOREA**

**Dead – 2**

Moon Eun-Young
Moon Eun-Jung

**UNKNOWN**

**Dead – 2**

**BRAZIL**

**Dead – 2**

Alexandre Moraes Watake
Sargento Marco Antonio Farias

**GREECE**

**Dead – 1**

Dimitris N Panagoulas

**POLAND**

**Dead – 1**

Daneta Beata Pawlak

**PORTUGAL**

**Dead – 1**

Diogo Miguel Dantas Riberinho

**ITALY**

**Dead – 1**

Antonio Roberto Sbironi

**ECUADOR**

**Dead – 1**

Ana Cecilia Aviles

**TAIWAN**

**Dead – 1**

Miss Hui-Min Kuo

**CHARGE SHEET: APPENDIX D**

**The following 28 people were injured in the 2002 Bali Bombing**





## CHARGE SHEET: APPENDIX E

**The following 11 people were killed in the 2003 J.W. Marriott Bombing**

**DUTCH**

**Dead – 1**

Hans Wimkelmolen

**INDONESIA**

**Dead – 10**

Slamat Hariyanto
Eyoh Zakaria
Hidayat
Harna
Yohanes Bolan
Rudi Dwi Laksono
Miftah Tobiin
Syamsudin
Edi Haryanto
Edi Sucipto

**CHARGE SHEET: APPENDIX F**

The following three people were injured in the 2003 J.W. Marriott Bombing



# ATTACHMENT H

| | | |
|---|---|---|
| ENCEP NURJAMAN | ) | IN THE UNITED STATES COURT OF |
| | ) | MILITARY COMMISSION REVIEW |
| *Petitioner*, | ) | |
| | ) | RESPONDENT'S OPPOSITION |
| | ) | TO PETITION FOR A WRIT OF |
| | ) | MANDAMUS AND PROHIBITION |
| | ) | |
| | ) | U.S.C.M.C.R. Case No. 22-001 |
| | ) | |
| v. | ) | Arraigned at Guantanamo Bay, Cuba |
| | ) | on August 30–31, 2021 |
| | ) | |
| | ) | Before a Military Commission |
| | ) | convened by |
| | ) | Colonel Jeffrey D. Wood, USA |
| | ) | |
| | ) | Presiding Military Judge |
| | ) | Captain Hayes C. Larsen, USN |
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| *Respondent*. | ) | DATE: December 30, 2022 |

**TO THE HONORABLE, THE JUDGES OF
THE UNITED STATES COURT OF MILITARY COMMISSION REVIEW**

Controlled by: DoD-OMC
Controlled by: OCP
CUI Categories: LEI, INV
Limited Dissemination Control: DL Only
POC: Michael J. O'Sullivan, 703-695-7025

# (U) TABLE OF CONTENTS

(U) TABLE OF AUTHORITIES......................................................................................... ii

(U) STATEMENT OF THE CASE ..................................................................................... 1

(U) STATEMENT OF FACTS............................................................................................ 2

    I.  (U) Petitioner and His Co-Accused Conspired, Planned, and Executed Terrorist
        Attacks Against the United States and Its Allies in Southeast Asia .................................. 2

    II.  (U) Specific Facts Related to the Referral of Charges....................................................... 6

(U) ARGUMENT ............................................................................................................. 10

    I.  (U) Petitioner Has Adequate Alternative Means of Presenting His Claims on
        Direct Appeal .............................................................................................................. 13

    II.  (U) Petitioner Cannot Show a Clear and Indisputable Right to Issuance of the
         Writ ............................................................................................................................. 18

        A.  (U) The Commission Applied the Correct Standard in Denying Petitioner's
            Motion.................................................................................................................. 19

        B.  (U) Petitioner Has Not Shown that the Commission Clearly and Indisputably
            Erred.................................................................................................................... 21

    III. (U) Mandamus Is Not Appropriate Under the Circumstances of this Case..................... 25

(U) CONCLUSION .......................................................................................................... 30

Page

(U) **CASES**

(U) *Agudas Chasidei Chabad of United States v. Russian Fed'n*, 19 F.4th 472
(D.C. Cir. 2021) ..................................................................................................11

(U) *Al Bahlul v. United States* (*Al Bahlul II*), 792 F.3d 1 (D.C. Cir. 2015) .................................22

(U) *Al Bahlul v. United States* (*Al Bahlul III*), 840 F.3d 757 (D.C. Cir. 2016) ..........................22

(U) *Ali v. United States*, 398 F. Supp. 3d 1200 (U.S.C.M.C.R. 2019) .........................................13

(U) *Allied Chemical Corp. v. Daiflon Inc.*, 449 U.S. 33 (1980) ...........................................11, 14

(U) *Arizona v. Fulminante*, 499 U.S. 279 (1991) ...................................................................20, 21

(U) *Bankers Life & Cas. Co. v. Holland*, 346 U.S. 379 (1953) ......................................14, 25, 30

(U) *Belize Soc. Dev. Ltd. v. Gov't of Belize*, 668 F.3d 724 (D.C. Cir. 2012) ..............................11

(U) *Brown v. Mississippi*, 297 U.S. 278 (1936) .............................................................................20

(U) *Cheney v. U.S. Dist. Court*, 542 U.S. 367 (2004) ..............................................2, 11, 13, 25, 28

(U) *Clinton v. Goldsmith*, 526 U.S. 529 (1999) .............................................................................30

(U) *Colonial Times, Inc. v. Gasch*, 509 F.2d 517 (D.C. Cir. 1975) ..................................27, 28, 29

(U) *Committee of United States Citizens Living in Nicaragua v. Reagan*, 859 F.2d 929
(D.C. Cir. 1988) ..................................................................................................23

(U) *Coppedge v. United States*, 311 F.2d 128 (D.C. Cir. 1962) ......................................19, 20, 29

(U) *EV v. United States*, 75 M.J. 331 (C.A.A.F. 2016) .........................................................17, 29

(U) *Ex parte Bradley*, 74 U.S. (7 Wall.) 364 (1868) ....................................................................30

(U) *Ex parte Burr*, 22 U.S. (9 Wheat.) 529 (1824) ......................................................................30

(U) *Ex parte Fahey*, 332 U.S. 258 (1947) .....................................................................................11

(U) *Ex parte Rowland*, 104 U.S. 604 (1881) .................................................................................15

(U) *Flanagan v. United States*, 465 U.S. 259 (1984) ...................................................................12

A162

(U) *Hawsawi v. United States*, 389 F. Supp. 3d 1001 (U.S.C.M.C.R. 2019) ...............................11

(U) *Heckler v. Ringer*, 466 U.S. 602 (1984) ..........................................................................13, 14

(U) *In re Al Baluchi*, 952 F.3d 363 (D.C. Cir. 2020) .........................................................12, 17, 18

(U) *In re Ali*, 558 F. Supp. 3d 1167 (U.S.C.M.C.R. 2021) ...........................................................18

(U) *In re Al-Nashiri* (*Al-Nashiri I*), 791 F.3d 71 (D.C. Cir. 2015) ............12, 13, 14, 15, 18, 21, 25

(U) *In re Al-Nashiri* (*Al-Nashiri III*), 921 F.3d 224 (D.C. Cir. 2019) ...........................................12

(U) *In re Al-Nashiri*, 577 F. Supp. 3d 1285 (U.S.C.M.C.R. 2021)..................................................14

(U) *In re Al-Nashiri* (*Al-Nashiri IV*), 47 F.4th 820 (D.C. Cir. 2022) ...........................................20

(U) *In re Al-Tamir*, 993 F.3d 906 (D.C. Cir. 2021) ......................................................................25

(U) *In re Cheney*, 406 F.3d 723 (D.C. Cir. 2005) ........................................................................11

(U) *In re Clinton*, 973 F.3d 106 (D.C. Cir. 2020) ........................................................................13

(U) *In re Flynn*, 973 F.3d 74 (D.C. Cir. 2020) ..........................................................11, 12, 13, 14, 25

(U) *In re Hawsawi*, 955 F.3d 152 (D.C. Cir. 2020) .......................................................................24

(U) *In re Khadr*, 823 F.3d 92 (D.C. Cir. 2016)....................................................................12, 18, 24

(U) *In re Papandreou*, 139 F.3d 247 (D.C. Cir. 1998)..............................................................14, 23

(U) *Kerr v. U.S. Dist. Court*, 426 U.S. 394 (1976).......................................................................14

(U) *Khadr v. United States*, 529 F.3d 1112 (D.C. Cir. 2008) .........................................................12

(U) *LRM v. Kastenberg*, 72 M.J. 364 (C.A.A.F. 2013) ......................................................15, 16, 17

(U) *Mohammad v. United States*, 393 F. Supp. 3d 1101 (U.S.C.M.C.R. 2019).......................11, 25

(U) *NetCoalition v. SEC*, 715 F.3d 342 (D.C. Cir. 2013) ..............................................................21

(U) *Randolph v. HV*, 76 M.J. 27 (C.A.A.F. 2017)........................................................................17

(U) *Rep. of Venez. v. Philip Morris, Inc.*, 287 F.3d 192 (D.C. Cir. 2002)......................................21

(U) *Roche v. Evaporated Milk Ass'n*, 319 U.S. 21 (1943)..................................................13, 14, 29

A163

(U) *Rose v. Mitchell*, 443 U.S. 545 (1979) ................................................................19

(U) *Schlagenhauf v. Holder*, 379 U.S. 104 (1964) ....................................................28

(U) *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004) ..................................................23

(U) *United States v. Abu Ali*, 395 F. Supp. 2d 338 (E.D. Va. 2005)............................1

(U) *United States v. Ali*, 71 M.J. 256 (C.A.A.F. 2012)................................................17

(U) *United States v. Al-Nashiri*, 191 F. Supp. 3d 1308 (U.S.C.M.C.R. 2016) ..............7

(U) *United States v. Cantu*, 15 M.J. 534 (A.F.C.M.R. 1982) ......................................19

(U) *United States v. Denson*, 603 F.2d 1143 (5th Cir. 1980) ......................................19

(U) *United States ex rel. Bernardin v. Duell*, 172 U.S. 576 (1899)..............................13

(U) *United States v. Hardy*, 4 M.J. 20 (C.M.A. 1977)................................................17

(U) *United States v. Kemp & Assocs.*, 907 F.3d 1264 (10th Cir. 2018) ......................30

(U) *United States v. Lawrence*, 3 U.S. (3 Dall.) 42 (1795)..........................................30

(U) *United States v. Loving*, 41 M.J. 213 (C.A.A.F. 1994) ...................................21, 29

(U) *United States v. Mahler*, 49 M.J. 558 (N-M. Ct. Crim. App. 1998)........................2

(U) *United States v. Manzano* (*In re United States*), 945 F.3d 616 (2d Cir. 2019) ......18

(U) *United States v. Moffett*, 27 C.M.R. 243 (C.M.A. 1959).......................................24

(U) *United States v. Murray*, 22 M.J. 700 (A.C.M.R. 1986).................................21, 29

(U) *Vasquez v. Hillery*, 474 U.S. 254 (1986)..............................................................19

(U) *Will v. Calvert Fire Ins. Co.*, 437 U.S. 655 (1978) ..............................................29

(U) *Will v. United States*, 389 U.S. 90 (1967) ............................................................11

**(U) STATUTES AND RULES**

(U) 10 U.S.C. § 859 ...............................................................................................21, 29

(U) 10 U.S.C. § 948a(9)...............................................................................................7

(U) 10 U.S.C. § 949p-4(b)(2)......................................................................................15

A164

(U) 10 U.S.C. § 950c(a) ...................................................................................14

(U) 10 U.S.C. § 950f(c) ..............................................................................12, 14

(U) 10 U.S.C. § 950f(d) ...................................................................................12

(U) 10 U.S.C. § 950g ........................................................................................14

(U) 10 U.S.C. § 950p(c) .....................................................................................7

(U) 28 U.S.C. § 1651 ........................................................................................10

(U) U.S.C.M.C.R. Rules of Practice ...................................................................2

**(U) OTHER MATERIALS**

(U) Intelligence Authorization Act for Fiscal Year 2003, Pub. L. No. 107-306, tit. 6, § 601, 116 Stat. 2383, 2408 (2002) ..............................................................6

(U) Manual for Military Commissions (2019 ed.) ...............................................7

(U) NAT'L COMM'N ON TERRORIST ATTACKS UPON THE UNITED STATES, THE 9/11 COMMISSION REPORT (2004) ..........................................................................6

(U) Order, *In re Al-Baluchi*, No. 18-1152 (D.C. Cir. June 27, 2018) ...............11

(U) Order, *In re Al-Nashiri*, No. 21-001 (U.S.C.M.C.R. Sept. 20, 2021) ..........13

(U) President George W. Bush, Remarks on the War on Terror, 2 PUB. PAPERS 1612 (Sept. 6, 2006) ............................................................................................6

(U) Scheduling Order, *United States v. Khadr*, No. 13-005 (U.S.C.M.C.R. Sept. 2, 2020) ............2

(U) Tr. of Oral Argument, *In re Al-Nashiri*, No. 21-1208 (D.C. Cir. May 4, 2022), ECF No. 1948107 ....................................................................................20, 21

## (U) STATEMENT OF THE CASE

(U) Respondent United States and Petitioner are united in recognition that "torture of any kind is legally and morally unacceptable, and that the judicial system of the United States will not permit the taint of torture in its judicial proceedings."[1] Assuming *arguendo* that the statements Petitioner challenges qualify as obtained by torture or cruel, inhuman, or degrading treatment, this petition for a writ of mandamus and prohibition ("Petition") is not about vindicating that principle. Rather, the Petition seeks an interlocutory appeal of the Commission's denial of Petitioner's Motion To Dismiss ("Motion").

(U) The Motion requested the Commission to dismiss all charges and specifications with prejudice or, in the alternative, dismiss the charges and specifications without prejudice and permanently disqualify all personnel assigned to the Office of the Chief Prosecutor and the Convening Authority from participating in any future prosecution of Petitioner.[2] The Motion presented two arguments: (1) there was a defective referral of charges due to the Convening Authority having been presented with portions of the 9/11 Commission Report; and (2) the prosecution committed misconduct by presenting that report to the Convening Authority.[3] The Commission denied the Motion with respect to both arguments,[4] but the Petition before this Court only challenges the Commission's ruling on the first.[5]

---

[1] (U) *United States v. Abu Ali*, 395 F. Supp. 2d 338, 379 (E.D. Va. 2005) (Lee, J.).

[2] (U) *See* AE 0032.001 (NUR) at 23, Def. Mot. To Dismiss Due to Prosecution Use of Prohibited Evidence Obtained by Torture, *United States v. Nurjaman, et al.* (Mil. Comm'n Mar. 14, 2022) (App. 124).

[3] (U) *Id*. at 3 (App. 104).

[4] (U) *See* AE 0032.010 (TJ), Ruling: Def. Mot. To Dismiss Due to Prosecution Use of Prohibited Evidence Obtained by Torture, *United States v. Nurjaman* (Mil. Comm'n Oct. 6, 2022) (Larsen, J.) (App. 524).

[5] (U) Pet. at 1.

(U) The Petition fails all three conditions required by the Supreme Court in *Cheney v. U.S. District Court* for this Court to grant mandamus relief.[6]  First, the Petition fails to establish that mandamus is the only available avenue of review, as the challenged ruling can be raised on direct appeal after final judgment.  Second, the Petition fails because it does not show that Petitioner is clearly and indisputably entitled to relief on his defective-referral claim.  To the contrary, it is clear that even under Petitioner's preferred interpretation of 10 U.S.C. § 948r(a), the Commission applied the correct standard to assess the legality of the referral, and it correctly determined that there was sufficient permissible evidence to support referral such that dismissal was not warranted.  Third, Petitioner fails to show that mandamus is appropriate under the circumstances, as the challenged ruling did not involve any "exceptional circumstances."

(U) Because Petitioner cannot satisfy any of the three *Cheney* conditions, each of which must be shown before the writ of mandamus is granted, the Court should dismiss the Petition.

## (U) STATEMENT OF FACTS[7]

### I.  (U) PETITIONER AND HIS CO-ACCUSED CONSPIRED, PLANNED, AND EXECUTED TERRORIST ATTACKS AGAINST THE UNITED STATES AND ITS ALLIES IN SOUTHEAST ASIA

(U) Petitioner Encep Nurjaman (a/k/a "Hambali"), along with his two co-accused, Mohammed Nazir Bin Lep (a/k/a "Lillie") and Mohammad Farik Bin Amin (a/k/a "Zubair"), have

---

[6] (U) 542 U.S. 367, 380 (2004).

[7] (U) The Petition makes many "[a]ssertions of fact" but largely does not "support[] [these assertions] by specific citations to the record of trial, exhibits, or, when appropriate, papers accompanying the record of trial (allied or related papers)."  U.S.C.M.C.R. Rules of Practice, App. 1 at 28.  The Court also has previously stated that, "[i]n its discretion, the Court may strike a filing that" fails to support factual assertions with citations to the record.  *See* Scheduling Order at 4, *United States v. Khadr*, No. 13-005 (U.S.C.M.C.R. Sept. 2, 2020) (ordering "that all references in any filing made pursuant to this Order to a fact upon which a party relies shall be annotated with a citation to the appendix page(s) or the affidavit paragraph(s) and/or exhibit(s) that provides record support for the asserted fact.  In its discretion, the Court may strike a filing that does not comply with this directive.  The forgoing shall apply to any brief, motion, and/or application subsequently filed by any party in the appeal before the Court.");  *see also United States v. Mahler*, 49 M.J. 558, 567 (N-M. Ct. Crim. App. 1998) ("The appellant bears the burden of

been jointly charged in a military commission with: (I) two specifications of Murder in Violation of the Law of War (10 U.S.C. § 950t(15)); (II) two specifications of Attempted Murder in Violation of the Law of War (10 U.S.C. § 950t(28)); (III) two specifications of Intentionally Causing Serious Bodily Injury (10 U.S.C. § 950t(13)); (IV) two specifications of Terrorism (10 U.S.C. § 950t(24)); (V) two specifications of Attacking Civilians (10 U.S.C. § 950t(2)); (VI) two specifications of Attacking Civilian Objects (10 U.S.C. § 950t(3)); (VII) two specifications of Destruction of Property in Violation of the Law of War (10 U.S.C. § 950t(16)); and (VIII) one specification of Conspiracy to commit offenses triable by military commission (10 U.S.C. § 950t(29)).[8]

(U) The charged offenses arise out of Petitioner's course of conduct and participation in a conspiracy—involving members of both al Qaeda and Jemaah Islamiyah ("JI")—to commit murder and other acts of terrorism against the United States and its allies.[9]  Included among the executed conspiratorial plots were the October 12, 2002 suicide bombings of Paddy's Pub and the Sari Club in Bali, Indonesia, and the August 5, 2003 suicide bombing of the J.W. Marriott hotel in Jakarta, Indonesia, which collectively killed 213 people, including 7 Americans, and injured 109 people, including 6 Americans.[10]

(U) The overall conspiracy to attack the United States and its allies in Southeast Asia began in 1996 when Petitioner—having voluntarily fought with the mujahedeen in Afghanistan, where

---

producing at least some evidence to substantiate each of his individual assignments of error. This court will not accept unsubstantiated allegations contained in an appellate brief as 'proof' of the matter asserted.").

[8] (U) *See* Nuriaman, Bin Lep, and Bin Amin Referred Charge Sheets (Jan. 21, 2021) (App. 1–33, 34–67, 68–101).  A ninth charge alleges one specification—Accessory After the Fact (10 U.S.C. § 950r)—against Bin Lep and Bin Amin, but not Petitioner.  *See* Bin Lep and Bin Amin Referred Charge Sheets (App. 53, 87).

[9] (U) Nurjaman Referred Charge Sheet at Continuation Sheet (MC Form 458, Block II) (Common Allegations) (App. 3–11).

[10] (U) *Id*. (App. 9, 11).

he met with Usama Bin Laden, Khalid Shaikh Mohammad, and other al Qaeda leaders—facilitated a meeting between Bin Laden and JI's leaders—Abdullah Sungkar and Abu Bak'r Ba'aysir—after which the JI leaders agreed to partner with al Qaeda in jihad.[11]

(U) In 1997, Petitioner became the leader of Mantiqi 1, one of JI's four organizational regions.[12] In this role, Petitioner recruited prospective jihadi fighters in Southeast Asia and sent them to jihadist military-style training camps in the Philippines and al Qaeda military-style training camps in Afghanistan. In the late 1990s, Petitioner, along with al Qaeda and JI leadership, coordinated the surveillance of Western targets, bomb-assembly, and movements of attack cells.[13] Thereafter, Petitioner coordinated financial transactions and bomb-making training for JI operatives working with al Qaeda operatives, and he funneled JI operatives into and out of Afghanistan and the Philippines in furtherance of multiple attack plans.[14]

(U) On or about December 24, 2000, Petitioner ordered JI members to perpetrate simultaneous terror bombings of multiple Christian churches throughout Indonesia, killing over a dozen civilians.[15]

(U) Following the September 11, 2001 terrorist attacks, Petitioner organized a four-man cell to execute another terrorist attack targeting civilians in the United States.[16] The members of

---

[11] (U) *Id*. (App. 3).

[12] (U) *Id*. (App. 3).

[13] (U) *Id*. (App. 4).

[14] (U) *Id*. (App. 3–4); AE 0032.004 (GOV), Attach. F at 5–6 (Tab R of the Referral Binder) (App. 249–250), Attach. N at 3–4 (Tab Q of the Referral Binder) (App. 343–344), Attach. O at 2–3 (Tab X of the Referral Binder) (App. 356–357), Attach. P at 5–6 (Tab AA of the Referral Binder) (App. 365–366), Attach. Q at 3, 9–10, 12, 17–18 (Tab H of the Referral Binder) (App. 375, 381–382, 384, 389–390), Attach. R at 5 (Tab P of the Referral Binder) (App. 419), Attach. U at 9–10 (Tab G of the Referral Binder) (App. 450–451), Attach. V at 5–6 (Tab T of the Referral Binder) (App. 479–480), Attach. Y (Tab GG of the Referral Binder) (App. 499).

[15] (U) Nurjaman Referred Charge Sheet (App. 6–7).

[16] (U) *Id*. (App. 7).

4

the cell—Bin Lep, Bin Amin, and named co-conspirators Masran Bin Arshad (a/k/a "Abdul Aziz") and Nik Amran Bin Mustafa (a/k/a "Afifi")—swore *ba'yat* (an oath of allegiance) to Bin Laden in Afghanistan and received operational instructions from Khalid Shaikh Mohammad.[17]

(U) In late 2001, after the ultimate failure of this and other joint al Qaeda/JI plots in Singapore, Australia, and the Philippines, Petitioner began devising plans to attack embassies, buildings, and locations frequented by Western tourists, such as bars, cafes, and nightclubs.[18] Throughout 2002, JI operatives began coordinating and preparing to attack tourist locales in Bali, Indonesia.[19] On or about October 12, 2002, JI operatives committed the aforementioned bombings of Paddy's Pub and the Sari Club in Bali, Indonesia.[20]

(U) Between late 2002 and early 2003, al Qaeda sent approximately $100,000 to Petitioner to fund additional JI terrorism operations.[21] Bin Lep, Bin Amin, and named coconspirator Majid Shoukat Khan served as intermediaries in the transfer of this money.[22] Throughout early and mid–2003, various JI operatives gathered to plan and coordinate another attack on a Western target in Indonesia.[23] On or about August 5, 2003, JI operatives committed the aforementioned bombing of the J.W. Marriott hotel in Jakarta, Indonesia.[24]

(U) Petitioner and his co-accused were captured in 2003 and held in the custody of the Central Intelligence Agency until 2006, when they were transferred to the custody of the

---

[17] (U) *Id*. (App. 7).

[18] (U) *Id*. (App. 9).

[19] (U) *Id*. (App. 9).

[20] (U) *Id*. (App. 9).

[21] (U) *Id*. (App. 10).

[22] (U) *Id*. (App. 10).

[23] (U) *Id*. (App. 11).

[24] (U) *Id*. (App. 11).

Department of Defense ("DoD").[25]  Since their transfer to DoD custody, they have been detained

at U.S. Naval Station Guantanamo Bay, Cuba.[26]

## II.    (U) SPECIFIC FACTS RELATED TO THE REFERRAL OF CHARGES

(U) On April 5, 2019, the prosecution swore charges against Petitioner and his two co-

accused in accordance with the Military Commissions Act of 2009 ("M.C.A.") and the Rules for

Military Commission ("R.M.C.").[27]

(U) On October 8, 2019, the prosecution transmitted the sworn charges and a compilation

of evidence in support thereof to the Convening Authority for his consideration.[28]  Included in the

more than 1,300 pages of supporting documentation was a nine-page excerpt from the

9/11 Commission Report,[29] the inclusion of which Petitioner challenges as a violation of

10 U.S.C. § 948r(a).  The prosecution highlighted portions of three pages of this nine-page excerpt

that reference Petitioner.[30]  The referral binder containing the materials included a "cover sheet"

that delineated each element of each specification with pinpoint citations to the corresponding

supporting evidence.[31]  The materials cited the excerpt from the 9/11 Commission Report on

---

[25] (U) *See* President George W. Bush, Remarks on the War on Terror, 2 PUB. PAPERS 1612, 1617 (Sept. 6, 2006) (announcing that 14 high-value detainees "in CIA custody," which included Petitioner and his co-accused, "have been transferred to the United States Naval Base at Guantanamo Bay" and that "[t]hey are being held in the custody of the Department of Defense").

[26] (U) *See id.*

[27] (U) *See* Nurjaman Referred Charge Sheet at 1 ¶ III (Swearing of Charges) (App. 1).

[28] (U) *Id.* at 2 ¶ V (Receipt of Charges by Convening Authority) (App. 2).

[29] (U) NAT'L COMM'N ON TERRORIST ATTACKS UPON THE UNITED STATES, THE 9/11 COMMISSION REPORT (2004).  This report was submitted by the independent "National Commission on Terrorist Attacks Upon the United States" pursuant to law.  *See* Intelligence Authorization Act for Fiscal Year 2003, Pub. L. No. 107-306, tit. 6, § 601, 116 Stat. 2383, 2408 (2002) (establishing "in the legislative branch the National Commission on Terrorist Attacks Upon the United States").

[30] (U) *See* AE 0032.004 (GOV) at 3 (App. 209).

[31] (U) The relevant excerpts of many of the documents presented to the Convening Authority were also highlighted.  These pinpoint citations and highlights were intended to aid—not limit—

18 occasions, each specifically citing the same three highlighted pages discussing Petitioner's role within the JI terrorist group and his relationship with key al Qaeda leaders.[32] Of these, 17 citations related to the same "hostilities" element for each charged offense,[33] and an additional 23 documents were also cited as supporting evidence for this specific element.[34] The remaining citation to the 9/11 Commission Report excerpt related to an element of conspiracy,[35] and the referral materials cited an additional six documents as supporting evidence for this element, which included statements made to the FBI by Petitioner and Khalid Shaikh Mohammad, a named co-conspirator.[36]

(U//FOUO/LES) With respect to the hostilities element, the 23 documents (excluding the challenged 9/11 Commission Report excerpt) described the following: After Bin Laden declared the United States an enemy of al Qaeda[37] and orchestrated armed attacks against the United States, Petitioner funneled prospective jihadists, including Bin Lep and Bin Amin, from Southeast Asia

---

the Convening Authority's review of the materials. The Commission described the highlighted portions in its October 6, 2022 Ruling denying the Motion (AE 0032.010 (TJ) (App. 524–532).

[32] (U) *See* AE 0032.004 (GOV) at 3 (App. 209) (citing Attachs. B–C (App. 226–233)).

[33] (U) All offenses triable by a military commission convened under the M.C.A. must have been "committed in the context of and associated with hostilities." 10 U.S.C. § 950p(c); Manual for Military Commissions, Part IV, ¶ 1(c). The term "hostilities" is defined as "any conflict subject to the laws of war." 10 U.S.C. § 948a(9). *See generally United States v. Al-Nashiri*, 191 F. Supp. 3d 1308, 1328 (U.S.C.M.C.R. 2016) (No. 14-001) (holding that "whether the offense 'was committed in the context of and associated with hostilities'" is not jurisdictional).

[34] (U) *See* AE 0032.004 (GOV) at 3 (App. 209) (citing Attach. B (App. 226–230)).

[35] (U) The endnotes from the excerpt of the 9/11 Commission Report were not included in the materials provided to the Convening Authority. Some of the sources cited in the endnotes are reports pertaining to statements made by Petitioner and other detainees in CIA custody.

[36] (U) *See* AE 0032.004 (GOV) at 3 (App. 209) (citing Attach. C (App. 231–233)).

[37] (U//FOUO/LES) Several documents were provided to the Convening Authority outlining Bin Laden's public statements in which he identified civilian and military interests of the United States as legitimate targets. *See generally* AE 0032.004 (GOV), Attach. H (Tab I of the Referral Binder) (App. 281–301), Attach. I (Tab K of the Referral Binder) (App. 303–311), Attach. J (Tab L of the Referral Binder) (App. 313–315), Attach. K (Tab M of the Referral Binder) (App. 317–326), Attach. L (Tab N of the Referral Binder) (App. 328–336), Attach. M (Tab O of the Referral Binder) (App. 338–339).

to Afghanistan for military-style training at al Qaeda camps.[38]   Petitioner intended to use these

trained jihadists to conduct attacks against the United States.[39]   In particular, Petitioner plotted

attacks against United States interests in Singapore, the Philippines, and Indonesia.[40]   Bin Lep and

Bin Amin, at Petitioner's behest, swore *ba'yat* to Bin Laden and agreed to participate in an

al Qaeda-directed martyr operation against America.[41]   Bin Lep and Bin Amin facilitated the

transfer of significant funds from al Qaeda to Petitioner—funds that were eventually delivered to

JI's explosives expert for operations in Indonesia.[42]   Despite numerous plots being thwarted or

otherwise failing, Petitioner's group executed armed attacks in Indonesia, including the Bali

bombing that killed 202 people.[43]   As such, the prosecution presented to the Convening Authority

23 documents, separate and independent from the 9/11 Commission Report, to support the

hostilities element.[44]

---

[38] (U) *See id.*, Attach. N at 2–3 (Tab Q of the Referral Binder) (App. 342–343); Attach. F at 2 (Tab R of the Referral Binder) (App. 245), Attach. O at 2 (Tab X of the Referral Binder) (App. 356), Attach. P at 5 (Tab AA of the Referral Binder) (App. 365).

[39] (U) *See id.*, Attach. Q at 10–11 (Tab H of the Referral Binder) (App. 382–383), Attach. R at 2 (Tab P of the Referral Binder) (App. 416), Attach. F at 7 (Tab R of the Referral Binder) (App. 250), Attach. G at 5 (Tab S of the Referral Binder) (App. 268).

[40] (U) *See id.*, Attach. Q at 10–12, 19, 25 (Tab H of the Referral Binder) (App. 382–384, 391, 397), Attach. R at 3–5 (Tab P of the Referral Binder) (App. 417–419).

[41] (U) *See id.*, Attach. F at 4 (Tab R of the Referral Binder) (App. 247), Attach. G at 5 (Tab S of the Referral Binder) (App. 268), Attach. O at 2–3 (Tab X of the Referral Binder) (App. 356–357).

[42] (U) *See id.*, Attach. G at 7–9 (Tab S of the Referral Binder) (App. 270–272), Attach. S at 5–6 (Tab WW of the Referral Binder) (App. 430–431).

[43] (U) *See id.*, Attach. F at 7 (Tab R of the Referral Binder) (App. 250).

[44] (U) *See* AE 0032.010 (TJ) at 7 (App. 530) (citing AE 0032.004 (GOV), Attach. D ("Summary of Additional Evidence: Hostilities") (App. 235–238) (citing Tabs G, H, P, Q, R, S, T, X, AA, and WW of the Referral Binder)).

A173

(U//FOUO/LES) With respect to the conspiracy element, the additional statements made by Petitioner and his co-conspirator Khalid Shaikh Mohammad to the FBI in January 2007,[45] described the following: Petitioner's statements showed that he maintained regular connection to key al Qaeda leaders, including Bin Laden, and received funding from al Qaeda for terrorist operations.[46] Mohammad's January 2007 statements to the FBI corroborated and expanded upon Petitioner's statements by describing instances in which al Qaeda operatives and money were sent to Southeast Asia to support JI's operations under Petitioner's command.[47] Both Bin Lep and Bin Amin described efforts they undertook, at Petitioner's direction, to obtain military-style training and engage in jihad against the United States or its interests.[48] In particular, Petitioner selected Bin Lep and Bin Amin to swear *ba'yat* to Bin Laden and to participate in a martyr operation against what they presumed to be an American target.[49] Further, Bin Lep and Bin Amin facilitated the transfer of money from al Qaeda to Petitioner that they believed was intended for operations.[50] As such, the prosecution presented to the Convening Authority six documents, separate from the 9/11 Commission Report, to support the "conspiracy" element.[51] These six

---

[45] (U) The statements Petitioner, his two co-accused, and other detainees made to the FBI that are referenced in this Opposition were made after they were transferred from the custody of the CIA to the Department of Defense.

[46] (U) *See* AE 0032.004 (GOV), Attach. T at 3 (Tab B of the Referral Binder) (App. 439).

[47] (U) *See id.*, Attach. U at 9–10, 16–17, 19–20 (Tab G of the Referral Binder) (App. 450–451, 457–458, 460–461).

[48] (U) *See id.*, Attach. F at 2–4 (Tab R of the Referral Binder) (App. 245–247), Attach. G at 3 (Tab S of the Referral Binder) (App. 266).

[49] (U) *See id.*, Attach. F at 4 (Tab R of the Referral Binder) (App. 247), Attach. G at 5 (Tab S of the Referral Binder) (App. 268), Attach. V at 4 (Tab T of the Referral Binder) (App. 478).

[50] (U) *See id.*, Attach. F at 9 (Tab R of the Referral Binder) (App. 252), Attach. G at 7–9 (Tab S of the Referral Binder) (App. 270–272).

[51] (U) *See id.*, Attach. F at 2–7, 9 (Tab R of the Referral Binder) (App. 245–250, 252), Attach. G at 4–5, 7–9 (Tab S of the Referral Binder) (App. 267–268, 270–272), Attach. T at 2–3 (Tab B of the Referral Binder) (App. 438–439), Attach. U at 9–10, 16–17, 19–21 (Tab G of the Referral Binder) (App. 450–451, 457–458, 460–462), Attach V at 4–7 (Tab T of the Referral Binder) (App. 478–481), Attach. W at 2, 4 (Tab A of the Referral Binder) (App. 486, 488).

A174

documents, obtained by law enforcement personnel, contain greater specificity for the same information as those challenged by Petitioner.[52]

(U) On January 13, 2021, the Acting Legal Advisor to the Convening Authority provided the pretrial advice required by R.M.C. 406, specifically setting forth the following conclusions: (i) each specification alleges an offense punishable under the M.C.A.; (ii) the allegation of each offense is warranted by the evidence; (iii) a military commission would have jurisdiction over both the accused and the alleged offenses; and (iv) after consultation with the Office of the Director of National Intelligence, trial of the charges would not be harmful to national security.[53]  The Acting Legal Advisor recommended referral of the sworn charges to a joint trial by military commission.[54]

(U) On January 21, 2021, the Convening Authority determined that there was probable cause that Petitioner and his two co-accused had committed the charged offenses, and the Convening Authority referred the sworn charges against Petitioner and his two co-accused to a joint trial by military commission.[55]

## (U) ARGUMENT

(U) To obtain the relief he seeks, Petitioner must demonstrate that he is entitled to the extraordinary remedy of mandamus pursuant to its exacting standard for relief.  Petitioner cannot satisfy these requirements, and the Court should accordingly dismiss the Petition.

(U) The writ of mandamus, codified at 28 U.S.C. § 1651, is one of "the most potent weapons in the judicial arsenal,"[56] and it is a "drastic" remedy reserved for "extraordinary

---

[52] (U) *See supra* note 51 (collecting citations).

[53] (U) *See* AE 0032.001 (NUR), Attach. G (Under Seal) (App. 203).

[54] (U) *Id*. (Under Seal) (App. 204).

[55] (U) *See* Nurjaman Charge Sheet at 2 ¶ VI (Referral) (App. 2).

[56] (U) *Will v. United States*, 389 U.S. 90, 107 (1967).

A175

causes."[57]  Accordingly, a "petition for a writ of mandamus may never be employed as a substitute for appeal."[58]  The Supreme Court has recognized that mandamus only applies where a petitioner satisfies the three conditions articulated in *Cheney v. U.S. District Court*.[59]

(U) First, under *Cheney*, "the party seeking issuance of the writ must have no other adequate means to attain the relief he desires."[60]  Second, the party seeking the writ must demonstrate "that his right to issuance of the writ is clear and indisputable."[61]  Third, the party must demonstrate that issuance of the writ is "appropriate under the circumstances."[62]  Because issuing a writ of mandamus is such a "drastic and extraordinary" remedy, mandamus jurisdiction "is strictly confined," "available only in 'extraordinary situations,' [and] relief is hardly ever granted."[63]  The U.S. Court of Appeals for the District of Columbia Circuit ("Court of Appeals")

---

[57] (U) *Ex parte Fahey*, 332 U.S. 258, 259–60 (1947); *see also Agudas Chasidei Chabad of United States v. Russian Fed'n*, 19 F.4th 472, 476 (D.C. Cir. 2021) ("Mandamus is a 'drastic and extraordinary remedy' and 'only exceptional circumstances amounting to a judicial usurpation of power or a clear abuse of discretion will justify [its] invocation.'" (quoting *Belize Soc. Dev. Ltd. v. Gov't of Belize*, 668 F.3d 724, 729 (D.C. Cir. 2012)) (alteration in original)).

[58] (U) *In re Flynn*, 973 F.3d 74, 78 (D.C. Cir. 2020) (per curiam) (en banc) (internal quotations and citations omitted).

[59] (U) 542 U.S. at 380; *see also Belize Soc. Dev. Ltd.*, 668 F.3d at 729–30 (holding that "the writ will only issue upon the satisfaction of [the] three conditions" the Supreme Court enumerated in *Cheney*).

[60] (U) *Cheney*, 542 U.S. at 380; *see also* Order, *In re Al-Baluchi*, No. 18-1152 (D.C. Cir. June 27, 2018), ECF No. 1737933 (denying a petition particularly because "petitioner has failed to demonstrate that he lacks an adequate alternative remedy").  The first *Cheney* condition ensures that the writ of mandamus "will not be used as a substitute for the regular appeals process." *Cheney*, 542 U.S. at 380–81.

[61] (U) *Id.* at 381 (brackets and citation omitted).

[62] (U) *Id.* at 380–81 (citations omitted).

[63] (U) *In re Cheney*, 406 F.3d 723, 729 (D.C. Cir. 2005) (en banc); *see also Mohammad v. United States*, 393 F. Supp. 3d 1101, 1106 (U.S.C.M.C.R. 2019) (Nos. 19-003 & 17-003) ("A writ of mandamus is a drastic remedy 'to be invoked only in extraordinary situations.'") (quoting *Allied Chem. Corp. v. Daiflon Inc.*, 449 U.S. 33, 34 (1980)); *Hawsawi v. United States*, 389 F. Supp. 3d 1001, 1006 (U.S.C.M.C.R. 2019) (Nos. 18-004 & 19-001) ("Mandamus is a 'drastic and extraordinary remedy'—one that is strictly confined to situations in which petitioners meet [the] three [*Cheney*] conditions . . . .").

A176

has stated that the standard to obtain mandamus relief is "daunting"[64] and that a petitioner must "identify some 'irreparable' injury that will go unredressed if he does not secure mandamus relief now."[65]

(U) The Court of Appeals has cautioned that, in the context of the military commissions, it must "faithfully enforce the traditional prerequisites for mandamus relief."[66]  That caution is necessary to give effect to the strict final-judgment rule in the M.C.A., which limits this Court's jurisdiction to "act[ing] only with respect to the findings and sentence as approved by the convening authority."[67]  As the Court of Appeals has recognized, the M.C.A.'s final-judgment rule "serves an important purpose that would be undermined if we did not faithfully enforce the traditional prerequisites" for an extraordinary writ.[68]  Among other things, rigorous enforcement of the final-judgment rule "helps preserve the respect due trial judges by minimizing appellate-court interference with the numerous decisions they must make in the prejudgment stages of litigation."[69]

---

[64] (U) *In re Khadr*, 823 F.3d 92, 97, 100 (D.C. Cir. 2016).

[65] (U) *In re Al-Nashiri* (*Al-Nashiri III*), 921 F.3d 224, 237 (D.C. Cir. 2019) (citation omitted); *see also In re Flynn*, 973 F.3d at 79.

[66] (U) *In re Al Baluchi*, 952 F.3d 363, 367 (D.C. Cir. 2020) (denying petition for writ of mandamus to order the United States to preserve the physical location of an overseas detention facility).

[67] (U) 10 U.S.C. § 950f(d); *see also id.* § 950f(c) (The U.S.C.M.C.R. "shall . . . review the record in each case that is referred to the Court by the convening authority."); *Khadr v. United States*, 529 F.3d 1112, 1116 (D.C. Cir. 2008) (observing that by deferring review "until after a military commission has found guilt and announced a sentence," the M.C.A. "clarifies that the 'final judgment' contemplated by the statute is indeed 'final'").

[68] (U) *In re Al-Nashiri* (*Al-Nashiri I*), 791 F.3d 71, 78 (D.C. Cir. 2015); *see also Flanagan v. United States*, 465 U.S. 259, 263–64 (1984) (noting that the final-judgment rule is "crucial to the efficient administration of justice").

[69] (U) *Flanagan*, 465 U.S. at 263–64; *see also Al-Nashiri I*, 791 F.3d at 78 (recognizing that a "judicial readiness to issue the writ of mandamus in anything less than an extraordinary situation" would lead to the harms associated with "piecemeal appellate litigation").

(U) Petitioner cannot satisfy the daunting standard for issuance of a writ of mandamus in this case for three reasons: (I) Petitioner has alternative means of presenting his claims on direct appeal; (II) Petitioner cannot show a clear and indisputable right to issuance of the writ; and (III) mandamus is not appropriate under the circumstances of this case.

# I.    (U) PETITIONER HAS ADEQUATE ALTERNATIVE MEANS OF PRESENTING HIS CLAIMS ON DIRECT APPEAL

(U) The Court should deny the Petition because Petitioner cannot demonstrate that there are "no other adequate means to attain the relief he desires."[70]  Petitioner has adequate alternative means of presenting his defective-referral challenge: direct appeal from final judgment. And because "[m]andamus is inappropriate in the presence of an obvious means of review,"[71] the Petition amounts to a request for an impermissible interlocutory appeal.[72]

(U) Mandamus is a remedy of last resort for a litigant who has "exhausted all other avenues of relief."[73]  As the Court has previously observed, "[t]he gravity of the burdens imposed on

---

[70] (U) *Cheney*, 542 U.S. at 380.

[71] (U) *Al-Nashiri I*, 791 F.3d at 78 (citing *Roche v. Evaporated Milk Ass'n*, 319 U.S. 21, 27–28 (1943)); *see also In re Flynn*, 973 F.3d at 79 (citing *Al-Nashiri I*) (denying the petition for mandamus where the petitioner had an obvious alternative remedy and could not show irreparable injury that warranted mandamus relief); Order, *In re Al-Nashiri*, No. 21-001 (U.S.C.M.C.R. Sept. 20, 2021) (observing that "'[m]andamus is inappropriate in the presence of an obvious means of review: direct appeal from final judgment'") (citation omitted).  By contrast, as the Court of Appeals recently noted, where a party cannot know *ex ante* if they can appeal an adverse decision at all, mandamus might remain a viable avenue for relief.  *See In re Clinton*, 973 F.3d 106, 112, 121 (D.C. Cir. 2020) (granting former Secretary of State's petition for writ of mandamus to stop a district court's deposition order, noting the petitioner lacked knowledge of whether she could appeal a contempt order if she refused to obey the district court's discovery orders).

[72] (U) *See Ali v. United States*, 398 F. Supp. 3d 1200, 1228 (U.S.C.M.C.R. 2019) (No. 19-002) (observing that an accused "has no interlocutory appellate rights under the Military Commission Act of 2009, 10 U.S.C. § 948a et seq.  Thus, we may review [a military judge's order] only through our post-conviction appellate jurisdiction, 10 U.S.C. § 950f(c), or our mandamus jurisdiction[.]") (citing *Al-Nashiri I*, 791 F.3d at 75–76).

[73] (U) *Heckler v. Ringer*, 466 U.S. 602, 616 (1984); *see also United States ex rel. Bernardin v. Duell*, 172 U.S. 576, 582 (1899) ("Nothing is better settled than that the writ of mandamus will not ordinarily be granted if there is another legal remedy . . . .").

A178

criminal defendants . . . without more, generally do not suffice to bring a case within mandamus's ambit."[74]  "Moreover, the United States Supreme Court has recognized a 'policy against piecemeal appellate review'—a policy generally undermined by granting mandamus."[75]  If the courts exercised a "readiness to issue the writ of mandamus in anything less than an extraordinary situation," it would defeat the "judgment of Congress that appellate review should be postponed until after final judgment."[76]

(U) Petitioner fails to show why direct appeal from final judgment would not be an adequate remedy for a claim of defective referral based on impermissible evidence.  The M.C.A. requires the Court to "review the record in each case that is referred to [it] by the convening authority . . . with respect to any matter properly raised by the accused."[77]  Furthermore, the M.C.A. empowers the Court of Appeals to "review all 'matters of law' once a military commission issues a final judgment and both the convening authority and [the U.S.C.M.C.R.] review it."[78]  That provision would allow the Court of Appeals to consider, in a post-judgment direct appeal,

---

[74] (U) *In re Al-Nashiri*, 577 F. Supp. 3d 1285, 1294–95 (U.S.C.M.C.R. 2021) (No. 21-004) (quoting *In re Flynn*, 973 F.3d at 79–80 (citing *Al-Nashiri I*, 791 F.3d at 80; *Roche*, 319 U.S. at 30)) (quotation marks omitted); *see also Roche*, 319 U.S. at 30 ("[A criminal t]rial may be of several months' duration and may be correspondingly costly and inconvenient. But that inconvenience is one which we must take it Congress contemplated in providing that only final judgments should be reviewable."); *Bankers Life & Cas. Co. v. Holland*, 346 U.S. 379, 383 (1953) ("[E]xtraordinary writs cannot be used as substitutes for appeals, even though hardship may result from delay and perhaps unnecessary trial." (citations omitted)).

[75] (U) *In re Al-Nashiri*, 577 F. Supp. 3d at 1294–95 (quoting *Allied Chem. Corp.*, 449 U.S. at 36 (per curiam); *see also In re Papandreou*, 139 F.3d 247, 250 (D.C. Cir. 1998) ("Lax rules on mandamus would undercut the [final judgment rule] and would lead to piecemeal appellate litigation.").

[76] (U) *Heckler*, 466 U.S. at 616 (quoting *Kerr v. U.S. Dist. Court*, 426 U.S. 394, 403 (1976)) (internal quotation marks omitted).

[77] (U) 10 U.S.C. § 950f(c); *see also id.* § 950c(a) ("Except as provided in subsection (b) [relating to waiver of right of review], in each case in which the final decision of a military commission under this chapter (as approved by the convening authority) includes a finding of guilty, the convening authority shall refer the case to the United States Court of Military Commissions Review.").

[78] (U) *Al-Nashiri I*, 791 F.3d at 79 (quoting 10 U.S.C. § 950g(a), (d)).

14

a claim that the Convening Authority impermissibly relied on evidence in referring charges. The availability of review through direct appeal of a final judgment similarly extends to *ex parte* proceedings conducted pursuant to the Military Commission Rule of Evidence ("M.C.R.E.") 505 process.[79] The classified information provisions of the M.C.A., which largely mirror the Classified Information Procedures Act ("CIPA") in Article III courts, require the government's *ex parte* presentations to be preserved and "made available to the appellate court in the event of an appeal."[80] Petitioner does not explain why that provision is insufficient to ensure adequate appellate review, particularly in light of the Court of Appeals' extensive experience in successfully conducting post-judgment appellate review of district courts' *ex parte* rulings under CIPA. Thus, appellate review should come after, not before, the Commission has entered final judgment.[81]

(U) The three cases Petitioner relies upon do not alter this analysis. For example, Petitioner's reliance on *LRM v. Kastenberg*[82] is misplaced. Petitioner quotes *LRM* to circumvent the first *Cheney* condition.[83] Specifically, Petitioner quotes *LRM* to argue that issuing the writ of mandamus "is the appropriate means of relief" when the trial judge's "ruling has a direct bearing on the information that will be considered by the military judge when determining the admissibility of evidence, and thereafter the evidence considered by the [military commission] on the issues of

---

[79] (U) *See* Pet. at 10 (challenging the ability of Petitioner and the public to "have any confidence" that *ex parte* litigation pursuant to M.C.R.E. 505 "will not be tainted by torture").

[80] (U) 10 U.S.C. § 949p-4(b)(2).

[81] (U) *Al-Nashiri I*, 791 F.3d at 78 ("'The general principle which governs proceedings by mandamus is, that whatever can be done without the employment of that extraordinary remedy, may not be done with it.'" (quoting *Ex parte Rowland*, 104 U.S. 604, 617 (1881))).

[82] (U) 72 M.J. 364 (C.A.A.F. 2013).

[83] (U) Pet. at 8 (quoting *LRM*, 72 M.J. at 368); *see also id*. at 26 (citing *LRM*, 72 M.J. at 372).

A180

guilt or innocence—which will form the very foundation of a finding and sentence.'"[84]  But this quotation from *LRM* does not support Petitioner's argument.

(U) First, the language Petitioner quotes is inapposite to the Court's analysis of Petitioner's alternative avenues of relief under *Cheney*.  In *LRM*, the language at issue informed an analysis by the Court of Appeals for the Armed Forces ("C.A.A.F.") of whether the Air Force Court of Criminal Appeals ("A.F.C.C.A.") had jurisdiction to hear the case, not whether the court should issue an extraordinary writ.[85]  *LRM* held that the A.F.C.C.A. "erred by holding that it lacked jurisdiction to hear LRM's petition for a writ of mandamus.  The All Writs Act, 28 U.S.C. § 1651 (2006), and Article 66, [Uniform Code of Military Justice ("U.C.M.J.")], 10 U.S.C. § 866 (2006), establish the [A.F.C.C.A.'s] jurisdiction."[86]  Petitioner thus quotes the language out of context.  Because the language quoted by Petitioner did not address whether the court should issue the writ, it did not cite *Cheney* or apply the *Cheney* conditions.

(U) Second, in asserting issuance of the requested writ is appropriate under the circumstances, Petitioner also emphasizes the C.A.A.F.'s prudential recognition that the substantive issues before it "present[ed] a novel legal question regarding the interpretation of the M.[C.]R.E. affecting an ongoing court-martial."[87]  Again, however, that portion of the *LRM* analysis does not inform the propriety of issuance of an extraordinary writ under these circumstances.  Instead of a *Cheney* analysis, the C.A.A.F. was considering its own authority to act under Article 67, U.C.M.J., regarding matters of law that the A.F.C.C.A. did not address.[88]

---

[84] (U) Pet. at 8 (quoting *LRM*, 72 M.J. at 368).

[85] (U) *LRM*, 72 M.J. at 368 ("Thus, the harm alleged has 'the potential to directly affect the findings and sentence,' and the CCA erred by holding that it lacked jurisdiction.").

[86] (U) *Id*. at 367.

[87] (U) Pet. at 26 (quoting *LRM*, 72 M.J. at 372).

[88] (U) *LRM*, 72 M.J. at 371–72.

A181

Furthermore, even within the context of that analysis, the C.A.A.F. deemed exercise of its Article 67, U.C.M.J., authority appropriate where there was "no other meaningful way for the[] issues to reach appellate review."[89]  In the years since *LRM* was decided, the C.A.A.F. has cabined this portion of *LRM* by limiting it to its specific facts.[90]  In two separate cases, the C.A.A.F. has further stated that the holding in *LRM* regarding the C.A.A.F.'s jurisdiction over mandamus petitions arising under Article 67(a)(2) has been superseded by statute.[91]

(U) The remaining two cases Petitioner cites are similarly unavailing.  *United States v. Hardy*[92] also did not involve a mandamus petition, does not cite *Cheney*, and provides no support for Petitioner's argument regarding satisfaction of the first *Cheney* condition.  Although *In re Al Baluchi*[93] did involve a mandamus petition, it sought to prevent the decommissioning of an overseas detention site.[94]  The challenged ruling here is nothing like the situation in *In re Al Baluchi*.  Unlike in that case, where the court found that waiting until direct appeal to challenge

---

[89] (U) *Id.* at 372.

[90] (U) *EV v. United States*, 75 M.J. 331, 334 (C.A.A.F. 2016) ("It may be argued that our decision in *LRM* . . . provides a basis for jurisdiction in this case.  It does not.  *LRM* was a case certified to us by the Judge Advocate General of the Air Force, and therefore stood on a wholly different jurisdictional basis from the present case.").

[91] (U) *See id.* at 334 (denying the petition because "*LRM* was decided before Congress had legislated in this area, either through the enactment of the substantive victims' rights provisions of Article 6b or through the later enactment of the remedial provision at issue here.  The *LRM* decision was rendered without the benefit of Congress's direction in the matter.  Congress having now legislated in the area, we are bound by the choices it made."); *Randolph v. HV*, 76 M.J. 27, 29 (C.A.A.F. 2017) ("'Jurisdiction is a question of law that this Court reviews de novo.'" (first quoting *LRM*, 72 M.J. at 367; and then citing *United States v. Ali*, 71 M.J. 256, 261 (C.A.A.F. 2012))); *id.* at 30 ("[W]e pointed out just last term that '[t]he *LRM* decision was rendered without the benefit of Congress's direction in the matter.  Congress having now legislated in the area, we are bound by the choices it made.'" (quoting *EV*, 75 M.J. at 334)).

[92] (U) *See* Pet. at 9 (citing *United States v. Hardy*, 4 M.J. 20, 25–26 (C.M.A. 1977)).

[93] (U) *See id.* at 8 (quoting *In re Al Baluchi*, 952 F.3d at 368).

[94] (U) *In re Al Baluchi*, 952 F.3d at 370 (holding that the petitioner failed to demonstrate that the military judge had abused his discretion by ruling that there were adequate substitutes for the physical location that would be permanently decommissioned).

the trial court's decision permitting the decommissioning would be too late to preserve the site,[95] here there is no reason to believe that the relief available on direct appeal would be circumscribed. In short, the case law Petitioner cites is unavailing to his argument that he lacks an adequate alternative remedy.

(U) Because Petitioner has failed to satisfy the first *Cheney* condition for mandamus relief, the Petition should be dismissed.

## II. (U) PETITIONER CANNOT SHOW A CLEAR AND INDISPUTABLE RIGHT TO ISSUANCE OF THE WRIT

(U) The Court should also deny the Petition because Petitioner cannot demonstrate a "clear and indisputable" right to relief.[96]  Indeed, "even if [a reviewing court] ultimately agree[s] with [a petitioner] on the merits, mandamus would not lie" where "the answer [is] hardly 'clear' *ex ante*."[97]  As the Court of Appeals has recently noted, "[a] petitioner's right to relief is clear and indisputable where he or she can point to cases in which a federal court has held that relief is warranted in a matter involving like issues and comparable circumstances."[98]  Therefore, the Court of Appeals stated it "will deny mandamus even if a petitioner's argument, though packing substantial force, is not clearly mandated by statutory authority or case law."[99]

---

[95] (U) *See United States v. Manzano* (*In re United States*), 945 F.3d 616, 624 (2d Cir. 2019) (concluding that "the first *Cheney* condition is plainly satisfied" where the government would not have another adequate means of obtaining relief for the district court's grant of defense counsel's request to argue jury nullification at trial, because "if Manzano prevails at trial, . . . double jeopardy will have attached and the government will not be able to appeal the jury's verdict of acquittal").

[96] (U) *Al-Nashiri I*, 791 F.3d at 381; *see also In re Khadr*, 823 F.3d at 97, 100 (rejecting mandamus petition because the petitioner did not show a clear and indisputable right to the requested relief).

[97] (U) *Al-Nashiri I*, 791 F.3d at 86.

[98] (U) *In re Al Baluchi*, 952 F.3d at 369 (citations and quotations omitted).

[99] (U) *Id*.; *see also In re Ali*, 558 F. Supp. 3d 1167, 1186 (U.S.C.M.C.R. 2021) (No. 21-002) (denying the petition for a writ of mandamus where it was "neither clear nor indisputable" that petitioner was entitled to relief, and observing that courts "will not issue [a writ of mandamus]

(U) To be entitled to issuance of the writ based on the consideration of improper evidence in referring charges, Petitioner must show clearly and indisputably that there was not "sufficient other [evidence] to support" the referral of charges by the Convening Authority.[100]  Petitioner has made no such showing under the standard articulated by the Court of Appeals in *Coppedge v. United States*.

### A. (U) The Commission Applied the Correct Standard in Denying Petitioner's Motion

(U) First, Petitioner attempts to discard the *Coppedge* standard for adjudicating challenges to charging decisions allegedly based on impermissible or improper evidence.  Although Petitioner concedes that the *Coppedge* standard is "generally" the rule,[101] he argues that no such harmless-error standard should be applied for alleged violations of Section 948r(a).  In support of his argument, Petitioner cites a line of Supreme Court cases holding that Fourteenth Amendment challenges to criminal convictions based on racial discrimination in the selection of grand juries can be maintained notwithstanding the fact that the defendant was later convicted by a properly constituted jury at trial.[102]

(U) But even assuming a constitutional analysis is appropriate here, there is no principled reason to apply Petitioner's context-specific exception to the recognized standard for alleged improper referral decisions.  As Petitioner is forced to recognize, his preferred rule jettisoning the harmless-error analysis has not been applied to other serious constitutional violations at the

---

to correct a duty that is to any degree debatable") (quoting *United States v. Denson*, 603 F.2d 1143, 1147 n.2 (5th Cir. 1980)) (additional internal citations omitted).

[100] (U) *Coppedge v. United States*, 311 F.2d 128, 131 (D.C. Cir. 1962); *see also United States v. Cantu*, 15 M.J. 534, 536 (A.F.C.M.R. 1982) (concluding that the referral of charges is not invalidated based on a convening authority's consideration of certain evidence when the "other available evidence was sufficient to warrant referral for trial").

[101] (U) Pet. at 19.

[102] (U) *See Rose v. Mitchell*, 443 U.S. 545, 558 (1979); *Vasquez v. Hillery*, 474 U.S. 254 (1986).

charging or trial stages of criminal cases that are far more analogous to Section 948r(a).[103]

For example, in *Arizona v. Fulminante*, a government agent was found to have coerced the defendant into confessing to a crime through the use of a "credible threat of physical violence" in prison, but the Supreme Court determined that the harmless-error analysis still applied.[104]

Even viewing the protections of Section 948r(a) through a constitutional lens, precedent demonstrates that a due process violation of the kind alleged by Petitioner, such as the use of involuntary statements, still merits a harmless-error analysis.[105] As the Court in *Fulminante* explained, "[i]t is evident from a comparison of the constitutional violations which we have held subject to harmless error, and those which we have held not, that involuntary statements or

---

[103] (U) *See Coppedge*, 311 F.2d at 131 (holding that a grand jury indictment, based in part on perjured testimony, was harmless when there was "sufficient other testimony to support the indictment"); *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991) (holding that the harmless-error standard applies to challenges based on the use of coerced confessions at trial); *see also In re Al-Nashiri* (*Al-Nashiri IV*), 47 F.4th 820, 827 (D.C. Cir. 2022) (emphasizing that mandamus relief is inappropriate where the petitioner could pursue direct appeal of any final judgment despite the petitioner's insistence that "the lower proceedings have been marked with the taint of torture, making any of the Commission's discovery or other preliminary rulings irreparably contaminated in ways that cannot be corrected post-trial") (citations and quotations omitted); Tr. of Oral Argument at 6, *In re Al-Nashiri*, No. 21-1208 (D.C. Cir. May 4, 2022), ECF No. 1948107 (App. 549) (statement of Sentelle, J.) (responding to the petitioner's assertion that he was seeking "essentially mandatory relief preventing the Government from using evidence obtained by torture, preventing the military commission judge from allowing the Government in essence from using evidence obtained by torture, unless authorized by statute" by inquiring: "But there's not an order harming you from which you can appeal, because the order does not say that it can be used. You're trying to say that it can't be used so for right now, it's not being used. That makes it moot. But what is the present harm analysis that is being caused by the Respondent that can be remedied in this action?"); *id.* at 8 (App. 551) (statement of Wilkins, J.) ("You're answering this question by saying that the harm is that the record will be tainted by evidence procured by torture, and the record should be scrubbed, but what particular injury does that confer upon your client?").

[104] (U) *Fulminante*, 499 U.S. at 310.

[105] (U) *Id.*; *cf. Brown v. Mississippi*, 297 U.S. 278, 284 (1936) (focusing throughout on the fact that the statements of the defendants—which were obtained by violent conduct offensive to "fundamental" principles of justice—were the *sole* basis for the defendants' convictions); *id.* at 287 ("The trial court knew that there was *no other evidence* upon which conviction and sentence could be based. Yet it proceeded to permit conviction and to pronounce sentence.") (emphasis added).

confessions belong in the former category."[106]

(U) Thus, the Commission applied the correct standard—looking to whether there was other evidence sufficient to support the referral of charges by the Convening Authority—when it denied Petitioner's Motion. Because the Commission correctly applied the Court of Appeals' harmless-error standard to determine whether the referral was defective, the Court need not address the scope of Section 948r(a) to conclude that Petitioner's request for issuance of an extraordinary writ fails.[107]

### B. (U) Petitioner Has Not Shown that the Commission Clearly and Indisputably Erred

(U) By failing to provide "binding precedent" that is "on point," Petitioner has "not come close" to showing that he has a "clear and indisputable" right to mandamus ordering his requested relief.[108] Petitioner argues that the prosecution included improper evidence in the materials provided to the Convening Authority during the referral process.[109] As discussed above, the prosecution included excerpts from the 9/11 Commission Report in the materials contained in the

---

[106] (U) *Fulminante*, 499 U.S. at 310; *see also* Tr. of Oral Argument at 10–11, *In re Al-Nashiri*, No. 21-1208 (D.C. Cir. May 4, 2022), ECF No. 1948107 (App. 553–554) (statement of Sentelle, J.) (responding to the petitioner's argument that "torture is different" and "torture is poison to the justice system" by questioning whether there is a legal distinction between coerced confessions and torture, and specifically asking: "How is that legally different? Is there a legal difference between torture and coerced confessions? I'm not sure what the legal difference is going to be").

[107] (U) Notably, the Commission concluded that any error was harmless irrespective of whether Section 948r(a) prohibits the introduction of statements in support of referral or only thereafter. *See* AE 0032.10 (TJ) at 7 (App. 530) ("The Commission further finds that the inclusion of nine-page excerpt of the [report at issue] in the referral binder (assuming the inclusion was in fact a violation of § 948r(a)) does not support the requested relief by the Defense. In determining the impact of a defective referral for courts-martial, military courts require a showing that the defect 'materially prejudiced the substantial rights of an accused.'" (first quoting 10 U.S.C. § 859, then citing *United States v. Loving*, 41 M.J. 213 (C.A.A.F. 1994); and then citing *United States v. Murray*, 22 M.J. 700 (A.C.M.R. 1986))).

[108] (U) *Al-Nashiri I*, 791 F.3d at 86 (citing *NetCoalition v. SEC*, 715 F.3d 342, 354 (D.C. Cir. 2013); *Rep. of Venez. v. Philip Morris, Inc.*, 287 F.3d 192, 199 (D.C. Cir. 2002)).

[109] (U) Pet. at 6–7, 12, 18.

A186

referral binder. The Convening Authority reviewed and considered the materials contained in that binder during the referral process.[110] Petitioner argues that the 9/11 Commission Report relied on statements obtained by torture.[111] Even assuming for purposes of resolving the Petition that this is true, Petitioner's argument that the referral was defective fails.

(U) Petitioner argues that "[t]he 9/11 Commission report was used in support of at least one element of every charge and for two elements of three of the charges."[112] This is incorrect. The referral binder did not cite the 9/11 Commission Report in the materials supporting every charge. The referral binder materials cited the 9/11 Commission Report in support of the hostilities element of seven charges.[113] But it did not cite the 9/11 Commission Report to support Charge II (attempted murder). Further, the referral materials cited the 9/11 Commission Report in support of the first element of Charge VIII (conspiracy). Significantly, the referral binder did not cite the 9/11 Commission Report to support any of the 60 overt acts.[114] And, contrary to Petitioner's suggestion,[115] the referral binder did not cite the 9/11 Commission Report to support more than one element of any charge.

(U) The Commission also conducted its own analysis of the referral binder. The Commission found that "[t]he referral binder in this commission contained in excess of

---

[110] (U) AE 0032.004 (GOV) at 2 (App. 208).

[111] (U) Pet. at 3–7.

[112] (U) *Id.* at 3.

[113] (U) Charge IX (accessory after the fact) incorporated the hostilities element of Charge V (attacking civilians).

[114] (U) *See Al Bahlul v. United States* (*Al Bahlul III*), 840 F.3d 757, 802 (D.C. Cir. 2016) (Wilkins, J., concurring) (observing that the M.C.A.'s "statutory conspiracy require[s] a victim and a defendant's own overt act"); *Al Bahlul v. United States* (*Al Bahlul II*), 792 F.3d 1, 47 (D.C. Cir. 2015) (Henderson, J., dissenting) (observing that the M.C.A. codified conspiracy as "an agreement to commit a war crime and an overt act in furtherance of that agreement").

[115] (U) Pet. at 3.

A187

1,300 pages of evidence. The excerpt [at issue] merely contained nine-pages. Of these nine-pages, less than two of those pages were highlighted for the convening authority."[116] The Commission recognized that the prosecution had "cited to the 9/11 Commission Report excerpt to support the 'hostilities' and 'conspiracy' elements."[117] To support the hostilities element, the prosecution had included 23 additional sources other than the excerpt from the 9/11 Commission Report in the referral binder.[118] Likewise, for the conspiracy element, the prosecution referenced six other additional sources other than the excerpt from the 9/11 Commission Report.[119]

(U) The Commission held that "there was sufficient evidence other than the nine-page excerpt [at issue] to support the referral decision of the" Convening Authority.[120] This determination was undoubtedly correct, and, in any event, was not clearly and indisputably erroneous.[121] The 23 documents relating to the hostilities element and the six documents relating to the conspiracy element—that were separate from the 9/11 Commission Report—collectively

---

[116] (U) AE 0032.010 (TJ) at 7 (App. 530).

[117] (U) *Id.*

[118] (U) *Id.*

[119] (U) *Id.* at 7–8 (App. 530–531); *see supra* note 51.

[120] (U) AE 0032.010 (TJ) at 7 (App. 530).

[121] (U) The authorities Petitioner cites to argue that "international comity" or "jus cogens" principles entitle him to mandamus relief similarly fail upon close inspection. First, the cases he cites are factually distinguishable—*In re Papandreou*, 139 F.3d at 251, is about foreign sovereign immunity, and *Committee of United States Citizens Living in Nicaragua v. Reagan*, 859 F.2d 929, 941 (D.C. Cir. 1988), is about the United States' funding of the Contras in Nicaragua. Second, neither case cites nor applies the *Cheney* conditions. Additionally, Petitioner cites dicta from those cases selectively. In *Committee*, the language Petitioner quotes is from a section of its analysis that uses heavy qualifying language on which the court's ultimate holding did not rely. *See* Pet. at 13 (quoting *Committee*, 859 F.2d at 941). And in *Papandreou*, the quoted language similarly was not used in the case's holding, nor did it appear in the section related to the right to relief— rather, the "the demands of international comity" was discussed in summarizing the effectiveness of an amicus brief filed by the U.S. Department of State. *See* Pet. at 13 (quoting *Papandreou*, 139 F.3d at 251). Petitioner ultimately does not cite any authority for the proposition that mandamus is required to prevent an alleged violation of *jus cogens* based on the facts and circumstances before the Court. *Cf. Sosa v. Alvarez-Machain*, 542 U.S. 692, 725 (2004) (observing that "judicial caution" is warranted in the realm of interpreting and applying customary international law).

23

demonstrate an agreement between Petitioner, Bin Lep, and Bin Amin, among other co-conspirators affiliated with al Qaeda and JI, to participate in terrorist operations against the United States.[122]  As such, the Convening Authority had more than sufficient evidence, separate from the 9/11 Commission Report, to conclude that there was probable cause that Petitioner and his co-accused had engaged in a conspiracy in violation of the M.C.A.[123]  Consequently, the Commission denied Petitioner's Motion.[124]

(U) Consistent with the Commission's analysis denying Petitioner's Motion, Petitioner has failed to satisfy the second *Cheney* condition that he has a "clear and indisputable right to the issuance of the writ."  The Commission properly rejected Petitioner's claim of a defective referral because "there was sufficient evidence other than the nine-page excerpt [at issue] to support the referral decision of the" Convening Authority.[125]  Even assuming *arguendo* that inclusion of the 9/11 Commission Report in the referral packet was improper,[126] Petitioner has failed to demonstrate clearly and indisputably that he is entitled to relief.[127]

---

[122] (U) When reviewed comprehensively, the materials provided to the Convening Authority demonstrate that this conspiracy involved a significant number of individuals across Southeast and Southwest Asia who, following the guidance of Bin Laden, planned numerous terrorist operations against the United States and its coalition partners, some of which were executed and some of which never came to fruition.  For the limited purposes of referral, this discussion of the agreement among the co-accused alone constitutes sufficient evidence of conspiracy to support the referral of charges.  *See supra* note 51.

[123] (U) *See United States v. Moffett*, 27 C.M.R. 243, 244 (C.M.A. 1959) ("We are of the opinion that in referring a case to trial the convening authority acts in a capacity similar to that of a grand jury.  The sole question for his determination at that stage is whether or not there is probable cause to believe the accused is guilty of the crime charged.  The convening authority only refers the case to a court-martial for trial for a determination of that question by the fact finders.").

[124] (U) *Id.*

[125] (U) AE 0032.010 (TJ) at 7 (App. 530).

[126] (U) *See* AE 0032.004 (GOV) at 2 (App. 208) ("In essence, to the extent that the inclusion of the 9/11 Commission Report excerpt was in error, its inclusion did not prejudice Mr. Nurjaman or his co-accused, nor did it result in an improper referral of charges."); *id.* at 4 (App. 210).

[127] *In re Hawsawi*, 955 F.3d 152, 157 (D.C. Cir. 2020) (observing that granting mandamus under the "clear and indisputable" standard "is a drastic and extraordinary remedy reserved for really extraordinary causes" (quoting *In re Khadr*, 823 F.3d at 97 (internal quotation marks

A189

(U) Because Petitioner has failed to satisfy the second *Cheney* condition for mandamus relief, the Petition should be dismissed.

## III.    (U) MANDAMUS IS NOT APPROPRIATE UNDER THE CIRCUMSTANCES OF THIS CASE

(U) Finally, even if Petitioner could satisfy the first two *Cheney* conditions, the Court, in the exercise of its discretion, should deny the Petition because Petitioner cannot demonstrate that issuance of the writ is "appropriate under the circumstances."[128]  Petitioner has the burden to demonstrate that mandamus would be appropriate.[129]  No such circumstances are present here, nor does Petitioner identify any.  Moreover, as indicated above, a "petition for a writ of mandamus may never be employed as a substitute for appeal."[130]

---

omitted))); *see also In re Al-Tamir*, 993 F.3d 906, 913 (D.C. Cir. 2021) (rejecting argument that mandamus was proper because the alleged error occurred early in commission proceedings).

[128] (U) *Cheney*, 542 U.S. at 381.

[129] (U) *Id.*; *see also Mohammad*, 393 F. Supp. 3d at 1106 ("[T]he supplementary review power conferred on the courts by Congress in the All Writs Act is meant to be used only in the exceptional case where there is clear abuse of discretion or usurpation of judicial power." (quoting *Bankers Life & Casualty Co.*, 346 U.S. at 383) (internal quotation marks and citation omitted)); *id.* at 1107 ("Given its 'exceptional' nature, we cannot use mandamus to remedy anything less than a 'clear abuse of discretion or usurpation of judicial power.'" (quoting *Al-Nashiri I*, 791 F.3d at 82) (internal quotation marks omitted)).

[130] (U) *In re Flynn*, 973 F.3d at 78 (internal quotations and citations omitted).

To date, the Military Commissions Defense Organization ("M.C.D.O.") has filed or joined 18 petitions for extraordinary relief with this Court.  *See* (1) Emergency Pet. for Writ of Mandamus and for Other Appropriate Relief, *Al Odah v. United States*, No. 08-001 (U.S.C.M.C.R. Mar. 12, 2008), *pet. denied*, Ruling: Mot. for Writ of Mandamus (Mar. 21, 2008); (2) Pet. for an Extraordinary Writ in the Nature of a Writ of Mandamus, *Mohammad v. United States*, No. 08-002 (U.S.C.M.C.R. May 28, 2008), *pet. denied*, Docketing Notice (June 3, 2008); (3) Pet. for Extraordinary Relief in the Nature of Writs of Mandamus and Prohibition, *Al Qosi v. United States*, No. 13-001 (U.S.C.M.C.R. Jan. 4, 2013), *pet. denied*, 28 F. Supp. 3d 1198 (2014); (4) Pet. for a Writ of Mandamus, *Miami Herald v. United States*, No. 13-002 (U.S.C.M.C.R. Feb. 13, 2013), *joined by* Mot. for Leave To Intervene by Ali Abdul Aziz Ali (Feb. 25, 2013), *pet. denied*, Order: Writ of Mandamus (Mar. 27, 2013); (5) Pet. for a Writ of Mandamus, *ACLU v. United States*, No. 13-003 (U.S.C.M.C.R. Feb. 21, 2013), *joined by* Abd Al Rahim Hussein Al Nashiri's Mot. for Leave To Intervene (Feb. 25, 2013), *and* Mot. for Leave To Intervene by Ali Abdul Aziz Ali (Feb. 26, 2013), *pet. denied*, Order: Writ of Mandamus (Mar. 27, 2013); (6) Pet. for New Trial, *Al Qosi v. United States*, No. 13-006 (U.S.C.M.C.R. Dec. 13, 2013), *pet. denied*, 28 F. Supp. 3d 1198 (2014); (7) Pet. for Writ of Mandamus, *Ali v. United States*, No. 18-001 (U.S.C.M.C.R. Feb. 9, 2018), *pet. denied*, Order: Writ Denied (Feb. 7, 2019); (8) Pet. for Extraordinary Relief in the Nature of a Writ of Mandamus, *Ali v. United States*, No. 18-003 (U.S.C.M.C.R. May 17, 2018),

A190

*pet. denied*, Order: Denial of Writ of Mandamus (June 18, 2019); (9) Pet. for Extraordinary Relief in the Nature of a Writ of Mandamus and Application for Stay of Proceedings, *Al Hawsawi v. United States*, No. 18-004 (U.S.C.M.C.R. Nov. 27, 2018), *pet. denied*, 389 F. Supp. 3d 1001 (2019); (10) Pet. for Extraordinary Relief in the Nature of a Writ of Mandamus, *Mohammad v. United States*, No. 19-001 (U.S.C.M.C.R. Feb. 13, 2019), *pet. denied sub nom. Hawsawi v. United States*, 389 F. Supp. 3d 1001 (2019); (11) Pet. for a Writ of Mandamus Directing the Mil. Comm'n To Take Unclassified Testimony from "the Former CIA Interpreter" in Open Session, *Ali v. United States*, No. 19-002 (U.S.C.M.C.R. Mar. 14, 2019), *remanded for reconsideration*, 398 F. Supp. 3d 1200 (2019); (12) Pet. for a Writ of Mandamus, *Mohammad v. United States*, No. 19-003 (U.S.C.M.C.R. Mar. 27, 2019), *pet. denied*, 393 F. Supp. 3d 1101 (2019); (13) Pet. for a Writ of Mandamus and Prohibition and Application for Stay of Proceedings, *Al Iraqi v. United States*, No. 19-004 (U.S.C.M.C.R. Sept. 13, 2019), *pet. denied*, 455 F. Supp. 3d 1273 (2020); (14) Pet. for a Writ of Mandamus and Prohibition and Application for Stay of Proceedings, *Al Iraqi v. United States*, No. 20-001 (U.S.C.M.C.R. Jan. 27, 2020), *pet. denied*, Order: Mot. To Dismiss or Show Cause (May 7, 2020); (15) Pet. for a Writ of Mandamus and Prohibition, *Al-Nashiri v. United States*, No. 21-001 (U.S.C.M.C.R. June 3, 2021), *pet. dismissed*, Order: Dismissing Pet. (Sept. 20, 2021); (16) Pet. for Writ of Mandamus, *Ali v. United States*, No. 21-002 (U.S.C.M.C.R. June 25, 2021), *pet. denied*, *In re Ali*, 558 F. Supp. 3d 1167 (2021); (17) Pet. for a Writ of Mandamus and Prohibition and Application for Stay of Proceedings, *Al-Nashiri v. United States*, No. 21-004 (U.S.C.M.C.R. Aug. 16, 2021), *pet. denied*, 577 F. Supp. 3d 1285 (2021); (18) Pet. for a Writ of Mandamus & Prohibition, *Nurjaman v. United States*, No. 22-001 (U.S.C.M.C.R. Nov. 22, 2022) (pending).

In addition, to date, M.C.D.O. has filed 29 petitions for extraordinary relief with the U.S. Court of Appeals for the District of Columbia Circuit. *See* (1) Pet. for Writ of Mandamus and Writ of Prohibition, *In re Bin Al-Shibh*, No. 09-1238 (D.C. Cir. Sept. 9, 2009), ECF No. 1205568, *pet. dismissed as moot*, 2010 U.S. App. LEXIS 15317 (July 23, 2010); (2) Pet. for Writ of Mandamus or Writ of Prohibition, *In re Al Hawsawi*, No. 09-1244 (D.C. Cir. Sept. 17, 2009), ECF No. 1206809, *pet. dismissed as moot*, 2010 U.S. App. LEXIS 15316 (July 23, 2010); (3) Pet. for Writ of Mandamus and Writ of Prohibition, *In re Al-Nashiri*, No. 09-1274 (D.C. Cir. Nov. 9, 2009), ECF No. 1215123, *pet. dismissed*, 2010 U.S. App. LEXIS 24338 (Nov. 24, 2010); (4) Pet. for Writ of Mandamus and Writ of Prohibition, *In re Kamin*, No. 09-1294 (D.C. Cir. Nov. 30, 2009), ECF No. 1219578, *pet. dismissed*, 2010 U.S. App. LEXIS 15321 (July 23, 2010); (5) Pet. for Writ of Mandamus and Writ of Prohibition, *In re Khadr*, No. 10-1067 (D.C. Cir. Mar. 23, 2010), ECF No. 1238333, *pet. denied*, 2010 U.S. App. LEXIS 16235 (Aug. 4, 2010); (6) Pet. for a Writ of Mandamus, *In re Al Qosi*, No. 14-1019 (D.C. Cir. Feb. 7, 2014), ECF No. 1479131, *pet. dismissed as moot*, Order (May 1, 2014), ECF No. 1490950; (7) Pet. for a Writ of Mandamus, *In re Al Qosi*, No. 14-1076 (D.C. Cir. May 13, 2014), ECF No. 1492985, *pet. dismissed*, 602 F. App'x 542 (2015); (8) Pet. for a Writ of Mandamus to the U.S. District Court for the District of Columbia, *In re Al-Nashiri*, No. 14-5229 (D.C. Cir. Sept. 23, 2014), ECF No. 1516665, *pet. denied*, Order (Nov. 18, 2014), ECF No. 1522826; (9) Pet. for a Writ of Mandamus and Prohibition to the United States Court of Military Commission Review, *In re Al-Nashiri*, No. 14-1203 (D.C. Cir. Oct. 14, 2014), ECF No. 1520369, *pet. denied*, 791 F.3d 71 (2015); (10) Pet. for a Writ of Mandamus and Prohibition, *In re Khadr*, No. 14-1227 (D.C. Cir. Nov. 4, 2014), ECF No. 1521025, *pet. denied*, 823 F.3d 92 (2016); (11) Pet. for a Writ of Mandamus and Prohibition to the Military Commission Created by Convening Order #11-02 (Sept. 28, 2011), *In re Al-Nashiri*, No. 15-1023 (D.C. Cir. Jan. 28, 2015), ECF No. 1538036, *pet. denied*, 835 F.3d 110 (2016); (12) Pet. for a Writ of Mandamus and Prohibition to the United States Court of Military Commission Review, *In re Al-Nashiri*, No. 16-1152 (D.C. Cir. May 24, 2016), ECF No. 1620463,

(U) In addressing the third *Cheney* condition,[131] Petitioner's two citations to authority are unavailing. First, Petitioner relies on *LRM*, which Respondent addressed above.[132] Second, the Court of Appeals' decision in *Colonial Times, Inc. v. Gasch*[133] does not support Petitioner's claim.

(U) *Colonial Times* predates *Cheney*, and the latter controls. Moreover, the facts of *Colonial Times* are distinguishable from this case. In *Colonial Times*, the petitioner was a

---

*pet. denied*, Order (May 27, 2016), ECF No. 1615339; (13) Pet. for a Writ of Mandamus and Prohibition, *In re Mohammad*, No. 17-1156 (D.C. Cir. June 15, 2017), ECF No. 1679823, *pet. granted*, 866 F.3d 473 (2017) (per curiam); (14) Pet. for a Writ of Mandamus and Prohibition, *In re Mohammad*, No. 17-1179 (D.C. Cir. July 21, 2017), ECF No. 1685371, *pet. denied*, Order (Oct. 19, 2018), ECF No. 1756215; (15) Pet. for Review, *Spears v. United States*, No. 18-1087, (D.C. Cir. Mar. 30, 2018), ECF No. 1725053, *pet. dismissed as moot*, Order (May 21, 2018), ECF No. 1732042; (16) Pet. for a Writ of Mandamus, *In re Al-Baluchi*, No. 18-1152 (D.C. Cir. June 27, 2018), ECF No. 1734211, *pet. denied*, Order (June 27, 2018), ECF No. 1737933; (17) Pet. for a Writ of Mandamus and Prohibition, *In re Al-Nashiri*, No. 18-1279 (D.C. Cir. Oct. 4, 2018), ECF No. 1754023, *pet. granted*, 921 F.3d 224 (2019); (18) Pet. for Writ of Mandamus, *In re Spears*, No. 18-1315 (D.C. Cir. Nov. 21, 2018), ECF No. 1761525, *pet. dismissed as moot*, 921 F.3d 224 (2019); (19) Pet. for a Writ of Mandamus, *In re Mohammad*, No. 19-1012 (D.C. Cir. Jan. 18, 2019), ECF No. 1769262, *pet. dismissed*, Order (Feb. 13, 2019), ECF No. 1773157; (20) Pet. for a Writ of Mandamus and Prohibition, *In re Hawsawi*, No. 19-1100 (D.C. Cir. May 9, 2019), ECF No. 1787250, *pet. denied*, 955 F.3d 152 (2020); (21) Pet. for a Writ of Mandamus, *In re Bin 'Atash*, No. 19-1117 (D.C. Cir. May 29, 2019), ECF No. 1790299, *pet. denied*, 955 F.3d 152 (2020); (22) Pet. for a Writ of Mandamus, *In re Al-Baluchi*, No. 19-1146 (D.C. Cir. July 15, 2019), ECF No. 1797162, *pet. denied*, 952 F.3d 363 (2020); (23) Pet. for a Writ of Prohibition, *In re Al-Baluchi*, No. 19-1156 (D.C. Cir. July 31, 2019), ECF No. 1800159, *pet. denied*, Order (Jan. 22, 2020), ECF No. 1825123; (24) Pet. for Writ of Mandamus, *In re Khadr*, No. 19-1157 (D.C. Cir. Aug. 6, 2019), ECF No. 1801016, *pet. denied*, Order (Jan. 13, 2020), ECF No. 1823890; (25) Pet. for a Writ of Mandamus and Prohibition, *In re Al-Tamir*, No. 19-1212 (D.C. Cir. Oct. 15, 2019), ECF No. 1810900, *pet. denied*, 993 F.3d 906 (2021); (26) Pet. for Writ of Mandamus, No. 20-1196, *In re Al-Qosi*, (D.C. Cir. June 9, 2020), ECF No. 1847205, *pet. denied*, 2020 U.S. App. LEXIS 33885 (Oct. 27, 2020); (27) Pet. for a Writ of Mandamus and Prohibition, *In re Al-Nashiri*, No. 21-1208 (D.C. Cir. Oct. 15, 2021), ECF No. 1918751, *pet. dismissed*, 47 F.4th 820 (2022); (28) Pet. for a Writ of Mandamus, *In re Al Baluchi*, No. 21-1211 (D.C. Cir. Oct. 22, 2021), ECF No. 1919411, *pet. denied*, 2022 U.S. App. LEXIS 6477 (Mar. 11, 2022); (29) Pet. for a Writ of Mandamus and Prohibition to the Military Commission Convened by Convening Order #21-01, *In re Bin Lep*, No. 22-5062 (D.C. Cir. Mar. 15, 2022), ECF No. 1939269, *pet. denied*, 2022 U.S. App. LEXIS 22238 (Aug. 10, 2022).

[131] (U) Pet. at 26.

[132] (U) *See supra* notes 82–91 and accompanying text.

[133] (U) Pet. at 26 (citing *Colonial Times, Inc. v. Gasch*, 509 F.2d 517, 524 (D.C. Cir. 1975)).

A192

publisher of a small-press "underground" newspaper that had been penalized by the U.S. Post Office for displaying on the cover "a sketch of an elderly woman, fully dressed, wearing a large lapel button expressing in harsh and graphic language disapproval of the District of Columbia food tax."[134] The petitioner filed a lawsuit seeking injunctive relief and sought to depose the Postal Service employees involved in the incidents alleged. The local court rules required that a judge issue a court order to proceed with the depositions, but the district court judge declined to issue that order.[135] The petitioner then filed a petition with the Court of Appeals seeking mandamus relief. In evaluating the merits of this pre-*Cheney* mandamus petition, the Court of Appeals interpreted "subpart (b)(4)" of Federal Rule of Civil Procedure 30. The Court of Appeals observed that "[s]ubpart (b)(4) was added to Rule 30 in 1970 with a cryptic commentary," and thus the question of how to interpret the new subpart was an issue of first impression within the circuit.[136] The Court of Appeals repeatedly emphasized that this question was an "issue of first impression."[137]

(U) Significantly, the Court of Appeals cited the Supreme Court's 1964 decision in *Schlagenhauf v. Holder*, which held that "mandamus would lie to review an 'issue of first impression' in order to 'settle new and important problems.'"[138] Thus, the Court of Appeals concluded that "mandamus lies in [*Colonial Times*] because the issue of discovery involved is one

---

[134] (U) *Colonial Times,* 509 F.2d at 519.

[135] (U) *Id*. at 520–21.

[136] (U) *Id*. at 520, 524.

[137] (U) *Id*. at 524–25.

[138] (U) 379 U.S. 104, 111 (1964). Notably, *Cheney* effectively subsumed *Schlagenhauf*. *Cheney* did not overrule *Schlagenhauf* but instead relied on *Schlagenhauf* as an example of when the third *Cheney* condition would be satisfied: "the need to avoid 'piecemeal litigation' and to settle important issues of first impression in areas where this Court bears special responsibility." *Cheney*, 542 U.S. at 391 (quoting *Schlagenhauf*, 378 U.S. at 111). As discussed below, this case does not involve an "issue of first impression."

of first impression and is important to the administration of discovery."[139]

(U) In contrast, this case does not involve an issue of first impression. Questions of sufficiency of the evidence for referral are not new, and, as previously explained, the Commission analyzed that question based on the controlling legal authority, including *Coppedge*, Article 59, U.C.M.J., and two decisions of military appellate courts (*United States v. Loving* and *United States v. Murray*). Each of those authorities support the approach taken by the Commission, namely that "[i]n determining the impact of a defective referral for courts-martial, military courts require a showing that the defect 'materially prejudiced the substantial rights of an accused.'"[140] It is clear from the Commission's findings, reasoning, and citations to controlling precedents, that a challenge for defective referral is not an issue of first impression. After conducting the proper analysis, the Commission concluded there was sufficient evidence to support the referral.[141]

(U) Finally, Petitioner argues the Court should issue a writ of mandamus in aid of its appellate jurisdiction because it has direct appellate jurisdiction over military commission convictions.[142] But Petitioner misapprehends what "in aid of appellate jurisdiction" means in the mandamus context. General appellate jurisdiction over a trial court is not a license to issue writs of mandamus "in aid of" its appellate jurisdiction for anything done by a trial court. Rather, the "traditional use of the writ in aid of appellate jurisdiction" has been "to confine an inferior court to a lawful exercise of its prescribed jurisdiction or to compel it to exercise its authority when it is its duty to do so."[143]

---

[139] (U) *Colonial Times*, 509 F.2d at 526.

[140] (U) AE 0032.010 (TJ) at 7 (App. 530) (first quoting 10 U.S.C. § 859; then citing *Loving*, 41 M.J. 213; and then citing *Murray*, 22 M.J. 700).

[141] (U) *Id.*

[142] (U) Pet. at 9.

[143] (U) *Will v. Calvert Fire Ins. Co.*, 437 U.S. 655, 661 (1978) (quoting *Roche*, 319 U.S. at 26); *see also EV*, 75 M.J. at 333 ("[I]t is axiomatic that the All Writs Act is not an independent source

A194

(U) For more than two centuries, the Supreme Court has consistently reiterated the general rule that an appellate court must not use mandamus to control the discretion of trial judges or simply review alleged errors.[144]  When a trial court merely adjudicates an issue properly before it, it acts within its prescribed jurisdiction and appropriately exercises its authority and discretion.[145]  Thus, while such decisions may be reviewed on direct appeal, they do not constitute a basis for an appellate court to intervene before direct appeal "in aid of" its appellate jurisdiction.[146]

(U) Because Petitioner has failed to satisfy the third *Cheney* condition for mandamus relief, the Petition should be dismissed.

## (U) CONCLUSION

(U) Petitioner has failed to satisfy any of the three *Cheney* conditions required for the Court to issue a writ of mandamus.  Therefore, the Court should dismiss the Petition.

---

of jurisdiction.  It does not expand this Court's jurisdiction, but only operates 'in aid of' our existing statutory jurisdiction.") (citing *Clinton v. Goldsmith*, 526 U.S. 529, 534–35 (1999)) (other citation omitted) (internal quotation marks omitted)).

[144] (U) *See Calvert Fire*, 437 U.S. at 665–66 ("Although the District Court's exercise of its discretion may be subject to review and modification in a proper interlocutory appeal . . . we are convinced that it ought not to be overridden by a writ of mandamus."); *Ex parte Bradley*, 74 U.S. (7 Wall.) 364, 377 (1868) ("For we agree that this writ does not lie to control the judicial discretion of the judge or court; and hence, where the act complained of rested in the exercise of this discretion, the remedy fails."); *Ex parte Burr*, 22 U.S. (9 Wheat.) 529, 530 (1824) (denying mandamus over discretionary action by lower court and explaining that a reviewing court "will always feel the delicacy of interposing its authority" over discretionary lower court rulings, and should "do so only in a plain case" where "the conduct of the Circuit or District Court was irregular, or was flagrantly improper"); *United States v. Lawrence*, 3 U.S. (3 Dall.) 42, 53 (1795) (denying mandamus because "the District Judge was acting in a judicial capacity . . . and (whatever might be the difference of sentiment entertained by this Court) we have no power to compel a Judge to decide according to the dictates of any judgment, but his own").

[145] (U) *Bankers Life & Casualty Co.*, 346 U.S. at 382–83.

[146] (U) *See United States v. Kemp & Assocs.*, 907 F.3d 1264, 1277–78 (10th Cir. 2018) (finding that mandamus was not appropriate where the district court ruling was not a "gross abuse of discretion" because "to hold otherwise, our circuit could expect a flood of mandamus petitions, and our case would soon be cited for the proposition that the jurisdictional boundaries created by [the statute defining appellate jurisdiction] are easily eluded through the use of mandamus.  Thus, to grant the requested mandamus relief here seems not only to be without legal support, it also would be poor policy").

30

Respectfully submitted,

_____//s//_____
MICHAEL J. O'SULLIVAN
HARIDIMOS V. THRAVALOS
Appellate Counsel

AARON C. RUGH
Rear Admiral, U.S. Navy
Chief Prosecutor

Appellate Counsel for the United States
Office of the Chief Prosecutor
Office of Military Commissions
1610 Defense Pentagon
Washington, D.C. 20301-1610
michael.j.osullivan14.civ@mail.mil
Tel. (703) 695-7025
Fax (703) 695-0701

A196

## CERTIFICATE OF COMPLIANCE

1.  This brief complies with the type-volume limitation of U.S.C.M.C.R. Rule of Practice 15(g) because:

> This brief contains 12,538 words.

2.  The brief complies with the typeface and type style requirements of U.S.C.M.C.R. Rule of Practice 15(e) because:

> This brief is written in 12-point Times New Roman font.

//s//

MICHAEL J. O'SULLIVAN
Appellate Counsel for the United States
Office of the Chief Prosecutor
Office of Military Commissions
1610 Defense Pentagon
Washington, D.C. 20301-1610
michael.j.osullivan14.civ@mail.mil
Tel. (703) 695-7025
Fax (703) 695-0701

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing was sent by electronic mail to Counsel for Petitioner on December 30, 2022.  In addition, I certify that Respondent's Appendix was electronically delivered to the Clerk of Court and Counsel for Petitioner on December 30, 2022.

//s//

MICHAEL J. O'SULLIVAN
Appellate Counsel for the United States
Office of the Chief Prosecutor
Office of Military Commissions
1610 Defense Pentagon
Washington, D.C. 20301-1610
michael.j.osullivan14.civ@mail.mil
Tel. (703) 695-7025
Fax (703) 695-0701